## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANDREA CASULA, ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED, | Civil Action No. |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | |
| ATHENAHEALTH, INC., JONATHAN BUSH and CARL B. BYERS, | JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff, individually and on behalf of all other persons similarly situated, by her undersigned attorneys, for her Class Action Complaint against defendants, alleges upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding athenahealth, Inc. ("athenahealth" or the "Company"), securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

### NATURE OF THE ACTION

1.      This is a securities fraud class action on behalf of all persons who purchased or acquired athenahealth securities during the period from October 29, 2009 through and including February 25, 2010 (the "Class Period").

2.      This class action is brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a); and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

3.      athenahealth engages in the provision of Internet-based business services for physician practices in the United States.  The company offers a revenue cycle management service that automates and manages billing-related functions for physician practices.  The Company assists physician clients with the handing of claims and billing processes to help submit claims.  It also automates and manages medical record management-related functions for physician practices that include an electronic medical record (EMR) platform.  It further assists physician practices and medical groups with the handling of physician orders and related communications to ensure that orders are carried out and to provide online patient clinical record.  Finally, it offers automated messaging services that remind patients of appointment details and allows them to use the automated system to confirm or reschedule an appointment.

4.      The Company was founded in 1997 and is headquartered in Watertown, Massachusetts.  It was a private company until September 20, 2007, when it completed an Initial Public Offering ("IPO").  The IPO provided that 31,600,399 shares of common stock would be outstanding following the offering.  Today, there are 33.69 million shares outstanding.

5.      On February 25, 2010, after the market closed, athenahealth announced that its previous financial statements could no longer be relied upon and that it would likely need to restate prior financial statements based on its methodology for calculating implementation revenue, causing the stock to drop almost 13%, falling from a close of $43.52 on February 25, 2010 to a close of $37.96 on February 26, 2010.

6.      On March 15, 2010, the Company issued a press release after the market closed, announcing that it needed to amortize its service implementation revenue over a period of 12 years, which reflects the amount of time it expects to do business with a new customer, rather than its previous method of amortizing implementation revenue over one year. As a result, the Company restated its financial results for fiscal years 2005 through 2008, as well as 2008 interim quarters and the first three quarters of 2009.

7.      The results of the Company's restatement are as follows:

| (in 000s except for EPS) | 2005 | 2006 | 2007 | Q1 2008 | Q2 2008 | Q3 2008 | FY 2008 | Q1 2009 | Q2 2009 | Q3 2009 |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Income Previously Reported | ($11,393) | ($9,224) | ($3,503) | $1,829 | $2,779 | $3,700 | $28,871 | $2,338 | $3,029 | $2,112 |
| Downward Adjustment | ($2,938) | ($3,138) | $3,998 | $884 | $1,068 | $1,598 | $4,418 | $1,334 | $1,308 | $1,577 |
| Percentage of Overstatement | 25.8% | 34.0% | 114.1% | 48.3% | 38.4% | 43.2% | 15.3% | 57.1% | 43.2% | 74.7% |
| | | | | | | | | | | |
| Basic EPS Reported | ($2.51) | ($1.96) | ($0.28) | $0.06 | $0.09 | $0.11 | $0.88 | $0.07 | $0.09 | $0.06 |
| Downward Adjustment | $0.65 | $0.67 | $0.32 | $0.03 | $0.04 | $0.05 | $0.13 | $0.04 | $0.04 | $0.05 |
| Percentage of Overstatement | 25.9% | 34.2% | 114.3% | 50.0% | 44.4% | 45.5% | 14.8% | 57.1% | 44.4% | 83.3% |

8.      Plaintiff and the Class have suffered serious financial damages as a result of defendants' material misstatements and omissions during the Class Period. While innocent investors were purchasing athenahealth securities throughout the Class Period, insiders profited more than $7.8 million in sales of the Company's securities, while they knowingly did not properly recognize revenue and materially overstated its revenue for the last 5 years.

9.      Further, the Company violated the Financial Accounting Standards Board's ("FASB") Statement of Financial Accounting Concepts Nos. 1 and 2.  GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in

accordance with GAAP are presumed to be misleading and inaccurate. Regulation S-X also requires that interim financial statements comply with GAAP. 17 C.F.R. § 210.10-01 (a). As a result of these false and misleading statements, athenahealth securities traded at artificially inflated prices throughout the Class Period.

10.     During the Class Period, the Company's internal auditors were also aware of these practices. Nonetheless, even though the issue was well known to athenahealth, and was an unquestionable GAAP violation, the Company continued to publish false and misleading financial statements, until defendant Carl Byers, its CFO since the Company was founded in 1997, resigned in early 2009 and a new CFO began to audit the Company's financials.

11.     By restating its financials, the defendants admitted that the representations made in the financial statements for the fiscal years 2005 through 2008 and the quarterly financials for 2008 and the first three quarters of 2009 were materially false and misleading when made, APB No. 20 ¶ 13, and, indeed, admitted that the amounts were material in the Company's restated Form 10-K/A for the year ended December 31, 2009.

12.     The disclosure on February 25, 2010 caused athenahealth's securities to close down $5.56 per share, a statistically significant, one-day decline of 13% on extremely high trading volume of more than 6.5 million shares, which injured Class members who had purchased at prices inflated by defendants' materially false and misleading statements.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).   athenahealth conducts business in this District and many of the acts and practices complained of herein occurred in substantial part in this District. In addition, the Company's principal executive offices are located in this District.

16.     In connection with the challenged conduct, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### Plaintiff

17.     Plaintiff, Andrea Casula, as set forth in her certification attached hereto, purchased athenahealth securities during the Class Period and was damaged when the disclosure of the Company's accounting improprieties caused the price of athenahealth shares to decline.

### Defendants

18.     Defendant athenahealth is a Delaware corporation which maintains its principal executive offices at 311 Arsenal Street, Watertown, Massachusetts 02472.   The Company provides Internet-based business services for physician practices.   The aggregate number of

shares of athenahealth securities outstanding immediately following the IPO was approximately 31,600,399 million shares.  athenahealth securities is actively traded on the NASDAQ under the ticker symbol "ATHN."

19.     Defendant Jonathan Bush ("Bush") is, and at all relevant times was, the Company's founder, Chairman of the Board, President and Chief Executive Officer.  Defendant Bush signed the Company's quarterly and annual reports filed with the SEC.

20.     Defendant Carl B. Byers ("Byers") was the Company's Chief Financial Officer since prior to the IPO until his retirement in January 2010.  He also served as the Company's Senior Vice-President, Treasurer and Chief Accounting Officer throughout that time period. Defendant Byers signed the Company's quarterly and annual reports filed with the SEC.

21.     The defendants referenced above in ¶¶ 19-20 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

22.     athenahealth engages in the provision of Internet-based business services for physician practices in the United States.  As such, when a new customer signs up, the Company generates implementation revenues.  The implementation fees are recorded as deferred revenues until the implementation service is complete and ongoing services begin.  Afterwards, the Company can begin to recognize the fees on a monthly basis over the "expected performance" period.  Up until the Company disclosed its need to restate its financials on February 25, 2010, the Company's practice was to defer implementation revenue until the client site was live and on the Company's systems.  At that point, revenue would be recognized over the initial contract term—one year, even though contracts renew automatically.  Implementation revenue accounted

for more than 5% of the Company's total revenue.

23.     On March 15, 2010, the Company said it needed to amortize its service implementation revenue *over a period of 12 years*, which reflects the amount of time it expects to do business with a new customer, *rather than its previous method for amortizing implementation revenue of one year*.

24.     The requirement of amortizing revenue over a longer period of time – namely 12 years – is not a judgment call or a matter requiring technical determination.  athenahealth did not have any good faith basis to claim that the revenue should have only been amortized over one year because it knew that its contracts were automatically renewed after the first year.

25.     Even though the issue was clear cut, athenahealth flagrantly disregarded GAAP. Instead, it improperly amortized its implementation revenue over a one year period, thereby over-reporting revenues for every financial period since 2005.

**Defendants' False and Misleading Statements**

26.     On October 29, 2009, the Company issued a press release announcing its financial results for the third quarter of fiscal 2009 ended September 30, 2009.  The Company reported total revenue of $48.7 million, with Non-GAAP Adjusted EBITDA of $9.5 million, constituting 17% of its revenue.  The Company further reported Non-GAAP Adjusted Net Income of $5 million, or $0.14 per diluted share.  Defendant Bush touted, "We made great strides in the third quarter on initiatives to improve operational scalability, client performance and market awareness of our unique capabilities…. We continue to experience strong growth as medical groups turn to our service-based model in order to improve their clinical, financial and operational performance.  Defendant Byers added, "Our differentiated business model continues to yield rapid and reliable growth while our ongoing effort to increase automation has brought us

to the threshold of our 2011 target gross margin range…. This economic engine enables us to make increasing investments in growth and innovation while also driving bottom line progress toward our long-term margin profile."   The Company explained the non-financial GAAP measures as follows.

### Explanation of Non-GAAP Financial Measures

athenahealth management believes that in order to properly understand the Company's short-term and long-term financial trends, investors may wish to consider the impact of certain non-cash or non-recurring items, when used as a supplement to financial performance measures prepared in accordance with GAAP.   These items result from facts and circumstances that vary in frequency and/or impact on continuing operations.   In addition, management uses results of operations before such items to evaluate the operational performance of the Company and as a basis for strategic planning.   Investors should consider these non-GAAP measures in addition to, and not as a substitute for, financial performance measures prepared in accordance with GAAP.   In addition to the description provided below, reconciliation of GAAP to non-GAAP results are provided in the financial statement tables included in this press release.

The Company defines "Adjusted EBITDA" as GAAP Net Income (loss) before (benefit from) provision for income taxes, net interest (income) expense, other (income) expense, unrealized gain/loss on interest rate derivative contract, depreciation and amortization, amortization of purchased intangibles, acquisition-related expenses, and stock-based compensation expense. The Company defines "Adjusted EBITDA Margin" as Adjusted EBITDA as a percentage of total revenue.

The Company defines "Adjusted Operating Income" as GAAP Net Income (loss) before (benefit from) provision for income taxes, net interest (income) expense, other (income) expense, unrealized gain/loss on interest rate derivative contract, amortization of purchased intangibles, acquisition-related expenses, and stock-based compensation expense. The company defines "Adjusted Operating Income Margin" as Adjusted Operating Income as a percentage of total revenue.

The Company defines "Adjusted Net Income" as GAAP Net Income (loss) before other (income) expense, unrealized gain/loss on interest rate derivative contract, amortization of purchased intangibles, acquisition-related expenses, and stock-based compensation expense and "Adjusted Net Income per diluted share" as Adjusted Net Income divided by weighted average diluted shares outstanding.

These non-GAAP financial measures, as the Company defines them, may not be similar to non-GAAP measures used by other companies.

Management believes that Adjusted Gross Margin, Adjusted EBITDA, Adjusted EBITDA Margin, Adjusted Operating Income, Adjusted Operating Income Margin, Adjusted Net Income, and Adjusted Net Income per diluted share provide useful information to investors about the Company's performance because they eliminate the effects of period-to-period changes in costs associated with capital investments; net income from interest on the Company's cash, cash equivalents and short-term investments; stock-based compensation expense; and similar expenses that are not directly attributable to the underlying performance of the Company's business operations. Management uses Adjusted Gross Margin, Adjusted EBITDA, Adjusted EBITDA Margin, Adjusted Operating Income, Adjusted Operating Income Margin, Adjusted Net Income, and Adjusted Net Income per diluted share in evaluating the overall performance of the Company's business operations and believes that these performance measures provide useful information to investors.

*     *     *

Although management finds Adjusted Gross Margin, Adjusted EBITDA, Adjusted EBITDA Margin, Adjusted Operating Income, Adjusted Operating Income Margin, Adjusted Net Income, and Adjusted Net Income per diluted share, useful for evaluating aspects of the Company's business, its reliance on these measures is limited because excluded items can have a material effect on the Company's earnings (or losses) calculated in accordance with GAAP. Therefore, management uses Adjusted Gross Margin, Adjusted EBITDA, Adjusted EBITDA Margin, Adjusted Operating Income, Adjusted Operating Income Margin, Adjusted Net Income, and Adjusted Net Income per diluted share in conjunction with GAAP Net Income (loss) in evaluating the overall performance of the Company's business operations. The Company believes that Adjusted Gross Margin, Adjusted EBITDA, Adjusted EBITDA Margin, Adjusted Operating Income, Adjusted Operating Income Margin, Adjusted Net Income, and Adjusted Net Income per diluted share provide investors with additional tools for evaluating the Company's core performance that are the same as management uses in its own evaluation of overall performance, as well as a baseline for assessing the future earnings potential of the Company. While GAAP results are more complete, the Company offers investors these supplemental metrics since, with reconciliations to GAAP, they may provide greater insight into the Company's financial results. Management does not intend the presentation of these non-GAAP financial measures to be considered in isolation or as a substitute for results prepared in accordance with GAAP. These non-GAAP financial measures should be read only in conjunction with the Company's consolidated financial statements prepared in accordance with GAAP.

27.     The following day, the Company filed its quarterly report for the third quarter of fiscal 2009 with the SEC on a Form 10-Q.  The Form 10-Q reiterated the previously announced financial results and was signed by defendants Bush and Byers. In addition, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), the Form 10-Q contained signed certifications by defendants Bush and Byers, stating that the Form 10-Q did not contain any material misrepresentations.

28.     On December 3, 2009, the senior management of athenahealth made a presentation at the Company's Second Annual Investor Summit ("Investor Summit").  As part of the presentation, the Company prepared a slide presentation which was filed in a Form 8-K with the SEC on December 3, 2009.  Among the senior management who made presentations at the Investor Summit included defendant Byers who touted the Company's "strong balance sheet" and "expanding profitability."   Indeed, defendant Byers as part of his slide presentation, represented that the Company has had increasing quarterly revenues since the first quarter of 2006 as the Company's "profitability is driven by" its business model.  In addition, defendant Byers represented in the slide presentation, the Company's Guarantee Accounting Program that was launched in September 2009 as being the "most meaningful program in industry; with intent to exclude any related charges from Non-GAAP #s."

29.     On January 11, 2010, athenahealth announced the appointment of Timothy M. Adams as Chief Financial Officer and Senior Vice-President, effective as of the announcement, and the concurrent step down of Carl Byers, the Company's Chief Financial Officer since the Company was founded in 1997.

30.     On February 4, 2010, after the market closed, the Company issued a press release entitled, "Athenahealth, Inc. Announces Change in Non-GAAP Reporting Methodology Fiscal

Year 2009 Results to Reflect Revised Methodology."  The press release stated in relevant part

the following:

> athenahealth, Inc., a leading provider of Internet- based business services for physician practices, announced today that the Company has revised its methodology for calculating non-GAAP Adjusted Net Income. The Company's fourth quarter and full year 2009 earnings results, scheduled for release after the close of market trading on Thursday, February 25, 2010, will reflect this revised calculation. This change in non-GAAP methodology does not reflect any change in the Company's operational performance. The Company has adopted this revised methodology to enable a more comparable performance assessment of the Company and its peers in the health care information technology sector.

> The Company reports its financial results in accordance with United States generally accepted accounting principles, or GAAP. However, management believes that in order to better assess short-term and long-term operating trends, investors may wish to consider the impact of certain non-cash, non-recurring, or other items. These items result from facts and circumstances that vary in frequency and/or impact on continuing operations. Management believes that such information may provide useful supplemental information to investors on the underlying performance of the Company's business operations.

> The Company has previously reported non-GAAP Adjusted Net Income, which it defined as GAAP net income before other (income) expense, unrealized gain/loss on an interest rate derivative contract, amortization of purchased intangibles, acquisition-related expenses and stock-based compensation expense. The Company defines non-GAAP Adjusted Net Income per Diluted Share as non-GAAP Adjusted Net Income divided by the weighted average diluted shares outstanding. Going forward, the Company expects to tax affect certain items added back to GAAP Net Income in the calculation of non-GAAP Adjusted Net Income under this revised reporting methodology.

> In the fourth quarter of fiscal year 2008, the Company reversed its valuation allowance against U.S. deferred tax assets which resulted in a non-cash tax benefit of $16.7 million. In the first quarter of fiscal year 2009, the Company began recording a GAAP tax provision at the effective tax rate. Therefore, the Company believes it is appropriate to calculate non-GAAP Adjusted Net Income by adding back certain items net of tax. The Company currently expects that a 40% tax rate is appropriate for this adjustment. This rate is comprised of the federal statutory tax rate of 34% plus a blended state tax rate of approximately 6%.

31.     On February 8, 2010, Barron's published an article entitled, "Diagnosis:

Unhealthy Accounting." The article stated the following:

This past Thursday, the highflying medical-data company Athenahealth made a significant downward restatement of its "adjusted" earnings for 2009.

In acknowledging an accounting mistake, the company (ticker: ATHN) said it is reducing these reported earnings by some two cents a quarter. That would mean that instead of hitting consensus adjusted earnings forecasts of around 60 cents a share for the year, the number would come in at about 52 cents.

The restatement, even in Friday's volatile market, proved a nonevent. In fact, the stock actually rallied, ending the day at 40.61, up 67 cents, or 1.7%, as most analysts who follow the stock continued to sing the company's praises. Indeed, one called any controversy surrounding the restatement mere "hocus pocus."

But investors would be wise to pay attention to the back story leading to the restatement and the way it was handled by Athenahealth's management, anchored by company co-founder and first cousin of George W. Bush, Jonathan Bush. Also, it should be noted that company insiders used the strength imparted to the stock by the flawed adjusted profit (the stock has more than doubled from its two-year low hit in late 2008) to unload more than $25 million of stock in the past 12 months. Jonathan Bush, in particular, sold more than $6 million of stock over the period.

Finally, investors should be concerned that the Securities and Exchange Commission might take some action. The agency has become more hard-nosed about such non-GAAP (or generally accepted accounting principles) disclosures lately, using Regulation G (an outgrowth of Sarbanes-Oxley legislation) to make sure that such calculations pass muster.

In fact, the agency last fall brought its first enforcement under Reg. G, charging that tech company SafeNet had used misclassified, one-time charges to goose up its non-GAAP earnings by adding the charges back into adjusted earnings. Along with a flurry of consent decrees reached with the company and three former managers, the company had to cough up a $1 million civil-suit fine, and the three executives agreed to some monetary disgorgements and other penalties.

The Athenahealth accounting mistake revolved around the size of the add-back to the company's GAAP earnings made when calculating adjusted earnings for 2009. The latter computation, of course, is the number that Wall Street and the investment community pays the most attention to. Such one-time charges and noncash outlays are added back to earnings to give a true picture of companies' ongoing earnings generation.

The company erred, however, by including in its add-back the entire noncash cost of stock-option compensation to employees. The company, for GAAP purposes, had become a better-than-40% tax-rate payer for the first time in 2009. Yet it

neglected to haircut or "tax effect" the add-back, and thus overstated its earnings by the aforementioned eight cents.

It wasn't that the company didn't know the accounting problem existed. Last December a Brean Murray Carret analyst, Bret Jones, discovered the mistake and brought it to management's attention. But, as he has told Barron's, he was stonewalled by the company even after he issued a report on Jan. 15 laying out the adjusted earnings overstatement.

Barron's over the last three weeks made two calls to the company and received a similar runaround. The company's public-relations honcho, John Hallock, insisted no restatement was required since Jones had "misinterpreted" accounting requirements and was the only analyst among the 25 or so covering the company who had a problem with the number. Each of our phone calls ended with the same plaintive question from Hallock: "You guys aren't planning on doing anything on us, are you?"

Perhaps the restatement was the result of what quantum physicists call the observer effect. Just as subatomic particles may change their behavior when tracked as to location and momentum, so to do companies tend to make embarrassing disclosures when confronted with the threat of negative press exposure.

The accounting misstep, to us, detracts from the company's considerable charms. Athenahealth is in the sweet part of health-care information technology, offering physicians the ability to outsource all their cumbersome claims-collection and billing. And it has recently moved into additional areas of electronic medical record-keeping, including digitizing all patients' testing and treatment data and maintaining doctors' appointment books. Such innovations helped the company practically to double its revenue from 2007 to 2009, to more than $190 million in revenue.

When he tells this story, Jonathan Bush exudes all the folksy charm of his cousin George W., whether at industry conclaves or with prospective customers and Wall Street. At one industry conference, he showed up on the podium in a suit jacket, oxford shirt, dress shoes -- and bare-legged in red running shorts. Those were an allusion to Apple's famous Super Bowl TV advertisement in 1984, introducing the Mac. In it, a woman in orange-red shorts sprints down a long corridor only to throw a hammer at a screen depicting Big Brother. Bush's point was that like Apple, Athenahealth is shattering the old paradigms of medical record-keeping.

The analytic community is so mesmerized by the story that it doesn't care about the company's credibility lapse. We would submit that investors should.

32.     The statements referenced above in ¶¶ 26-28, and 30 above were materially false and/or misleading because they misrepresented reported revenues and earnings by recognizing implementation revenues over an improper period of only one year, as opposed to twelve years, thereby materially inflating revenue.

**The Truth Emerges**

33.     On February 25, 2010, after the market closed, athenahealth shocked the market, disclosing for the first time that it was undergoing an ongoing internal review of the Company's procedure for recognizing previously deferred implementation revenue. The Company disclosed in a press release entitled, "athenahealth, Inc. Postpones Fourth Quarter and Fiscal Year 2009 Earnings Release," and stated, in relevant part, as follows:

> athenahealth, Inc., a leading provider of Internet- based business services for physician practices, today announced that it will postpone the release of its financial results for the fourth quarter of 2009 and the year ended December 31, 2009, and its previously announced conference call to discuss these results originally scheduled for February 26, 2010, in order to allow additional time to complete the year-end audit and conduct an internal accounting policy review related to the timing of amortization for deferred implementation revenue.

> The Company expects to file a Notification of Late Filing on Form 12b-25 with the Securities and Exchange Commission on Tuesday, March 2, 2010 notifying the Commission that the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2009 could not be filed without unreasonable expense or effort within the prescribed time period. The Company will announce the revised date for reporting Q4 and fiscal year 2009 earnings in a subsequent release.

> The Company is postponing the release of its financial results for the fourth quarter of 2009 and the year ended December 31, 2009 in connection with an internal review, initiated by the Company, of its accounting policy for the amortization period for deferred implementation revenue. Implementation revenue is generated from the implementation of the Company's services for new customers and as reported, was captured within the "Implementation and Other" revenue line …

*     *     *

The Company records implementation fees as deferred revenue until the implementation service is complete and ongoing services commence, at which time the fees are amortized, or recognized ratably, on a monthly basis over the "expected performance period". athenahealth's clients typically purchase one-year contracts that renew automatically and, to date, the Company has determined the expected performance period to be equal to the initial contract period. Management is now reviewing whether the period of amortization for deferred implementation revenue should be extended to a longer expected performance period.

If the Company determines that a change is necessary, and the financial impact is deemed material, the Company would restate prior year financial statements. Any such change related to the amortization period for deferred implementation revenue would not have an impact on the Company's cash flow from operations, as non-refundable implementation revenues are billed and paid up front, but it would impact reported implementation revenue from operations on a period to period basis, and the corresponding net income/(loss) in each period.

34.     Upon this news, athenahealth's securities dropped 13% to 36.84 from a previous day close of $43.52, and on volume of 6,661,800, in contrast to the average daily volume of 697,000 over the last 12 months.

35.     The next day, analysts from Robert W. Baird and JMP Securities downgraded their rating of athenahealth to Outperform.

### POST-DISCLOSURE EVENTS CONFIRM THAT MISREPRESENTATIONS WERE MATERIAL TO INVESTORS

36.     On March 15, 2010, after the market closed, the Company issued a press release announcing the results of its restatement.  The Company disclosed, in part, the following:

athenahealth, Inc., a leading provider of Internet-based business services for physician practices, today announced financial and operational results for the fourth quarter and full year of 2009.

In addition, the Company announced the completion of a restatement of prior period financials due to a change in the amortization period for deferred implementation revenue. The Company's financial statements for the fiscal years ended 2005, 2006, 2007 and 2008, each quarterly period in 2008, and the quarterly periods for Q1 through Q3 in 2009 were restated as a result of an

internal accounting policy review, initiated by the Company, related to the timing of amortization for deferred implementation revenue.

The Company will conduct a conference call tomorrow, Tuesday, March 16, 2010, at 8:00 a.m. Eastern Time to discuss these results and management's outlook for future financial and operational performance.

Fourth Quarter and Full Year 2009 Results
Due to the Company's change in implementation fee amortization, all prior period comparisons contained within this press release reflect restated financial results.

Total revenue for the three months ended December 31, 2009, was $54.4 million, compared to $40.8 million in the same period last year, an increase of 33%. Full year 2009 revenue was $188.5 million, compared to full year 2008 revenue of $136.3 million, an increase of 38%.

"I am very proud of our accomplishments in 2009, a year in which we further established athenaClinicals as a leading electronic health record service, strengthened our unique value proposition with a patent issued on our payer rules engine, and stepped up our investments in growth by acquiring Anodyne Health Partners," said Jonathan Bush, the Company's Chairman, President, and Chief Executive Officer. "As physicians face increasing complexity associated with payment reform and incentive programs, I continue to believe that our unique approach as a software-enabled-service will deliver superior results to both physicians and investors."

For the three months ended December 31, 2009, non-GAAP Adjusted EBITDA grew to $13.0 million, or 24% of revenue, from non-GAAP Adjusted EBITDA of $7.1 million, or 18% of revenue, in the same period last year. GAAP net income for the fourth quarter of 2009 was $4.3 million, or $0.12 per diluted share, and non-GAAP Adjusted Net Income was $5.9 million, or $0.17 per diluted share, under the Company's revised non-GAAP methodology.

"It is very exciting to join athenahealth on the heels of such a tremendous year," said Tim Adams, the Company's Chief Financial Officer. "Looking ahead to 2010 and beyond, I believe there is no shortage of opportunity for the Company to flourish as an innovator while striving to achieve our strategic and financial goals."

For the year ended December 31, 2009, non-GAAP Adjusted EBITDA grew to $34.7 million, or 18% of revenue, from non-GAAP Adjusted EBITDA for 2008 of $19.2 million, or 14% of revenue. For 2009, GAAP net income was $9.3 million, or $0.27 per diluted share. Non-GAAP Adjusted Net Income for the year was $15.0 million, or $0.43 per diluted share, under the Company's revised non-GAAP methodology.

\*      \*      \*

Financial Restatement
The Company has completed its previously announced internal accounting review related to the amortization period for deferred implementation revenue. Implementation revenue consists primarily of professional services fees related to assisting customers with the implementation of the Company's services. These non-refundable fees are generally billed up front and recorded as deferred revenue until the implementation is complete and then recognized ratably over the expected performance period. Previously, the expected performance period was based upon the initial customer contract term, which, for the vast majority of contracts, was one year in duration. Implementation and other revenue has ranged from four to seven percent of total revenue on an annual basis since 2007.

As a result of the internal review, the Company concluded that in prior and future periods, deferred implementation revenue will be amortized over a longer expected performance period of twelve years in order to reflect the estimated expected customer life. Accordingly, as described above, the Company will restate the "implementation and other" revenue within its previously filed consolidated financial statements to reflect a longer amortization period for deferred implementation revenue. The Company will continue to record implementation expenses in the period as incurred. The length of the amortization period for deferred implementation revenue recognition does not impact cumulative total implementation revenue under contract nor does it impact cash flow.

In addition, in connection with the restatement, certain prior year amounts have been reclassified to correct the presentation in the financial statements. These reclassifications had no effect on net income or shareholders' equity for any period and pertain to: (a) reimbursements of out-of-pocket expenses that were previously netted against corresponding expense and have now been grossed up and included in "implementation and other" revenue, (b) certain deferred tax liabilities that have been reclassified from non-current to current, (c) draw downs of capital lease lines that were previously presented as sources of cash within the financing activities section of the cash flow statements and have been reclassified as investing activities, and (d) the excess tax benefit from stock-based awards that were previously presented as sources of cash within the "operating activities" section of the consolidated statements of cash flows in the accrued expense line and have been reclassified as "operating activities" in the excess tax benefit from stock-based awards line item.

"I am proud of the Company's timely completion of this review process," added Tim Adams. "The changes made to this accounting item relate to a small portion of revenue and do not affect the Company's cash flow or underlying business."

37.     The Company has admitted that its accounting was improper and restated its financial statements between 2005 and 2009 to correct for material errors in implementation revenue.

## INSIDER SALES DURING THE CLASS PERIOD

38.     While investors suffered immeasurable losses caused by defendants' false and misleading statements and material omissions, all of the defendants profited handsomely.   In fact, Company insiders profited more than $7.8 million during the Class Period. Defendants, in particular, profited as follows from sales of athenahealth stock during the Class Period: (a) defendant Bush profited more than $3.5 million; and (b) defendant Byers more than $61,000.

## CLASS ACTION ALLEGATIONS

39.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired athenahealth securities during the Class Period (the "Class") and were damaged thereby.   Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

40.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, athenahealth securities were actively traded on the Nasdaq.   While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by athenahealth or its transfer agent and may be

notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

41.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

42.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

43.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of athenahealth;

- whether the Individual Defendants caused athenahealth to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of athenahealth securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

44.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

45.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- athenahealth securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the Nasdaq, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold athenahealth securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

46.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

**CLAIMS FOR RELIEF**

**COUNT I**

**(Against All Defendants For Violations of**
**Section 10(b) And Rule 10b-5 Promulgated Thereunder)**

47.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

49.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of athenahealth securities; and (iii) cause Plaintiff and other members of the Class to purchase athenahealth securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

50.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for athenahealth securities and options.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about athenahealth's finances and business prospects.

51.     By virtue of their positions at athenahealth, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

52.     Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of athenahealth securities from their personal portfolios.

53.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of athenahealth, the Individual Defendants had knowledge of the details of athenahealth internal affairs.

54.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of athenahealth.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to athenahealth's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public

statements, the market price of athenahealth securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning athenahealth's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased athenahealth securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants and were damaged thereby.

55.    During the Class Period, athenahealth securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of athenahealth securities and options at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased said shares and options, or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiff and the Class, the true value of athenahealth securities and options were substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of athenahealth securities and options declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

56.    By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

57.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the

Company had been disseminating misrepresented financial statements to the investing public related to implementation revenue.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

58.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

59.     (a)     During the Class Period, the Individual Defendants participated in the operation and management of athenahealth, and conducted and participated, directly and indirectly, in the conduct of athenahealth's business affairs.  Because of their senior positions, they knew the adverse non-public information about athenahealth's misstatement of income and expenses and false financial statements.

(b)     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to athenahealth's financial condition and results of operations, and to correct promptly any public statements issued by athenahealth which had become materially false or misleading.

(c)     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which athenahealth disseminated in the marketplace during the Class Period concerning athenahealth's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause athenahealth to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of athenahealth within the meaning of Section 20(a) of the Exchange Act.  In this

capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of athenahealth securities and options.

60.     Each of the Individual Defendants, therefore, acted as a controlling person of athenahealth.  By reason of their senior management positions and/or being directors of athenahealth, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, athenahealth to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of athenahealth and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

61.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by athenahealth.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands

trial by jury of all issues that may be so tried.

DATED:  March 19, 2010                    **BERMAN DEVALERIO**

By:    /s/ Jeffrey C. Block
Jeffrey C. Block (BBO #600747)
Jason M. Leviton
One Liberty Square
Boston, Massachusetts 02109
Telephone:  (617) 542-8300
Facsimile:   (617) 542-1194

*Local Counsel for Plaintiff*

**POMERANTZ HAUDEK
GROSSMAN & GROSS LLP**
Marc I. Gross
Jeremy A. Lieberman
100 Park Avenue, 26th Floor
New York, New York 10017
Telephone: (212) 661-1100
Facsimile:  (212) 661-8665

**POMERANTZ HAUDEK
GROSSMAN & GROSS LLP**
Patrick V. Dahlstrom
Leigh Handelman Smollar
One North LaSalle Street, Suite 2225
Chicago, Illinois  60602
Telephone**:** (312) 377-1181
Facsimile**:** (312) 377-1184

*Counsel for Plaintiff*

**Certification of Plaintiff**
**Pursuant to Federal Securities Laws**

1.   I, Andrea Casula, make this declaration pursuant to Section 101 of the Private Securities Litigation Reform Act of 1995 as required by Section 21D (a) (2) of Title I of the Securities Exchange Act of 1934.

2.   We have reviewed a Complaint against athenahealth, Inc ("ATHN"), and authorize a filing of a comparable complaint on my behalf.

3.   I did not purchase my ATHN securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under Title I of the Securities Exchange Act of 1934.

4.   I am willing to serve as a representative party on behalf of a class as set forth in the Complaint, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action and that the Pomerantz Firm will exercise its discretion in determining whether to move on my behalf for appointment as lead plaintiff.

5.   To the best of my current knowledge, the attached sheet lists all of my purchases and sales in ATHN securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws, except as follows:

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

8.   The matters stated in this declaration are true to the best of my current knowledge, information and belief.

I declare under penalty or perjury that the foregoing is true and correct.

Executed _March 18, 2010_ , at   _Glen Ellyn, Illinois_
(Date)                              (City, State)

_Andrea C. Casula_
(Signature)

_ANDREA C. CASULA_
(Type or Print Name)

## Summary of Purchases and Sales

| DATE | TRANSACTION TYPE: PURCHASE OR SALE | NUMBER/ TYPE OF SECURITY | PRICE OF SECURITY |
|---|---|---|---|
| 1-27-2010 | PURCHASE | 10 shares | #41.10 per share |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |