**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ANDREA CASULA, On Behalf of Herself and All Others Similarly Situated,<br><br>                        Plaintiff,<br><br>   vs.<br><br>ATHENAHEALTH, INC., JONATHAN BUSH and CARL B. BYERS,<br><br>                       Defendants. | No. 1:10-cv-10477-GAO<br><br>CLASS ACTION<br><br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

By and through its undersigned counsel, Lead Plaintiff Waterford Township General Employees Retirement System ("Plaintiff" or "Waterford GERS") alleges the following against athenahealth, Inc. ("athenahealth" or the "Company"), Jonathan Bush ("Bush"), and Carl B. Byers ("Byers") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by athenahealth and other related parties and non-parties with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles and shareholder communications; (d) review of other

publicly available information concerning athenahealth, the other Defendants and related non-parties; (e) consultation with experts; and (f) interviews with factual sources, including individuals formerly employed by athenahealth, and other industry participants.

## I.    SUMMARY OF THE ACTION

1.    This is a federal securities fraud class action against athenahealth and certain of its officers and/or directors for violations of the federal securities laws.  Plaintiff brings this action on behalf of all persons or entities who purchased or acquired shares of athenahealth between September 20, 2007 and February 25, 2010 (the "Class Period") (the "Class") seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiff alleges that during the Class Period, Defendants engaged in a fraudulent scheme to inflate the Company's stock price by prematurely recognizing, and thus, inflating the Company's implementation revenues.  As a result of the fraud described herein, shareholders suffered millions of dollars in losses.

2.    athenahealth was founded in 1997 and completed an Initial Public Offering ("IPO") in September of 2007.  The Company provides Internet-based business services for physician practices, including, among others, revenue cycle management services, clinical cycle management services, and other practice management services.  To take advantage of the services offered by athenahealth, clients are not required to purchase any hardware or software licenses.  Instead, they can access the Company's services through a web portal.   Accordingly, the Company refers to its business model as "software-as-a-service."  The Company charges a monthly fee for its services based on a percentage of collections.

3.    Once a client signs up with athenahealth, athenahealth's Professional Services personnel work with the client to get it up and running on the athenahealth system.  This process is known as the implementation process and involves several phases, including enrollment, uploading

client data, and training for the practitioner's staff.  This process is time-consuming and often subject

to delays.  In addition to the monthly, collection-based fees athenahealth charges, the Company also

charges clients fees for implementation, which are received in two installments: half upon the

signing of the contract, and the remaining fees upon the completion of the implementation.

4.      Throughout the Class Period, Defendants represented that the Company accounted for

implementation fees as deferred revenue until the completion of its implementation service, at which

time it recognized this revenue ratably on a monthly basis over the expected performance period.

Defendants knew that the expected performance period for athenahealth's implementation fees was

well over a year in length.  Indeed, under Defendants' software-as-a-service model, Defendants

continued many of the services related to implementation over the course of its relationship with

clients.  Moreover, Defendants knew that the Company's expected customer life was long.  As

admitted by Defendants throughout the Class Period, the Company had a client retention rate of

approximately 92%, and its client contracts automatically renewed after their initial one-year term.

As numerous confidential witnesses explained, the Company's high client retention was driven by

the fact that once a client became a part of the athenahealth system, it was very difficult for the client

to back out its data and leave.

5.      Despite the Company's long relationships with clients and the lengthy performance

period associated with its implementation fees, during the Class Period, Defendants amortized the

Company's implementation revenue over the length of its initial contracts with clients, which in the

vast majority of cases was only a one-year period.  In such a way, Defendants  improperly

recognized implementation revenues prematurely in clear violation of Generally Accepted

Accounting Principles ("GAAP").  By improperly recognizing the Company's implementation

revenue, Defendants artificially inflated the Company's revenues, income, and numerous other

financial metrics that they touted to the market.  Through Defendants' accounting manipulations, the price of athenahealth's common stock was artificially inflated during the Class Period.

6.      On February 25, 2010, the market finally learned the truth about Defendants' improper accounting.  On this day, after the market closed, Defendants revealed that the Company would be postponing the release of its financial results for the fourth quarter of 2009 and the year ended December 31, 2009, in order to allow additional time to complete the year-end audit and *conduct an internal accounting policy review* related to the *timing of amortization for deferred implementation revenue*.  The market was shocked by this announcement, which caused the Company's stock price to plummet by nearly 18%  from $43.52 on February 25, 2010 to $35.87 on March 1, 2010, on unusually heavy trading volume, resulting in millions of dollars of investor losses.

7.      On March 15, 2010, the Company revealed that it would in fact be required to restate its prior period financials for the fiscal years ended 2005, 2006, 2007 and 2008, each quarterly period in 2008, and the quarterly periods for first quarter through the third quarter in 2009 due to a change in the amortization period for deferred implementation revenue. The Company revealed that previously it had been amortizing revenues over an expected performance period of the initial contract term, which, for the vast majority of contracts, was one year in duration.  However, the Company stated that the appropriate expected performance period of the implementation fees was actually *twelve years*, which represented the estimated expected customer life.  Through the Company's restatement, Defendants admitted that they had materially overstated implementation revenues during the Class Period.

8.      Then, on April 29, 2010, the market learned the full impact that Defendants' accounting machinations had on the Company's financial results.  On this date, the Company

announced its first quarter 2010 results, and explained that the Company's bottom line results were impacted by increased investments in sales and marketing *as well as higher general and administrative expenses of approximately $1.0 million related to the Company's recent accounting review and restatement process*.  The market was again stunned by this revelation, causing the Company's stock price to plummet by nearly 24% from $35.35 on April 29, 2010 to $26.96 on May 6, 2010, on unusually heavy trading volume, resulting in millions of dollars of investor losses.

9.      At the same time investors were suffering, Defendants Bush and Byers lined their pockets.  In fact, with athenahealth's stock price buoyed by their misrepresentations during the Class Period, these Defendants unloaded significant percentages of their common stock holdings for proceeds totaling more than $24.3 million.

## II.      JURISDICTION AND VENUE

10.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

11.      Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District.  Additionally, athenahealth's principal place of business is within this District.

12.      In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

### III.    PARTIES

####     A.    Plaintiff

13.    Lead Plaintiff Waterford GERS, as set forth in its certification already filed with the Court, and incorporated by reference herein, purchased the common stock of athenahealth, at artificially inflated prices during the Class Period and has been damaged thereby.  On June 3, 2010, the Court appointed Waterford GERS to serve as Lead Plaintiff in this action.

####     B.    Defendants

14.    Defendant athenahealth is a Delaware corporation which maintains its principal executive offices at 311 Arsenal Street, Watertown, Massachusetts 02472.  The Company provides Internet-based business services for physician practices. The aggregate number of shares of athenahealth common stock outstanding as of March 12, 2010 was approximately 34,034,323 shares. athenahealth securities are actively traded on the NASDAQ under the ticker symbol "ATHN."  As of December 31, 2009, athenahealth provided these services to more than 23,350 medical providers, including more than 15,700 physicians, across 43 states and the District of Columbia and 60 medical specialties.

15.    Defendant Bush is, and at all relevant times was, the Company's founder, Chairman of the Board, President and Chief Executive Officer.  Defendant Bush signed the Company's quarterly and annual reports filed with the SEC.

16.    Defendant Byers was the Company's Chief Financial Officer since prior to the IPO until his retirement in January 2010. He also served as the Company's Senior Vice-President, Treasurer and Chief Accounting Officer throughout that time period.  Defendant Byers signed the Company's quarterly and annual reports filed with the SEC.

17.    Defendants Bush and Byers are collectively referred to herein as the "Individual Defendants."

18.     During the Class Period, the Individual Defendants, as senior executive officers of athenahealth, were privy to confidential and proprietary information concerning athenahealth, its operations, finances, financial condition, and present and future business prospects.  The Individual Defendants also had access to material adverse non-public information concerning athenahealth, as discussed in detail below.  Because of their positions with athenahealth, the Individual Defendants had access to non-public information about athenahealth's business, finances, products, markets, and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

19.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of athenahealth's business.

20.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports, and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their executive and managerial positions with athenahealth, each of the Individual Defendants had

access to the adverse undisclosed information about athenahealth's business prospects, financial condition, and performance as particularized herein, and knew or recklessly disregarded that these adverse facts rendered the positive representations made by or about athenahealth and its business issued or adopted by the Company materially false and misleading.

21.    The Individual Defendants, because of their positions of control and authority as officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

22.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in the Company's public filings, press releases, and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above.  Each of the above officers of athenahealth, by virtue of his high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the

false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

23.     As senior executive officers and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to athenahealth's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue so that the market price of athenahealth's securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

24.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of athenahealth's publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme deceived the investing public regarding athenahealth's business, operations, management and the intrinsic value of athenahealth's common stock and caused Plaintiff and other members of the Class to purchase athenahealth common stock at artificially inflated prices.

25.     Defendants are liable for: (i) making false statements; and/or (ii) failing to disclose adverse facts known to them about athenahealth.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of athenahealth common stock was a success, as it: (i) deceived the investing public regarding athenahealth's prospects and business; (ii)

artificially inflated the price of athenahealth common stock; and (iii) caused Plaintiff and other members of the Class to purchase athenahealth common stock at inflated prices.

## IV.    FACTUAL BACKGROUND[1]

### A.    Background of the Company

26.    athenahealth was founded in 1997 by Todd Park and Jonathan Bush. *See* athenahealth, Corporate Fact Sheet, as of March 31, 2010, http://www.athenahealth.com/our-company/corporate-facts.php (last visited July 26, 2010).   The Company is headquartered in Watertown, Massachusetts but has operational facilities in Belfast, Maine; Rome, Georgia; and Chennai, India.   *Id.*   athenahealth provides billing and medical records to physicians over the Internet.   *Id.*   The Company covers 60 medical specialties and services approximately 24,000 medical providers on its athenaNet.   *Id.*

27.    On September 19, 2007, the Company completed an IPO, in which it initially offered 6,286,819 shares of common stock for $18.00 per share.  As a newly public company, which did not offer guidance,[2] athenahealth was motivated to meet the market's expectations or "consensus estimates."   A consensus estimate is a figure based on the combined estimates of the analysts covering a public company.   *See Investopedia*, Consensus Estimate, http://www.investopedia.com/terms/c/consensusestimate.asp (last visited July 27, 2010).   Analysts generally give a consensus for a company's projected earnings per share and revenue. *Id.*  Meeting consensus estimates is critical to maintaining a company's stock price and investor confidence.

---

[1]    All confidential witnesses are referred to in the masculine to protect their identities.

[2]    "Guidance" or "Earnings Guidance" is "information that a company provides as an indication or estimate of its future earnings."   Investopedia, Guidance, http://www.investopedia.com/terms/g/guidance.asp (last visited July 29, 2010).

Thus, in an attempt to meet market expectations and grow investor confidence, throughout the Class Period, Defendants engaged in a fraudulent accounting scheme designed to inflate revenues, earnings per share, and the Company's stock price.

### B.    athenahealth's Service Offerings

28.    athenahealth holds itself out as the "leading provider of Internet-based business services for physician practices." *See* Form 10-K for the period ended December 31, 2009, filed on March 15, 2010. The Company states that athenahealth's service offerings are based on four integrated components: (1) its proprietary Internet-based software; (ii) its continually updated database of payer reimbursement process rules; (iii) its back-office service operations that perform administrative aspects of billing and clinical data management for physician practices; and (iv) its automated and live patient communication services. *Id.*

29.    The former Senior Project Associate[3] explained that the athenahealth suite of systems was Internet-based, and for this reason, the clients did not have to purchase new hardware to run the athenahealth suite of systems. Instead, the clients' data were uploaded onto athenahealth's "stack of servers" through the Internet, and patient data, claims, and electronic health records ("EHR") were processed and stored in secure, web-based platforms that the clients accessed through a web portal.

30.    athenahealth offers three primary services, including: (i) athenaCollector; (ii) athenaClinicals; and (iii) athenaCommunicator. athenaCollector is the Company's revenue cycle management service, which automates and manages billing-related functions for physician practices

---

[3]    The former Senior Project Associate was employed with the Company from October 2005 through September 2008. Throughout his tenure at the Company, this former employee worked in the "practice management" organization and in the athenaClinicals group. In this capacity, the former Senior Project Associate was responsible for working with new clients to implement new systems and training clients and their staff on the operation of the new systems.

and includes a medical practice management platform.  athenaCollector assists physicians with the handling of claims and billing processes to help manage reimbursement quickly and efficiently.  The former Senior Project Associate explained that the athenaCollector system provided "practice management" to clients.  Indeed, the athenaCollector system allowed practitioners from different specialties to electronically manage their practice and provided practitioners with basic patient and detailed revenue management, including the ability to manage patient information, scheduling, and claims processing.  Practitioners used the athenaCollector system to enroll patients, schedule patient visits, check in patients, charge patients, manage patients' insurance arrangements, determine patient co-pays, manage claims-related billing, submit claims to state or private insurance companies, and post payments received from these payers.

31.    The former Senior Project Associate and the former Director of Professional Services[4] explained that the Company had three levels of athenaCollector -- the basic model (athenaBasic), the plus model (athenaPlus), and athenaCollector.  According to the former Senior Project Associate, the basic model was sold to clients who only desired the athenaCollector system to process claims.  Clients who operated the athenaCollector basic system were responsible for following up with the insurance companies regarding claim denials without the assistance of athenahealth.  The athenaCollector plus model provided practice management and claims processing to clients.  Under this model, athenahealth was more involved in working with the insurance companies regarding payment on denied claims.

_____

[4]    The former Director of Professional Services was employed with athenahealth from February 2004 through October 2006.  In this capacity, he led a team of 25 to 50 Professional Services Personnel, including Project Managers, Project Associates, Training Associates, and "technical people," in training clients on the athenahealth system, making sure the provider and insurance data was properly set up in the athenahealth system, and working with clients throughout and after the implementation phase.

32.     Finally, the full athenaCollector system provided full-scale revenue cycle management to clients.   Under this model, the clients only had to provide the service and athenahealth handled all of the claims processing, payments, and posting processes.   Once athenaCollector was implemented, athenahealth took over the client's active billing process.   The Company submitted claims to insurance companies on the client's behalf and received and processed checks and explanations of benefit ("EOB") from the payers.   In addition, athenahealth resolved claims denials with the insurance companies and deposited checks from insurance companies into the client's account.   Indeed, there was an entire staff at the athenahealth facility in Maine who was responsible for evaluating and liaising with insurance companies regarding denied claims.

33.     According to the former Senior Project Associate, the athenaClinicals system was the second athenahealth system that clients implemented.   athenaClinicals is the Company's clinical cycle management service, which automates and manages medical-record-related functions for physician practices.   *See* Form 10-K for the year ended December 31, 2007, filed on March 7, 2008. While the athenaClinicals system works in conjunction with athenaCollector, it also provides EHR management capabilities to providers.   athenaClinicals assists medical groups with the proper handling of physician orders and related inbound and outbound communications in an attempt to ensure that orders are carried out quickly and accurately and to provide an up-to-date and accurate online patient clinical record.

34.     According to the former Senior Project Associate, the athenaCommunicator system was the Company's most recently developed product.   athenaCommunicator is the Company's patient cycle management service, which provides practitioners with the ability to compare the number of claims processed, denied, and paid with other practitioners of the same specialty that operated on the athenahealth suite of systems.   The athenaCommunicator system also provided a

patient portal, through which practitioners and patients could communicate electronically in a secure environment regarding services provided, prescriptions, and other patient-specific data. The athenaCommunicator also included ReminderCall, an automated appointment reminder system offered by athenahealth that allows patients to either confirm the appointment or request rescheduling, along with other automated patient messaging services, live operator services, and a patient web portal.

### C.    The Implementation Process

35.    athenahealth's direct sales force is responsible for finding clients for its products, understanding their needs, developing service proposals, and negotiating contracts with clients. *See* athenahealth's Form 10-K for the period ending December 31, 2008, filed on March 2, 2009. According to the former Project Manager,[5] the client contracts, which varied by client, contained, among other terms, service level agreements detailing what the clients received with the athenaCollector system and related services. The contracts also provided the terms and costs of implementation – the process in which clients get up and running on the athenahealth system. This was confirmed by the former Director of Professional Services, who stated that the sales contracts contained all details relating to the implementation process, including the timeline for implementation and its price.

36.    Once contracts were signed by clients, Sales Representatives received their commissions. According to the former Project Manager, Sales Representatives would communicate to the Professional Services staff that new clients had been signed and implementations were

---

[5]    The former Project Manager was employed with athenahealth from February 2006 to July 2008 in Watertown, Ma. In this capacity, the former Project Manager reported to the Director of Professional Services, and was responsible for traveling to client locations to implement the athenaCollector system.

pending.  The pending implementations were prioritized by the Engagement Manager.  The former Senior Project Associate explained that as part of the implementation process, there were a number of athenahealth personnel assigned to each client, including representatives from the Content and Development team, a Sales Representative, the Professional Services Director, a Project Manager, and a Project Associate.

37.     The former Project Manager explained that before the implementation process began, the Sales Representative, Project Manager, and other athenahealth employees assigned to the account participated in a telephone "kick off call" to plan the implementation.  The call participants discussed the scope of the implementation, including how many users would be accessing the system, determine whether the client was willing to pay for an on-site visit from the athenahealth Professional Services staff, discuss the fee schedule, and inform the client that athenahealth personnel would set up and train the client on the athenaCollector system.

38.     The Professional Services Director assigned implementations to the Project Managers, who were responsible for executing the implementations.  Project Associates worked closely with the client in the implementation process, including training the client and the client's staff.  The other athenahealth employees assigned to each client monitored the progress of implementation and worked with clients to resolve issues.  Indeed, as the former Director of Professional Services explained, a Project Manager and Project Associate met with the client on at least a weekly basis throughout the implementation process.

### 1.     Enrollment

39.     Before the implementation process could begin, a new athenahealth client had to be "enrolled."  The former Project Manager explained that the enrollment phase of implementation entailed getting the client "payers on file."  In essence, the athenahealth Enrollment team evaluated the number of insurance payers that the client utilized, ensured that the clients were "credentialed"

with the payers, meaning that the clients met all of the payers' requirements to submit and receive payments on claims, confirmed the pay rates that the clients were entitled to bill the payers, and established the necessary parameters in the athenaCollector system to process claims according to the terms of the agreements between the practitioners and payers.

40.     The former Senior Project Associate further explained that enrollment pertained particularly to the athenaCollector system. athenaCollector was the first system that athenahealth implemented at client sites. Moreover, the athenaCollector system had to be implemented before other athenahealth systems were implemented at the client sites. While there were also implementation processes associated with athenaClinicals and athenaCommunicator, these processes only typically occurred after the athenaCollector system had been up and running for some time.

41.     The former Senior Project Associate explained that members of the athenahealth Project Management organization communicated regularly with the Enrollment Analysts to track the progress of enrollment for implementations that were pending. Once all of the enrollment paperwork was completed for a new client, the implementation process could begin.

42.     The implementation process involved getting customers up and running on the athenahealth system. According to the former VP of Sales of the Western Region,[6] the tasks involved in the process included uploading the customer's data, training the customer, and initiating the operation of the athenahealth revenue cycle management system. During the implementation, athenahealth establishes and checks the appropriate connections and registrations, loads data onto its athenaNet system, set ups up data tables and provides initial training to practice personnel. As

---

[6]     The former Vice President ("VP") of Sales of the Western Region was employed with athenahealth from June 2001 through December 2007. This former employee was one of four Vice Presidents of Sales and was responsible for all sales activity in the Western region, which covered Texas through Hawaii, including forecasting and reporting.

detailed below, an average implementation could take as long as three to five months, depending on the variables at issue.

## 2. The Implementation Plan

43. According to the former VP of Sales of the Western Region, the implementation process was outlined in a document known as the "implementation plan." The "implementation plan" included details about the Professional Services team members assigned to the implementation, the schedule, and the tools to be used in the implementation process. Clients signed off on the initial "implementation plan" document. The Project Manager was responsible for documenting and securing customers' signatures on phases of the implementation process. The former Project Manager explained that the clients signed-off on various phases of the implementation as they were completed. In some instances, the client's administration staff had signatory responsibility. The client's signatures were received by athenahealth via fax, in hard copy on-site, or electronically in a PDF document. The Engagement Manager tracked the implementation documentation.

44. The former Engagement Manager[7] confirmed that the process for documenting implementations was very thorough. "There were tons of activities [in the implementation process] that required sign off." The phases of the implementation process that required sign-off included uploading the client data to the athenahealth system, training, and the "go live" date, which as the

---

[7] The former Engagement Manager was employed with athenahealth from 2005 through June 2010. In this capacity, the former Engagement Manager was responsible for leading implementations of athenahealth systems, including the athenaCollector revenue cycle management system, in large hospitals and small medical practices and clinics. This former employee led or participated in "100 plus" implementations of the athenahealth revenue cycle management system throughout his employment.

former Project Manager explained, signified when the practitioner's existing accounting system would be "cut off" and the client would begin using the athenaCollector system.

45.     While the former Engagement Manager explained that the amount of documentation varied by Project Manager, all customers signed off on the "go live" date, or the completion of implementation.  The "go live" sign-off was the "biggest" of the "steps" in implementation that required a client signature.  The former Engagement Manager further explained that the enrollment and training phases had to be completed prior to the "go live" date.  Moreover, the athenahealth system could not begin to run until the "go live" signatures from clients were secured.  The former Engagement Manager explained that there were goals about when each project would "go live" that were set collectively by the Sales and Project Management personnel.  However, the Project Managers had "leeway" in finalizing the implementation and determining when the project would "go live."  Some clients were more eager to "go live" than others, and the willingness of the client had an impact on whether the anticipated "go live" date was met.

46.     The former Engagement Manager explained that the sign-offs represented the clients' authorization that the phases of the implementation had been completed to their satisfaction and expectations.   They were also used as "leverage," if necessary, to collect payment for implementation from clients.  Project Managers could be "fired" if they did not secure the required signatures from clients.

**D.     athenahealth's Fee System**

47.     The former VP of Sales of the Western Region explained that the Company followed a "very simplified pricing methodology," for its service offerings.  The methodology was based on a practice's estimated collections and the number of practitioners.  athenahealth's pricing methodology involved charging customers a percentage of collections, implementation fees, and a "minimum fee." The pricing methodology was designed to generate as much business as possible.

48.     First, according to the VP of Sales of the Western Region, the Company charged customers a monthly fee based on a percentage of collections.  The percentage of collections generally ranged in the neighborhood of three to five percent of the practitioner's billing.  This was confirmed by the former Senior Project Associate, who explained that clients paid athenahealth a percentage of revenues received -- typically three to five percent -- in exchange for being able to operate on the athenaCollector system and for athenahealth's revenue cycle management services.  The Company was motivated to process and secure payment on as many claims as possible given the percentage of revenue fee arrangement for athenaCollector.   This pricing methodology was confirmed by the former Project Manager, who explained that the fee schedule for athenaCollector was based on a percentage of the client's revenue, depending on the number of claims athena processed on the client's behalf.

49.     According to the former Senior Project Associate, the Company also charged a recurring fee for the athenaClinicals system.  The recurring fee represented $800 per provider.  Accordingly, where a client had 10 doctors and utilized the athenaClinicals system, athenahealth earned $8,000 per month from that client.

50.     In addition to the monthly and collections-based fees charged by athenahealth, the Company also charged implementation fees, which covered the cost of getting customers up and running on the athenahealth system.  The former VP/Director of Business Development[8] explained that the Company used a variety of factors to determine how much to charge for implementation

---

[8]     The former VP/Director of Business Development was employed with the Company for approximately 12 years from July 1997 through July 2009.  This former employee served as the Company's Chief Technical Officer from 1997 through 2006, at which time he took over a position as Product Manager.  From 2008 until he left the Company in July 2009, this former employee served as VP/Director of Business Development.

fees, including the number of physicians to use the Company software, the number of sites and the amount of staff that required training. However, this former employee explained that essentially the implementation fees broke down to approximately $2,700 per doctor. Moreover, the Company sales person responsible for selling to the customer "ultimately set the implementation fees." The former VP of Sales of the Western Region recounted that implementation fees were paid in two installments: "up front" when the deal was signed and the remaining amount when the implementation was complete and the system "went live." This was confirmed by the former Director of Professional Services.

51.     The former Senior Project Associate also explained that implementation charges covered the time of the Project Associate, Project Manager, the development of "work flows" required to properly set up the client on the athenahealth system(s), the enrollment process, on-site visits by the athenahealth staff, and training for the client on the new system. The implementation fees included the travel costs for the athenahealth Project Managers to visit the client's site and oversee the implementation.

52.     The former Senior Project Associate explained that the price of the implementation varied significantly depending on the size of the client. Some clients purchased the basic athenaCollector package. The athenaCollector package was typically for smaller clients with one to four practitioners. The athenahealth Professional Services staff did not travel to client locations to implement the athenaCollector basic software. Instead, the Professional Services staff implemented the system remotely and trained the client using WebEx presentations. Implementations of the basic athenaCollector system could cost as little as $6,000 and take only a couple of months. The former Senior Project Associate estimated that athena earned "millions of dollars" from implementation fees annually.

53.     The former Vice President of Sales of the Western Region explained that there was a chart the athenahealth Sales Representatives used to price deals.  The chart showed, for instance, that if the practice earned $1 million per provider, there was pre-determined pricing for the deal and implementation fees.  The pre-determined pricing dictated the percentage of collections that athenahealth charged the customer.  Upgrades were also priced using the same chart.  As an example, a practice with $10 million in collections might have upgraded to a higher level of the athenahealth revenue cycle management system, resulting in a three percent increase in the monthly fees athenahealth charged -- or a total deal value of $300,000.  The chart showed exactly what the implementation fees would be based on the collections per provider.

54.     Finally, the Company earned revenues from the "minimum fees" that it charged.  According to the former Vice President of Sales of the Western Region, the "minimum fees" were fees that were assessed in the period after implementation was complete, the customer had "gone live," and athenahealth was "ramping up" collections for the customer.  There was typically a four to six month period between when the implementation was complete and when athenahealth could expect to begin collecting the full monthly value of a deal.  During this four to six month period, athenahealth initiated collection on the customer's behalf, but the full amount of the customer billing potential had not been reached.  As such, athenahealth assessed a "minimum fee" during this period to help the Company "stay afloat."  The "minimum fee" was usually set at an "85 percent floor" of the expected "ramped up" monthly revenues from the customer.  For example, if athenahealth anticipated earning $10,000 per month from a customer based on the customer's collections and number of practitioners, the "minimum fee" was $8,500.  The "minimum fee" was not considered part of the Company's professional services revenues.

**E.      athenahealth's Implementation Revenue Recognition Policy**

55.      As further detailed below, to comply with GAAP and SEC reporting requirements,

Defendants were required to recognize implementation fees in accordance with Staff Accounting

Bulletin ("SAB") 104, which states that:

- *The revenue recognition period should extend beyond the initial contractual period if the relationship with the customer is expected to extend beyond the initial term* and the customer continues to benefit from the payment of the up-front fee…[9]

- The staff believes that, provided all other revenue recognition criteria are met, service revenue should be recognized on a straight-line basis, unless evidence suggests that the revenue is earned or obligations are fulfilled in a different pattern, *over the contractual term of the arrangement or the expected period during which those specified services will be performed, whichever is longer*…

56.      Defendants acknowledged that this was the appropriate revenue recognition policy in

the Revenue Recognition section of the Critical Accounting Policies portion of the Company's

annual report.  For example, in the Company's Forms 10-K for the period ending December 31,

2007, filed on March 7, 2008, and for the period ending December 31, 2008, filed on March 7, 2009,

Defendants stated:

> As the implementation service is not separable from the ongoing business services, we record implementation fees as deferred revenue until the implementation service is complete, at which time we recognize revenue ratably on a monthly basis over the expected performance period.

57.      Likewise,  Defendants acknowledged this revenue recognition policy in the Summary

of Significant Accounting Policies in the Company's annual reports.  In the Company's Forms 10-K

for the period ending December 31, 2007, filed on March 7, 2008, and for the period ending

December 31, 2008, filed on March 2, 2009, Defendants stated that:

---

[9]      Internal citations are omitted and emphasis is added, unless otherwise stated.

> Implementation revenue consists primarily of professional services fees related to assisting customers with the implementation of the Company's services and are generally billed upfront and recorded as deferred revenue until the implementation is complete and then recognized ratably over the performance period.

58.    Accordingly, to be compliant with GAAP, Defendants were required to amortize implementation revenues over the expected performance period.   Moreover, in determining the expected performance period of its implementation fees, Defendants were required to consider the length of its customer relationships and whether its customers continued to benefit from the implementation fees beyond the initial contract period.

**F.    athenahealth's Expected Performance Period Was Longer Than a Year**

59.    Although implementation typically occurred within the first year of the Company's client relationship, the services provided in implementation benefited the clients throughout the course of their relationships with the Company.   In addition, athenahealth's business model was designed to ensure that clients stayed with athenahealth year after year and that client attrition was minimal.   Accordingly, under GAAP, it was evident that the expected performance period of the Company's implementation revenues was far longer than the one-year amortization period utilized by Defendants, as further detailed below.

**G.    athenahealth's Software-As-A-Service Model**

60.    As the former Client Services Supervisor explained, there was "a lot of emphasis" placed on athenahealth's software-as-a-service business model.  The former Director of Professional Services further clarified that the athenahealth business model was based on selling and providing a "service," as opposed to software.  According to the former Client Services Supervisor, the software-as-a-service business model was "part of the uniqueness of athena" and one of the reasons why the clients chose athenahealth over some of its competitors that operated as software licensing companies.  The athenahealth customers liked the fact that they were purchasing "access to the

[system] and ongoing services and training," as opposed to purchasing a software license that would be "obsolete in six months." Indeed, the initial contract included ongoing training and services that the customers could access anytime online through WebEx and reporting on the performance of the client by the athenahealth Account Management team.

61.     Moreover, services related to implementation did not stop once the implementation process was complete. The former Director of Professional Services revealed that Project Managers returned to the client site one month after implementation was complete, in order to "tie up loose ends" and provide any remaining training that the clients needed. In addition, this former employee recounted that the Professional Services personnel were "brought back in" to resolve "training issues," work with clients who did not understand how to properly use the system, or "who needed hand holding."

62.     According to the former Client Services Supervisor,[10] the Client Services group continued to provide ongoing training to answer "product-related" questions and teach them how to use the athenaNet system after implementation had been completed. The clients did not pay additional fees beyond the implementation fees for the services provided by the Client Services group. In such a way, athenahealth's implementation process and the fees charged benefited the client throughout the life of the relationship.

### 1.    Clients Stayed With athenahealth Year After Year

63.     athenahealth customers were typically long-term customers. As detailed below, once the athenahealth systems were implemented, it was difficult for clients to leave. Moreover, since

---

[10]     The former Client Services Supervisor was employed with the Company from November 2008 through 2009. In this capacity, he led the athenahealth system "call center" that provided customer service to athenahealth clients.

athenahealth managed many of the back office functions for practitioners, athenahealth often replaced staff members who had previously handled the services it provided.  The difficulty of leaving athenahealth, coupled with customer loyalty, drove athenahealth's low attrition rate and high client retention.

### a.      athenahealth Admittedly Had a Low Attrition Rate

64.      athenahealth had a low attrition rate.  Indeed, athenahealth contracts were typically one year in length with a "90 day cancellation without cause clause."  athenahealth customers could cancel their contracts with athenahealth without cause with 90-days notice.  However, most customers did not cancel their contracts, but rather renewed their annual contracts.  This was confirmed by the former Senior Project Associate, who stated that the contracts renewed annually. This was also confirmed by the former VP/Director of Business Development, who stated, "We had such low attrition – always between 3% and 4%."  By way of example, this former employee noted that the Company's first customer went live in 2000 and that customer is still a client of the Company.

65.      According to the former VP of Sales of the Western Region, the customer attrition rate during his employment was "less than one percent."  Indeed, there were only one or two customers in the Western region during his six-year employment term that left athenahealth.  This former employee explained that the Company had "Apple-like loyalty," meaning that customers were extremely loyal to the athenahealth brand and that athenahealth demonstrated "very similar loyalty patterns to that of Apple Computers."  Indeed, the Company's Sales Representatives used to refer to the customers as having "drank the Kool-Aid," meaning that the customers had a passionate affinity toward athenahealth that spanned the customer base.  As the former Senior Manager of

Claims Resolution[11] noted, some of the longer standing athenahealth customers were Winchester Hospital in MA, SUNY Hospital in NY, St. Joseph's Healthcare System in NJ, Methodist Hospital in TX, San Antonio Orthopedics in TX, and Hughston Clinic in GA.  These customers had been with athenahealth for "years and years," with St. Joseph's Healthcare System and San Antonio Orthopedics being two of the longest standing customers.

66.     The former Engagement Manager also confirmed athenahealth's low attrition.  He stated that it was "rare" that a client left athenahealth once the system was implemented.  "Most of the clients are still with them."  Clients stayed with athenahealth for "at least five years."  The Company's low attrition rate was confirmed by the former Senior Project Associate, who stated that the Company anticipated that a client would operate on the athenahealth suite of systems for "the life of the practitioner's practice."  The former Client Services Supervisor also noted the Company's low attrition rate.  He stated that the low attrition rate was well known throughout the Company. Moreover, as detailed below, Defendants repeatedly admitted that athenahealth had a low attrition rate and that its clients stayed with the Company year after year.

67.     Indeed, as the former Director of Professional Services stated, clients rarely left athenahealth.  He explained that it was well known that clients remained with athenahealth beyond the one-year contract.  "The whole point was to bring on clients and service them long term."  The aim was absolutely for "the client to get all of its services from athena."  The ultimate goal at athenahealth was to "be a full service provider for all clients."

---

[11]     The former Senior Manager of Claims Resolution was employed with the Company from December 2000 to June 2009.  In this capacity, he oversaw a team of 50 or more Claims Resolution personnel, who were collectively responsible for managing claims denials, including appealing denied claims, following-up on unpaid claims, analyzing denied claims, and working with internal teams and payers to prevent denials.

## 2.    It Was Difficult to Leave athenahealth

68.     The Company's low attrition rate was driven by the athenahealth system itself. Indeed, the former VP of Sales of the Western Region explained that the revenue cycle management system was "very sticky," meaning that it was "hard" for customers to bring the revenue cycle management function back "in-house" after using the athenahealth system.  Indeed, the longer the client operated on the athenahealth system(s) and the more athenahealth systems the client operated, the more difficult it was to "back out" the client's and patients' data from the systems.  This was especially true if a client operated athenaClinicals.  According to this former employee, "Backing out" the client data -- meaning removing it from the athenahealth platforms and putting the data into a form or system that was meaningful to the client -- was "the most awful" process.  When a client operated athenaClinicals, there was simply "no way possible to map the EHR data into another system."  For this reason, once a client implemented athenaClinicals, it was unlikely that that client would cease doing business with the Company.  Accordingly, the former Senior Project Associate remarked that the amortization period of one year was a gross "overstatement" of revenues because it was obvious that athenahealth intended to do business with its clients for a much longer period of time than one year.

69.     As the former Client Services Supervisor stated, "In reality, if a client lasted past the first six to nine months with athenahealth, that client remained with the Company for an extended period of time" beyond the initial one-year contract.  The first six to nine months were typically a "rough period" for new clients, as they adjusted to the athenahealth system(s).  Once they became comfortable with the system, the clients continued to use it for years.

70.     The "stickiness" of the athenahealth system was compounded by the fact that, as the former VP of Sales of the Western Region explained, the customers' staff responsible for claims processing and billing were usually laid off after the athenahealth revenue cycle management system

was implemented, saving the customers staffing costs.  This further exacerbated the difficulty of "bringing back" the services provided by athenahealth "in-house."

### 3. Implementations Are Time Consuming and Often Delayed

71.     The substantial amount of time required for implementation of the athenahealth systems and the delays that often occurred in the process also demonstrate that the expected performance period for the implementation process and associated fees was longer than a year.  As the implementation process was often dragged out, clients were not likely to leave athenahealth in the year following implementation.

### a. The Implementation Process Required Substantial Time and Expenses

72.     The implementation process required substantial resources.  *See* Form 10-K for the period ending December 31, 2008, filed on March 2, 2009 ("[d]uring the implementation cycle, we expend substantial time, effort, and financial resources implementing our services, . . .").  According to the Company, athenahealth's implementation cycle is variable, and typically ranges from three to five months from contract execution to completion of implementation.  *See* Form 10-K for the period ending December 31, 2007, filed on March 7, 2008.  However, as the Company has noted, some of its "new-client set-up projects are complex and require a lengthy delay and significant implementation work."  *Id.*  Indeed, as the Company admitted, "[i]n some cases, especially those involving larger clients, the sales cycle and the implementation cycle may exceed the typical ranges by substantial margins."  *Id.*

73.     The former Engagement Manager explained that the length of implementations varied depending on the size of the client and other "variables."  For example, the former Project Manager explained that there were "small group" and large client implementations. The "small group" implementations entailed the implementation of athenaCollector for clients with one to four

practitioners.  The Project Managers did not travel to the "small group" client locations for implementations.  Instead, the Project Managers remotely implemented the athenaCollector systems, including uploading data files from the client and walking the client through a tutorial on the athenaCollector system.  For larger implementations, the Project Managers traveled to the client site and worked closely with the client staff on the migration of data from the existing client systems to athenaCollector.  Implementations for smaller clients were quicker than implementations for larger customers.

74.    In addition to the size of the client, the length of the implementation could be impacted by the length of the enrollment and training phases.  For example, according to the former Engagement Manager, one of the lengthiest phases of the implementation process was "enrollment." The enrollment phase had a "huge impact [on the length of] the project" because all of the payers -- the insurance organizations with which the clients worked -- had to be set up to receive and pay claims submitted by the providers.  The former Project Manager explained that the more payers with which a client worked, the longer the enrollment phase of implementation took.  This was confirmed by the former Senior Project Associate, who represented that enrollments could take as long as three months.  Enrollments became especially tedious if the practitioner billed a greater number of insurance companies.   Indeed, some practitioners had relationships with 20 to 30 insurance companies.  In particular, enrollments took a significant amount of time with practitioners who had relationships with Medicare because Medicare was notoriously bureaucratic and took an inordinate amount of time to complete the athenahealth enrollment paperwork.

75.    Likewise, the former Engagement Manager explained that the training phase also had an impact on the length of the implementation.  First, the length of the training phase could be impacted by the eagerness of physicians and their staff to complete training on the new athenahealth

system.  The client's eagerness to train on the new system often depended on the amount of disruption the training was likely to cause to the physician's practice.  Secondly, the computer savvy of the client and its staff also impacted the length of the training phase.  The Company trained clients on the use of the athenahealth system via WebEx modules that the client and the client's staff were required to complete before the system could "go live."  As the former Senior Project Associate explained, in some instances, implementations would "drag on" because the client's staff was not "professionally capable" of grasping all of the new information regarding the new athenahealth system(s).  This was especially true if the clients went from using paper-based, manual claims systems to running the athenahealth system(s), which required the client's staff to be technologically savvy and learn the athenahealth system(s) in a short period of time.

76.     Another variable that affected the length of the implementation process was the medical specialty of the practitioner.  As the former Senior Project Associate recounted, the implementation of clients who practiced medical specialties different from the existing athenahealth client base faced longer implementations.  Indeed, the implementation for a new medical specialty could take as long as six months and required the participation of as many as 10 to 11 athenahealth employees.

### b.     The Implementation Process Was Prone to Delay

77.     The already lengthy implementation process was often plagued by substantial delays. Indeed, the former Engagement Manager explained that implementations were delayed for a number of reasons, including "credentialing," payers changing regulations during the implementation process, and clients not having the "right" computer and networking capabilities to interface with the athenahealth system(s).  Of these issues, the enrollment process caused the greatest number of delays in implementations.  Indeed, some implementations were delayed as long as six months while issues with "credentialing" or other portions of enrollment related to the payers were resolved.  For

example, some clients claimed to have already been "credentialed" with particular insurance companies (or payers), but the athenahealth enrollment process indicated that the "credentialing" had actually not been completed. And, the implementation process could not proceed as planned until the "credentialing" issues were resolved. The former Engagement Manager stated that when implementations were delayed, there was a negative impact to athenahealth's and the clients' "finances" and the "performance."

78.      Issues with payer organizations also caused delays in implementing the athenahealth system and processing claims through the system. For example, the former Engagement Manager explained that Medicare notoriously created issues for athenahealth and its clients. This former employee explained that "Medicare was a shell game," and the paperwork required for practitioners to enroll with Medicare and process claims through Medicare was "always changing." As a result, athenahealth customers that sought to have claims paid by Medicare could experience delays in the implementation process that could be as long as two months.

79.      Furthermore, according to the former Inside Sales Representative,[12] during at least 2008, there was a nine-month wait for the athenahealth systems to be implemented at a customer's office. The Company was growing so fast, "we just didn't have enough people to get around to all of the implementations." Because customers had to wait so long just to get onto the system, I can't imagine they would want out after only one year." As former Inside Sales Representative stated, most customers would have to be customers for much longer than a single year.

---

[12]      The former Inside Sales Representative was employed with the Company for two years, ending in April 2008. This former employee provided customer leads, set up meetings, and provide support for Outside Sales Representatives. This former employee worked in the "Large Group," meaning that he was responsible for doctors' offices with more than three physicians and covered the area including South Carolina, Tennessee and Georgia.

80.     In sum, there were numerous variables that affected the length of the implementation process.  As implementations required substantial resources and were often dragged out, it was likely that athenahealth customers would stay for longer than one year.

### 4.     athenahealth's Commission Clawbacks Demonstrate That Customer Life Was Longer Than A Year

81.     The Company's commission clawbacks also demonstrate that the expected customer life was longer than a year.  The former VP/Director of Business Development recalled that the Company would not recognize revenue from implementation before the customer would "go live."  At this point, Company sales employees received an additional commission.  However, the former VP/Director of Business Development  explained that it was "very difficult" to determine the value of the customer without the customer first being on the Company system.  As a result, the Company had a "look-back" or "clawback" for all sales commissions.  For each customer, the Company performed a "look-back" 18 months from the go-live date "to more accurately determine the value of the customer."  The timeframe for this commission clawback demonstrates that athenahealth's expected customer life, and accordingly, expected performance life was longer than a year.

### H.     Defendants Knew That The Expected Performance Period of the Company's Implementation Fees Was Longer Than A Year

#### 1.     Defendants Closely Monitored Attrition Rates and Implementation Fees

82.     According to the former VP/Director of Business Development, the Company and Company Management closely tracked customer attrition through the Company's Customer Relationship Management Software ("CRM") – salesforce.com and later Sugar.  The former Client Services Supervisor explained that both the athenanet and Sugar CRM systems contained fields that showed how long clients had been with or stayed with athenahealth.  This was confirmed by the former Inside Sales Representative and the former Director of Professional Services, who explained

that both Salesforce.com and Sugar showed how long a customer had been with the Company. Indeed, the software systems showed the exact date a given customer joined with the Company and the exact date a customer terminated a contract. The former Inside Sales Representative represented that "Bush and Byers were looking at the numbers" on Salesforce.com and Sugar.

83. The Individual Defendants' knowledge of attrition rates was confirmed by the former Client Services Supervisor, who expressed that there were no secrets at athenahealth from Defendant Bush "on down." Bush was "pretty open about professional services and attrition rates" during the quarterly meetings that were held at the Belfast, Maine and Watertown, Massachusetts facilities. The former Client Services Supervisor explained that during most of the quarterly meetings throughout his employment, Bush "detailed attrition rates" and made "announcements" and presented slides that provided facts to the attendees about the customer attrition rates. The Vice President of Client Services, Ralph Catalano, also made presentations that included facts about the low customer attrition rate at athenahealth.

84. In addition, the former Senior Manager of Claims Resolution explained that everyone at athenahealth was privy to customer attrition and renewal rates. The attrition and renewal rates were "standard statistics" that were shared at each informal meeting before the Company went public, and quarterly meeting after the Company went public. The customer renewal rates and attrition rates were presented on a PowerPoint slide at the company-wide quarterly meetings, which were attended by Defendants Bush and Byers. This former employee noted that these Individual Defendants "acknowledged" the renewal rates. Indeed, the former Senior Manager of Claims Resolution elaborated that Byers, and even more so Bush, were "intimately familiar with how long customers had been with athena." Bush was "involved in the sales pipeline" and very aware of any issues with clients, namely larger clients, that could potentially jeopardize the client's business

relationship with athenahealth.   "It was obvious to everyone in the room [at the meetings] that Jonathan [Bush] was closely connected to information regarding sales, the sales pipeline, and anything that would put a customer relationship in jeopardy."   Moreover, Vice President of Sales Robert Hueber provided Bush with updates regarding sales.   According to the former Senior Manager of Claims Resolution, "Jonathan [Bush] could rattle off those numbers [about customer attrition rates and sales figures] in his sleep."

85.     Moreover, the former VP/Director of Business Development explained that the highest levels of management discussed how much to charge for implementation fees.  This former employee noted that "we talked about it repeatedly."  This former employee recalled that both Defendants Bush and Byers were very familiar with the Company's implementations and implementation revenue.  Indeed, this former employee explained that the former Director of Professional Services provided Bush and Byers with a Weekly Implementation Status Report.  Even after the former Director of Professional Services left the Company, this report was provided by his replacement Tom Cady.

86.     The former Director of Professional Services confirmed that he was responsible for preparing a monthly report about the number of clients in implementation and the number of clients that would "go live" in the upcoming period.  This report was typically in Word format and was submitted to the Chief Operating Officer Betsy Seeley ("Seeley") on a monthly basis, who then incorporated the report into a more comprehensive report that was delivered via e-mail to all athenahealth employees, including Defendants Bush and Byers.  The comprehensive report included an "executive summary" and a section on sales.

87.     The former Director of Professional Services revealed that this monthly report was discussed at monthly meetings with the "executive team," including, Seeley, Bush, Byers, Co-

Founder Todd Park and the department leaders, such as the former Director of Professional Services. Defendants Bush and Byers asked questions about the reports during these meetings.  Their questions and topics of discussion at the monthly meetings typically centered on customer related issues, the sales process, and "hand offs" in operations.

**2.  Defendants Admitted That the Company Had a Low Attrition
Rate and Automatic Contract Renewal**

88.    Defendants' knowledge that performance period of implementation fees was longer than a year is evident from their repeated acknowledgement of athenahealth's low attrition rate and the Company's automatic renewal of its one-year contracts.  Indeed, Defendants frequently admitted atheneahealth's low attrition rate on multiple occasions.

89.    In June 2009, Rob Cosinuke, the Company's Chief Marketing Officer, made the following statement:  "On a practical level, the business model is a supercharged subscription business, . . .Think about a newspaper, a magazine, or OnStar, which I used to work on, . . . Those kinds of entities experience on the order of a 20 to 30 percent attrition level every year. We have delighted 'athenistas' year after year, . . . We say, we've got skin in the game with you. And our customers see themselves getting paid better and faster."  Cosinuke stated that this was a key factor in the Company's ongoing growth.  He further stated, "Because we're not charging them a big licensing fee up front for the software, it's dependent on our having customers staying with us for years and years. We like to say, high-tech, no fees upfront, and very low-cost. They pay us for performance." Cosinuke also explained that given that model, the Company's financial health will be "totally dependent on knowing that our customers will stay with us year after year." See Healthcare Informatics, "Athenahealth: Service First," http://www.healthcare-informatics.com/ME2/dirmod

- 35 -

.asp?sid=9B6FFC446FF7486981EA3C0C3CCE4943&nm=Articles%2FNews&type=Publishing&m

od=Publications%3A%3AArticle&mid=8F3A7027421841978F18BE895F87F791&tier=4&id=81EF

DDF76B1F4A6FA8AFE4D72F612B03.

90.     Similar admissions include:

- Following the restatement, John Hollack, the athenahealth spokesman, admitted with respect to the longer amortization period that athenahealth has a "close relationship with clients that speaks to the longevity of its product use, and that this was an issue that had to be taken into consideration."  *See TheStreet*, Healthcare Gainer: AthenaHealth, http://www.thestreet.com/story/10704042/ healthcare-gainer-athenahealth.html (last visited July 27, 2010).

- In an interview in November of 2006, Defendant Bush stated that "[l]ast year, 0.3% customers left."  *See* HIStalk, "An Exclusive Interview with Jonathan Bush, Chairman and CEO of athenahealth," http://histalk.blog-city.com/an_exclusive_interview_ with_jonathan_bush_chairman_and_ceo_o.htm (last visited July 27, 2010).

- On the fourth quarter 2007 earnings call held on March 5, 2008, Defendant Bush stated: "I consider 2007 to have been an enormous success.  We continued to grow the Company at a rapid rate.  ***We maintained high customer loyalty.***  We delivered improved customer outcomes to drive that loyalty."

91.     Likewise, throughout the Class Period, Defendants continually admitted that the

Company's contracts automatically renewed year after year.  For example:

- The Company's Forms 10-K for the periods ending December 31, 2007 and December 31, 2008, represented that: "Our clients typically purchase one-year contracts that renew automatically upon completion."

- On the May 6, 2008 earnings conference call, when asked the following question by an analyst: "In terms of customer renewals, any deviation from the very high renewal rates you've seen in the past?"  Bush responded: "We do not have a deviation that we're -- that we can see.  We do not do a complete study of that every quarter, ***we do a thorough look about twice a year.  And we have remained steady at that 97% at the account level renewal rate***."

- On the November 7, 2008 earnings conference call, when asked " . . . I think in the prior quarters you talked, I assume this hasn't changed, but just the renewal rates are still up in the high 90's?  Any change there?"  Defendant Bush responded that "Renewal rates remain in the high 90s.  We did have a (sic) attrition blip in the third

quarter, which we believe is in fact of (sic) blip and so we didn't make a big deal about it.  We expect still to be 97% recurring revenue.  We'll let you know if that changes."

- Likewise, on the February 27, 2009 conference call, Defendant Byers explained that historically the Company has had a 97% renewal rate.

92.    This further demonstrates that Defendants knew the expected performance period of the implementation revenue would be longer than one year.

I.    **Defendants Violated GAAP to Artificially Inflate Revenues and the Company's Stock Price**

93.    As detailed above, Defendants knew that the Company was required to amortize its implementation fees over their expected performance period.

Despite this knowledge, throughout the Class Period, Defendants improperly recognized the Company's implementation revenues over the initial contract term, the vast majority of which were one year in length.

94.    Moreover, Defendants knew that the expected performance period was longer than a year because, as the Company admitted,  its clients typically purchased one-year contracts that renewed automatically and, accordingly, the performance period was greater than the initial contract. Second, the Company's initial implementation process, which included enrollment, data entry and training was designed to benefit the client for the life of the relationship not just for initial contract term.   Defendants continued to provide product-related support for clients without charging additional fees beyond implementation fees.  Third, as detailed above, athenahealth had extremely low attrition rates because once its systems were implemented, it was nearly impossible for the Company's customers to leave.  Fourth, the Company's commission clawback period of 18 months illustrates that Defendants knew that the expected customer life was longer than a year.  Finally, as numerous confidential witnesses explained, implementations were often delayed for numerous

reasons, and it could take nearly a year to get the athenahealth system up and running.  Under these circumstances, the likelihood of clients leaving athenahealth before a year were minimal. Even though Defendants knew that its customers continued to benefit from the implementation fees for longer than one year and that, accordingly, the expected performance period over which its services would be performed was longer than one year, Defendants improperly amortized its implementation revenues over a one-year period.

95.    As detailed above, Defendants were motivated to engage in these aggressive accounting machinations to portray the Company in the best possible light to the market and to artificially inflate the Company's stock price.  Indeed, the implementation process was time-consuming and involved a large expenditure of resources by Defendants.  Yet, under athenahealth's pricing methodology, the Company could not begin to collect monthly, collection-based fees until after the implementation was completed and the Company began to provide services to clients. Accordingly, by aggressively amortizing implementation fees over a one-year period rather than a twelve-year period, Defendants were able to inflate the Company's income and revenue streams in the same year they undertook the clients' implementations.

96.    Through Defendants' fraudulent accounting and false and misleading financial reporting, Defendants were able to maintain investor confidence and inflated the Company's stock price during the Class Period.

## V.    THE TRUTH IS REVEALED

97.    On February 25, 2010, the truth was revealed when after the market closed, athenahealth issued a press release attached to a Form 8-K filed by Defendants, which stated in pertinent part:

> WATERTOWN, Mass.--(BUSINESS WIRE)--February 25, 2010--athenahealth, Inc. (Nasdaq: ATHN), a leading provider of Internet-based business services for physician practices, *today announced that it will postpone the release of its*

*financial results for the fourth quarter of 2009 and the year ended December 31, 2009*, and its previously announced conference call to discuss these results originally scheduled for February 26, 2010, *in order to allow additional time to complete the year-end audit and conduct an internal accounting policy review related to the timing of amortization for deferred implementation revenue.*

The Company expects to file a Notification of Late Filing on Form 12b-25 with the Securities and Exchange Commission on Tuesday, March 2, 2010 notifying the Commission that the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2009 could not be filed without unreasonable expense or effort within the prescribed time period. The Company will announce the revised date for reporting Q4 and fiscal year 2009 earnings in a subsequent release.

*The Company is postponing the release of its financial results for the fourth quarter of 2009 and the year ended December 31, 2009 in connection with an internal review, initiated by the Company, of its accounting policy for the amortization period for deferred implementation revenue.* Implementation revenue is generated from the implementation of the Company's services for new customers and as reported, was captured within the "Implementation and Other" revenue line as follows:

\*       \*       \*

The Company records implementation fees as deferred revenue until the implementation service is complete and ongoing services commence, at which time the fees are amortized, or recognized ratably, on a monthly basis over the "expected performance period". athenahealth's clients typically purchase one-year contracts that renew automatically and, *to date, the Company has determined the expected performance period to be equal to the initial contract period. Management is now reviewing whether the period of amortization for deferred implementation revenue should be extended to a longer expected performance period.*

*If the Company determines that a change is necessary, and the financial impact is deemed material, the Company would restate prior year financial statements.* Any such change related to the amortization period for deferred implementation revenue would not have an impact on the Company's cash flow from operations, as non-refundable implementation revenues are billed and paid up front, but it would impact reported implementation revenue from operations on a period to period basis, and the corresponding net income/(loss) in each period.

98.     The market was stunned by this news, as is evidenced by analyst commentary following this announcement.  For example:

(a)     On February 25, 2010, Deutsche Bank Securities, Inc. issued a report, which stated that "[w]e think this announcement adds a bit more risk to the ATHN story, and on account of

- 39 -

this, we have reduced our target multiple used to determine our price target (from 40x to 35x our FY11 EPS of $1.15). Based on this, we have reduced our price target from $46.50 to $40.00." The report further stated that "[k]ey risks include the above-mentioned accounting review and its implications as well as decreased spending & competitive pressures, while a faster-than-expected impact from stimulus spending would provide upside."

      (b)    On February 26, 2010, Caris & Company issued a report, which stated in pertinent part:

> Because Implementations revenues account for more than 5% of total revenues, ATHN could see a material earnings impact and may be required to restate prior year financials. ***Since it is the second accounting revision announced within a month, ATHN management's credibility has diminished considerably.*** In the long run, ATHN's new accounting conservatism will lead to better earnings quality. Until we have clarity on the dynamics behind recognition of Implementation revenues, we cannot estimate the potential earnings impact.

      (c)    On February 26, 2010, BB&T issued a report, which noted that "[w]hile the scope of the accounting review covers less than 6% of the company's revenue, we tend to view any accounting reviews on revenue recognition policies with healthcare IT companies as ***disconcerting.***"

    99.    As Defendants' announcement and resulting analyst commentary made its way into the market, the market reacted negatively, causing the Company's stock price to plummet by nearly 18% from $43.52 on February 25, 2010 to $35.87 on March 1, 2010, on unusually heavy trading volume, resulting in millions of dollars in investor losses.

    100.    On March 15, 2010, the market learned that the Company would in fact be required to restate its financial results when the Company issued a press release, which stated in pertinent part:

> WATERTOWN, MA – March 15, 2010 - athenahealth, Inc. (Nasdaq: ATHN), (the "Company"), a leading provider of Internet-based business services for physician practices, today announced financial and operational results for the fourth quarter and full year of 2009.

*In addition, the Company announced the completion of a restatement of prior period financials due to a change in the amortization period for deferred implementation revenue. The Company's financial statements for the fiscal years ended 2005, 2006, 2007 and 2008, each quarterly period in 2008, and the quarterly periods for Q1 through Q3 in 2009 were restated as a result of an internal accounting policy review, initiated by the Company, related to the timing of amortization for deferred implementation revenue.*

\*       \*       \*

Financial Restatement

*The Company has completed its previously announced internal accounting review related to the amortization period for deferred implementation revenue. Implementation revenue consists primarily of professional services fees related to assisting customers with the implementation of the Company's services.* These non-refundable fees are generally billed up front and recorded as deferred revenue until the implementation is complete and then recognized ratably over the expected performance period. Previously, the expected performance period was based upon the initial customer contract term, which, for the vast majority of contracts, was one year in duration. Implementation and other revenue has ranged from four to seven percent of total revenue on an annual basis since 2007.

*As a result of the internal review, the Company concluded that in prior and future periods, deferred implementation revenue will be amortized over a longer expected performance period of twelve years in order to reflect the estimated expected customer life. Accordingly, as described above, the Company will restate the "implementation and other" revenue within its previously filed consolidated financial statements to reflect a longer amortization period for deferred implementation revenue.* The Company will continue to record implementation expenses in the period as incurred. The length of the amortization period for deferred implementation revenue recognition does not impact cumulative total implementation revenue under contract nor does it impact cash flow.

101.   Also, after the close of the market on March 15, 2010, Defendants issued the Company's annual report for the period ending December 31, 2009 on Form 10-K. This Form 10-K contained the details of the restatement as further detailed in Section VI.B below. In particular, the Form 10-K contained the following disclosures regarding the restatement:

We have completed our previously announced internal accounting review related to the amortization period for deferred implementation revenue. Implementation revenue consists primarily of professional services fees related to assisting customers with the implementation of our services. These non-refundable fees are generally billed up front and recorded as deferred revenue until the implementation is complete

and then recognized ratably over the expected performance period. Previously, the expected performance period was estimated based upon the initial customer contract terms, the vast majority of which were one year in duration. Implementation and other revenue has ranged from four to seven percent of total revenue on an annual basis since 2007.

*As a result of this review, we have concluded that in prior and future periods, we will amortize deferred implementation revenue over a longer expected performance period of twelve years in order to reflect the estimated expected customer life. Accordingly, we will restate the "implementation and other" revenue within our previously filed consolidated financial statements to reflect the longer amortization period for deferred implementation revenue.* We will continue to record implementation expenses in the period as incurred. The length of the amortization period for deferred implementation revenue recognition does not impact cumulative total implementation revenue under contract nor does it impact cash flow. The restatement will result in the deferral to future periods of $22.3 million of implementation revenue previously recognized through September 30, 2009.

\*     \*     \*

*Financial information included in the Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, and Current Reports on Form 8-K filed by us prior to March 15, 2010, and all earnings, press releases, and similar communications issued by us prior to March 15, 2010, should not be relied upon and are superseded in their entirety by this Annual Report on Form 10-K.*

\*     \*     \*

All revenue, other than implementation revenue, is recognized when the service is performed. Relative to our business services offering that is based on the collections of amounts by our customers; we do not recognize revenue until our customers have been paid. *As the implementation service is not separable from the ongoing business services, we record implementation fees as deferred revenue until the implementation service is complete, at which time we recognize revenue ratably on a monthly basis over the longer of the estimated expected customer life or contract life.*

\*     \*     \*

*Our clients typically purchase one-year contracts that renew automatically upon completion.*

\*     \*     \*

*We are required to recognize our non-refundable up-front fees over the contract term or estimated expected customer life, whichever is longer.*

*The determination of the amount of revenue we can recognize each accounting period requires management to make estimates and judgments on the estimated expected customer life. We determined the estimated customer life considering the following key factors:*

- *Renewal rate considerations*

- *Economic life of the product or service*

- *Industry data*

- *Marketing studies*

- *Data used to set the pricing terms of the arrangement.*

*   *   *

Remediation of Material Weakness — Technical Accounting Related to Revenue Recognition for Implementation Fees

On February 25, 2010, we announced that we were conducting an internal accounting policy review related to the timing of amortization for deferred implementation revenue to determine whether these policies were appropriate and in accordance with the generally accepted accounting principles. As a result, under the direction of the Audit Committee, we commenced a process to review our deferred implementation revenue policies. On March 15, 2010, we announced that certain previously issued financial statements would be restated to correct items relating to the timing of revenue recognition for implementation fees. See the "Explanatory Note Regarding Restatement" immediately preceding Part I, Item 1, and Note 2 of the Notes to Consolidated Financial Statements in Part II, Item 8.

*In connection with such review, we identified a control deficiency relating to the application of applicable accounting literature related to revenue recognition for implementation fees.* Specifically, the control deficiency related to our interpretation of the Revenue Recognition topic of the FASB Accounting Standards Codification in determining the proper period over which to amortize implementation fees.

102.    The next day, on March 16, 2010, Defendants held an earnings conference call with analysts, in which they further elaborated on the nature of the restatement.  On this call, Tim Adams, the Company's new CFO stated in pertinent part:

As a part of my transition, Jonathan asked that I conduct a thorough review of athenahealth's financial statements and accounting policies.  During the course of this review and in conjunction with the year-end audit, I initiated an evaluation of the amortization period for deferred implementation of revenue.   This is the nonrefundable revenue we earn by assisting clients with the implementation of our

services and is captured within the implementation and other revenue line in our financial statements.

Since 2007, implementation and other revenue has ranged from approximately 4% to 7% of the Company's total revenue.  Historically, the Company has collected implementation fees upfront, but deferred revenue recognition until the go-live date for athenaCollector and athenaClinics services.  *Then we recognize that revenue over the initial customer contract term, the vast majority of which are one year in length, as the best estimate for the expected performance period.*

This made sense given the rapid pace at which our services change and intuitively the value of our implementation is received during the first year.  *However, following a thorough review and in close consultation with the national office of our auditors, Deloitte & Touche, we have concluded that it is more appropriate to amortize the implementation fees over the estimated expected customer life as the expected performance period.*

*Given our strong client retention and the ongoing nature of our services, we have calculated an estimate of our expected customer life as 12 years.  We believe that this revised amortization period is the most appropriate approach.*

*Due to this conclusion, we have changed the amortization period used historically by restating our prior financial statements.* Please note that none of these changes have any impact on the total amount of revenue the Company will recognize over time, nor do these changes impact our cash flow. The Company will continue to recognize costs associated with implementation services in the period incurred. You can find more detail on the restated financial periods in notes 2 and 20 contained in the 2009 annual report on Form 10-K that we filed yesterday.

103.    The market reacted negatively upon learning the details of the Company's restatement, as is evidenced by analyst commentary following this announcement.  For example:

(a)      On March 16, 2010, Maxim Group issued a report, stating that:  "ATHN reports slightly lower-than-expected 4Q09 results due mostly due to a change in implementation revenue recognition, which will now be amortized over a period of 12 years, versus a prior 1-year period; There were no other material accounting adjustments, but uncertainties remain; Maintain Hold."  Moreover, the report stated that: " Yesterday, after the market close, ATHN reported 4Q09 total revenue of $54.4 million (y/y growth of 33%), short of our and consensus estimates of $56.9

million and $55.0 million, respectively.   We attribute the lower revenue to the new longer

performance period during which implementation revenue is amortized."

(b)      On March 17, 2010, William Bair & Company issued a report, entitled "Near-

Term Risk/Reward Cloudier Than Before, Although Focus Remains on Long-Term Opportunity;

Reinstating Outperform Rating."   The report stated in pertinent part:

> However, as discussed below, we also have a mixed view of some of the
> commentary management provided on the call with investors Tuesday morning and
> of some underlying operating trends in the business.  In particular, management
> downwardly revised the near-term financial goals communicated in December, due
> to a combination of the aforementioned accounting change and increased
> reinvestment in the business.  Additionally, we view both the near-term outlook and
> the longer-term goals as riskier to achieve, and more dependant on cross sell and new
> products than before.

104.    Then, on April 29, 2010, the market learned the full impact that the restatement would

have on the Company's financial results.   On that day, after the close of the market, Defendants

issued a press release attached to a Form 8-K, which stated in part:

> WATERTOWN, MA — April 29, 2010 - athenahealth, Inc. (Nasdaq: ATHN), (the
> "Company"), a leading provider of Internet-based business services for physician
> practices, today announced financial and operational results for the first quarter of
> fiscal year 2010.
>
> *          *          *
>
> For the three months ended March 31, 2010, Non-GAAP Adjusted Gross Margin was
> 58.5%, up from 55.9% in the same period last year. Non-GAAP Adjusted EBITDA
> was $6.4 million, or 12% of total revenue, compared to Non-GAAP Adjusted
> EBITDA of $6.1 million, or 15% of total revenue in the same period last year. GAAP
> Net Income for the first quarter of 2010 was $0.3 million, or $0.01 per diluted share
> compared to GAAP Net Income of $1.5 million or $0.04 per diluted share in the
> same period last year. Non-GAAP Adjusted Net Income was $2.3 million, or $0.06
> per diluted share compared to $2.6 million or $0.08 per diluted share in the same
> period last year. ***As planned, the Company's bottom line results were impacted by
> increased investments in sales and marketing as well as higher general and
> administrative expense of approximately $1.0 million related to the Company's
> recent accounting review and restatement process.***

105.     The next day, April 30, 2010, the Company held a earnings conference call with

analysts.  On this call, Adams made the following statements:

> As expected, we drove expansion in non-GAAP adjusted gross margins over Q1 of 2009, but higher indirect expense levels caused our bottom line profit to decline. These heightened expense levels were driven by three key factors.  One, the rest of FICA payroll taxes for the new year on a larger employee base.  ***Two, higher G&A expenses for legal and accounting fees associated with our restatement.***

106.     Also, when questioned about the Company's implementation revenues, Defendant

Bush and Adams admitted that the Company had consistently had a high retention rate:

**Charles Ray - *Oppenheimer & Co. - Analyst:***

I'm trying to think about that $650 million number. Should we think of that as a net number? When I look at the implementation revenues it looked like it spiked up here in the quarter and I'm just trying to understand why it would necessarily spike up since we didn't really see a big tick up in the physician adds. Maybe the better number to look at is what is the retention rate that you've been posting in terms of clients that might be coming on versus clients who might be leaving?

**Jonathan Bush - *Athenahealth, Inc. - Chairman, President, CEO:***

Go ahead, Tim.

**Tim Adams - *Athenahealth, Inc. - CFO:***

Charles, ***the retention rate has been very consistent. We have always talked about revenue retention staying in the mid 90 percentile.***

**Jonathan Bush - *Athenahealth, Inc. - Chairman, President, CEO:***

Mid-90s.

**Tim Adams - *Athenahealth, Inc. - CFO:***

Mid-90s.

**Jonathan Bush - *Athenahealth, Inc. - Chairman, President, CEO*:**

95, that's the mid 90s.

**Tim Adams - *Athenahealth, Inc. - CFO*:**

***Right mid-90s. That's been a very consistent number, it's been a very positive number.*** Back to Jonathan's earlier point, selling the double barrel deals and triple

barrel deals. One, it increases the value of the client. And number two I think it increases the stickiness of we are in deeper in the client's practice and they are going to stick around a lot longer as well.

**Jonathan Bush - *Athenahealth, Inc. - Chairman, President, CEO:***

I'm not exactly sure we covered you there on that but the implementation fees start, we start counting it as soon as the doctor goes live and it runs. Is that right? It's just a running pile. It's a 12-year long pile so it's difficult to keep track of it all. The implementation fee increase was not as a result of us rolling forward implementation fees of doctors that we lost. ***So we are very happy with our attrition.*** In fact, the maturity of clinicals, I can point to numerous deals that two years ago would have been lost business because the larger hospital system drove a big movement to get everybody on EMR at all cost that now have turned into not just save but expansion of our sales opportunities. ***So we are feeling as good as we have in a long time in a while on attrition.***

107.    In addition, in response to analyst questions, Defendant Bush elaborated on the

expenses associated with the restatement:

**Sean Wieland - *Piper Jaffray & C o. - Analyst:***

Can you talk about how these results compare to what you expected to do as of the first of the year for the first quarter?

**Jonathan Bush - *Athenahealth, Inc. - Chairman, President, CEO:***

 . . . Obviously we didn't plan on, or I'm not ecstatic about dropping $1 million on recounting things.

\*        \*        \*

**Doug Simpson - *Morgan Stanley - Analyst:***

Good morning. Just to try to connect the dots on some of the comments. Trying to understand, your comments related to the margin progression throughout the year, you talked to the top line, the confidence in the 30%. But as we are sitting here the expense is coming in a little bit higher even as you are cross selling more and your doc heads are a little bit light. The $6 million in EBITDA came in I think light of what most people were expecting. As you roll forward the margin comments over the balance of the year should we be looking for an EBITDA dollar amount for the full year north of $50 million, just as a place holder?

**Jonathan Bush - *Athenahealth, Inc. - Chairman, President, CEO:***

I don't think I said one thing about EBITDA or operating margin and you just said I did. What I said is gross margin.

**Doug Simpson - *Morgan Stanley - Analyst:***

Right.

**Jonathan Bush - *Athenahealth, Inc. - Chairman, President, CEO:***

Okay. So that's different. I feel very confident about gross margin for the rest of the year.

**Doug Simpson - *Morgan Stanley - Analyst:***

How should we translate that?

**Jonathan Bush - *Athenahealth, Inc. - Chairman, President, CEO:***

What you do is you take the gross margin that you have in mind for us, take the revenue which I'm saying you ought to be able to count on 30%, take the gross margin you have for us, add this expanded sales and marketing expense which is maybe 50%, 55% cost of bookings, 20% of revenue, maybe 21%. ***Then you throw in a bunch of crap for the SEC, Deloitte, all the stuff around making our implementation fees 12 years long. And then you get the number.*** Taking taxes. Nothing else is going on. Our G&A isn't out of whack other than for those specific events. I'm not getting a triple in my salary or whatever. Make sense?

*     *     *

**Sandy Draper - *Raymond James & Associates - Analyst***

One quick one for Tim.  When we look at the expense that Jonathan didn't really like, spend $1 million on recounting the beans, is that number completely gone, so take $1 million off the first quarter number and start building from there?

**Tim Adams - *Athenahealth, Inc. - CFO***

No Sandy.  *I believe a comment I made on last quarter's call was that we would spend $1 million in the quarter, Q1, that's about where it came out and that there could be an additional $1 million between Q2 and Q3.  As everyone is aware, there is a lawsuit out there and there are legal costs associated with that that will trail into Q2, Q3.  A little hard to predict exactly where that's going to land.  But once we get past that, our objective is to keep absolute G&A spend as flat as we can this year when you take out the spike for Q1 in the piece that trails into Q2 and Q3.*

108.    The market reacted negatively upon learning how the Company's restatement, among other things, had impacted the Company's bottom line.  This was evidenced by analyst commentary following this announcement.  For example:

(a)     On April 30, 2010, Maxim Group issued a report stating: "ATHN reports lower-than-expected 1Q10 results on weak collections per physicians; We remain cautious in light of near-term risks and an expensive valuation; Maintain Hold."

(b)     On April 30, 2010, BB&T Capital Markets issued a report stating: "ATHN: Q1'10, Now That's a Disappointment"

109.     As Defendants' announcement and resulting analyst commentary made its way into the market, the market reacted negatively, causing the Company's stock price to plummet by nearly 24%  from $35.35 on April 29, 2010 to $26.96 on May 6, 2010, on unusually heavy trading volume, resulting in millions of dollars of investor losses.  While investors were suffering, as detailed below, Defendants profited from their fraud, by unloading significant percentages of their athenahealth common stock holdings at artificially inflated prices during the Class Period for proceeds of more than $24.3 million.

## VI.     DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND FINANCIAL REPORTING

### A.     Defendants' False and Misleading Statements

#### 1.     Defendants Issue A False and Misleading IPO Prospectus

110.     The Class Period begins on September 20, 2007.  On that date, Defendants filed a Form 424B4 with the SEC, which contained its registration statement and prospectus for the IPO of its common stock (the "IPO Prospectus").  The IPO Prospectus contained the following statement regarding the Company's revenue recognition policy:

> All revenue, other than implementation revenue, is recognized when the service is performed. As the implementation service is not separable from the ongoing business services, we record implementation fees as deferred revenue until the implementation service is complete, at which time we recognize revenue ratably on a monthly basis over the expected performance period.

111.    In addition, the IPO Prospectus also contained numerous consolidated financial statements from fiscal years 2005 through 2006, as well as the first and second fiscal quarters of 2007.  These financial statements contained various measures of revenue and income, including figures for implementation revenue, total revenue, operating income, net income, and net income per share, among others.  In particular, the IPO Prospectus reported the following financial results for the 2005 fiscal year:

| Implementation and Other Revenue | $4,582,000 |
| Total Revenue | $53,540,000 |
| Operating Income | ($9,638,000) |
| Net Income | ($11,393,000) |
| Net Income Per Share (Basic) | ($2.51) |
| Net Income Per Share (Diluted) | ($2.51) |

112.    Moreover, the IPO Prospectus reported the following financial results for the 2006 fiscal year:

| Implementation and Other Revenue | $5,161,000 |
| Total Revenue | $75,813,000 |
| Operating Income | ($5,850,000) |
| Net Income | ($9,224,000) |
| Net Income Per Share (Basic) | ($1.96) |
| Net Income Per Share (Diluted) | ($1.96) |

113.    For the reasons stated in the Factual Background above, in Section VI.B below, and as further detailed herein, the statements in the Company's IPO Prospectus set forth in ¶¶110-112 above were materially false and misleading when made or omitted to make such statements not false and misleading because: (a) Defendants materially inflated and falsified athenahealth's reported implementation and other revenue, total revenue, net income, operating income, net income per share, general financial condition, and other financial information by improperly and prematurely amortizing implementation revenue from client contracts over the shorter contract life of one year

and not the true expected performance period; (b) the Company's expected performance period for implementation fees was much longer than a year as is evidenced by the Company's automatically renewable contracts, low attrition rates, high customer loyalty, and Defendants' admissions at the end of the Class Period; and (c) athenahealth's financial statements failed to comply with GAAP, despite Defendants' false assurances that they were GAAP compliant.

114.    In addition, the statements contained in ¶¶110-112 were materially false and misleading because, as revealed in athenahealth's Form 10-K filed with the SEC on March 15, 2010, Defendants' consolidated financial statements for 2005 and 2006 were materially false and misleading.  In particular, the Form 10-K filed with the SEC on March 15, 2010 revealed that the 2005 financial results detailed in ¶111 were false because:

(a)    implementation and other revenue for fiscal year 2005 was actually $2,199,000, not the $4,582,000 reported, *a decrease of 52%*;

(b)    total revenue for fiscal year 2005 was actually $51,157,000, not the $53,540,000 reported;

(c)    operating income for fiscal year 2005 was actually ($12,576,000), not the ($9,638,000) reported, *a decrease of 30%*;

(d)    net income for fiscal year 2005 was actually ($14,331,000), not the ($11,393,000) reported, *a decrease of nearly 26%*;

(e)    net income per share (basic) for fiscal year 2005 was actually ($3.16), not the ($2.51) reported, *a decrease of nearly 26%*; and

(f)    net income per share (diluted) for fiscal year 2005 was actually ($3.16), not the ($2.51) reported, *a decrease of nearly 26%*.

115.    Likewise, the Form 10-K filed with the SEC on March 15, 2010 revealed that the financial results for the fiscal year 2006 detailed in ¶112 were false because:

(a)    implementation and other revenue for fiscal year 2006 was actually $2,665,000, not the $5,161,000 reported, *a decrease of 48%*;

(b)    total revenue for fiscal year 2006 was actually $73,317,000, not the $75,813,000 reported;

(c)    operating income for fiscal year 2006 was actually ($8,988,000), not the ($5,850,000) reported, *a decrease of 53%*;

(d)    net income for fiscal year 2006 was actually ($12,362,000), not the ($9,224,000) reported, *a decrease of 34%*;

(e)    net income per share (basic) for fiscal year 2006 was actually ($2.63), not the ($1.96) reported, *a decrease of 34%*; and

(f)    net income per share (diluted) for fiscal year 2006 was actually ($2.63), not the ($1.96) reported, *a decrease of 34%*.

## 2.    Defendants Release False Financial Results for Third Quarter 2007

116.    On November 1, 2007, Defendants issued a press release attached to a Form 8-K, entitled "athenahealth, Inc. Reports Third Quarter 2007 Financial Results," which contained the Company's financial results for the quarter ended September 30, 2007.  The press release stated in pertinent part:

> Total revenue for the three months ended September 30, 2007 was $26.2 million, compared to $19.6 million for the same period last year, an increase of 33%.

> "This quarter included several important milestones for athenahealth, including our IPO and our first quarter of net income," said Jonathan Bush, Chairman and Chief Executive Officer of athenahealth. "Our growth demonstrates the appeal of our network-based service offering."

For the three months ended September 30, 2007, the Company's Non-GAAP Adjusted EBITDA of $4.2 million was 16% of revenue, compared to Non-GAAP Adjusted EBITDA for the same period last year of $0.4 million which was 2% of revenue. GAAP net income in the quarter was $0.5 million, compared to a GAAP net loss of $2.0 million in the same period last year. Non-GAAP adjusted net income for the quarter was $2.1 million, compared to a Non-GAAP adjusted net loss of $1.8 million in the same period last year.

117.   In this press release, Defendant Byers stated: "The financial results in the quarter demonstrate the power of our recurring revenue model and the operating leverage of our business, . . . . Our IPO and our positive earnings have put the Company in a position of financial strength."

118.   The November 1, 2007 press release also contained condensed consolidated financial statements confirming the Company's third quarter 2007 financial results.

119.   Also on November 1, 2007, the Company hosted an earnings conference call with various analysts to discuss athenahealth's third quarter 2007 financial results. Defendants Bush and Byers both participated in this call, on which they reiterated the Company's third quarter 2007 financial results. Defendant Byers noted, "[W]e were pleased to see strong revenue growth in Q3 to $26.2 million, with revenue up 33% over the same period last year, slightly exceeding our stated long-term annual objective of 30% growth."

120.   The market reacted positively to Defendants' statements regarding the Company's third quarter 2007 financial results. For example, Jefferies & Company, Inc. issued a report on November 2, 2007 maintaining its "Buy" rating and highlighting that athenahealth rolled "fast out of the gates with a strong performance."

121.   As a result of Defendants' misrepresentations, and resulting analyst affirmation, the Company's stock price rose from a close of $38.23 per share on October 31, 2007 to an artificially inflated price of $46.99 on November 5, 2007.

122.   On November 13, 2007, Defendants filed the Company's third quarter Form 10-Q with the SEC, for the period ending September 30, 2007, which was signed by Defendants Bush and

Byers.  The 2007 third quarter 10-Q reaffirmed the financial results announced in the press release in

¶¶116-118.  Further, the Form 10-Q contained the following statements:

- For the nine months ended September 30, 2007 we generated revenue of $72.6 million versus $55.0 million for the nine months ended September 30, 2006.  Given the scope of our market opportunity, we have increased our spending each year on growth, innovation and infrastructure.  Despite increased spending in these areas, higher revenue and lower direct operating expense as a percentage of revenue have led to smaller net losses.

- Revenue from implementations and other sources was $5.0 million for the nine months ended September 30, 2007, an increase of $1.2 million, or 31%, over revenue of $3.8 million for the nine months ended September 30, 2006.  This increase was driven by new client implementations and increased professional services for our larger client base.

- Revenue from implementations and other sources was $1.8 million for the three months ended September 30, 2007, an increase of $0.5 million, or 39%, over revenue of $1.3 million for three months ended September 30, 2006.  This increase was primarily due to the expansion of our client base, which required additional implementation services.

- All revenue, other than implementation revenue, is recognized when the service is performed.  As the implementation service is not separable from the ongoing business services, we record implementation fees as deferred revenue until the implementation service is complete, at which time we recognize revenue ratably on a monthly basis over the expected performance period.

- The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("GAAP") for interim financial reporting and as required by Regulation S-X, Rule 10-01.

- In the opinion of management, all adjustments (including only adjustments which are normal and recurring) considered necessary for a fair presentation of the interim financial information have been included.

123.    The third quarter 2007 Form 10-Q also included condensed consolidated financial

statements, which reported, *inter alia*, the Company's implementation and other revenue, total

revenue, direct operating costs, total expenses, operating income, income before income taxes,

income tax expense, net income, net income per share (basic), net income per share (diluted), total

current assets, total assets, total current liabilities, total liabilities, accumulated deficit, and total stockholders' equity.

124.     Moreover, Defendants Bush and Byers asserted that the information contained in the third quarter 2007 Form 10-Q was accurate.   Specifically, Defendants Bush and Byers signed Sarbanes-Oxley ("SOX") certifications that stated:

1.     I have reviewed this quarterly report on Form 10-Q of athenahealth, Inc;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    a.     designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.     not applicable

    c.     evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.     disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):

        a.     all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

        b.     any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

125.     Additionally, Defendants Bush and Byers asserted that the Company's disclosure controls and internal controls over financial reporting were effective. Specifically, the 2007 third quarter Form 10-Q:

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed by us in reports we file or submit under the Securities and Exchange Act of 1934 is reported, processed, summarized and reported within the time periods specified in the SEC's rules and forms. As of September 30, 2007 (the "Evaluation Date"), our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities and Exchange Act of 1934). Our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. ***Our Chief Executive Officer and Chief Financial Officer concluded based upon the evaluation described above that, as of the Evaluation Date, our disclosure controls and procedures were effective at the reasonable assurance level.***

126.     For the reasons stated in the Factual Background above, in Section VI.B below, and as further detailed herein, the statements in the Company's Form 10-Q set forth in ¶¶116-119, 122-125 above were materially false and misleading when made or omitted to make such statements not false and misleading because: (a) Defendants materially inflated and falsified athenahealth's reported implementation and other revenue, total revenue, net income, operating income, net income per share, general financial condition, and other financial information by improperly and prematurely

amortizing implementation revenue from client contracts over the shorter contract life of one year

and not the true expected performance period; (b) the Company's expected performance period for

implementation fees was much longer than a year as is evidenced by the Company's automatically

renewable contracts, low attrition rates, high customer loyalty, and Defendants' admissions at the

end of the Class Period; (c) athenahealth's financial statements failed to comply with GAAP, despite

Defendants' false assurances that they were GAAP compliant; (d) for the reasons detailed herein, the

SOX certifications signed by Defendants and incorporated in the Company's Forms 10-Q and 10-K

were false as later admitted through the restatement; and (e) for the reasons detailed herein, the

certifications signed by Defendants Bush and Byers and incorporated in the Company's Forms 10-Q

and 10-K, representing that athenahealth's disclosure controls and procedures and internal controls

over financial reporting were effective, were false as later admitted through the restatement.

### 3. Defendants Release False Financial Results for Fourth Quarter and Fiscal Year 2007

127.   On March 5, 2008, Defendants issued a press release attached to a Form 8-K,

reporting athenahealth's financial results for the fiscal year ended 2007 and fiscal quarter ended

December 31, 2007.  The press release stated in pertinent part:

> Total revenue for the three months ended December 31, 2007 was $28.2 million,
> compared to $20.8 million for the same period last year, an increase of 35%. Full
> year 2007 revenue was $100.8 million, compared to full year 2006 revenue of $75.8
> million, an increase of 33%.
>
> "We are pleased with our 2007 financial performance and we are thrilled with the
> progress we have made in building out the depth and breadth of our national network
> for physicians," said Jonathan Bush, Chairman and Chief Executive Officer of
> athenahealth.
>
> For the three months ended December 31, 2007, the Company's Non-GAAP
> Adjusted EBITDA of $3.7 million was 13% of revenue, compared to a breakeven
> Non-GAAP Adjusted EBITDA for the same period last year. GAAP net income in
> the quarter was $2.1 million, compared to a GAAP net loss of $2.7 million in the
> same period last year. Non-GAAP adjusted net income for the quarter was $2.4

million, compared to a Non-GAAP adjusted net loss of $2.3 million in the same period last year.

***"We were pleased to achieve our 32nd consecutive quarter of organic revenue growth,"*** said Carl Byers, Chief Financial Officer. ***"As we grow, we will look to expand profitability given our scalable operating model."***

For the year ended December 31, 2007, the Company's Non-GAAP Adjusted EBITDA of $11.3 million was 11% of revenue, compared to Non-GAAP Adjusted EBITDA for 2006 of $0.7 million which was 1% of revenue. For 2007, the GAAP net loss was $3.5 million, compared to a GAAP net loss of $9.2 million in 2006. Non-GAAP adjusted net income for the year ended December 31, 2007 was $3.5 million, compared to a Non-GAAP adjusted net loss of $7.8 million in 2006.

128.   The earnings release also contained consolidated financial statements confirming the fourth quarter 2007 and 2007 fiscal year financial results.

129.   Also, on March 5, 2008, the Company hosted an earnings conference call with analysts to discuss the Company's fourth quarter 2007 and 2007 fiscal year financial results. Defendants Bush and Byers participated in this conference call.   Defendant Bush opened the call with general praise for the Company's success, and Defendant Byers followed with a recap of the 2007 fourth quarter and year end results.   In particular, Defendant Byers stated, "Regarding profitability, we experienced substantial improvement on the bottom line, delivering our second profitable quarter.  Our net income was $2.1 million, which was up sharply from the same period last year when we had a net loss of $2.7 million."

130.   The market reacted positively to Defendants' statements regarding the Company's fourth quarter and fiscal year 2007 financial results.  For example, on March 6, 2008, Jefferies & Company, Inc. reiterated its "Buy" rating while noting that "4Q results trend[ed] positively in line with expectations."

131.   On March 7, 2008, the Company filed its annual report for the year ended 2007 on Form 10-K with the SEC, which was signed by Defendants Bush and Byers. The 2007 Form 10-K reaffirmed the financial results announced in the press release in ¶¶127-128 above.  Further, it

repeated substantially the same language regarding athenahealth's disclosure controls and procedures contained in the third quarter 2007 Form 10-Q.  Moreover, the 2007 Form 10-K contained the same SOX certifications from Defendants Bush and Byers that were included in the third quarter 2007 Form 10-Q.  Further, the Form 10-K contained the following statements:

- All revenue, other than implementation revenue, is recognized when the service is performed. As the implementation service is not separable from the ongoing business services, we record implementation fees as deferred revenue until the implementation service is complete, at which time we recognize revenue ratably on a monthly basis over the expected performance period.

- We prepare our financial statements in accordance with accounting principles generally accepted in the United States.

132.    The 2007 Form 10-K also included consolidated financial statements that provided various measures of the Company's financial health, including, *inter alia*, implementation and other revenue, total revenue, direct operating costs, total expenses, operating income, income before income taxes, income tax expense, net income, net income per share (basic), net income per share (diluted), total current assets, total assets, total current liabilities, total liabilities, accumulated deficit, and total stockholders' equity.  In particular, the Form 10-K reported the following financial results for the 2007 fiscal year:

| | |
|---|---|
| Implementation and Other Revenue | $6,591,000 |
| Total Revenue | $100,773,000 |
| Operating Income | $4,487,000 |
| Income Before Income Taxes | ($3,469,000) |
| Net Income | ($3,503,000) |
| Net Income Per Share (Basic) | ($0.28) |
| Net Income Per Share (Diluted) | ($0.28) |

133.    For the reasons stated in the Factual Background above, in Section VI.B below, and as further detailed herein, the statements contained in ¶¶127-129, 131-132 above, which touted among other things, the Company's revenue and income growth, were materially false and

misleading when made or omitted to make such statements not false and misleading for the reasons stated above in ¶126.

134.     In addition, they were materially false and misleading or contained omissions of material facts to not make such statements false or misleading for the reasons stated in the Company's Form 10-K filed with the SEC on March 15, 2010.  In particular, the Form 10-K filed with the SEC on March 15, 2010 revealed that the financial results detailed in ¶132 were false because:

(a)     implementation and other revenue for fiscal year 2007 was actually $3,436,000, not the $6,591,000 reported, *a decrease of nearly 48%*;

(b)     total revenue for fiscal year 2007 was actually $97,618,000, not the $100,773,000 reported;

(c)     operating income for fiscal year 2007 was actually $489,000, not the $4,487,000 reported, *a decrease of 89%*;

(d)     income before income taxes for fiscal year 2007 was actually ($7,467,000), not the ($3,469,000) reported, *a decrease of 115%*;

(e)     net income for fiscal year 2007 was actually ($7,501,000), not the ($3,503,000) reported, *a decrease of 114%*;

(f)     net income per share (basic) for fiscal year 2007 was actually ($0.60), not the ($0.28) reported, *a decrease of 114%*; and

(g)     net income per share (diluted) for fiscal year 2007 was actually ($0.60), not the ($0.28) reported, *a decrease of 114%*.

4.      **Defendants Release False Financial Results for First Quarter 2008**

135.    On May 6, 2008, Defendants issued a press release attached to a Form 8-K announcing the financial results for the first quarter of 2008, the period ended March 31, 2008. The press release stated in pertinent part:

> Total revenue for the three months ended March 31, 2008 was $29.8 million, compared to $21.9 million for the same period last year, an increase of 36%.

> "In the first quarter we increased our revenue growth rate as we added to the size and scope of our national physician network," said Jonathan Bush, Chairman and Chief Executive Officer of athenahealth. "Our financial performance is a credit to the loyalty and hard work of our clients and the effectiveness of our software-enabled services."

> For the three months ended March 31, 2008, the Company's Non-GAAP Adjusted EBITDA of $4.0 million was 13% of revenue, compared to a Non-GAAP Adjusted EBITDA of $0.7 million for the same period last year. Non-GAAP Adjusted Net Income in the quarter was $3.1 million, compared to a Non-GAAP Adjusted net loss of $1.5 million in the same period last year. GAAP net income for the quarter was $1.8 million, compared to a GAAP Net Loss of $2.7 million in the same period last year.

136.    In this press release, Defendant Byers stated, "In our history, the first quarter often involves margin compression due to costs at the start of the year and lower seasonal physician collections, so we were quite pleased to see strength both in revenue growth and in margin expansion this quarter."

137.    The May 6, 2008 earnings release also included consolidated financial statements confirming the Company's first quarter financial results.

138.    On May 6, 2008, the Company hosted an earnings conference call with various analysts to discuss athenahealth's first quarter 2008 financial results. Defendants Bush and Byers participated in this conference call. On the call, Defendant Bush opened with a recitation of the "outstanding first quarter" athenahealth had enjoyed. Defendant Byers added:

***We were pleased to see strong revenue growth in Q1 2008 to $29.8 million***, up 36% over the same period last year. This represents our 33rd consecutive quarter of organic revenue growth. The Q1 growth rate exceeded the Q4 2007 growth rate, which in turn exceed the Q3 2007 growth rate.

139.    On this same day, the Company filed its quarterly report for the first quarter of 2008 on Form 10-Q with the SEC, for the period ended March 31, 2008, which was signed by Defendants Bush and Byers. The 2008 first quarter 10-Q reaffirmed the financial results announced in the press release in ¶¶135-137. Further, it repeated substantially the same language regarding athenahealth's disclosure controls and procedures contained in the third quarter 2007 Form 10-Q. Moreover, the first quarter 2008 Form 10-Q contained the same SOX certifications from Defendants Bush and Byers that were included in the third quarter 2007 Form 10-Q. Further, the Form 10-Q contained the following statements:

- The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("GAAP") for interim financial reporting and as required by Regulation S-X, Rule 10-01. Accordingly, they do not include all of the information and footnotes required by GAAP for complete financial statements. In the opinion of management, all adjustments (including only adjustments which are normal and recurring) considered necessary for a fair presentation of the interim financial information have been included.

- As the implementation service is not separable from the ongoing business services, we record implementation fees as deferred revenue until the implementation service is complete, at which time we recognize revenue ratably on a monthly basis over the expected performance period.

- Revenue from implementations and other sources was $1.9 million for the three months ended March 31, 2008, an increase of $0.4 million, or 28%, over revenue of $1.5 million for the three months ended March 31, 2007. This increase was driven by new client implementations and increased professional services for our larger client base. In the three months ended March 31, 2008, approximately 59 new accounts were implemented, an increase of 28 accounts, or 90%, over 31 new accounts implemented in the three months ended March 31, 2007.

140.    The first quarter 2008 Form 10-Q also contained condensed consolidated financial statements, which reported, *inter alia*, the Company's implementation and other revenue, total

revenue, direct operating costs, total expenses, operating income, income before income taxes, income tax provision, net income, net income per share (basic), net income per share (diluted), total current assets, total assets, total current liabilities, total liabilities, accumulated deficit, total stockholders' equity, and total liabilities and stockholders' equity.  In particular, the first quarter 2008 Form 10-Q reported the following financial results:

| | |
|---|---|
| Implementation and Other Revenue | $1,866,000 |
| Total Revenue | $29,755,000 |
| Operating Income | $1,307,000 |
| Income Before Income Taxes | $2,011,000 |
| Net Income | $1,829,000 |
| Net Income Per Share (Basic) | $0.06 |
| Net Income Per Share (Diluted) | $0.05 |

141.    The market reacted positively to Defendants' statements regarding the Company's first quarter 2008 financial results.  For example:

(a)    On May 7, 2008, William Blair & Company upgraded its athenahealth stock rating to "Outperform" based, in part, on the Company's strong business model and "relatively open-ended earnings growth story characterized by a 30%+ revenue growth outlook and significant margin expansion potential over the next several years."

(b)    That same day, Jefferies & Company, Inc. reiterated its "Buy" rating: "In 1Q08, strong gross profit margin of 57% offers evidence that ATHN executed well in the quarter and that its core operations are humming along."

142.    As a result of Defendants' misrepresentations, and resulting analyst affirmation, the Company's stock price rose to close at an artificially inflated price of $29.71 per share on May 7, 2008, on unusually heavy trading volume.

143.    For the reasons stated in the Factual Background above, in Section VI.B below, and as further detailed herein, the statements contained in ¶¶135-140 above, which touted among other

things, the Company's implementation and other revenue growth, were materially false and misleading when made or omitted to make such statements not false and misleading for the reasons stated above in ¶126.

144.   In addition, they were materially false and misleading or contained omissions of material facts to not make such statements false or misleading for the reasons stated in the Company's Form 10-K filed with the SEC on March 15, 2010.  In particular, the Form 10-K filed with the SEC on March 15, 2010 revealed that the financial results detailed in ¶140 were false because:

(a)      implementation and other revenue for the first fiscal quarter 2008 was actually $1,247,000, not the $1,866,000 reported, *a decrease of 33%*;

(b)      total revenue for the first fiscal quarter 2008 was actually $29,136,000, not the $29,755,000 reported;

(c)      operating income for the first fiscal quarter 2008 was actually $423,000, not the $1,307,000 reported, *a decrease of more than 67%*;

(d)      income before income taxes for the first fiscal quarter 2008 was actually $1,127,000, not the $2,011,000 reported, *a decrease of nearly 44%*;

(e)      net income for the first fiscal quarter 2008 was actually $945,000, not the $1,829,000 reported, *a decrease of 48%*;

(f)      net income per share (basic) for the first fiscal quarter 2008 was actually $0.03, not the $0.06 reported, *a decrease of 50%*; and

(g)      net income per share (diluted) for the first fiscal quarter 2008 was actually $0.03, not the $0.05 reported, *a decrease of 40%*.

**5.      Defendants Release False Financial Results for Second Quarter 2008**

145.    On August 4, 2008, Defendants issued a press release, which was attached to a Form 8-K filed with the SEC, announcing athenahealth's financial results for the second quarter 2008, for the period ended June 30, 2008.  The press release stated in pertinent part:

> Total revenue for the three months ended June 30, 2008 was $33.0 million, compared to $24.5 million for the same period last year, an increase of 35%.
>
> *      *      *
>
> For the three months ended June 30, 2008, the Company's Non-GAAP Adjusted EBITDA of $5.5 million was 17% of revenue, compared to a Non-GAAP Adjusted EBITDA of $2.7 million for the same period last year. Non-GAAP Adjusted Net Income in the quarter was $3.9 million, compared to a Non-GAAP Adjusted Net Income of $0.5 million in the same period last year. GAAP net income for the quarter was $2.8 million, compared to a GAAP Net Loss of $3.4 million in the same period last year.

146.    In this press release, Defendant Bush commented, "Our second quarter 2008 financial results reflect outstanding performance by our operations team to implement a high volume of new business while also executing several critically important initiatives in the quarter."  Defendant Byers added that the Company "saw rapid growth matched by outstanding operational performance" in second quarter 2008.

147.    The press release also included the Company's condensed consolidated financial statements confirming the Company's second quarter 2008 financial results.

148.    As a result of Defendants' misrepresentations, the Company's stock price rose to close at an artificially inflated price of $34.10 per share on August 5, 2008, up from a close of $27.22 on August 4, 2008, on unusually heavy trading volume.

149.    On August 5, 2008, Defendants hosted an earnings conference call with various analysts to discuss the Company's second quarter 2008 financial results.  Defendants Bush and Byers participated in this call.  Defendant Bush began the call by highlighting the Company's second

quarter revenue of $33 million, "representing growth of 35% over second quarter of 2007, well above our long term target model growth rate of 30%." Defendant Byers also discussed the Company's second quarter 2008 financial results in more detail.

150.    Also, on August 5, 2008, Defendants filed the Company's second quarter 2008 Form 10-Q with the SEC, for the period ending June 30, 2008, which was signed by Defendants Bush and Byers. The 2008 second quarter Form 10-Q reaffirmed the financial results announced in the press release in ¶¶145-147 above.  Further, it repeated substantially the same language regarding athenahealth's disclosure controls and procedures contained in the third quarter 2007 Form 10-Q. Moreover, the 2008 second quarter Form 10-Q contained the same SOX certifications from Defendants Bush and Byers that were included in the third quarter 2007 Form 10-Q.  Further, it contained the following false statements:

- The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("GAAP") for interim financial reporting and as required by Regulation S-X, Rule 10-01.

- In the opinion of management, all adjustments (including only adjustments which are normal and recurring) considered necessary for a fair presentation of the interim financial information have been included.

- As the implementation service is not separable from the ongoing business services, we record implementation fees as deferred revenue until the implementation service is complete, at which time we recognize revenue ratably on a monthly basis over the expected performance period.

- Revenue from implementations and other sources was $3.6 million for the six months ended June 30, 2008, an increase of $0.4 million, or 15%, over revenue of $3.2 million for the six months ended June 30, 2007.  This increase was driven by a rise in the total accounts live and increased professional services for our larger client base.

- Revenue from implementations and other sources was $1.8 million for the three months ended June 30, 2008, an increase of $0.1 million, or 4%, over revenue of $1.7 million for the three months ended June 30, 2007.  This increase was driven by a rise in the total accounts live and increased professional services for our larger client base.

151.    The second quarter 2008 Form 10-Q also included condensed consolidated financial statements that provided various measures of the Company's financial health, including, *inter alia*, the Company's implementation and other revenue, total revenue, direct operating costs, total expenses, operating income, income before income taxes, income tax provision, net income, net income per share (basic), net income per share (diluted), total current assets, total assets, total current liabilities, total liabilities, accumulated deficit, total stockholders' equity, and total liabilities and stockholders' equity.   In particular, the second quarter 2008 Form 10-Q reported the following financial results:

| | |
|---|---|
| Implementation and Other Revenue | $1,783,000 |
| Total Revenue | $32,973,000 |
| Operating Income | $2,768,000 |
| Income Before Income Taxes | $3,090,000 |
| Net Income | $2,779,000 |
| Net Income Per Share (Basic) | $0.09 |
| Net Income Per Share (Diluted) | $0.08 |

152.    The market reacted positively to Defendants' statements regarding the Company's second quarter 2008 results.  For example:

(a)    On August 5, 2008, Jefferies & Company, Inc., reiterating its "Buy" rating based, in part, on better-than-expected revenue growth, labeled athenahealth's stock "a gem for the long-term."

(b)    On August 5, 2008, William Blair & Company was "impressed that year-to-date revenue growth of 35% has trended well ahead of the company's annual 30% revenue growth goal."  It maintained its "Outperform" rating.

153.    For the reasons stated in the Factual Background above, in Section VI.B below, and as further detailed herein, the statements contained in ¶¶145-147, 149-151 above, which touted among other things, the Company's implementation and other revenue growth, were materially false

and misleading when made or omitted to make such statements not false and misleading for the reasons stated above in ¶126.

154.    In addition, they were materially false and misleading or contained omissions of material facts to not make such statements false or misleading for the reasons stated in the Company's Form 10-K filed with the SEC on March 15, 2010.  In particular, the Form 10-K filed with the SEC on March 15, 2010 revealed that the financial results detailed in ¶151 were false because:

(a)    implementation and other revenue for the second fiscal quarter 2008 was actually $995,000, not the $1,783,000 reported, *a decrease of 44%*;

(b)    total revenue for the second fiscal quarter 2008 was actually $32,185,000, not the $32,973,000 reported;

(c)    operating income for the second fiscal quarter 2008 was actually $1,700,000, not the $2,768,000 reported, *a decrease of more than 38%*;

(d)    income before income taxes for the second fiscal quarter 2008 was actually $2,022,000, not the $3,090,000 reported, *a decrease of more than 34%*;

(e)    net income for the second fiscal quarter 2008 was actually $1,711,000, not the $2,779,000 reported, *a decrease of more than 38%*;

(f)    net income per share (basic) for the second fiscal quarter 2008 was actually $0.05, not the $0.09 reported, *a decrease of 44%*; and

(g)    net income per share (diluted) for the second fiscal quarter 2008 was actually $0.05, not the $0.08 reported, *a decrease of more than 37%*.

6.      **Defendants Release False Financial Results for Third Quarter
2008**

155.    On November 6, 2008, Defendants issued a press release, attached to a Form 8-K

filed with the SEC, reporting the Company's financial results for the third quarter 2008, the period

ended September 30, 2008.  The press release stated in pertinent part:

> Total revenue for the three months ended September 30, 2008, was $35.4 million,
> compared to $26.2 million for the same period last year, an increase of 35%.

> *       *       *

> For the three months ended September 30, 2008, the Company's Non-GAAP
> Adjusted EBITDA grew to $6.1 million, compared to a Non-GAAP Adjusted
> EBITDA of $4.2 million for the same period last year. Non-GAAP Adjusted Net
> Income was $4.8 million, compared to a Non-GAAP Adjusted Net Income of $2.1
> million in the same period last year. GAAP net income for the quarter was $3.7
> million, compared to a GAAP net income of $0.5 million in the same period last
> year.

156.    In this press release, Defendant Bush declared, "The third quarter was athenahealth's

strongest quarter to date as a public company; we added a record number of net new physicians and

providers to our network, including the providers of MinuteClinic.  These implementations reflect

the appeal of our service offering and the outstanding work of our operations teams."

157.    The press release also contained condensed consolidated financial statements

confirming the Company's third quarter 2008 financial results.

158.    On the following day, November 7, 2008, the Company hosted an earnings

conference call with analysts to discuss the Company's third quarter 2008 financial results.

Defendants Bush and Byers participated in this call.  In his opening remarks, Defendant Bush touted

the Company's quarter as its "strongest ever."  Defendant Byers then followed with a more detailed

description of the financial results that drove athenahealth's ***"35th consecutive quarter of revenue
growth."***

159.    Also, on November 7, 2008, Defendants filed the Company's third quarter 2008 Form 10-Q with the SEC, which was signed by Defendants Bush and Byers.  The third quarter 2008 Form 10-Q reaffirmed the Company's financial results announced in the press release in ¶¶155-157 above. Further, it repeated substantially the same language regarding athenahealth's disclosure controls and procedures contained in the third quarter 2007 Form 10-Q.  Moreover, the 2008 second quarter Form 10-Q contained the same SOX certifications from Defendants Bush and Byers that were included in the third quarter 2007 Form 10-Q.  Further, it contained the following false statements:

- The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("GAAP") for interim financial reporting and as required by Regulation S-X, Rule 10-01.

- In the opinion of management, all adjustments (including only adjustments which are normal and recurring) considered necessary for a fair presentation of the interim financial information have been included.

- As our implementation services are not separable from our ongoing business services, we record implementation fees as deferred revenue until those implementation services are complete, at which time we recognize revenue ratably on a monthly basis over the expected performance period.

- Revenue from implementations and other sources was $6.0 million for the nine months ended September 30, 2008; an increase of $1.0 million, or 21%, over revenue of $5.0 million for the nine months ended September 30, 2007. This increase was driven by new client implementations and increased professional services for our larger client base. As of September 30, 2008, the numbers of accounts live on our revenue cycle management service, athenaCollector, increased of 282 accounts since September 30, 2007. As of September, 2008, the number of accounts live on our clinical cycle management service, athenaClinicals, increased 73 accounts since September 30, 2007.

- Revenue from implementations and other sources was $2.3 million for the three months ended September 30, 2008, an increase of $0.6 million, or 31%, over revenue of $1.8 million for the three months ended September 30, 2007. This increase was driven by new client implementations and increased professional services for our larger client base. As of September 30, 2008, the numbers of accounts live on our revenue cycle management service, athenaCollector, increased of 282 accounts since September 30, 2007. As of September, 2008, the number of accounts live on our clinical cycle

management service, athenaClinicals, increased 73 accounts since September 30, 2007.

160.     The third quarter 2008 Form 10-Q also contained condensed consolidated financial statements that provided various measures of the Company's financial health, including, *inter alia*, the Company's implementation and other revenue, total revenue, direct operating costs, total expenses, operating income, income before income taxes, income tax provision, net income, net income per share (basic), net income per share (diluted), total current assets, total assets, total current liabilities, total liabilities, accumulated deficit, total stockholders' equity, and total liabilities and stockholders' equity.   In particular, the third quarter 2008 Form 10-Q reported the following financial results:

| | |
|---|---|
| Implementation and Other Revenue | $2,348,000 |
| Total Revenue | $35,428,000 |
| Operating Income | $3,403,000 |
| Income Before Income Taxes | $3,778,000 |
| Net Income | $3,700,000 |
| Net Income Per Share (Basic) | $0.11 |
| Net Income Per Share (Diluted) | $0.11 |

161.     The market reacted positively to Defendants' statements regarding the Company's third quarter 2008 results.  For example:

(a)     On November 6, 2008, Thomas Weisel Partners reiterated its "Overweight" rating thanks to "ATHN demonstrat[ing] impressive top and bottom line growth, despite the economy."

(b)     The following day, Cantor Fitzgerald issued a "Buy" rating upon news of athenahealth's "solid 3Q of fiscal 2008."

162.     For the reasons stated in the Factual Background above, in Section VI.B below, and as further detailed herein, the statements contained in ¶¶155-160 above, which touted among other

things, the Company's implementation and other revenue growth, were materially false and misleading when made or omitted to make such statements not false and misleading for the reasons stated above in ¶126.

163.    In addition, they were materially false and misleading or contained omissions of material facts to not make such statements false or misleading for the reasons stated in the Company's Form 10-K filed with the SEC on March 15, 2010.  In particular, the Form 10-K filed with the SEC on March 15, 2010 revealed that the financial results detailed in ¶160 were false because:

(a)    implementation and other revenue for the third fiscal quarter 2008 was actually $1,070,000, not the $2,348,000 reported, *a decrease of more than 54%*;

(b)    total revenue for the third fiscal quarter 2008 was actually $34,150,000, not the $35,428,000 reported;

(c)    operating income for the third fiscal quarter 2008 was actually $1,805,000, not the $3,403,000 reported, *a decrease of nearly 47%*;

(d)    income before income taxes for the third fiscal quarter 2008 was actually $2,180,000, not the $3,778,000 reported, *a decrease of 42%*;

(e)    net income for the third fiscal quarter 2008 was actually $2,102,000, not the $3,700,000 reported, *a decrease of 43%*;

(f)    net income per share (basic) for the third fiscal quarter 2008 was actually $0.06, not the $0.11 reported, *a decrease of more than 45%*; and

(g)    net income per share (diluted) for the third fiscal quarter 2008 was actually $0.06, not the $0.11 reported, *a decrease of more than 45%*.

### 7. Defendants Release False Financial Results for Fourth Quarter and Fiscal Year 2008

164.    On February 26, 2009, Defendants issued a press release, attached to a Form 8-K filed

with the SEC, detailing the Company's financial results for fiscal year 2008 and the fourth quarter

2008, the period ended December 31, 2008.  The press release stated in relevant part:

> Total revenue for the three months ended December 31, 2008 was $41.4 million, compared to $28.2 million in the same period last year, an increase of 47%. Full year 2008 revenue was $139.6 million compared to full year 2007 revenue of $100.8 million, an increase of 38%.
>
> *        *        *
>
> For the three months ended December 31, 2008, non-GAAP Adjusted EBITDA grew to $8.0 million or 19% of revenue, from non-GAAP Adjusted EBITDA of $3.7 million or 13% of revenue in the same period last year. After concluding that its U.S. operations have achieved sustainable profitability, in the fourth quarter of 2008, the Company reversed its valuation allowance against U.S deferred tax assets, which resulted in a non-cash $16.7 million GAAP tax benefit.
>
> As a result, GAAP net income for the fourth quarter of 2008 was $20.6 million or $0.60 per diluted share, compared to GAAP net income of $2.1 million in the same period last year. Non-GAAP Adjusted Net Income for the fourth quarter of 2008 was $23.4 million or $0.68 per diluted share, compared to Non-GAAP Adjusted Net Income of $2.4 million in the same period last year. Excluding the GAAP tax benefit, GAAP net income for the fourth quarter of 2008 would have been $3.8 million or $0.11 per diluted share, and non-GAAP Adjusted Net Income would have been $6.6 million or $0.19 per diluted share.
>
> *        *        *
>
> For the year ended December 31, 2008, non-GAAP Adjusted EBITDA grew to $23.7 million or 17% of revenue, from non-GAAP Adjusted EBITDA for 2007 of $11.3 million or 11% of revenue. For 2008, GAAP net income was $28.9 million compared to a GAAP net loss of $3.5 million in 2007. Non-GAAP Adjusted Net Income for the year ended December 31, 2008, was $35.1 million, compared to non-GAAP Adjusted Net Income of $3.5 million in 2007. Excluding the GAAP tax benefit, GAAP net income for 2008 would have been $12.1 million or $0.35 per diluted share and non-GAAP Adjusted Net Income would have been $18.4 million or $0.53 per diluted share.

165.    In addition, in this press release, Defendant Bush commented, "We are pleased with

our strong performance during 2008. . . . During our first full year as a public company, we

implemented a record number of new providers while continuing to execute on operational and strategic initiatives in support of continued growth."

166.    The earnings release also contained consolidated financial statements confirming the fourth quarter 2008 and 2008 fiscal year financial results.

167.    On February 27, 2009, the Company hosted an earnings conference call with analysts to discuss the Company's fourth quarter 2008 and 2008 fiscal year financial results.  Defendants Bush and Byers both participated on this call.  Defendant Bush opened his remarks by stating that "2008 was our first year as a public company and we are pleased to report that it was a tremendous success."  Defendant Byers then added:

> [W]e were pleased to see robust revenue growth in Q4 to $41.4 million, up 47% over the same period last year.  This represents our 36th consecutive quarter of revenue growth, and we would emphasize that this is organically driven.

> 2008 full year revenue grew by 38% to $139.6 million over 2007.

168.    On March 2, 2009, Defendants filed the Company's annual report for the year ended December 31, 2008 on Form 10-K with the SEC, which was signed by Defendants Bush and Byers. The 2008 Form 10-K reaffirmed the financial results announced in the press release in ¶¶164-166 above.  Further, it repeated substantially the same language regarding athenahealth's disclosure controls and procedures contained in the third quarter 2007 Form 10-Q.  Moreover, Defendants Bush and Byers asserted that the information contained in the 2008 Form 10-K was accurate.  Specifically, Defendants Bush and Byers signed SOX certifications that stated:

1.      I have reviewed this Annual Report on Form 10-K of athenahealth, Inc;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the

financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):

    a.  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

    b.  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

169.   Further, the 2008 Form 10-K contained the following false statements:

- All revenue, other than implementation revenue, is recognized when the service is performed. Relative to our business services offering that is based on the collections of amounts by our customers; we do not recognize revenue until our customers have been paid. As the implementation service is not separable from the ongoing business services, we record implementation fees as deferred revenue until the implementation service is complete, at which time we recognize revenue ratably on a monthly basis over the expected performance period.

- Implementation revenue consists primarily of professional services fees related to assisting customers with the implementation of the Company's services and are generally billed upfront and recorded as deferred revenue until the implementation is complete and then recognized ratably over the performance period.

- Revenue from implementations and other sources was $7.7 million for the year ended December 31, 2008, an increase of $1.1 million, or 16%, over revenue of $6.6 million for the year ended December 31, 2007. This increase was driven by new client implementations and increased professional services for our larger client base. As of December 31, 2008, the numbers of accounts live on our revenue cycle management service, athenaCollector, increased by 305 accounts since December 31, 2007. As of December 31, 2008, the numbers of accounts live on our clinical cycle management service, athenaClinicals, increased by 80 accounts since December 31, 2007. The increase in implementation and other revenue is the result of the increase in the volume of our business.

- Revenue from implementations and other sources was $6.6 million for the year ended December 31, 2007, an increase of $1.4 million, or 28%, over revenue of $5.2 million for the year ended December 31, 2006. This increase was driven by new client implementations and increased professional services for our larger client base. In the year ended December 31, 2007, approximately 366 new accounts were implemented, an increase of 110 accounts, or 43%, over 256 new accounts implemented in the year ended December 31, 2006. The increase in implementation and other revenue is the result of the increase in the volume of our business.

- We prepare our financial statements in accordance with accounting principles generally accepted in the United States.

170.   The 2008 Form 10-K also included consolidated financial statements that featured various measures of the Company's financial health, including, *inter alia*, the Company's implementation and other revenue, total revenue, direct operating costs, total expenses, operating

income, income before income taxes, income tax provision, net income, net income per share

(basic), net income per share (diluted), total current assets, total assets, total current liabilities, total

liabilities, accumulated deficit, total stockholders' equity, and total liabilities and stockholders'

equity.  In particular, the Form 10-K reported the following financial results for the fourth quarter of

2008:

| | |
|---|---|
| Implementation and Other Revenue | $1,676,000 |
| Total Revenue | $41,396,000 |
| Operating Income | $4,525,000 |
| Income Before Income Taxes | $3,939,000 |
| Net Income | $20,563,000 |
| Net Income Per Share (Basic) | $0.62 |
| Net Income Per Share (Diluted) | $0.59 |

171.    The Form 10-K also reported the following financial results for the 2008 fiscal year:

| | |
|---|---|
| Implementation and Other Revenue | $7,673,000 |
| Total Revenue | $139,552,000 |
| Operating Income | $12,003,000 |
| Income Before Income Taxes | $12,818,000 |
| Net Income | $28,871,000 |
| Net Income Per Share (Basic) | $0.88 |
| Net Income Per Share (Diluted) | $0.83 |

172.    The market reacted positively to Defendants' statements regarding the Company's

fourth quarter and fiscal year 2008 results.  For example:

(a)    On February 27, 2009, Jefferies & Company, Inc. reiterated its "Buy" rating:

"ATHN remains [our] top physician pick.  Strong performance in doc[tor] adds (& clinical

adoption), rev[enue] and margins support our positive view of [athenahealth's] business model."

(b)    In light of the Company's results, on February 27, 2009, ThinkEquity LLC

recommended investors "accumulate" athenahealth stock and raised its 2009 and 2010 estimates for

revenue and earnings per share.

173.    For the reasons stated in the Factual Background above, in Section VI.B below, and as further detailed herein, the statements contained in ¶¶164-171 above, which touted among other things, the Company's revenue and income growth, were materially false and misleading when made or omitted to make such statements not false and misleading for the reasons stated above in ¶126.

174.    In addition, they were materially false and misleading or contained omissions of material facts to not make such statements false or misleading for the reasons stated in the Company's Form 10-K filed with the SEC on March 15, 2010.  In particular, the Form 10-K filed with the SEC on March 15, 2010 revealed that the financial results for the fourth quarter 2008 detailed in ¶170 were false because:

(a)    implementation and other revenue for the fourth fiscal quarter 2008 was actually $1,091,000, not the $1,676,000 reported, *a decrease of nearly 35%*;

(b)    total revenue for the fourth fiscal quarter 2008 was actually $40,811,000, not the $41,396,000 reported;

(c)    operating income for the fourth fiscal quarter 2008 was actually $3,657,000, not the $4,525,000 reported, *a decrease of 19%*;

(d)    income before income taxes for the fourth fiscal quarter 2008 was actually $3,071,000, not the $3,939,000 reported, *a decrease of 22%;*

(e)    net income for the fourth fiscal quarter 2008 was actually $26,844,000, not the $20,563,000 reported;

(f)    net income per share (basic) for the fourth fiscal quarter 2008 was actually $0.81, not the $0.62 reported; and

(g)      net income per share (diluted) for the fourth fiscal quarter 2008 was actually $0.77, not the $0.59 reported.[13]

175.     Likewise, the Form 10-K filed with the SEC on March 15, 2010 revealed that the financial results for the fiscal year 2008 detailed in ¶171 were false because:

(a)      implementation and other revenue for fiscal year 2008 was actually $4,403,000, not the $7,673,000 reported, *a decrease of more than 42%*;

(b)      total revenue for fiscal year 2008 was actually $136,282,000, not the $139,552,000 reported;

(c)      operating income for fiscal year 2008 was actually $7,585,000, not the $12,003,000 reported, *a decrease of nearly 37%*;

(d)      income before income taxes for fiscal year 2008 was actually $8,400,000, not the $12,818,000 reported, *a decrease of 34%;*

(e)      net income for fiscal year 2008 was actually $31,602,000, not the $28,871,000 reported;

(f)      net income per share (basic) for fiscal year 2008 was actually $0.97, not the $0.88 reported; and

(g)      net income per share (diluted) for fiscal year 2008 was actually $0.91, not the $0.83 reported.[14]

---

[13]      Due to advantageous deferred tax benefits resulting from its restatement, the Company's net income, net income per share (basic), and net income per share (diluted) actually increased despite its total revenues having decreased after the restatement.

[14]      *See* n.13 above.

### 8.     Defendants Release False Financial Results for First Quarter 2009

176.     On April 30, 2009, Defendants issued a press release entitled, "athenahealth, Inc.

Reports First Quarter 2009 Results," attached to a Form 8-K filed with the SEC, which reported the

Company's financial results for the first quarter of 2009, the period ended March 31, 2009.  The

press release stated in pertinent part:

> Total revenue for the three months ended March 31, 2009, was $42.1 million, compared to $29.8 million in the same period last year, an increase of 41%.
>
> "Our strong performance in the first quarter of 2009 demonstrates our growing significance as a unique software-enabled service in healthcare," said Jonathan Bush, the Company's Chairman, President, and Chief Executive Officer. "We have strengthened our position as a leader in revenue cycle management and continue to extend our expertise in managing complexity and cash flow within the electronic health record (EHR) space."
>
> For the three months ended March 31, 2009, non-GAAP Adjusted EBITDA grew to $7.4 million, or 18% of revenue, from non-GAAP Adjusted EBITDA of $4.0 million, or 13% of revenue, in the same period last year. Non-GAAP Adjusted Net Income for the first quarter of 2009 was $4.0 million, or $0.12 per diluted share, compared to Non-GAAP Adjusted Net Income of $3.1 million, or $0.09 per diluted share, in the same period last year. GAAP net income for the quarter was $2.3 million, compared to GAAP net income of $1.8 million in the same period last year. As previously announced, following the reversal of a valuation allowance against U.S. deferred tax assets in the fourth quarter of 2008, the Company's reported GAAP net income and non-GAAP Adjusted Net Income now reflect a full GAAP tax rate.

177.     In this press release, Defendant Byers commented: "We were pleased to see revenue

increase 41% over last year, while operating income grew at much higher rate. . . . We achieved this

even as we intensified investments in operational and strategic initiatives to support our long-term

goals."

178.     The April 30, 2009 earnings release also contained financial statements confirming

the Company's first quarter 2009 financial results.

179.    As a result of Defendants' announcement of the Company's first quarter success, the Company's stock price rose to close at an artificially inflated price of $33.78 per share on May 1, 2009, on unusually heavy trading volume.

180.    On May 1, 2009, the Company hosted a conference call with securities analysts to discuss athenahealth's first quarter 2009 financial results.  Defendants Bush and Byers both participated in the call and reaffirmed the results for the first fiscal quarter announced the day before.

181.    The market reacted positively to Defendants' statements.  For example, on May 1, 2009, Thomas Weisel Partners issued a report maintaining its "Overweight" rating for athenahealth stock based, in part, on the Company's meeting its 2009 consensus revenue estimates.  The report further noted, "Given its compelling offering, ATHN is not experiencing any material slowdown related to the economy.  We continue to be buyers of ATHN shares at current levels."

182.    On May 1, 2009, the Company filed its quarterly report for the first quarter of 2009 on Form 10-Q with the SEC, which was signed by Defendants Bush and Byers.  The 2009 first quarter Form 10-Q reaffirmed the financial results announced in the press release in ¶¶176-178 above.  Further, it repeated substantially the same language regarding athenahealth's disclosure controls and procedures contained in the third quarter 2007 Form 10-Q.  Moreover, the 2009 first quarter Form 10-Q contained the same SOX certifications from Defendants Bush and Byers that were included in the 2008 Form 10-K.  Further, it contained the following false statements:

- For the three months ended March 31, 2009, we generated revenue of $42.1 million from the sale of our services compared to $29.8 million for the three months ended March 31, 2008. In 2008, we generated revenue of $139.6 million from the sale of our services compared to $100.8 million in 2007. Given the scope of our market opportunity, we have increased our spending each year on growth, innovation, and infrastructure. Despite increased spending in these areas, higher revenue and lower operating expenses as a percentage of revenue have led to greater net profits.

- Revenue from implementations and other sources was $2.2 million for the three months ended March 31, 2009, an increase of $0.3 million, or 18%, over revenue of $1.9 million for the three months ended March 31, 2008. This increase was driven by new client implementations and increased professional services for our larger client base. As of March 31, 2009, the numbers of accounts live on our revenue cycle management service, athenaCollector, increased by 353 accounts since March 31, 2008. As of March 31, 2009, the number of accounts live on our clinical cycle management service, athenaClinicals, increased by 69 accounts since March 31, 2008. The increase in implementation and other revenue is the result of the increase in the volume of our business.

- The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("GAAP") for interim financial reporting and as required by Regulation S-X, Rule 10-01.

- In the opinion of management, all adjustments (including only adjustments that are normal and recurring) considered necessary for a fair presentation of the interim financial information have been included.

183. The first quarter 2009 Form 10-Q also included condensed consolidated financial statements, which reported, *inter alia*, the Company's implementation and other revenue, total revenue, direct operating costs, total expenses, operating income, income before income taxes, income tax provision, net income, net income per share (basic), net income per share (diluted), deferred tax assets, total current assets, total assets, total current liabilities, total liabilities, accumulated deficit, total stockholders' equity, and total liabilities and stockholders' equity. In particular, the first quarter 2009 Form 10-Q reported the following financial results:

| Implementation and Other Revenue | $2,204,000 |
|---|---|
| Total Revenue | $42,099,000 |
| Operating Income | $3,781,000 |
| Income Before Income Taxes | $4,237,000 |
| Net Income | $2,338,000 |
| Net Income Per Share (Basic) | $0.07 |
| Net Income Per Share (Diluted) | $0.07 |

184.    For the reasons stated in the Factual Background above, in Section VI.B below, and as further detailed herein, the statements contained in ¶¶176-180, 182-183 above, which touted among other things, the Company's implementation and other revenue growth, were materially false and misleading when made or omitted to make such statements not false and misleading for the reasons stated above in ¶126.

185.    In addition, they were materially false and misleading or contained omissions of material facts to not make such statements false or misleading for the reasons stated in the Company's Form 10-K filed with the SEC on March 15, 2010.  In particular, the Form 10-K filed with the SEC on March 15, 2010 revealed that the first quarter 2009 financial results detailed in ¶183 were false because:

(a)    implementation and other revenue for the first fiscal quarter 2009 was actually $1,133,000, not the $2,204,000 reported, *a decrease of more than 48%*;

(b)    total revenue for the first fiscal quarter 2009 was actually $41,028,000, not the $42,099,000 reported;

(c)    operating income for the first fiscal quarter 2009 was actually $2,447,000, not the $3,781,000 reported, *a decrease of 35%*;

(d)    income before income taxes for the first fiscal quarter 2009 was actually $2,903,000, not the $4,237,000 reported, *a decrease of more than 31%;*

(e)    net income for the first fiscal quarter 2009 was actually $1,538,000, not the $2,338,000 reported, *a decrease of 34%*;

(f)    net income per share (basic) for the first fiscal quarter 2009 was actually $0.05, not the $0.07 reported, *a decrease of more than 28%*; and

(g)      net income per share (diluted) for the first fiscal quarter 2009 was actually $0.04, not the $0.07 reported, *a decrease of nearly 43%*.

### 9.      Defendants Issue False Second Quarter 2009 Financial Results

186.    On August 5, 2009, Defendants issued a press release, attached to a Form 8-K filed with the SEC, reporting athenahealth's financial results for the second quarter 2009, the period ended June 30, 2009.   The press release stated in pertinent part:

> Total revenue for the three months ended June 30, 2009, was $46.7 million, compared to $33.0 million in the same period last year, an increase of 42%.
>
> *            *            *
>
> For the three months ended June 30, 2009, non-GAAP Adjusted EBITDA grew to $9.0 million, or 19% of revenue, from non-GAAP Adjusted EBITDA of $5.5 million, or 17% of revenue, in the same period last year. Non-GAAP Adjusted Net Income for the second quarter of 2009 was $4.7 million, or $0.14 per diluted share, compared to Non-GAAP Adjusted Net Income of $3.9 million, or $0.11 per diluted share, in the same period last year. GAAP net income for the quarter was $3.0 million, compared to GAAP net income of $2.8 million in the same period last year. As previously announced, following the reversal of a valuation allowance against U.S. deferred tax assets in the fourth quarter of 2008, the Company's reported GAAP net income and non-GAAP Adjusted Net Income now reflect a full GAAP tax rate.

187.    In this press release, Defendant Bush commented, "I am very pleased with our performance in the second quarter, during which we expanded our service capabilities and strengthened our position in the enterprise space. . . . We continue to exceed our growth targets and are well positioned to help medical groups tackle new requirements brought on by healthcare reform."

188.    The August 5, 2009 earnings release also contained financial statements confirming the Company's second quarter 2009 financial results.

189.    On August 6, 2009, the Company hosted an earnings conference call with analysts to discuss the Company's second quarter 2009 financial results.   Defendants Bush and Byers both participated in this call.   Indeed, Defendant Bush opened the call by repeating the Company's second

quarter 2009 financial results.  Defendant Byers added, "[We] achieved significant year-over-year revenue growth of 42% during Q2 . . . While our adjusted net income now includes the impact of a full tax rate, adjusted EPS still increased by more than 20% year-over-year to $0.14 per diluted share compared to $0.11 in Q2 of 2008."

190.    On the same day, the Company filed its quarterly report for the second quarter of 2009 on Form 10-Q with the SEC, the period ended June 30, 2009, which was signed by Defendants Bush and Byers.  The 2009 second quarter Form 10-Q reaffirmed the financial results announced in the press release in ¶¶186-188 above.  Further, it repeated substantially the same language regarding athenahealth's disclosure controls and procedures contained in the third quarter 2007 Form 10-Q.  Moreover, the 2009 second quarter Form 10-Q contained the same SOX certifications from Defendants Bush and Byers that were included in the 2008 Form 10-K.  Further, it contained the following false statements:

- The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("GAAP") for interim financial reporting and as required by Regulation S-X, Rule 10-01.

- In the opinion of management, all adjustments (including only adjustments that are normal and recurring) considered necessary for a fair presentation of the interim financial information have been included.

- For the six months ended June 30, 2009, we generated revenue of $88.8 million from the sale of our services compared to $62.7 million for the six months ended June 30, 2008.  For the three months ended June 30, 2009, we generated revenue of $46.7 million from the sale of our services compared to $33.0 million for the three months ended June 30, 2008.  In 2008, we generated revenue of $139.6 million from the sale of our services compared to $100.8 million in 2007.  Given the scope of our market opportunity, we have increased our spending each year on growth, innovation, and infrastructure. Despite increased spending in these areas, higher revenue and lower operating expenses as a percentage of revenue have led to greater net profits.

- Revenue from implementations and other sources was $4.5 million for the six months ended June 30, 2009, an increase of $0.8 million, or 23%, over

revenue of $3.6 million for the six months ended June 30, 2008.  This increase was driven by new client implementations and increased professional services for our larger client base. As of June 30, 2009, the numbers of accounts live on our revenue cycle management service, athenaCollector, increased by 358 accounts since June 30, 2008.  As of June 30, 2009, the number of accounts live on our clinical cycle management service, athenaClinicals, increased by 90 accounts since June 30, 2008.  The increase in implementation and other revenue is the result of the increase in the volume of our business.

- Revenue from implementations and other sources was $2.3 million for the three months ended June 30, 2009, an increase of $0.5 million, or 28%, over revenue of $1.8 million for the three months ended June 30, 2008. This increase was driven by new client implementations and increased professional services for our larger client base. As of June 30, 2009, the numbers of accounts live on our revenue cycle management service, athenaCollector, increased by 358 accounts since June 30, 2008. As of June 30, 2009, the number of accounts live on our clinical cycle management service, athenaClinicals, increased by 90 accounts since June 30, 2008. The increase in implementation and other revenue is the result of the increase in the volume of our business.

191.    The second quarter 2009 Form 10-Q also contained condensed consolidated financial statements that provided various measures of the Company's financial health, including, *inter alia*, the Company's implementation and other revenue, total revenue, direct operating costs, total expenses, operating income, income before income taxes, income tax provision, net income, net income per share (basic), net income per share (diluted), deferred tax assets, total current assets, total assets, total current liabilities, total liabilities, accumulated deficit, total stockholders' equity, and total liabilities and stockholders' equity.  In particular, the second quarter 2009 Form 10-Q reported financial results as follows:

| Implementation and Other Revenue | $2,290,000 |
|---|---|
| Total Revenue | $46,719,000 |
| Operating Income | $5,040,000 |
| Income Before Income Taxes | $5,464,000 |
| Net Income | $3,029,000 |
| Net Income Per Share (Basic) | $0.09 |
| Net Income Per Share (Diluted) | $0.09 |

192.    The market reacted positively to Defendants' statements regarding the Company's second quarter 2009 financial results.  For example:

(a)    On August 5, 2009, Thomas Weisel Partners issued a report entitled "Revenue In Line But Margins Were Exceptional; We Remain Buyers Of The Shares."

(b)    That same day, Morgan Stanley added: "Overall, the top-line of $46.7 million closely matched our forecast and margin leverage looked solid, as ATHN posted gross margins of 60% and adjusted EBITDA margins of 19.3%, ~50 bps better than expected."

(c)    After the earnings call, on August 6, 2009, Deutsche Bank declared, "Growth remains solid, with ATHN well-positioned for LT success."  One key takeaway was "[a]nother [quarter] of very strong revenue growth highlight[ing] business momentum."

193.    As a result of Defendants' misrepresentations, and resulting analyst affirmation, the Company's stock price rose to close at an artificially inflated price of $37.54 per share on August 7, 2009, up from a close of $35.93 on August 6, 2009.

194.     For the reasons stated in the Factual Background above, in Section VI.B below, and as further detailed herein, the statements contained in ¶¶186-191 above, which touted among other things, the Company's implementation revenue and other growth, were materially false and misleading when made or omitted to make such statements not false and misleading for the reasons stated above in ¶126.

195.    In addition, they were materially false and misleading or contained omissions of material facts to not make such statements false or misleading for the reasons stated in the Company's Form 10-K filed with the SEC on March 15, 2010.  In particular, the Form 10-K filed with the SEC on March 15, 2010 revealed that the financial results detailed in ¶191 were false because:

(a)     implementation and other revenue for the second fiscal quarter 2009 was actually $1,219,000, not the $2,290,000 reported, *a decrease of nearly 47%*;

(b)     total revenue for the second fiscal quarter 2009 was actually $45,648,000, not the $46,719,000 reported;

(c)     operating income for the second fiscal quarter 2009 was actually $3,732,000, not the $5,040,000 reported, *a decrease of nearly 26%*;

(d)     income before income taxes for the second fiscal quarter 2009 was actually $4,156,000, not the $5,464,000 reported, *a decrease of nearly 24%*;

(e)     net income for the second fiscal quarter 2009 was actually $2,244,000, not the $3,029,000 reported, *a decrease of nearly 26%*;

(f)     net income per share (basic) for the second fiscal quarter 2009 was actually $0.07, not the $0.09 reported, *a decrease of 22%*; and

(g)     net income per share (diluted) for the second fiscal quarter 2009 was actually $0.06, not the $0.09 reported, *a decrease of 33%*.

### 10.    The Fraud Continues: Third Quarter 2009

196.    On October 29, 2009, Defendants issued a press release, attached to a Form 8-K filed with the SEC, announcing its financial results for the third quarter 2009, the period ended September 30, 2009.  The press release stated in relevant part:

> Total revenue for the three months ended September 30, 2009, was $48.7 million, compared to $35.4 million in the same period last year, an increase of 37%.

> "We made great strides in the third quarter on initiatives to improve operational scalability, client performance and market awareness of our unique capabilities" said Jonathan Bush, the Company's Chairman, President, and Chief Executive Officer. "We continue to experience strong growth as medical groups turn to our service-based model in order to improve their clinical, financial and operational performance."

For the three months ended September 30, 2009, non-GAAP Adjusted EBITDA grew to $9.5 million, or 19% of revenue, from non-GAAP Adjusted EBITDA of $6.1 million, or 17% of revenue, in the same period last year. As previously announced, following the reversal of a valuation allowance against U.S. deferred tax assets in the fourth quarter of 2008, the Company's reported GAAP Net Income and non-GAAP Adjusted Net Income now reflect a full GAAP tax rate. Accordingly, non-GAAP Adjusted Net Income for the third quarter of 2009 was $5.0 million, or $0.14 per diluted share, compared to non-GAAP Adjusted Net Income of $4.8 million, or $0.14 per diluted share, in the same period last year. GAAP Net Income for the quarter was $2.1 million, compared to GAAP Net Income of $3.7 million in the same period last year.

197.    In the press release, Defendant Byers commented on the results: "Our differentiated business model continues to yield rapid and reliable growth while our ongoing effort to increase automation has brought us to the threshold of our 2011 target gross margin range."

198.    The October 29, 2009 earnings release also included financial statements confirming the Company's third quarter financial results.

199.    On the following day, the Company hosted an earnings conference call with analysts to discuss the Company's third quarter 2009 financial results.   Defendants Bush and Byers participated in the conference call.  On the call, Defendant Bush reiterated the Company's success:

I'm pleased to report that Athenahealth performed very well in Q3 of 2009.

In the third quarter we generated record revenue of $48.7 million, growth of 37% over Q3 of 2008.  We also expanded our profitability to record levels with adjusted gross margin reaching 61% in the third quarter, that's up 2 points over Q3 of 2008 and approaching our 2011 target range.

Achieving this level of profitability ahead of schedule was the result of exceptional work by our technology and operations team to increase automation and thereby reduce variable cost.  Adjusted operating income increased by 61% over Q3 of last year, that's nearly double the rate of our revenue growth.  Because we are now applying a full tax rate, adjusted net income only grew 4% over last year to $0.14 per diluted share.

200.    Defendant Byers added:

While we continue to invest in growth and innovation, our adjusted EBITDA and adjusted operating income expanded year-over-year at a much faster pace than revenue did.  Our adjusted EBITDA margin was 19.4% in the third quarter, an

increase of 210 basis points over Q3 of 2008.  Adjusted operating income was 15.1% of revenue in the quarter, up 220 basis points over Q3 of 2008.

201.    On October 30, 3009, Defendants filed with the SEC the Company's third quarter 2009 quarterly report, for the period ended September 30, 2009, which was signed by Defendants Bush and Byers.  The 2009 third quarter Form 10-Q reaffirmed the financial results announced in the press release in ¶¶196-198 above.  Further, it repeated substantially the same language regarding athenahealth's disclosure controls and procedures contained in the third quarter 2007 Form 10-Q.  Moreover, the 2009 third quarter Form 10-Q contained the same SOX certifications from Defendants Bush and Byers that were included in the 2008 Form 10-K.  Further, it contained the following false statements:

- The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("GAAP") for interim financial reporting and as required by Regulation S-X, Rule 10-01.

- In the opinion of the Company's management, the accompanying unaudited condensed consolidated financial statements contain all adjustments (consisting of items of a normal and recurring nature) necessary to present fairly the financial position as of September 30, 2009, and the results of operations for the three month and nine month periods ended September 30, 2009 and 2008 and cash flows for the nine month periods ended September 30, 2009 and 2008.

- For the nine months ended September 30, 2009, we generated revenue of $137.5 million from the sale of our services compared to $98.2 million for the nine months ended September 30, 2008. For the three months ended September 30, 2009, we generated revenue of $48.7 million from the sale of our services compared to $35.4 million for the three months ended September 30, 2008. Given the scope of our market opportunity, we have increased our spending each year on growth, innovation, and infrastructure. Despite increased spending in these areas, higher revenue and lower operating expenses as a percentage of revenue have led to greater operating income. However, the reversal of a valuation allowance against U.S. deferred tax assets that occurred in the fourth quarter of 2008 has had and will have an impact on net profits, as our GAAP results are now fully taxed.

- Revenue from implementations and other sources was $7.6 million for the nine months ended September 30, 2009, an increase of $1.6 million, or 26%,

over revenue of $6.0 million for the nine months ended September 30, 2008. This increase was driven by new client implementations and increased professional services for our larger client base. As of September 30, 2009, the numbers of accounts live on our revenue cycle management service, athenaCollector, increased by 359 accounts since September 30, 2008. As of September 30, 2009, the number of accounts live on our clinical cycle management service, athenaClinicals, increased by 106 accounts since September 30, 2008. The increase in implementation and other revenue is the result of the increase in the number of new providers added to our business.

• Revenue from implementations and other sources was $3.1 million for the three months ended September 30, 2009, an increase of $0.7 million, or 31%, over revenue of $2.3 million for the three months ended September 30, 2008. This increase was driven by new client implementations and increased professional services for our larger client base. As of September 30, 2009, the number of accounts live on our revenue cycle management service, athenaCollector, increased by 359 accounts since September 30, 2008. As of September 30, 2009, the number of accounts live on our clinical cycle management service, athenaClinicals, increased by 106 accounts since September 30, 2008. The increase in implementation and other revenue is the result of the increase in the volume of our business.

202.     The third quarter 2009 Form 10-Q also included condensed consolidated financial statements that provided various measures of the Company's financial health, including, *inter alia*, the Company's implementation and other revenue, total revenue, direct operating costs, total expenses, operating income, income before income taxes, income tax provision, net income, net income per share (basic), net income per share (diluted), deferred tax assets, total current assets, total assets, total current liabilities, total liabilities, accumulated deficit, total stockholders' equity, and total liabilities and stockholders' equity.  In particular, the third quarter 2009 Form 10-Q reported financial results as follows:

| Implementation and Other Revenue | $3,083,000 |
|---|---|
| Total Revenue | $48,692,000 |
| Operating Income | $4,499,000 |
| Income Before Income Taxes | $4,416,000 |
| Net Income | $2,112,000 |
| Net Income Per Share (Basic) | $0.06 |
| Net Income Per Share (Diluted) | $0.06 |

203.   The market reacted positively to Defendants' statements regarding the Company's third quarter 2009 financial results.  For example:

(a)   On October 30, 2009, BB&T Capital Markets declared athenahealth was "poised for improvement" and raised its fourth quarter 2009 earnings estimates.  The report also noted, "Implementation and other revenue increased 31% yr/yr and 35% sequentially to $3.1M, which was $0.4M above our estimate."

(b)   That same day, following the Company's press release and earnings call, ThinkEquity LLC, Brean Murray Carret & Co., Cantor Fitzgerald, Maxim Group, and Jefferies & Company, Inc. all reiterated their "Buy" ratings for athenahealth stock.

(c)   On November 2, 2009, Jefferies & Company, Inc. maintained its "Buy" rating based, in part, on "Business service revenue increas[ing] 37.9% to $45.6MM and Implementation & Other increas[ing] 31.3% to $3.1MM."

204.   As a result of Defendants' misrepresentations, and resulting analyst affirmation, the Company's stock price rose to close at an artificially inflated price of $40.00 per share on November 2, 2009, up from a close of $37.61 per share on October 30, 2009.

205.    For the reasons stated in the Factual Background above, in Section VI.B below, and as further detailed herein, the statements contained in ¶¶196-202 above, which touted among other things, the Company's implementation and other revenue growth, were materially false and misleading when made or omitted to make such statements not false and misleading for the reasons stated above in ¶126 above.

206.   In addition, they were materially false and misleading or contained omissions of material facts to not make such statements false or misleading for the reasons stated in the Company's Form 10-K filed with the SEC on March 15, 2010.  In particular, the Form 10-K filed

with the SEC on March 15, 2010 revealed that the third quarter 2009 financial results detailed in ¶202 were false because:

(a)      implementation and other revenue for the third fiscal quarter 2009 was actually $1,796,000, not the $3,083,000 reported, *a decrease of nearly 42%*;

(b)      total revenue for the third fiscal quarter 2009 was actually $47,405,000, not the $48,692,000 reported;

(c)      operating income for the third fiscal quarter 2009 was actually $2,922,000, not the $4,499,000 reported, *a decrease of 35%*;

(d)      income before income taxes for the third fiscal quarter 2009 was actually $2,839,000, not the $4,416,000 reported, *a decrease of nearly 36%*;

(e)      net income for the third fiscal quarter 2009 was actually $1,166,000, not the $2,112,000 reported, *a decrease of nearly 45%*;

(f)      net income per share (basic) for the third fiscal quarter 2009 was actually $0.03, not the $0.06 reported, *a decrease of 50%*; and

(g)      net income per share (diluted) for the third fiscal quarter 2009 was actually $0.03, not the $0.06 reported, *a decrease of 50%*.

### 11.   Defendants Highlight False Financial Results at the Company's Second Annual Investor Summit

207.    On December 3, 2009, Defendants convened the Company's Second Annual Investor Summit to extol athenahealth's previous successes and encourage the Company's investors of Defendants' bright plans for the future.  Defendants Bush and Byers both participated in the Company's presentation at this event.  Specifically, Defendant Byers highlighted the Company's "solid financial foundation" and reiterated its record of "strong" quarterly revenue growth.

Moreover, Defendant Byers' presentation touted the Company's total revenue figures for the first, second, and third quarter 2009, along with various other measures of income and revenue.

208.     The slides from Defendants' presentation at the Second Annual Investor Summit were filed with the SEC on Form 8-K on December 3, 2009.  These slides contained the financial results highlighted by Defendant Byers.

209.     The market reacted positively to Defendants' December 3, 2009 presentation.  For example, on December 4, 2009, analysts such as ThinkEquity LLC, Brean Murray Carret & Co., and Jefferies & Company, Inc. maintained a "Buy" rating for athenahealth stock.  In addition, Jefferies & Company, Inc. stated that: "Thorough deep dive & strong near-term & long-term growth outlook provided excitement at analyst day.  With rev. growth set at 30% through 2014, execution will be key."

210.     As a result of Defendants' misrepresentations, and resulting analyst affirmation, the Company's stock price rose to close to an artificially inflated price of $46.74 per share on December 4, 2010, up from a close of $43.93 per share on December 2, 2009.

211.     For the reasons stated in the Factual Background above, in Section VI.B below, and as further detailed herein, the statements contained in ¶¶207-208 above, which touted among other things, the Company's strong revenue growth, were materially false and misleading when made or omitted to make such statements not false and misleading for the reasons stated above in ¶126.

**B.     Defendants' False Financial Reporting**

**1.     Defendants Violated GAAP**

212.     At all relevant times during the Class Period, Defendants represented that the Company's financial statements when issued were prepared in conformity with GAAP, which are principles recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practices at a particular time. However, in

order to artificially inflate the price of athenahealth's stock, Defendants prematurely recognized revenue in violation of GAAP and SEC reporting requirements to falsely inflate athenahealth's revenues, earnings and earnings per share prior to and during the Class Period.

213.    athenahealth restated its financial statements for the fiscal years ended December 31, 2005, 2006, 2007 and 2008; each quarterly period in its fiscal year ended December 31, 2008; and the first three quarterly periods in its fiscal year ended December 31, 2009 to restate "implementation and other" revenue to reflect a longer amortization period for deferred implementation revenue.   athenahealth's materially false and misleading financial statements resulted from Defendants' decision to amortize deferred implementation revenue over a period of only one year instead of over the entire expected performance period of twelve years.  As a result of the accounting fraud, the Audit Committee determined that the Company's financial statements and the related audit opinions of Deloitte & Touche LLP, athenahealth's independent auditor, can no longer be relied upon for 2005, 2006, 2007, 2008 and the first three quarters of 2009.  The Company's Form 10-K for the fiscal year ended December 31, 2009 includes details of the restatement.

214.    As set forth in Statement of Financial Accounting Concepts ("SFAC") No. 1, *Objectives of Financial Reporting by Business Enterprises*, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented.

215.    The SEC requires that public companies file quarterly and annual financial statements that are prepared in conformity with GAAP.[15]  SEC Rule 4-01(a) of Regulation S-X states that

---

[15]    On June 30, 2009, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards ("SFAS") No. 168, *The* FASB Accounting Standards

"[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. §210.4-01(a)(1).

216.    Management is responsible for preparing financial statements that conform with GAAP.  The AICPA Professional Standards provide:

> The financial statements are management's responsibility. . . . Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. . . . Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

AU §110.03.

217.    Generally GAAP provides that revenue should not be recognized until it is realized or realizable and earned.  FASB Statement of Financial Accounting Concepts No. *5, Recognition and Measurement in Financial Statements of Business Enterprises* (December 1984) ("SFAC No.5"), ¶83-84; Accounting Research Bulletin No. 43, *Restatement and Revision of Accounting Research Bulletins* (June 1953) Chapter 1A ¶1; Accounting Principles Board Opinion No. 10 *Omnibus Opinion,* (December 1966), ¶12.

218.    SFAC No. 5, paragraph 83(b) states, "[a]n entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing

---

Codification™ *and the Hierarchy of Generally Accepted Accounting Principles – a replacement of FASB Statement No. 162.*  For reporting periods ending after September 15, 2009, *FASB Accounting Standards Codification*™ became the source of authoritative U.S. accounting and reporting standards for nongovernmental entities, in addition to guidance issued by the SEC.  These allegations use the historical references to US GAAP, as such references existed during the restated periods.

major or central operations, and revenues are considered to have been earned when the entity has

substantially accomplished what it must do to be entitled to the benefits represented by the

revenues."

219.    SFAC No. 5, Paragraph 84(a) continues, "[t]he two conditions (being realized or

realizable and being earned) are usually met by the time product or merchandise is delivered or

services are rendered to customers, and revenues from manufacturing and selling activities and gains

and losses from sales of other assets are commonly recognized at time of sale (usually meaning

delivery)."

220.    SFAC No. 5, Paragraph 84(d) continues, "[i]f services are rendered or rights to use

assets extend continuously over time (for example, interest or rent), reliable measures based on

contractual prices established in advance are commonly available, and revenues may be recognized

as earned as time passes."

221.    SEC Staff Accounting Bulletin No. 104, Topic 13A - Revenue Recognition ("SAB

104"),[16] states that:

> The [SEC] staff believes that revenue generally is realized or realizable and earned
> when all of the following criteria are met:
>
> - Persuasive evidence of an arrangement exists,
> - Delivery has occurred or services have been rendered,
> - The seller's price to the buyer is fixed or determinable, and
> - Collectability is reasonably assured.

---

[16]     SAB 104 which was issued in December 2003 and amends SAB 101, which was issued in
December 1999.  These staff accounting bulletins summarize the SEC staff's views in applying
GAAP to revenue recognition in financial statements. Thus, such revenue recognition guidance was
not new to Defendants.

222.   Under the section on nonrefundable up-front fees, such as athenahealth's implementation fees, SAB 104 provides further guidance on appropriate revenue recognition practices:

> Unless the up-front fee is in exchange for products delivered or services performed that represent the culmination of a separate earnings process, the deferral of revenue is appropriate.
>
> *      *      *
>
> Supply or service transactions may involve the charge of a nonrefundable initial fee with subsequent periodic payments for future products or services…the staff believes that up-front fees, even if nonrefundable, are earned as the products and/or services are delivered and/or performed over the term of the arrangement or the expected period of performance and generally should be deferred and recognized systematically over the periods that the fees are earned.
>
> *      *      *
>
> ***The revenue recognition period should extend beyond the initial contractual period*** if the relationship with the customer is expected to extend beyond the initial term and the customer continues to benefit from the payment of the up-front fee…
>
> *      *      *
>
> The staff believes that, provided all other revenue recognition criteria are met, service revenue should be recognized on a straight-line basis, unless evidence suggests that the revenue is earned or obligations are fulfilled in a different pattern, ***over the contractual term of the arrangement or the expected period during which those specified services will be performed, whichever is longer***…

223.   athenahealth's implementation fees were nonrefundable up-front fees that customers would not have paid if not for athenahealth's continuing involvement under the arrangement.  As set forth in athenahealth's 2007 Form 10-K, the Company's policy on recognition of implementation revenue was stated as follows: "As the implementation service is not separable from the ongoing business services, we record implementation fees as deferred revenue until the implementation service is complete, at which time we recognize revenue ratably on a monthly basis over the expected performance period."  What athenahealth failed to disclose is that they were using the

initial contract period of one year, rather than the actual expected performance period.  As admitted by the Company, the contracts renew automatically, "there is a history of customers renewing all the time," and there is an approximate 92% retention rate – all clear indications of an expected performance period greater than one year.  Moreover, athenahealth admitted that "certain prior technical accounting judgments and conclusions related to revenue recognition **were not supportable**."  *See* Item 9A of Form 10-K for year ended December 31, 2009.  Thus, for athenahealth to amortize deferred implementation revenue over a one-year period rather than the actual expected performance period of 12 years was unreasonable and in violation of GAAP and resulted in materially misstated financial statements.

224.   From at least as far back as 2005 through the third quarter of 2009, Defendants knowingly and intentionally booked and reported material amounts of implementation revenue in violation of GAAP.  Defendants did so by deliberately, or at least severely recklessly, employing an accounting manipulation in which they prematurely recognized implementation revenue that had been deferred over a one-year period, rather than over a 12-year period.  The press releases, conference calls with analysts, and filings with the SEC detailing the Company's financial results were materially false and misleading because athenahealth's financial results from 2005 until the end of the Class Period were artificially inflated due to this improper revenue recognition practice.

225.   Defendants were required to cause the Company to disclose in its periodic filings with the SEC, financial statements, and news releases the existence of the material facts described herein, and to appropriately recognize and report income in conformity with GAAP.  Defendants failed to cause the Company to make such disclosures and to account for and to report income in conformity with GAAP.

226.     Due to the non-disclosures and non-GAAP accounting, the above particularized documents which Defendants caused the Company to disseminate to the investing public during the Class Period were materially false and misleading.

227.     Defendants knew and ignored, or were reckless in not knowing, the facts which indicated that the above particularized press releases, public statements, and filings with the SEC which were disseminated to the investing public during the Class Period, were materially false and misleading for the reasons set forth above.

### 2.     athenahealth's Financial Restatement

228.     There is no dispute about the falsity of athenahealth's financial statements.  The fact that athenahealth restated is an admission that (1) the publicly-issued financial statements for each of the restated periods were ***not prepared in conformity with GAAP;*** (2) they ***materially misrepresented*** the Company's financial condition and results of operations; and (3) the financial statements reported during the Class Period were ***incorrect based on information available to Defendants at the time the results were originally reported.***

229.     Under GAAP, a restatement of previously issued financial statements is the most serious step, reserved only for circumstances where no lesser remedy is available. As noted by the SEC, "GAAP only allows a restatement of prior financial statements based upon information 'that existed at the time the financial statements were prepared,'" and "restatements should not be used to make any adjustments to take into account subsequent information that did not and could not have existed at the time the original financial statements were prepared."[17]  FASB, the governing body

---

[17]     Brief of the United States Securities and Exchange Commission as *Amicus Curiae* Regarding Defendants' Motions *in Limine* to Exclude Evidence of the Restatement and Restatement Report, *In re Sunbeam Sec. Litig.*, No. 98-cv-8258-DMM, at 11, 13 (S.D. Fla. Feb. 22, 2002) ("Sunbeam Brief"), *available at* http://www.sec.gov/litigation/briefs/sunbeam.htm.

that promulgated the accounting rules regarding restatements of prior financial statements has defined "restatement" as "the process of revising previously issued financial statements to reflect the correction of an error in those financial statements." SFAS No. 154, Accounting Changes and Error Corrections, ¶2.  A mere change in accounting estimate is not eligible for restatement treatment. SFAS No. 154, ¶19.  FASB has also defined the "errors" that may be corrected through a restatement: "an error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of GAAP, or oversight or misuse of *facts that existed at the time that the financial statements were prepared*." *Id.*  Indeed, as alleged herein, the restatement at issue here was not due to a simple mathematical error, honest misapplications of a standard or oversight; rather, as admitted by Defendants, it was due to accounting errors that Plaintiff alleges were due to intentional misuse of the facts that were known at the time.

230.    By restating its own financial statements, athenahealth admitted that each document publishing the original financial statements contained an untrue statement of material fact.  The Company's restatement is an admission that each of the annual and quarterly reports on Form 10-K and Form 10-Q for the fiscal years 2005, 2006, 2007, 2008, and the first three quarters of 2009, that were filed with the SEC contained untrue statements of material fact.  Similarly, by restating, the Company also conceded that each of the press releases disseminated to the investing public and other statements contained untrue statements of material fact.

231.    This restatement was material and had a significant impact on revenue, net income and earnings per share, as illustrated in the table below:

| (In $000's, except per share data) | | | | |
|---|---|---|---|---|
| | Originally Reported | Restated | Amount Overstated/ (Understated) | % Reported Amount Overstated/ (Understated) |

**Year Ended 12/31/05:**

| | | | | |
|---|---|---|---|---|
| Implementation and Other Revenue | 4,582 | 2,199 | 2,383 | 52% |
| Net Loss | (11,393) | (14,331) | (2,938) | (26)% |
| Loss Per Share | $ (2.51) | $ (3.16) | $ (0.65) | (26)% |

**Year Ended 12/31/06:**

| | | | | |
|---|---|---|---|---|
| Implementation and Other Revenue | 5,161 | 2,665 | 2,496 | 48% |
| Net Loss | (9,224) | (12,362) | (3,138) | (34)% |
| Loss Per Share | $ (1.96) | $ (2.63) | $ (0.67) | (34)% |

**Year Ended 12/31/07:**

| | | | | |
|---|---|---|---|---|
| Implementation and Other Revenue | 6,591 | 3,436 | 3,155 | 48% |
| Net Loss | (3,503) | (7,501) | (3,998) | (114)% |
| Loss Per Share | $ (0.28) | $ (0.60) | $ (0.32) | (114)% |

**Quarter Ended 3/31/08:**

| | | | | |
|---|---|---|---|---|
| Implementation and Other Revenue | 1,866 | 1,247 | 619 | 33% |
| Net Income | 1,829 | 945 | 884 | 48% |
| Earnings Per Share | $ 0.05 | $ 0.03 | $ 0.02 | 40% |

**Quarter Ended 6/30/08:**

| | | | | |
|---|---|---|---|---|
| Implementation and Other Revenue | 1,783 | 995 | 788 | 44% |
| Net Income | 2,779 | 1,711 | 1,068 | 38% |
| Earnings Per Share | $ 0.08 | $ 0.05 | $ 0.03 | 38% |

**Quarter Ended 9/30/08:**

| | | | | |
|---|---|---|---|---|
| Implementation and Other Revenue | 2,348 | 1,070 | 1,278 | 54% |
| Net Income | 3,700 | 2,102 | 1,598 | 43% |
| Earnings Per Share | $ 0.11 | $ 0.06 | $ 0.05 | 45% |

**Quarter Ended 12/31/08:**

| | | | | |
|---|---|---|---|---|
| Implementation and Other Revenue | 1,676 | 1,091 | 585 | 35% |
| Net Income | 20,563 | 26,844 | (6,281) | (31)% |
| Earnings Per Share | $ 0.59 | $ 0.77 | $ (0.18) | (31)% |

**Year Ended 12/31/08:**

| | | | | |
|---|---|---|---|---|
| Implementation and Other Revenue | 7,673 | 4,403 | 3,270 | 43% |
| Net Income | 28,871 | 31,602 | (2,731) | (9)% |
| Earnings Per Share | $ 0.83 | $ 0.91 | $ (0.08) | (10)% |

**Quarter Ended 3/31/09:**

| | | | | |
|---|---|---|---|---|
| Implementation and Other Revenue | 2,204 | 1,133 | 1,071 | 49% |
| Net Income | 2,338 | 1,538 | 800 | 34% |

| | | | | |
|---|---|---|---|---|
| Earnings Per Share | $ 0.07 | $ 0.04 | $ 0.03 | 43% |
| **Quarter Ended 6/30/09:** | | | | |
| Implementation and Other Revenue | 2,290 | 1,219 | 1,071 | 47% |
| Net Income | 3,029 | 2,244 | 785 | 26% |
| Earnings Per Share | $ 0.09 | $ 0.06 | $ 0.03 | 33% |
| **Quarter Ended 9/30/09:** | | | | |
| Implementation and Other Revenue | 3,083 | 1,796 | 1,287 | 42% |
| Net Income | 2,112 | 1,166 | 946 | 45% |
| Earnings Per Share | $ 0.06 | $ 0.03 | $ 0.03 | 50% |

232.    The SEC has reiterated its position that, in its investigations of restated financial statements, it often finds that the persons responsible for the improper accounting acted with scienter:

> [T]he Commission often seeks to enter into evidence restated financial statements, and the documentation behind those restatements, in its securities fraud enforcement actions in order, *inter alia*, to prove the falsity and materiality of the original financial statements [and] to demonstrate that persons responsible for the original misstatements acted with scienter...

Sunbeam Brief at 1.

233.    The restatements at issue in this case contain several indicators of scienter:

(a)    ***The type of restatement (misuse of the facts)*** - The restatement at issue was due to blatant misuse of the facts. As alleged herein, Defendants either knew what the correct accounting treatment was, and ignored it, or recklessly turned a blind eye to the information they had.

(b)    ***The size of the restatement*** - athenahealth's net loss was understated by 26%, 34%, and 114% for the years 2005, 2006, and 2007, respectively, and implementation and other revenue was overstated by approximately 50%.

(c)    ***The duration over which the improper accounting was perpetrated*** - The revenue recognition method corrected by the restatement had been utilized for at least five years.

(d)   ***The time period restated*** - As more fully detailed herein, athenahealth restated more than four years of financial statements to correct fraudulent accounting for fiscal years 2005, 2006, 2007, and 2008, as well as the 2008 quarters and the first three quarters of 2009.

### 3.   Defendants' Additional GAAP Violations

234.   In addition to the GAAP and SEC violations described above, the Company also violated several additional fundamental GAAP principles.

(a)   The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)   The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (SFAC No. 1, ¶34);

(c)   The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (SFAC No. 1, ¶40);

(d)   The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (SFAC No. 1, ¶50);

(e)   The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although

- 104 -

investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (SFAC No. 1, ¶42);

(f)      The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (SFAC No. 2, ¶¶58-59);

(g)      The principle of completeness, which means that no information is omitted that may be necessary to ensure that the Financial Statements validly represent underlying events and conditions, was violated (SFAC No. 2, ¶79); and

(h)      The principle that conservatism be used as a prudent reaction to uncertainty in order to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (SFAC No. 2, ¶¶95, 97).

235.    Additionally, Defendants' improper accounting for revenue was material, given the SEC's guidance on materiality.  SAB Topic 1M, Materiality, summarizes GAAP definitions of materiality.  SAB Topic 1M represents the codification of certain SABs, including SAB No. 99, Materiality, as of May 9, 2003.  SAB No. 99 became effective August 12, 1999.  SAB Topic 1M says, inter alia, "[a] matter is 'material' if there is substantial likelihood that a reasonable person would consider it important."  It also stresses that materiality requires qualitative, as well as quantitative considerations.  For example, considerations such as whether a misstatement hides a failure to meet analysts' consensus expectations or whether a misstatement masks a change in earnings or other trends are factors that should be taken into account in determining the materiality of the misstatement.

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

236.   The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, and knowingly or severely recklessly substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

237.   In addition to the numerous allegations throughout the Complaint, herein incorporated by reference, demonstrating the Individual Defendants' scienter, for the reasons further detailed herein, each of the Individual Defendants had knowledge of or recklessly disregarded that the public statements and documents the Company issued or disseminated were materially false and misleading and were motivated to conceal the fraud alleged in order to sell more than $24.3 million worth of athenahealth stock collectively at inflated prices during the Class Period.

238.   Indeed, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding athenahealth and its business practices, their control over and/or receipt of athenahealth's allegedly materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning athenahealth, were active and culpable participants in the fraudulent scheme alleged herein.  The Individual Defendants knew and/or severely recklessly disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public.  The ongoing fraud as described herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and/or severe recklessness and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

A.      **Defendants Certified that Their Disclosures Were Truthful**

239.    Internal control[18] is a process, carried out by an entity's board of directors, management and other personnel, designed to provide reasonable assurance that, among other things, the financial statements are reliable and accurate and that a company complies with applicable laws and regulations.

240.    Management of any public company is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act.

241.    Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must: "(A) make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and (B) devise and maintain a system of internal controls sufficient to provide reasonable assurances that . . . transactions are recorded as necessary . . . to permit the preparation of financial statements in conformity with [GAAP]."  These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets.  *SEC v. World-Wide Coin Invs., Ltd.,* 567 F. Supp. 724, 750 (N.D. Ga. 1983).

242.    Notwithstanding the allegations above and the indicators of scienter herein, Defendants knew or were reckless in not knowing that athenahealth's system of internal accounting

---

[18]    AU 319.06, *Internal Control in a Financial Statement Audit*, defines internal control as "a process – effected by an entity's board of directors, management, and other personnel – designed to provide reasonable assurance regarding the achievement of objectives in the following categories: *(a)* reliability of financial reporting, *(b)* effectiveness and efficiency of operations, and *(c)* compliance with applicable laws and regulations.

controls governing revenue recognition for implementation fees was inadequate. According to

athenahealth's SEC filings, under the supervision and with the participation of management,

including Defendants Bush and Byers, evaluations were carried out each quarter regarding the

effectiveness of the design and operation of the Company's disclosure controls and procedures,

beginning no later than September 30, 2007. Thus, Defendants were fully aware of athenahealth's

control procedures. As of the end of each quarter from the third quarter 2007 through the third

quarter 2009, Defendants Bush and Byers positively concluded that based on their evaluations,

athenahealth's "disclosure controls and procedures were effective at the reasonable assurance level"

necessary to ensure that information required to be disclosed by athenahealth in reports filed or

submitted under the Securities and Exchange Act of 1934 was processed, summarized and reported

within the time periods specified in the SEC's rules and forms. *See* Part I, Item 4. Controls and

Procedures of the Forms 10-Q and Part II, Item 9A of the Forms 10-K. Similarly, in the 2008 Form

10-K, Defendant Bush and Defendant Byers positively concluded that based on their evaluations,

athenahealth's "internal controls over financial reporting were effective." *See* Item 9A of the 2008

Form 10-K.

243.    Subsequently, after the restatement was announced, Defendants were forced to

change their story. Defendants disclosed that athenahealth's financial disclosure controls and

procedures were not effective as of December 31, 2009. Management identified significant control

deficiencies that constituted a material weakness[19] in the Company's internal control over financial

reporting rendering it ineffective, specifically related to "the area of technical accounting relating to

---

[19]    AU 325.06, *Communicating Internal Control Related Matters Identified in an Audit*, defines
a material weakness as "a significant deficiency, or a combination of significant deficiencies, that
results in more than a remote likelihood that a material misstatement of the financial statements will
not be prevented or detected."

the application of applicable accounting literature related to revenue recognition for implementation fees." The control deficiency related to Defendants' interpretation of the Revenue Recognition Topic of the FASB Accounting Standards Codification in determining the proper period over which to amortize implementation fees. Thus, the certifications made by Defendants Bush and Byers in the SEC filings that athenahealth's disclosure controls and procedures were effective and that the Company's internal controls over financial reporting were effective, were false and misleading when made.

244.   Leading up to and throughout the Class Period, Defendants were aware of the adequacies and inadequacies of athenahealth's internal controls. Despite this knowledge, athenahealth did not comply with the following requirements for internal control over financial reporting: Rules 13a-15(f) and 15d-15(f) under the Exchange Act, Sections 302, 404 and 906 of the Sarbanes-Oxley Act of 2002, and Item 308 of Regulation S-K.

245.   For example, athenahealth violated §13(b)(2)(A) of the Exchange Act by failing to maintain accurate records concerning various items such as its revenues, liabilities and net income. It overstated revenue and net income, and understated liabilities. Moreover, athenahealth's inaccurate and false records were not isolated or unique instances because they were improperly maintained for multiple reporting periods from at least 2005 through the third quarter of 2009.

246.   In addition, Defendants violated §13(b)(2)(B) of the Exchange Act by failing to implement procedures reasonably designed to prevent accounting irregularities. Defendants failed to ensure that adequate controls were in place to ensure that the Company was properly recognizing revenue. Defendants failed to ensure that implementation revenue was reported in accordance with GAAP.

247.    Under Section 302 of the Sarbanes-Oxley Act of 2002, the principal officers of the Company are required to certify that: they are responsible for establishing, maintaining and regularly evaluating the effectiveness of the issuer's internal controls; they have made certain disclosures to the issuer's auditors and the audit committee of the board of directors about the issuer's internal controls; and they have included information in the issuer's quarterly and annual reports about their evaluation.

248.    Under Section 906 of the Sarbanes-Oxley Act of 2002, the Chief Executive Officer and the Chief Financial Officer must certify each periodic report containing financial statements filed by an issuer with the SEC pursuant to Section 13(a) or 15(d) of the Exchange Act, 15 U.S.C. §78m(a) or §78o(d), and that information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations of the issuer.

249.    Under Item 308, *Internal Control Over Financial Reporting*, of Regulation S-K, management is required to provide a report of the registrant's internal control over financial reporting (as defined in Rule 13a-15(f) or Rule 15d-15(f) under the Exchange Act) that contains: (a) a statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the registrant; (b) a statement identifying the framework used by management to evaluate the effectiveness of the registrant's internal control over financial reporting as required by paragraph (c) of Rule 13a-15 or Rule 15d-15 under the Exchange Act; (d) management's assessment of the effectiveness of the registrant's internal control over financial reporting as of the end of the registrant's most recent fiscal year, including a statement as to whether or not internal control over financial reporting is effective – this discussion must include disclosure of any material weakness in the registrant's internal control over financial reporting identified by management and management is not permitted to conclude that the registrant's internal control over

financial reporting is effective if there are one or more material weaknesses in the registrant's internal control over financial reporting; and (e) a statement that the registered public accounting firm that audited the financial statements included in the annual report containing the disclosure required by this Item has issued an attestation report on management's assessment of the registrant's internal control over financial reporting.

250.  Prior to and during the Class Period, Defendants violated the requirements for internal control over financial reporting alleged above as follows:

(a)  athenahealth's SEC filings contained certifications required by Rule 13a-14 of the Exchange Act.  These certifications from September 30, 2007 through September 30, 2009 were signed by Defendants Bush and Byers.  The certifications signed by Defendants Bush and Byers knowingly or recklessly were false or misleading given Defendants' later admissions about athenahealth's false financial reports and ineffective internal controls;

(b)  Defendants failed to establish and maintain an adequate system of internal controls, and failed to effectively regularly evaluate the status of those controls or the lack thereof; and

(c)  Defendants did not maintain effective process and transaction level controls.

251.  Defendants' failure to strengthen athenahealth's known inadequate internal controls rendered athenahealth's financial reporting inherently unreliable and contributed to the Company's inability to prepare financial statements that complied with GAAP.  Nonetheless, as detailed above, throughout the Class Period, the Company regularly issued quarterly financial statements without ever disclosing the known existence of the significant and material deficiencies in its internal accounting controls and falsely asserted that its financial statements complied with GAAP.

**B.      Individual Defendants' Suspicious Insider Trading**

252.     In addition, while in possession of non-public adverse information regarding the Company's improper recognition of implementation revenues and the Company's inflated income and revenues, among other metrics of financial performance, throughout the Class Period, Defendants took full advantage of the artificial inflation of athenahealth's common stock caused by Defendants' misrepresentations.  In fact, Defendants Bush and Byers disposed of huge quantities of their stock and reaped massive proceeds.  For instance, between September 25, 2007 and February 22, 2010, Defendant Bush sold 674,136 shares of common stock for proceeds of more than $21.2 million.  *See* **Exhibit A**.  Likewise, between April 25, 2008 and October 23, 2009, Defendant Byers sold 95,500 shares of common stock for proceeds of more than $3 million.  *See* **Exhibit B**.

253.     The Individual Defendants' stock sales were unusual and suspicious in that such sales were executed at times calculated to maximize their personal benefit from the artificial inflation of athenahealth' stock price.  Both Defendants Bush and Byers began trading after Defendants engaged in improper accounting of the Company's implementation revenue and the Company's revenues and stock price were inflated.  Accordingly, Defendants Bush and Byers' stock sales were conspicuously well-timed.

254.     Further, the stock sales were unusual and suspicious in amount.  Defendant Bush liquidated 674,136 shares of common stock for $21,204,090.  In so doing, Defendant Bush liquidated more than 43.39% of his common stock holdings.  Likewise, Defendant Byers' stock sales were unusual and suspicious in amount. As detailed above, Defendant Byers liquidated 95,500 shares of common stock for proceeds of $3,129,125.  This amount was unusual in that it represented more than 16.64% of his common stock holdings.

255.     According to their SEC filings, Defendants Bush and Byers sold some or all of their stock pursuant to Rule 10b5-1 plans.  Defendant Bush had 10b5-1 trading plans entered into on

January 7, 2008 and June 9, 2009.  Defendant Byers had 10b5-1 trading plans entered into on

January 8, 2008 and December 16, 2008.  Although Plaintiff is unaware of the details of these plans ,

by the time that the Individual Defendants established these plans and began trading under them,

they were already aware of material adverse non-public information that should have prevented their

insider selling.    Indeed, Defendants had been improperly accounting for the Company's

implementation revenue since at least 2005, as is evidenced by the restatement.

**C.**      **Defendant Bush Profited From the IPO**

256.    On September 20, 2007, the Company completed its IPO at a price of $18.00 per

share.  Defendant Bush personally profited from this IPO by selling his shares to the market at

artificially inflated prices.  For instance, Defendant Bush realized $1,440,000 through sale of 80,000

shares in the over-allotment of the IPO.

**D.**      **The Individual Defendants Were Aware of Potential Accounting
Errors With Respect to Implementation Revenue**

257.    Defendants' knowledge of potential problems in the manner in which they were

accounting for implementation revenues is also evidenced by the change Defendants made in the

fourth quarter of 2008 with respect to implementation revenue.  According to an article by Eric

Rosenbaum in The Street, "Athena Health Dives on Accounting Issues," and based upon information

provided by Brean Murray Carret & Co. analyst Bret Jones, Defendants had been aware of potential

improper accounting with respect to its implementation revenues and had already made a change for

the way it accounted for implementation revenues with respect to a specific group of physicians.  *See*

The     Street,     Eric     Rosenbaum,     "Athena     Health     Dives     on     Accounting     Issues,"

http://www.thestreet.com/story/10690575/3/athena-health-dives-on-accounting-issues.html   (last

visited July 30, 2010).  This was admitted by Defendant Byers in the fourth quarter 2008 earnings

conference call, on which he stated:

**Richard Close  - *Jefferies & Company - Analyst:***

Okay. And just two final questions here. With respect to the implementation and other line item on the income statement. That was somewhat or a little below what we were looking for. Is there anything going on there? Any changes? And then can you give us the employee count for direct operating expenses?

**Carl Byers - *AthenaHealth Inc - SVP, CFO, Treas.:***

Sure. I would be happy to. First with regard to implementation (inaudible) which is just the small component of our two revenue components. That is essentially flat year over year because of a deferral of onetime items that we use to recognize as they happened.

It used to be an immaterial number, it became a bigger number and so there was -- it was what we call provider adds where we add doctors to existing accounts. There's a professional services charge for that work to configure the new provider.

We used to recognize it as it happened, and an abundance of caution after the auditor stops debating with itself what it thought. We decided to defer that into '09. So it is about $0.01 of revenue and pure margin that we pushed in to '09.

258.    Defendants' awareness of accounting issues related to implementation revenues in the fourth quarter of 2008 evidences at a minimum, their severe recklessness in continuing to amortize for implementation revenues over a one-year period.

**E.    Defendants' Earlier Accounting Errors Demonstrate Their Recklessness Towards GAAP Compliance**

259.    Defendants' improper and premature recognition of implementation revenues was not the only incident in which Defendants knowingly and/or recklessly engaged in accounting improprieties.  On February 4, 2010, the Company announced that it had revised its methodology for calculating non-GAAP Adjusted Net Income and had also revised its fourth quarter and full year 2009 results to reflect this change.  According to the Barron's article by Jonathan R. Laing entitled "Diagnosis: Unhealthy Accounting:"[20]

---

[20]    *See* http://online.barrons.com/article/SB126542261787741699.html (last visited July 30, 2010).

The athenahealth accounting mistake revolved around the size of the add-back to the company's GAAP earnings made when calculating adjusted earnings for 2009. The latter computation, of course, is the number that Wall Street and the investment community pays the most attention to. Such one-time charges and noncash outlays are added back to earnings to give a true picture of companies' ongoing earnings generation.

The company erred, however, by including in its add-back the entire noncash cost of stock-option compensation to employees. The company, for GAAP purposes, had become a better-than-40% tax-rate payer for the first time in 2009. Yet it neglected to haircut or "tax effect" the add-back, and thus overstated its earnings by the aforementioned eight cents.

260.   Moreover, the article revealed that Defendants knew about the accounting problem since December but did not take any steps to correct it for several months even after being confronted by an analyst:

It wasn't that the company didn't know the accounting problem existed. Last December a Brean Murray Carret analyst, Bret Jones, discovered the mistake and brought it to management's attention. But, as he has told Barron's, he was stonewalled by the company even after he issued a report on Jan. 15 laying out the adjusted earnings overstatement.

Barron's over the last three weeks made two calls to the company and received a similar runaround. The company's public-relations honcho, John Hallock, insisted no restatement was required since Jones had "misinterpreted" accounting requirements and was the only analyst among the 25 or so covering the company who had a problem with the number. Each of our phone calls ended with the same plaintive question from Hallock: "You guys aren't planning on doing anything on us, are you?"

261.   Accordingly, Defendants' improper recognition of implementation revenue and restatement was one of several incidents in which the Company knowingly and/or recklessly ignored GAAP rules to inflate financial results to the market and reflects a flagrant pattern of Defendants' intentional, or at least reckless, disregard of GAAP's mandates.

F.     **The Restatement Demonstrates Defendants' Scienter**

262.   In addition to these various indicia of the Individual Defendants' scienter, the restatement at issue in this case contains several other indicators of their scienter that further

evidence the Individual Defendants' knowledge and/or severe recklessness in issuing false and misleading statements and financial results during the Class Period, including:

(a)     ***The type of restatement (misuse of the facts)*** - The restatement at issue was due to blatant misuse of the facts. As alleged herein, athenahealth either knew what the correct accounting treatment was, and ignored it, or recklessly turned a blind eye to the information they had.

(b)     ***The size of the restatement*** - athenahealth's net loss was understated by 26%, 34% and 114% for the years 2005, 2006 and 2007, respectively, and implementation and other revenue was overstated by approximately 50%.

(c)     ***The duration over which the improper accounting was perpetrated*** - The revenue recognition method corrected by the restatement had been utilized for at least five years.

(d)     ***The time period restated*** - As more fully detailed herein, athenahealth restated more than four years of financial statements to correct fraudulent accounting for fiscal years 2005, 2006, 2007 and 2008, as well as the 2008 quarters and the first three quarters of 2009.

## VIII.   FRAUD ON THE MARKET DOCTRINE

263.     The market for athenahealth's publicly traded securities was open, well-developed, and efficient at all times.  As a result of these materially false and misleading statements and failures to disclose, athenahealth's publicly traded securities traded at artificially inflated prices during the Class Period.   Plaintiff and other members of the Class purchased or otherwise acquired athenahealth's publicly traded securities relying upon the integrity of the market price of those securities and the market information relating to athenahealth, and have been damaged thereby.

264.     At all relevant times, the market for athenahealth's securities was an efficient market for the following reasons, among others:

(a)     athenahealth's stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, athenahealth regularly made public filings, including its Forms 10-K, Forms 10-Q and related press releases with the SEC and the NASDAQ;

(c)     athenahealth regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     athenahealth was followed by several securities analysts employed by major brokerage firms, such as William Blair & Company, Oppenheimer & Company, and Caris & Company, among others, who wrote research reports that were distributed to the brokerage firms' sales force and the public at large.  Each of these reports was publicly available and entered the public marketplace.

265.     As a result of the foregoing, the markets for athenahealth's securities promptly digested current information regarding athenahealth from all publicly available sources and reflected such information in the prices of athenahealth's securities.

266.     Under these circumstances, all purchasers of athenahealth's securities during the Class Period suffered similar injury through their purchase of athenahealth's securities at artificially inflated prices and a presumption of reliance applies.

267.     At the times they purchased or otherwise acquired athenahealth's securities, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.  As a result, the

presumption of reliance applies. Plaintiff will also rely, in part, upon the presumption of reliance established by a material omission.

268.    In sum, Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations or failed to disclose facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's securities traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    Plaintiff and the other members of the Class purchased the Company's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

## IX.    LOSS CAUSATION

269.    As detailed throughout and further herein, Defendants' fraudulent scheme artificially inflated athenahealth's stock price by failing to disclose that: (a) Defendants materially inflated and falsified athenahealth's reported implementation and other revenue, total revenue, net income, operating income, net income per share, general financial condition, and other financial information by improperly and prematurely amortizing implementation revenue from client contracts over the shorter contract life of one year and not the true expected performance period; (b) the Company's expected performance period was much longer than a year as is evidenced by the Company's automatically renewable contracts, low attrition rates, high customer loyalty, and Defendants' admissions at the end of the Class Period; (c) athenahealth's financial statements failed to comply with GAAP, despite Defendants' false assurances that they were GAAP compliant; and (d)

Defendants' internal controls and procedures and internal controls over financial reporting were ineffective during the Class Period.

270.    These false and misleading statements, individually and collectively, concealed athenahealth's true financial circumstances and future business prospects, resulting in the stock being artificially inflated until, as indicated herein, the relevant truth about athenahealth was revealed.  While each of these misrepresentations was independently fraudulent, they were all motivated by Defendants' desire to artificially inflate athenahealth's stock price and the image of its future business prospects to give the market the false notion that athenahealth's revenues were the result of account growth.  Defendants' false and misleading statements had the intended effect and causes, or were a substantial contributing cause of athenahealth's stock trading at artificially inflated levels, reaching as high as $47.82, throughout the Class Period.

271.    These false and misleading statements and omissions, among others, had the intended effect of preventing the market from learning the full truth and keeping the Company's stock price artificially inflated throughout the Class Period.  The true picture of athenahealth's business, operations, and finances was finally disclosed to the market on February 25, 2010, March 15, 2010, and April 29, 2010.  On February 25, 2010, after the market closed, the market learned that the Company had postponed the release of its financial results for the fourth quarter of 2009 and the year ended December 31, 2009 in order to undertake an internal accounting policy review related to the Company's timing of amortization for deferred implementation review.  On March 15, 2010, the market learned that the Company would be restating its financial statements for the fiscal years ended 2005, 2006, 2007, and 2008, each quarterly period in 2008, and the quarterly periods for the first through the third quarters in 2009 because the Company had materially overstated its implementation revenue by amortizing it over the life of the contract rather than the longer expected

performance period of twelve years in order to reflect the estimated expected customer life.  On April 29, 2010, after the market closed, the market learned that the Company's bottom line results for the first quarter 2010 would be impacted in part by "higher general and administrative expense of approximately $1.0 million related to the Company's recent accounting review and restatement process." These disclosures revealed to the market that athenahealth's revenue growth was actually the product of its fraudulent accounting practices.

272.    When athenahealth provided the market with these revelations, it was an indication to the market that Defendants' prior Class Period statements were false and misleading.  As a result of the information revealed to the market on February 25, 2010, the market cast doubt on the veracity of Defendants' prior statements causing athenahealth's stock to drop approximately 18%, as it fell $7.65 per share to close at $35.87 on March 1, 2010 on abnormally high trading volume.  The market's negative reaction to athenahealth's February 25, 2010 revelation is demonstrated in the stock chart below:



273.    Likewise, as a result of the information revealed to the market on April 29, 2010, the market cast doubt on the veracity of Defendants' prior statements causing athenahealth's stock to drop nearly 24%, as it fell $8.39 per share to close at $26.96 on May 6, 2010 on abnormally high

trading volume.  The market's negative reaction to athenahealth's April 29, 2010 revelation is demonstrated in the stock chart below:



274.   The rapid declines in athenahealth's stock price following the Company's February 25, 2010 and April 29, 2010 disclosures were a direct and foreseeable consequence of the revelation of the falsity of Defendants' Class Period misrepresentations and omissions to the market.  Thus, the revelation of truth at the close of the Class Period, as well as the resulting clear market reaction, support a reasonable inference that the market understood that athenahealth's prior statements were false and misleading.

275.   While the Company's stock price did not decline as a result of the March 15, 2010 disclosures, this was in part due to the fact that the market was already apprised of the Company's improper recognition of implementation revenue from the February 25, 2010 disclosure, which was reflected in the stock price decline between February 25, 2010 and March 1, 2010.  Moreover, the lack of a stock price decline following the March 15, 2010 disclosures was also due to the fact that Defendants attempted to offset the announced restatement with positive information regarding its financial results and statements that:

- "I am very proud of our accomplishments in 2009, a year in which we further established athenaClinicals as a leading electronic health record service, strengthened our unique value proposition with a patent issued on our payer rules engine, and stepped up our investments in growth by acquiring Anodyne Health Partners," said Jonathan Bush, the Company's Chairman, President, and Chief Executive Officer. "As physicians face increasing complexity associated with payment reform and incentive programs, I continue to believe that our unique approach as a software-enabled-service will deliver superior results to both physicians and investors."

- "It is very exciting to join athenahealth on the heels of such a tremendous year," said Tim Adams, the Company's Chief Financial Officer. "Looking ahead to 2010 and beyond, I believe there is no shortage of opportunity for the Company to flourish as an innovator while striving to achieve our strategic and financial goals."

276.    These disclosures had the intended effect of offsetting the news regarding the restatement and buoying the stock price.

277.    In sum, as the truth about Defendants' prior misrepresentations and concealments was revealed, the Company's stock price quickly sank, the artificial inflation came out of the stock, and Plaintiff was damaged suffering true economic losses.

278.    The declines in athenahealth's stock price by: (1) nearly 18% from $43.52  on February 25, 2010 to $35.87 on March 1, 2010; and (2) nearly 24%  from $35.35 on April 29, 2010 to $26.96 on May 6, 2010, were the direct result of the nature and extent of the revelations made to investors and the market regarding the Company's fraudulent accounting practices aimed at artificially inflating the Company's income, revenues and other key financial metrics, that had been concealed or misrepresented by Defendants' scheme and misstatements.

279.    The timing and magnitude of athenahealth's stock price decline negates any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  This point is evidenced by the chart below that demonstrates the clear divergence of athenahealth's stock price from its peer index as the revelation of the truth became known to the market:



280.    The economic loss, *i.e.*, damages, suffered by Plaintiff was a direct and proximate result of Defendants' scheme and misrepresentations and omissions which artificially inflated athenahealth's stock price and the subsequent significant decline in the value of athenahealth's stock when the truth concerning Defendants' prior misrepresentations and fraudulent conduct entered the market place.

## X.    NO SAFE HARBOR

281.    The federal statutory safe harbor providing for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-

looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of athenahealth who knew that those statements were false when made. Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## XI.   PLAINTIFF'S CLASS ACTION ALLEGATIONS

282.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired the publicly traded common stock of athenahealth between September 20, 2007 and February 25, 2010, inclusive (the "Class Period"), and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

283.   Because athenahealth has millions of shares of stock outstanding and because the Company's shares were actively traded on the NASDAQ, members of the Class are so numerous that joinder of all members is impracticable. According to athenahealth's SEC filings, as of shortly before the close of the Class Period, athenhealth had approximately 34,034,323 shares outstanding. While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number at least in the thousands and that they are geographically dispersed.

284.   Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained of herein.

285.    Plaintiff will fairly and adequately protect the interests of the Class members and have retained counsel experienced and competent in class actions and securities litigation. Plaintiff has no interests that are contrary to, or in conflict with, the members of the Class they seek to represent.

286.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

287.    Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the federal securities laws as alleged herein;

(b)    whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)    whether Defendants breached any duty to convey material facts or to correct material facts previously disseminated;

(d)    whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

(e)    whether Defendants acted willfully, with knowledge or severe recklessness, in omitting and/or misrepresenting material facts;

(f)     whether the market prices of athenahealth's securities during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g)     whether the members of the Class have sustained damages as a result of the decline in value of athenahealth's stock when the truth was revealed and the artificial inflation came out and, if so, what is the appropriate measure of damages.

## COUNT I
## FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 OF PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

288.     Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against all Defendants.

289.     During the Class Period, athenahealth and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of athenahealth's publicly traded securities; and (iii) cause Plaintiff and other members of the Class to purchase athenahealth's publicly traded securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, athenahealth and the Individual Defendants, and each of them, took the actions set forth herein.

290.     These Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for athenahealth's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  These Defendants are sued as primary participants in the

wrongful and illegal conduct charged herein.  The Individual Defendants are also sued as controlling

persons of athenahealth, as alleged below.

291.    In addition to the duties of full disclosure imposed on Defendants as a result of their

making affirmative statements and reports, or participating in the making of affirmative statements

and reports to the investing public, they each had a duty to promptly disseminate truthful information

that would be material to investors in compliance with the integrated disclosure provisions of the

SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10,

*et seq.*) and other SEC regulations, including accurate and truthful information with respect to the

Company's operations, sales, product marketing and promotion, financial condition, and operational

performance so that the market prices of the Company's publicly traded securities would be based on

truthful, complete, and accurate information.

292.    athenahealth and the Individual Defendants, individually and in concert, directly and

indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails,

engaged and participated in a continuous course of conduct to conceal adverse material information

about the business, business practices, sales performance, product marketing and promotion,

operations, and future prospects of athenahealth as specified herein.

293.    These Defendants each employed devices, schemes, and artifices to defraud, while in

possession of material adverse non-public information and engaged in acts, practices, and a course of

conduct as alleged herein in an effort to assure investors of athenahealth's value and performance

and continued substantial sales, financial and operational growth, which included the making of, or

the participation in the making of, untrue statements of material facts and omitting to state material

facts necessary in order to make the statements made about athenahealth and its business operations

and future prospects in the light of the circumstances under which they were made, not misleading,

as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of athenahealth's securities during the Class Period.

294.   The Individual Defendants' primary liability and controlling person liability arise from the following facts:  a) the Individual Defendants were high-level executives at the Company during the Class Period; b) the Individual Defendants, by virtue of their responsibilities and activities as senior executive officers, were privy to, and participated in the creation, development, and reporting of, the Company's internal sales and marketing plans, projections, and/or reports; c) the Individual Defendants enjoyed significant personal contact and familiarity with, was advised of, and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and d) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded were materially false and misleading.

295.   Each of the Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with severely reckless disregard for the truth, in that each failed to ascertain and disclose such facts, even though such facts were available to each of them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or with deliberate recklessness and for the purpose and effect of concealing athenahealth's operating condition, sales, product marketing and promotional practices, and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by the Individual Defendants' overstatements, misstatements and omissions of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in

failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

296.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of athenahealth's securities were artificially inflated during the Class Period.  In ignorance of the fact that market prices of athenahealth's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or disregarded with deliberate recklessness by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired athenahealth's securities during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among others, the stock price declines on or about February 26, 2010 through March 1, 2010, and April 30, 2010 through May 6, 2010, when the artificial inflation was released from athenahealth's stock.

297.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, sales, marketing, promotion and other fraudulent business practices, future prospects and intrinsic value of athenahealth, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their athenahealth publicly traded securities during the Class Period; or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

298.    By virtue of the foregoing, athenahealth and the Individual Defendants have each

violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

299.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the

other members of the Class suffered damages in connection with their respective purchases and sales

of the Company's securities during the Class Period, as evidenced by, among others, the stock price

declines on or about February 26, 2010 through March 1, 2010, and April 30, 2010 through May 6,

2010, when the artificial inflation was released from athenahealth stock.

**COUNT II**
**FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE**
**INDIVIDUAL DEFENDANTS**

300.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth

herein.  This claim is asserted against the Individual Defendants.

301.    The Individual Defendants acted as controlling persons of athenahealth within the

meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level

positions with the Company, participation in and/or awareness of the Company's operations and/or

intimate knowledge of the Company's fraudulent marketing practices and actual performance, the

Individual Defendants had the power to influence and control and did influence and control, directly

or indirectly, the decision making of the Company, including the content and dissemination of the

various statements which Plaintiff contends are false and misleading.  The Individual Defendants

were provided with, or had unlimited access to, copies of the Company's reports, press releases,

public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after

these statements were issued and had the ability to prevent the issuance of the statements or cause

the statements to be corrected.

302.    In addition, the Individual Defendants had direct involvement in the day-to-day

operations of the Company and, therefore, are presumed to have had the power to control or

influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

303.    As set forth above, athenahealth and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period, as evidenced by, among others, the stock price declines on or about February 26, 2010 through March 1, 2010, and April 30, 2010 through May 6, 2010, when the artificial inflation was released from athenahealth stock.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on its own behalf and on behalf of the Class, pray for relief and judgment, as follows:

(a)    Declaring that this action is a proper class action and certifying Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel for the proposed Class;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)    Such other and further relief as the Court deems appropriate.

## XIII.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  August 2, 2010

ROBBINS GELLER RUDMAN
  & DOWD LLP


*/s/ Jack Reise*
JACK REISE

JACK REISE *(pro hac vice)*
ELIZABETH A. SHONSON *(pro hac vice)*
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com
eshonson@rgrdlaw.com

***Lead Counsel for Plaintiff***

HUTCHINGS, BARSAMIAN, MANDELCORN
  & ZEYTOONIAN, LLP
THEODORE M. HESS-MAHAN, BBO #557109
110 Cedar Street, Suite 250
Wellesley Hills, MA  02481
Telephone:  781/431-2231
781/431-8726 (fax)
thess-mahan@hutchingsbarsamian.com

***Liaison Counsel***

SULLIVAN, WARD, ASHER & PATTON, P.C.
CYNTHIA J. BILLINGS
25800 Northwestern Highway
1000 Maccabees Center
Southfield, MI  48075-1000
Telephone:  248/746-0700
248/746-2760 (fax)

***Additional Counsel for Plaintiff***

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on August 2, 2010.

*/s/ Jack Reise*
JACK REISE
