UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ANDREA CASULA, on Behalf of Herself and All Others Similarly Situated, | ) ) ) ) | Leave to File Granted on Sept. 30, 2010 |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 1:10-CV-10477-GAO |
| ATHENAHEALTH, INC., JONATHAN BUSH and CARL B. BYERS, | ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

Deborah S. Birnbach (BBO #628243)
Haimavathi Varadan Marlier (BBO #668400)
Marcy D. Smirnoff (BBO #663662)
Goodwin Procter LLP
53 State Street
Boston, MA 02109
Tel:  617-570-1000
Fax:  617-523-1231
dbirnbach@goodwinprocter.com
hmarlier@goodwinprocter.com
msmirnoff@goodwinprocter.com

**Attorneys for Defendants**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................................1

PLAINTIFFS' ALLEGATIONS ........................................................................................4

ARGUMENT ...................................................................................................................11

I.      The Amended Complaint Does Not Meet The Heightened Pleading Standard
        For Securities Fraud Claims .................................................................................11

II.     Plaintiffs Do Not Adequately Allege Scienter.....................................................12

        A.      The Amended Complaint Contains No Particularized Facts
                Permitting A Strong Inference of Scienter ..................................................15

                1.      Plaintiffs Fail To Plead Facts Permitting A Strong Inference
                        That Defendants Had Knowledge That Prior Statements Were
                        False When Made...................................................................................15

                2.      Plaintiffs Allege No Facts That The Company's Application Of
                        The Complex Principles Of SAB 104 Amounts To Anything
                        Other Than A Reasonable Accounting Judgment ..............................18

                3.      The Reasons For And Magnitude Of The Restatement Negate
                        A Strong Inference Of Scienter ...........................................................21

                4.      The Audit Or Review Of All Financial Statements For The
                        Periods In Question By The Company's Independent Auditor
                        Is Strongly Probative Of The Absence Of Scienter ...........................24

        B.      Plaintiffs' Allegations Highlight The Mere Existence Of A
                Restatement And Are, Therefore, Insufficient To Allege Scienter ...............25

        C.      The Individual Defendants' Stock Sales Negate Any Inference of
                Scienter.........................................................................................................26

                1.      Plaintiffs' Allegations Of Stock Sales And Profits Do Not
                        Suffice, Especially Where The Individual Defendants Retained
                        The Vast Majority Of Their Holdings ..................................................26

                2.      The Individual Defendants Traded Largely Pursuant To
                        10b5-1 Trading Plans...........................................................................28

                3.      The Pattern Of The Individual Defendants' Stock Sales
                        Mitigates Against Scienter ..................................................................29

III.    Plaintiffs Do Not Adequately Allege Loss Causation ........................................31

IV.     Plaintiffs Fail To State A Claim For Control Person Liability...........................32

        CONCLUSION ......................................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACA Financial Guaranty Corp. v. Advest, Inc.*,
    512 F.3d 46 (1st Cir. 2008) ........................................................................ passim

*In re Alkermes Sec. Litig.*,
    No. 03-12091-RCL, 2005 WL 2848341 (D. Mass. Oct. 6, 2005) ..........................................31

*Ashcroft v. Iqbal*,
    556 U.S. ___, 129 S. Ct. 1937 (2009) ..................................................................11

*Brodsky v. Yahoo! Inc.*,
    630 F. Supp. 2d 1104 (N.D. Cal. 2009) ..............................................................27

*In re Buca, Inc. Sec. Litig.*,
    No. 05-1762, 2006 WL 3030886 (D. Minn. Oct. 16, 2006) ..................................................32

*In re Cabletron Sys., Inc.*,
    311 F.3d 11 (1st Cir. 2002) ........................................................................16, 18

*Chalverus v. Pegasystems, Inc.*,
    59 F. Supp. 2d 226 (D. Mass. 1999) ..............................................................21, 22

*City of Dearborn Heights Act 345 Police & Fire Retirement Sys. v. Waters Corp.*,
    699 F. Supp. 2d 331 (D. Mass. 2010) .............................................................. passim

*Clorox Co. Puerto Rico v. Proctor & Gamble Comm. Co.*,
    228 F.3d 24 (1st Cir. 2000) ........................................................................2, 27

*In re Cytyc Corp.*,
    No. 02-12399, 2005 WL 3801468 (D. Mass. Mar. 2, 2005) ..................................................9

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) ..............................................................................31

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976) ..............................................................................12

*Ezra Charitable Trust v. Tyco Intern., Ltd.*,
    466 F.3d 1 (1st Cir. 2006) ........................................................................1, 18, 25

*In re The First Marblehead Corp. Sec. Litig.*,
    639 F. Supp. 2d 145 (D. Mass. 2009) .............................................................. passim

*Fitzer v. Sec. Dynamics. Tech., Inc.*,
  119 F. Supp. 2d 12 (D. Mass. 2000) .......................................................................12

*In re Focus Enhancements, Inc. Sec. Litig.*,
  309 F. Supp. 2d 134 (D. Mass. 2001) ........................................................21, 26, 29

*In re FX Energy, Inc. Sec. Litig.*,
  Nos. 2:07-CV-874, 2:07-CV-938, 2:07-CV-966, 2009 WL 1812828
  (D. Utah June 25, 2009) ............................................................................................2

*In re Galileo Corp. S'holders Litig.*,
  127 F. Supp. 2d 251 (D. Mass. 2001) ....................................................................21

*Gelfer v. Pegasystems, Inc.*,
  96 F. Supp. 2d 10 (D. Mass. 2000) .................................................................. passim

*Genzyme Corp. v. Federal Ins. Co.*,
  657 F. Supp. 2d 282 (D. Mass. 2009) .......................................................................2

*Greebel v. FTP Software, Inc.*,
  194 F.3d 185 (1st Cir. 1999) ........................................................................... passim

*In re Intelligroup Sec. Litig.*,
  527 F. Supp. 2d 262 (D.N.J. 2007) .......................................................................16

*In re Int'l Rectifier Corp. Sec. Litig.*,
  No. 07-02544, 2008 WL 4555794 (C.D. Cal. May 23, 2008) ...............................29

*Isham v. Perini Corp.*,
  665 F. Supp. 2d 28 (D. Mass. 2009) ..................................................................11, 13

*Jones v. Corus Bankshares Inc.*,
  701 F. Supp. 2d. 1014 (N.D. Ill. 2010) ................................................................31

*In re Lernout & Hospie Sec. Litig.*,
  286 B.R. 33 (D. Mass. 2002) ................................................................................20

*Local No. 38 Intern. Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*,
  No. 09-CV-3016, 2010 WL 2834226 (S.D.N.Y. July 19, 2010) ...........................10

*Malin v. XL Capital LTD.*,
  499 F. Supp. 2d 117 (D. Conn. 2007) ............................................................. passim

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC, Inc.*,
  537 F.3d 35 (1st Cir. 2008) ....................................................................................16

*Orton v. Parametric Tech. Corp.*,
  344 F. Supp. 2d 290 (D. Mass. 2004) ...................................................................16

*In re Parametric Tech. Corp. Sec. Litig.*,
   300 F. Supp. 2d 206 (D. Mass. 2001) ..................................................26

*In re PEC Solutions Sec. Litig.*,
   418 F.3d 379 (4th Cir. 2005) ...........................................................18

*In re PEC Solutions Sec. Litig.*,
   No. 03-CV-331,  2004 WL 1854202 (E.D. Va. May 25, 2004),
   *aff'd*, 418 F.3d 379 (4th Cir. 2005) ...............................................24

*In re Peritus Software Serv., Inc. Sec. Litig.*,
   52 F. Supp. 2d 211 (D. Mass. 1999) ..........................................25, 28

*In re Praecis Pharmaceuticals, Inc. Sec. Litig.*,
   No. 04-12581, 2007 WL 951695 (D. Mass. Mar. 28, 2007) ...........13, 16

*In re Rhodia S.A. Sec. Litig.*,
   531 F. Supp. 2d 527 (S.D.N.Y. 2007).................................................32

*In re Segue Software, Inc. Sec. Litig.*,
   106 F. Supp. 2d 161 (D. Mass. 2000) .........................................13, 25

*Serabian v. Amoskeag Bank Shares*,
   24 F.3d 357 (1st Cir. 1994).....................................................15, 20, 24

*In re Silicon Graphics Inc. Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999) ...........................................................27

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
   160 F. Supp. 2d 1059 (N.D. Cal. 2001) ............................................27

*Stiegele ex rel Viisage Technology Inc. v. Bailey*,
   No. 05-10677, 2007 WL 4197496 (D. Mass. Aug. 23, 2007) .........26, 28

*In re Taleo Corp. Sec. Litig.*,
   No. 09-00151, 2010 WL 597987 (N. D. Cal. Feb. 17, 2010) ........ passim

*Teachers' Retirement Sys. of LA v. Hunter*,
   477 F.3d 162 (4th Cir. 2007) ...........................................................30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007).................................................................. passim

*In re The Vantive Corp. Sec. Litig.*,
   283 F.3d 1079 (9th Cir. 2002) .........................................................27

*In re Vertex Pharmaceuticals Inc. Sec. Litig.,*
    357 F. Supp. 2d 343 (D. Mass. 2005) .....................................................................................17

*W. R. Carney v. Cambridge Tech. Partners, Inc.*,
    135 F. Supp. 2d 235 (D. Mass. 2001) .....................................................................................27

*Wenger v. Lumisys, Inc*.
    2 F. Supp. 2d 1231 (N.D. Cal. 1998) ......................................................................................28

*Woodward v. Raymond James Financial, Inc. et al.*,
    No. 09-CV-5347, 2010 WL 3239411 (S.D.N.Y. Aug. 16, 2010) ...........................................10

## STATUTES

15 U.S.C. § 78t(a) .......................................................................................................................32

15 U.S.C. § 78u-4(b)(2) .........................................................................................................12, 13

15 U.S.C. § 78u-4(b)(4) ..............................................................................................................31


## OTHER AUTHORITIES

Fed. R. Civ. P. 12(b)(6)............................................................................................................1, 11

Fed. R. Civ. P. 9(b) ............................................................................................................. passim

Securities and Exchange Commission Staff Accounting Bulletin 104 ................................. passim

Pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), Defendants athenahealth,

Inc. ("Athena" or the "Company"), and Jonathan Bush and Carl B. Byers (together, the

"Individual Defendants") (collectively, "Defendants") respectfully submit this memorandum of

law in support of their motion to dismiss with prejudice Plaintiffs' Amended Class Action

Complaint (the "Amended Complaint" or "AC").

## PRELIMINARY STATEMENT

On February 25, 2010, Athena—a Software-as-a-Service ("SaaS") company that provides

internet-based billing, collection, data management, and patient communication services for

physician practices—announced an internal review of its accounting policy related to the period

for amortization of a small portion of the Company's total revenue known as implementation fee

revenue.  AC ¶ 6.  On March 15, 2010, Athena announced it would restate its financial results

and would spread over a longer period than before its recognition of implementation fee revenue

previously recognized through the third quarter of 2009 (the "restatement").  AC ¶ 7.  As is often

the case when a public company's stock price declines, Plaintiffs filed this speculative securities

fraud class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the

"Exchange Act") accusing the Company and its senior management of fraud.[1]

Plaintiffs would have this Court find that any accounting restatement, without more, is

securities fraud.  "Merely stating in conclusory fashion that a company's books are out of

compliance with GAAP would not itself demonstrate liability under section 10(b) or Rule 10b-

5."  *Ezra Charitable Trust v. Tyco Intern., Ltd.*, 466 F.3d 1, 12 (1st Cir. 2006) (affirming

dismissal).  A company may change its judgments and estimates in determining how to most

appropriately apply GAAP, but such a change does not equal fraud.  *Id.* at *13.  Rather, the

---

[1]     Plaintiffs purport to represent shareholders who acquired stock any time from the date of the IPO—September
20, 2007—to the announcement of the internal review—February 25, 2010. AC ¶ 1.

Amended Complaint—based on a change in accounting judgment alone—does not meet the applicable heightened pleading requirement because it fails to plead any specific facts permitting a strong inference that the Defendants knew earlier disclosures were false when made.

The Company's total revenue has always consisted of two unequal components, clearly displayed in every reported financial statement.  The vast majority of the Company's total revenue consists of "business services" revenue, which is primarily driven by a percentage of collections for health care services rendered by physicians and other medical providers. Declaration of Deborah S. Birnbach in Support of Defendants' Motion to Dismiss the Amended Class Action Complaint ("Birnbach Decl."), Ex. A, at 51 (2009 SEC Form 10-K) (Mar. 15, 2010) (incorporated by reference in AC ¶ 24).[2]  "Implementation and other" revenue, the subject of the restatement, has at all times relevant to this litigation accounted for a mere 4% to 7% of total revenue.  AC ¶ 100; Birnbach Decl., Ex. B, at 46 (2007 SEC Form 10-K) (Mar. 7, 2008) (incorporated by reference in AC ¶ 33), Ex. C, at 46 (2008 SEC Form 10-K) (Mar. 2, 2009) (incorporated by reference in AC ¶ 35), Ex. A, at ii, 48 (2009 SEC Form 10-K).  Implementation fees are nonrefundable, generally billed up front, and for services such as establishing access to business services like Athena's web-based system, loading data into the system, setting up data tables, and initial training for the medical practice personnel. AC ¶ 100; *e.g.*, Birnbach Decl., Ex. A, at 23 (2009 SEC Form 10-K).  Before the restatement, rather than recognizing these revenues

---

[2]   When deciding a motion to dismiss, "a court may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint." *Genzyme Corp. v. Federal Ins. Co.*, 657 F. Supp. 2d 282, 285 n.3 (D. Mass. 2009) (dismissing complaint) (citing *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)); *see also Clorox Co. Puerto Rico v. Proctor & Gamble Comm. Co.*, 228 F.3d 24, 32 (1st Cir. 2000) ("It is a well settled rule that when a written instrument contradicts allegations in the complaint to which it was attached, the exhibit trumps the allegations") (internal citation omitted); *In re FX Energy, Inc. Sec. Litig.*, Nos. 2:07-CV-874, 2:07-CV-938, 2:07-CV-966, 2009 WL 1812828, at *6 (D. Utah June 25, 2009) (if "documents on which the Plaintiffs rely 'contradict the allegations of the….complaint, the documents control and [a] court need not accept as true the allegations in the….complaint'") (quoting *Rapoport v. Asia Elecs. Holding Co., Inc*. 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000)).  Moreover, the Court may take judicial notice of documents publicly filed with the Securities and Exchange Commission ("SEC") on a motion to dismiss.  *See Genzyme*, 657 F. Supp. 2d at 284 n.2.

at the time the services are provided to the customer or at the time the nonrefundable fees are paid, the Company consistently and transparently deferred the implementation fee revenues until after the "Go-Live" date when the customer was up and running. AC ¶ 81; Birnbach Decl., Ex. D, at 2 (Earnings Call Transcript) (Mar. 16, 2010) (incorporated by reference in AC ¶ 102), Ex. B, at 50 (2007 SEC Form 10-K), Ex. C, at 50 (2008 SEC Form 10-K).  The Company amortized implementation fees over the "expected performance period" for implementation services, which it determined should be represented by the initial customer contract term, typically one year.  AC ¶¶ 4, 56.

The Company's accounting treatment for implementation fees was expressly disclosed in its numerous filings with the SEC, and earnings calls with investors and market analysts throughout the purported class period.  AC ¶ 56, 110, 122, 131, 139, 150, 169, 223.  Though the Amended Complaint cites statements from nine confidential witnesses (see *generally* AC ¶¶ 29-87) —supposedly to plead scienter—none of these witnesses had any knowledge of or role in accounting or finance at the Company, nor do they provide any information concerning Defendants' knowledge of any inappropriate accounting judgments.  Rather, the confidential witnesses provide only information that was transparently disclosed to the public.  The Amended Complaint does not—and cannot—allege that anyone, including the Company's independent auditor (Deloitte & Touche LLP ("Deloitte")) called into question Athena's implementation fee revenue accounting practices during the years affected by the restatement, even though the Company accurately disclosed its prior practice for amortizing implementation fee revenue. Plaintiffs do not contend that the Company hid its prior accounting judgment; indeed, the Company fully and accurately disclosed its accounting treatment, and the amount of implementation fee revenues was listed as a separate line item each and every quarter so that

investors could see its exact amount.  The Company itself, as distinct from any third party,

initiated an internal review of its implementation fee revenue recognition policy in connection

with its new CFO's review of the Company's accounting policies.  *Id.*¶¶ 97, 100-102.

Plaintiffs describe an implausible fraud that purportedly happened in plain sight, and their

Amended Complaint alleges nothing more than that the Company changed its accounting for the

timing of recognizing implementation fee revenues.  Plaintiffs' claims suffer from the following

fatal defects, among others, each of which is an independent basis for dismissal:

- **No scienter**.  The Amended Complaint lacks any specific facts supporting an inference that Athena or the Individual Defendants *knew or should have known* that the Company's previous accounting for implementation fees was incorrect, let alone fraudulent.  A restatement of earnings, without more, does not support even a weak inference of scienter.  Moreover, the facts and circumstances surrounding the Company-initiated accounting review and restatement (especially the small portion of total revenue restated) and Plaintiffs' trading allegations, actually negate any inference of scienter.

- **No loss causation.**  Plaintiffs fail to link the alleged corrective disclosures to a "significant" drop in Athena's stock price.  Although the price dropped upon the February 25, 2010 announcement of the internal review, the Company's stock price actually *rose* following the March 15, 2010 restatement announcement, the corrective disclosure that forms the basis for the Amended Complaint.

- **No control person liability**.  Plaintiffs' "control person" claims against the Individual Defendants must be dismissed because Plaintiffs have failed to plead an underlying violation of the Exchange Act.

Defendants respectfully request that the Court dismiss the Amended Complaint with prejudice.

*See In re Credit Suisse First Boston Corp.*, No. 02-12056-GAO, 2005 WL 852455, at *11 (D.

Mass. Mar. 31, 2005) (O'Toole, J) (dismissing with prejudice for failure to meet heightened

pleading requirements).

## PLAINTIFFS' ALLEGATIONS

### Overview of Athena

Athena was founded in 1997 and became publicly traded on the NASDAQ after an IPO

in 2007.  AC ¶ 2.  Mr. Bush is a co-founder of the Company, and at all relevant times was the

CEO of Athena.  *Id.* ¶ 15.  Mr. Byers joined the Company at its founding and was the CFO until his departure on January 11, 2010.[3]  *Id.* ¶ 16.  The Company provides internet-based business services for physician practices, including software for physician practices that automates and manages billing and medical record-related functions.  *Id.* ¶ 28; Birnbach Decl., Ex. A, at 1-2 (2009 SEC Form 10-K).  In 2009, the Company incorporated automated patient messaging services, live operator services, and a patient web portal, and also added an intelligence platform that analyzes and displays practice performance data.  *Id.* at 2.

The Company's business model is "Software-as-a-Service," which means that customers access Athena's services through a web portal and do not purchase separate software.  AC ¶ 2. Athena provides implementation services that include enrollment (setting up physician access), uploading of client data (linking or setting up patient files), and training for the practitioners' staff.  *Id.* ¶¶ 3, 39-42.  "The length and details of this implementation process vary widely from client to client," but typically varies from three to five months from the execution of the contract to implementation completion.[4]  *Id.* ¶ 42; Birnbach Decl., Ex. A, at 23 (2009 SEC Form 10-K). Athena continually updates its web-based services and active clients can access these services with no additional software or disruption to their businesses.  AC ¶ 2; Birnbach Decl., Ex. A, at 5 (2009 SEC Form 10-K).  Customers generally sign an initial one-year contract with Athena.  AC ¶¶ 4-5.  The Company has enjoyed a high customer renewal rate, which was frequently disclosed to the market.  *Id.* ¶¶ 4, 64, 84, 88, 91, 94, 97, 113, 223, 269.

---

[3]  Athena announced on June 4, 2009 that Mr. Byers intended resign from his position as CFO in early 2010 to pursue a family goal to live abroad.  Birnbach Decl., Ex. E, at Ex. 99.1 (SEC Form 8-K) (June 4, 2009).

[4]  The Complaint contains no allegations that the implementation process took longer than one year.

**Overview of the Company's Revenue Accounting**

Athena's revenue consists of two *unequal* components: business services (the revenues Athena earns from its main customer services) and implementation and other services (the nonrefundable fees paid up front by customers for the implementation services providing access to Athena's web-based service). AC ¶ 47-50; Birnbach Decl., Ex. A, at 48, 51 (2009 SEC Form 10-K). The primary driver of Athena's total revenue is business services, which constituted approximately 97.2%, 96.8%, and 96.5% of total revenues for the years ended December 31, 2009, 2008, and 2007, respectively. *Id.* at 51, 58 (percentages after restatement). By contrast, implementation fees, which are nonrefundable and are billed up front, comprise just 2.8%, 3.2%, and 3.5% of total revenues in the years ended December 31, 2009, 2008, and 2007, respectively. *Id.* at 48, 51, 58 (2009 SEC Form 10-K) (percentages after restatement).[5]

The Company historically recorded implementation fees as deferred revenue until the implementation service was complete and ongoing services commenced (the "Go-Live" date), at which time the fees were amortized, or recognized ratably, on a monthly basis over the "expected performance period."[6] AC ¶¶ 4, 56. This "expected performance period" was the initial contract period; Athena's clients typically purchase one-year contracts that renew automatically. *See, e.g., id.* ¶¶ 4, 5, 7, 64, 88, 93, 94; Birnbach Decl., Ex. B, at 50 (2007 SEC Form 10-K), Ex. C, at 50 (2008 SEC Form 10-K).

---

[5]   Even before the restatement, implementation revenues comprised a minimal percentage of total revenue each year, at just 6.5% and 5.5% of total revenues in the years ended December 31, 2007 and 2008, respectively. Birnbach Decl., Ex. B, at 46 (2007 SEC Form 10-K), Ex. C, at 46 (2008 SEC Form 10-K).

[6]   SEC Staff Accounting Bulletin 104 ("SAB 104") addresses the accounting for nonrefundable, up-front fees, like implementation fees. It states that registrants should consider the specific facts and circumstances to determine the appropriate accounting. Where there are on-going services that are essential to the customer receiving the benefit of the up-front fee, that fee is earned as the products or services are delivered or performed over the term of the arrangement or the expected period of performance. Footnote 39 states that the recognition period should extend beyond the initial contract period if the relationship with the customer is expected to extend beyond the initial term *and* the customer continues to benefit from the payment of the up-front fee during the relationship. Birnbach Decl., Ex. F, at 46 (SAB 104) (partially quoted in AC ¶ 55).

Importantly, the Company openly disclosed in SEC filings and earnings calls cited throughout the Amended Complaint information regarding (1) how it recognized implementation fee revenues and (2) its high rate of customer retention.  AC ¶¶ 56, 57, 72, 89-91, 110, 122, 131, 139, 150, 159, 169; *see also* Birnbach Decl., Ex. B, at 50, F-8 (2007 SEC Form 10-K), Ex. C, at 50, F-7 (2008 SEC Form 10-K), Ex. G, at 14 (Earnings Call Transcript) (Aug. 6, 2009) (incorporated by reference in AC ¶ 189).  In addition, Athena's consolidated financial statements, historically, have clearly and separately itemized the amount every quarter of "implementation and other" revenue as a small percentage of total revenue.  *See, e.g.*, AC ¶¶ 132, 170; Birnbach Decl., Ex. B, at 46 (2007 SEC Form 10-K) (6.5% before the restatement), Ex. C, at 46 (2008 SEC Form 10-K) (5.5% before the restatement).

Athena's independent auditor, Deloitte, audited the Company's annual financial statements for the years 2007 and 2008, and reviewed all quarterly financial statements through the third quarter of 2009, during which time the Company amortized and recognized ratably implementation fees over the one-year "expected performance period."[7]  Deloitte consistently concluded that the Company's "consolidated financial statements present[ed] fairly, in all material respects, the financial position of athenahealth, Inc." Birnbach Decl., Ex. B, at F-2 (2007 SEC Form 10-K), Ex. C, at 68, F-2 (2008 SEC Form 10-K).

---

[7]   Athena's accounting policy for recognizing implementation revenues was also in line with those of other SaaS companies, including Taleo Corporation, and SuccessFactors, Inc., which similarly recognized their set-up or implementation fees over the term of the customer contract.  *See, e.g.* Birnbach Decl., Ex. J, at 66 (Taleo Corporation, 2008 SEC Form 10-K) (Apr. 30, 2009), Ex. K, at 40 (SuccessFactors, Inc., 2009 SEC Form 10-K) (Feb. 26, 2010).

Taleo restated its revenue in April 2009, after it determined that it should recognize the "consulting" revenue, which comes mainly from set-up and training services, ratably over the life of the contract, rather than as services are delivered. *In re Taleo Corp. Sec. Litig.*, No. 09-00151, 2010 WL 597987, at *4 (N. D. Cal. Feb. 17, 2010).  As noted in note 13, *infra*, Taleo's restatement is consistent with Athena's pre-restatement accounting.

**The March 15, 2010 Restatement**

On January 11, 2010, Timothy Adams became Athena's new CFO.  Birnbach Decl., Ex.

H (SEC Form 8-K) (Jan. 11, 2010).  As part of Mr. Adams' initial work as CFO, Mr. Bush asked

him to review Athena's financial statements and accounting policies.  AC ¶ 102; Birnbach Decl.,

Ex. D, at 2 (Earnings Call Transcript) (Mar. 16, 2010).  Pursuant to Mr. Adams' direction, the

Company announced on February 25, 2010 that it would conduct an internal accounting policy

review related to the timing of amortization for deferred implementation fees and, accordingly,

would postpone the release of its fourth quarter 2009 and 2009 year-end financial results.  AC ¶

271; Birnbach Decl., Ex. I, at Ex. 99.1 (SEC Form 8-K) (Feb. 25, 2010) (incorporated by

reference in AC ¶ 6).  The Company initiated this review; it did not stem from a request, urging

or inquiry of any auditor, analyst, shareholder, or other third party.  AC ¶¶ 97, 100-102; Birnbach

Decl., Ex. I, at Ex. 99.1 (SEC Form 8-K) (Feb. 25, 2010).

On March 15, 2010, the Company issued its 10-K for the year ended December 31, 2009

and announced that it would restate its financial results related to its recognition of

implementation fee revenue for the years December 31, 2005 – 2008 and the first three quarters

of 2009.  AC ¶¶ 7, 100.  With advice from its new CFO, Mr. Adams, and Deloitte's national

office, the Company revised the "expected performance period" over which to amortize

implementation fee revenue, and determined that the revenue should be deferred over the

expected customer life, which it conservatively determined to be twelve years.  AC ¶¶ 7, 102;

Birnbach Decl., Ex. A, at ii (2009 SEC Form 10-K).

Because the fees were nonrefundable and paid up front, the restatement had no cash

impact, no impact on cumulative revenues earned by Athena, and resulted in a *very small*

adjustment to total revenue for the restated time period.  AC ¶¶ 100-101; Birnbach Decl., Ex. L,

at Ex. 99.1 (SEC Form 8-K) (Mar. 15, 2010) (incorporated by reference in AC ¶ 7), Ex. A, at 48

(2009 SEC Form 10-K).  The only change in the restatement was that the revenue was

recognized over a longer period.  The Company announced that it restated approximately $22.3

million of implementation revenue previously recognized through September 30, 2009 to later

periods.  AC ¶ 101; Birnbach Decl., Ex. A, at ii (2009 SEC Form 10-K).  The restated

implementation revenue represents just 3.4% of Athena's restated total revenue from 2005 to

September 30, 2009.  *Id.* at 48, F-39.  The chart below reflects the impact of the restatement on

*total* revenue, as compared to Plaintiffs' misleading assertions regarding the effect of the

restatement on only the Company's "implementation and other revenue."[8]

| Total Revenue (In $000's) | Originally Reported | Restated | Change | Change as a Percentage of Total Revenues |
|---|---|---|---|---|
| Total Revenue Year Ended 12/31/07 | 100,773 | 97,618 | 3,155 | 3.1% |
| Total Revenue Year Ended 12/31/08 | 139,552 | 136,282 | 3,270 | 2.3% |
| Total Revenue 9 Months Ended 9/30/09 | 137,510 | 134,081 | 3,429 | 2.5% |

The market reacted positively to Athena's year-end financial reporting, with the stock

price increasing from $37.29 at the close of March 15, 2010 trading to $39.71 at the close of

March 16, 2010 trading, up 6.5%.  Birnbach Decl., Ex. M (Athena stock prices).[9]  Plaintiffs

conveniently omit this stock price *increase* from the Amended Complaint.[10]

---

[8]   The sources of information for this chart are: AC ¶ 231; Birnbach Decl., Ex. A, at F-10-11, F-39 (2009 SEC Form 10-K).  Plaintiffs' allegation that year-end implementation revenues were overstated by percentages ranging from 43% - 52% (AC ¶ 231) simply ignores what a small percentage implementation revenues are of *total* revenues.

[9]   A court may take judicial notice of stock prices at the motion to dismiss stage .  *In re Cytyc Corp.*, No. 02-12399, 2005 WL 3801468, at *12 (D. Mass. Mar. 2, 2005) (dismissing complaint).

[10]  Despite providing charts in AC ¶¶ 272-73 to demonstrate the supposed decline in stock price after the February 25 and April 29 announcements, the Amended Complaint omits mention of the stock price *increase* following the March 15 announcement.  Nor do Plaintiffs include a chart to illustrate the stock price trend during the entire relevant period.  These omissions add unwarranted importance to the stock price drops following the February

**The Amended Complaint**

The Amended Complaint contains 303 paragraphs of allegations on 133 pages, largely due to a long purported Class Period and lengthy (and often irrelevant) cut-and-paste block quotes from Athena's SEC filings.[11]  Plaintiffs insert block quotes from each earnings release filed with the SEC during the lengthy Class Period and then summarily allege that the statements contained in the release were false and misleading.  AC ¶¶ 116-8, 126-8, 133, 135-7, 143, 145-7, 153, 155-7, 162, 164-6, 173, 176-8, 184, 186-8, 194, 196-8, 205.  Approximately 50 paragraphs of allegations alone set forth irrelevant information from nine so-called confidential witnesses ("CWs").  *See generally* AC ¶¶ 29-87.  These former employees had *no role whatsoever* in the Company's finance or accounting activities, were not in positions to have any accounting knowledge, set forth no allegations about the accounting judgments, and provide no facts even remotely relevant to the question of whether the Defendants *knew* that the Company's prior accounting judgment for the length of the amortization period for implementation revenues was made in anything other than good faith.

---

25 and April 29 announcements, which are part of a lengthy downward trend, undermining Plaintiffs' loss causation argument.  *See* Section III, *infra*; Birnbach Decl. Ex. M (Athena stock prices), Ex. T (stock price line graph).

[11]   Indeed, the Complaint fails the notice pleading requirements of Rule 8(a)(2) for a "*short and plain* statement of the claim showing that the pleader is entitled to relief."  (Emphasis added).  The bulk of the Complaint consists of large, superfluous block quotes from earnings releases and analyst calls and irrelevant statements from nine so-called confidential witnesses.  Such block-style pleading does not satisfy the PSLRA or Rule 9(b).  Courts—increasingly weary of lengthy securities fraud complaints based on irrelevant allegations—have cited Rule 8(a)(2) as an independent ground for dismissal.  *See, e.g., Woodward v. Raymond James Financial, Inc. et al.,* No. 09-CV-5347, 2010 WL 3239411, at *13 n.2 (S.D.N.Y. Aug. 16, 2010) ("the extreme length of the Amended Complaint is an independent ground for dismissal, pursuant to Rule 8(a)(2)"); *see also Local No. 38 Intern. Bhd. of Elec. Workers Pension Fund v. Am. Express Co.,* No. 09-CV-3016, 2010 WL 2834226, at *1 (S.D.N.Y. July 19, 2010) ("While securities fraud claims must be pled with particularity, a plaintiff need not lard a pleading with streams of consciousness from confidential witnesses and block quotes from analyst calls.  Plaintiff's hydra-like complaint sprawls over 243 paragraphs, some silted with more than 500 words.")

## ARGUMENT

### I.     The Amended Complaint Does Not Meet The Heightened Pleading Standard For Securities Fraud Claims

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), although courts

must accept *well-pled* factual allegations in the complaint as true, "[t]his does not mean . . . that

the court must 'swallow the plaintiff's invective hook, line, and sinker.'" *In re The First*

*Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 153 (D. Mass. 2009) (dismissing complaint)

(citing *Aulson v. Blanchard,* 83 F.3d 1, 3 (1st Cir. 1996)).  The maxim that the "court must

accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions

[;] [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. ___, 129 S. Ct. 1937, 1949 (2009); *see*

*also City of Dearborn Heights Act 345 Police & Fire Retirement Sys. v. Waters Corp*., 699 F.

Supp. 2d 331, 340 (D. Mass. 2010) (dismissing complaint) ("[C]ourts are not required to accept .

. . 'bald assertions,' ;unsubstantiated conclusions" and the like.") (citing *Aulson,* 83 F.3d at 3).

The plaintiff has the burden to allege "a plausible entitlement to relief."  *ACA Financial*

*Guaranty Corp. v. Advest, Inc.*, 512 F.3d 46, 58 (1st Cir. 2008) (affirming dismissal) (citing *Bell*

*Atl. Corp. v. Twombly,* 550 U.S. 544, 559 (2007)).  Thus, in order to survive a motion to dismiss,

"a complaint must contain factual allegations sufficient 'to raise a right to relief above the

speculative level.'"  *Isham v. Perini Corp*., 665 F. Supp. 2d 28, 33 (D. Mass. 2009) (dismissing

complaint) (citing *Twombly,* 550 U.S. at 555).

This action is subject to the "notably strict and rigorous" pleading requirements of both

Rule 9(b) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b) (2006)

(the "PSLRA").  *See Advest*, 512 F.3d at 58, n.7; *Isham,* 665 F. Supp. 2d at 33; *Waters*, 699 F.

Supp. 2d at 340.  These requirements far exceed Rule 8's notice pleading standards.[12]  *See*

PSLRA, 15 U.S.C. § 78u-4(b) (2006).

For a complaint to state a claim for securities fraud under section 10(b) and Rule 10b-5, it

must plead six elements: (1) a material misrepresentation or omission; (2) scienter, or a wrongful

state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic

loss; and (6) loss causation.  *Advest*, 512 F.3d at 58 (citing *Dura Pharm., Inc. v. Broudo*, 544

U.S. 336, 341-42, (2005)).  Rule 9(b) provides that "[i]n all averments of fraud . . . , the

circumstances constituting the fraud . . . shall be stated *with particularity*." FED. R. CIV. P. 9(b)

(emphasis added).  Among other things, the PSLRA requires the complaint to "state with

particularity facts giving rise to a strong inference" that the defendant acted with scienter.  15

U.S.C. § 78u-4(b)(2).  The plaintiff must specify (1) the statements that the plaintiff contends

were fraudulent; (2) the identity of the speaker; (3) where and when the statements were made;

and (4) *why* the statements were fraudulent.  *Fitzer v. Sec. Dynamics. Tech., Inc.*, 119 F. Supp.

2d 12, 18 (D. Mass. 2000) (dismissing complaint).  The Amended Complaint falls far short of

meeting these heightened pleading requirements.

## II.     Plaintiffs Do Not Adequately Allege Scienter

The Amended Complaint must be dismissed because Plaintiffs have failed to plead

scienter, "a mental state embracing intent to deceive, manipulate, or defraud."  *See Ernst & Ernst*

*v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *Credit Suisse*, 2005 WL 852455, at *11

(dismissing with prejudice for failure to plead scienter).  Plaintiffs face the heavy burden of

adequately pleading "either *conscious intent* to defraud or a high degree of *recklessness*."  *See*

---

[12]   Congress passed the PSLRA to curb the "abusive practices committed in private securities litigation," such as "the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer, and with only faint hope that the discovery process might lead eventually to some plausible cause of action." H.R. Conf. Rep. No. 104-369, at 41 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 730.

*Marblehead*, 639 F. Supp. 2d at 163 (citing *Advest*, 512 F.3d at 58) (emphasis added).  The

securities laws impose no liability for negligence or even mismanagement.  *Id.* at 163; *In re*

*Segue Software, Inc. Sec. Litig.*, 106 F. Supp. 2d 161, 166 (D. Mass. 2000) (dismissing

complaint).  The PSLRA requires plaintiffs to state with particularity facts that give rise to a

*strong* inference of scienter:  mere reasonable inferences are not sufficient to survive a motion to

dismiss.  *See Waters*, 699 F. Supp. 2d at 341 (dismissing complaint for failure to plead scienter);

*Isham*, 665 F. Supp. 2d at 33 (same); *Marblehead*, 639 F. Supp. 2d at 163 (same); *In re Praecis*

*Pharmaceuticals, Inc. Sec. Litig.*, No. 04-12581, 2007 WL 951695, at *7, 12 (D. Mass. Mar. 28,

2007) (O'Toole, J.) (same); *see also* 15 U.S.C. § 78u-4(b)(2) (a complaint alleging securities

fraud "shall, with respect to each [alleged] act or omission . . . state with particularity facts

giving rise to a *strong inference* that the defendant acted with the required state of mind")

(emphasis added).  To plead scienter:

> A 10b-5 plaintiff must allege details of defendants' alleged
> fraudulent involvement, *including specifics as to what defendants*
> *had knowledge of and when*.  To satisfy this requirement,
> complaints typically identify internal reports, memoranda, or the
> like, and allege both the contents of those documents and
> defendants' possession of them at the relevant time.

*Isham*, 665 F. Supp. 2d at 34 (citing *In re Boston Tech., Inc. Sec. Litig.*, 8 F. Supp. 2d 43, 58 (D.

Mass. 1998)) (emphasis added).  "[G]eneral allusions to unspecified internal corporate

information" are insufficient to plead scienter.  *Id.* (citation omitted).

Moreover, "[a] complaint will survive . . . only if a reasonable person would deem the

inference of scienter *cogent* and *at least as compelling* as any opposing inference one could draw

from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)

(emphasis added); *see also Advest*, 512 F.3d at 59 (adopting same).  Accordingly, the Court must

weigh all "plausible nonculpable explanations for the defendant's conduct" against the

"inferences favoring the plaintiff." *Tellabs,* 551 U.S. at 324; *see also Advest*, 512 F.3d at 59.

The recent Northern District of California opinion in the securities fraud case *In re Taleo Corp. Sec. Litig.*, No. 09-00151, 2010 WL 597987 (N. D. Cal. Feb. 17, 2010) is instructive. Taleo—like Athena—is a SaaS company founded in the late 1990s and that went public in 2005 and provides web-based software for its customers. *Taleo*, 2010 WL 597987, at *1. Taleo recognized revenue from its set-up and training services when those services were delivered, as opposed to ratably over the life of the customer contract.[13] *Id.* at *3. In November 2008, Taleo announced that *its auditors* had requested a re-evaluation of this accounting treatment. This review resulted in a restatement of Taleo's earnings in April 2009, and a change in accounting policy to recognize revenue from services ratably over a three-year period. *Id.* at *4. As here, a securities fraud lawsuit was filed alleging that Taleo "recognized revenue before it was earned, in order to drive up Taleo's stock price." *Id.* at *2; *see* AC ¶¶ 93-96 ("Defendants violated GAAP to artificially inflate revenues and the company's stock price").

The *Taleo* court disagreed, dismissing the plaintiff's attempt—much like the instant case—to avoid pleading specific facts permitting a strong inference of conscious intent to defraud or recklessness and to rely on the fact of the restatement alone to establish scienter. *See Taleo*, 2010 WL 597987, at *8 (plaintiff "must allege facts to show that the defendants knew specific facts at the time that rendered their accounting determinations fraudulent") (internal quotation and citation omitted). The court in *Taleo* found that the plaintiff failed to allege specific facts showing that (1) the defendants "were likely to know first hand the facts that were key" to properly applying the relevant accounting principles; (2) the accounting principles at

---

[13] Indeed, Athena's previous accounting was more conservative than Taleo's because Athena deferred revenue until implementation was complete and amortized it ratably over a one-year initial contract period, unlike Taleo, which did not defer and recognized similar revenue as services were rendered. *Compare Taleo*, 2010 WL 597987, at *3, *with*, AC ¶ 4. Notably, Taleo's restated period—i.e. the life of the customer *contract*—is consistent with Athena's *pre*-restatement accounting. *See* AC ¶ 100.

issue were so simple that the defendants' failure to properly apply them amounted to recklessness, (3) the magnitude of the restatement—as measured against Taleo's total revenue— was indicative of scienter, (4) there were any prior weaknesses in internal controls, and (5) management's stock sales were indicative of scienter. *Id.* at \*9, \*11-13.  Application of *Taleo* makes clear that the Amended Complaint has the same shortcomings that warranted dismissal of the Taleo complaint, plus additional defects, as discussed herein.

### A.    The Amended Complaint Contains No Particularized Facts Permitting A Strong Inference of Scienter

Despite rambling for 303 paragraphs, the Amended Complaint lacks even one specific fact supporting an inference that the Individual Defendants, or any other member of senior management, *consciously intended* to defraud investors or *recklessly* disregarded that the Company's previous accounting for implementation fees was inconsistent with GAAP or that a restatement was imminent.  *See Marblehead Corp.*, 639 F. Supp. 2d at 163; *see also Serabian v. Amoskeag Bank Shares*, *Inc.*, 24 F.3d 357, 361 (1st Cir. 1994) ("General averments of the defendants' knowledge of material falsity will not suffice" to plead scienter) (internal quotations and citations omitted).  There is not a single factual allegation that any of the Defendants *knew* that the implementation fee amortization period was incorrect or an unreasonable application of the complex revenue recognition accounting rules, much less an allegation that Defendants *intentionally* made incorrect accounting judgments.

### 1.    Plaintiffs Fail To Plead Facts Permitting A Strong Inference That Defendants Had Knowledge That Prior Statements Were False When Made

The Amended Complaint must be dismissed because it impermissibly speculates that because of their positions as "senior executive officers of athenahealth" and their access to Company information, the Individual Defendants must have known that the historic method the

Company transparently used to account for implementation fee revenue violated GAAP.[14]  *See*
AC ¶¶ 18, 20, 22, 23, 294.  In the absence of *any specific facts* permitting such a strong
inference, Plaintiffs resort to irrelevant CW allegations that (1) are entirely unrelated to the
Company's implementation fee accounting procedures or the Individual Defendants' knowledge
of or responsibility therefore, *and* (2) do nothing more than reiterate information the Company
*repeatedly disclosed* to investors.  *See* AC ¶¶ 29-87 (confidential witness allegations).  None of
the allegations contains specific facts that Defendants knew the accounting judgments were in
any way inappropriate, much less that they violated GAAP.  *Praecis*, 2007 WL 951695, at *9
("The facts pled by the plaintiffs do not give rise to a strong inference that either Garnick or
Gefter had actual knowledge that the projections were false at the time they were made."); s*ee In
re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 565 (S.D.N.Y. 2004) (citation omitted)
(dismissing complaint where plaintiff failed to plead any facts showing that defendants *knew or
should have known* that revenue from certain sales should have been accounted for differently
and, thus, that contemporaneous financials were incorrect).

Courts must take a "hard look at [CW allegations] to evaluate their worth."  *N.J.
Carpenters Pension & Annuity Funds v. Biogen IDEC, Inc.*, 537 F.3d 35, 51-52 (1st Cir. 2008)
(affirming dismissal for failure to plead scienter).  Confidential source allegations in securities
fraud cases must satisfy the particularity requirements of the PSLRA.  *In re Cabletron Sys., Inc.*,
311 F.3d 11, 30 (1st Cir. 2002) (requiring CW allegations to contain "specific descriptions of the

---

[14]   Plaintiffs set forth conclusory allegations, *see* AC ¶ 126, that the Individual Defendants—by virtue of their
corporate positions—were able to control the content of SEC filings, press releases, and other public statements
and complete Sarbanes-Oxley Act ("SOX") certifications.  Courts have routinely disregarded such attempts to
plead scienter.  *See, e.g., Orton v. Parametric Tech. Corp.*, 344 F. Supp. 2d 290, 306 (D. Mass. 2004) (scienter
not adequately pled with "vague assertion that a defendant must have known about the fraud by virtue of his
position of authority" or allegation regarding SEC filing control); *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d
262, 355 (D.N.J. 2007) (dismissing complaint where plaintiff failed to plead that defendants consciously
avoided any meaningful exposure to the information that was rendering their SOX certification erroneous).

precise means through which [the fraud] occurred").  The Amended Complaint's CW allegations do not display a "strong basis of knowledge" that establishes reliability on any accounting judgment whatsoever, because Plaintiffs have pled no facts indicating that a single CW has knowledge of the accounting or finance area or revenue recognition decisions for implementation fees.[15] *See id.* at 30 (each witness must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"); *see also In re Vertex Pharmaceuticals Inc. Sec. Litig.,* 357 F. Supp. 2d 343, 353-354 (D. Mass. 2005) (dismissing with prejudice based in part on insufficiency of CW allegations).

The Amended Complaint sets forth no facts indicating that any of the nine CWs had *any* knowledge of accounting generally, of how Athena made accounting judgments, and particularly of how complex revenue recognition accounting principles were applied to Athena's business. *See, e.g.*, AC ¶¶ 29 n.3, 31 n.4, 35 n.5, 42 n.6, 44 n.7, 50 n.8, 62 n.10.  Indeed, Plaintiffs do not allege that the CWs had *any* role in accounting or finance at the Company or were in a "position to hear remarks or observe conduct on the part of the Individual Defendants that support a strong inference" of scienter.  *380544 Canada, Inc. v. Aspen Technology*, 544 F. Supp. 2d 199, 229 (S.D.N.Y. 2008) (dismissing complaint in part because of insufficiency of CW allegations).  To the contrary, the CWs provide information regarding Athena's products, the implementation process, pricing information, and customer retention rates which the Company readily publicly disclosed to shareholders.  *See* AC ¶¶ 29-31, 33-54, 60-70, 73-79, 81-87.  Merely pleading facts

---

[15]   The confidential witnesses are a Senior Project Associate from the practice management group, AC ¶ 29 n.3, Director of Professional Services in client training, AC ¶ 31 n.4, Project Manager working with clients and reporting to the Director of Professional Services, AC ¶ 35 n.5, VP of Sales of the Western Region, AC ¶ 42 n.6, Engagement Manager on customer implementations, AC ¶ 44 n.7, VP/Director of Business Development, AC ¶ 50 n.8, Client Services Supervisor, customer call center, AC ¶ 62 n.10, Senior Manager of Claims Resolution for customer insurance claims, AC ¶ 65 n.11, and Inside Sales Representative, providing sales leads for physicians' offices with more than three physicians, AC ¶ 79 n.12.

regarding a company's operations—here, Athena's implementation process—rather than the accounting treatment for revenues associated with those operations, without any facts permitting a strong inference of fraud, is insufficient to plead scienter. *See Cabletron*, 311 F.3d at 29-30; *see also Bristol-Myers Squibb*, 312 F. Supp. 2d at 565 (plaintiff pled mere knowledge of the facts that led to a restatement and nothing more).

>    2.    **Plaintiffs Allege No Facts That The Company's Application Of The Complex Principles Of SAB 104 Amounts To Anything Other Than A Reasonable Accounting Judgment**

Plaintiffs have similarly failed to allege facts giving rise to a strong inference of recklessness. To adequately plead scienter based on a GAAP violation, Plaintiffs must allege facts tending to show that "no *reasonable accountant* would have made the same decisions if confronted with the same facts."[16] *See In re PEC Solutions Sec. Litig.*, 418 F.3d 379, 389 (4th Cir. 2005) (affirming dismissal) (emphasis added) (internal citations omitted). Plaintiffs can accomplish this by showing that, as an example, "the accounting was so simple and basic that defendants could not have made an innocent mistake."[17] *See Taleo*, 2010 WL 597987, at *10 (internal citations omitted). Plaintiffs do not, and cannot, allege the application of SAB 104 here is so simple and basic.

To the contrary, application of SAB 104 to implementation revenues is complex and requires an exercise of judgment. *See Taleo,* 2010 WL 597987, at *9 (similar discussion regarding application of EITF 00-21); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 205 (1st Cir. 1999) (GAAP can "tolerate a range of reasonable treatments, leaving the choice among alternatives to management"). Specifically, companies must make a two-part determination

---

[16]   The fact that a senior executive "changes his or her mind and decides after the fact that an earlier opinion was ill-advised is insufficient to support an averment of subjective falsity." *Ezra*, 466 F.3d 1, at *13.

[17]   As discussed in more detail in Section II(A)(4), *infra*, Plaintiffs cannot make such an allegation where Deloitte reviewed and signed off on all of the financial statements upon which the Amended Complaint is based.

whether the "[1] relationship with the customer is expected to extend beyond the initial term and [2] customer continues to benefit from the payment of the up-front fee (*e.g.,* if subsequent renewals are priced at a bargain to the initial up-front fee)."  Birnbach Decl., Ex. F, at 46 n.39 (SAB 104); *see also* AC ¶ 55 (partially quoting SAB 104).  Thus, the CW allegations regarding low customer attrition rates, indicative that customer relationships generally continued beyond the initial contract term, are only one small part of the calculus.  *See* AC ¶¶ 82-87.  When confronted with the decision of whether the customer would *continue to benefit from the payment for implementation services* beyond the initial contract period, as opposed to benefitting from ongoing access to Athena's web-based *business* services, Athena determined that the appropriate deferral period was the contract term, typically one year.  AC ¶ 93; Birnbach Decl., Ex. B, at 50 (2007 SEC Form 10-K), Ex. C, at 50 (2008 SEC Form 10-K).  Any scienter inference is also negated by widespread application of this accounting treatment in the SaaS industry:  other companies employed similar accounting procedures, with some even recognizing similar fees up-front (i.e. no deferral).  *See, e.g.*, Birnbach Decl. Ex., J, at 40-41, 66 (Taleo Corporation, 2008 SEC Form10-K), Ex. K, at 40 (SuccessFactors, Inc. 2009 SEC Form 10-K). Indeed, the Amended Complaint is devoid of any suggestion that implementation services themselves took longer than one year.  Thus, application of SAB 104 requires the careful exercise of accounting judgment and is not, therefore, a simple task.  *See Taleo,* 2010 WL 597987, at *10.  Plaintiffs have failed to allege facts from which the Court can make a strong, cogent and compelling inference that Defendants recklessly misapplied an accounting principle that "was so simple and basic that [D]efendants could not have made an innocent mistake."[18] *See id.*

---

[18]  Indeed, this is not a case where management ignored "red flags" indicating the impropriety of their accounting practices, as clean audit opinions indicated none existed.  *See, e.g., In re Lernout & Hospie Sec. Litig.,* 286 B.R.

Moreover, as discussed in more detail in Section II(A)(4), *infra*, Deloitte audited all of the financial statements in question and Plaintiffs do not allege that there was ever *any* objection to the Company's pre-restatement implementation fee revenue recognition practice. Birnbach Decl., Ex. B, at F-2 (2007 SEC Form 10-K) (Company's "consolidated financial statements present fairly, in all material respects, the financial position of athenahealth, Inc."), Ex. C, at 68, F-2 (2008 SEC Form 10-K) (same). Deloitte's opinion, as the Company's auditor, deserves deference. *See Serabian*, 24 F.3d at 362 (outside auditor's approval of Defendant's accounting method "arguably cast[s] doubt on the existence of any impropriety"); *Kushner v. Beverly Enter., Inc.*, 317 F.3d 820, 829 (8th Cir. 2003) (affirming dismissal) ("It is telling to us that [defendant's] outside auditors did not question its accounting practices. . . ."); *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1158 (C.D. Cal. 2007) (dismissing complaint) ("The Court finds Deloitte & Touche LLP's unqualified opinion 'highly probative' of an absence of scienter.").

Finally, Athena has historically and transparently amortized implementation fees ratably over the contract period, typically one year.[19] *See, e.g.*, AC ¶ 5; Birnbach Decl., Ex. B, at 23, 50 (2007 SEC Form 10-K), Ex. C, at 23, 50 (2008 SEC Form 10-K). Thus, Athena's shareholders, analysts, or any other interested parties had access to the facts required to form a judgment as to the propriety of the Company's accounting.[20] The Amended Complaint does not allege that anyone challenged management's accounting policies during the four years in question. Nor

---

33, 38 (D. Mass. 2002) (defendants "ignored KPMG's admonitions over at least two years regarding deficiencies in the internal audit controls and KPMG's report of serious accounting, cash collection and revenue recognition issues in the second and third quarter of 1999"); *Gelfer v. Pegasystems, Inc.*, 96 F. Supp. 2d 10, 15 - 19 (D. Mass. 2000) (prior lawsuit and explicit recommendation of auditor put defendants on notice of the improper accounting practices).

[19]    It is undisputed that the Company was also entirely transparent about the source of its implementation fees, the implementation fee process, and the rates of customer retention. *See* AC ¶¶ 4, 35, 72, 88-91, 101-102, 106, 223.

[20]    Indeed, as a public company, Athena was closely observed by numerous analysts. *See* AC ¶¶ 91, 98, 102-103.

could they:  the Company's public statements make entirely clear that the *Company*, as distinct

from an auditor or other third party, initiated the internal review of its implementation fee

revenue recognition policy in connection with the appointment of the new CFO.  *In re Bausch &*

*Lomb, Inc. Sec .Litig.*, 592 F. Supp. 2d 323, 342 -343 (W.D.N.Y. 2008) (dismissing complaint

and noting company undertook accounting review "on its own initiative"); *see also* AC ¶ 102;

Birnbach Decl., Ex. I, at Ex. 99.1 (SEC Form 8-K) (Feb. 25, 2010), Ex. A, at F-7 (2009 SEC

Form 10-K), Ex. D, at 2 (Earnings Call Transcript) (Mar. 16, 2010).

### 3.    The Reasons For And Magnitude Of The Restatement Negate A Strong Inference Of Scienter

When confronted with motions to dismiss Section 10(b) claims based on accounting

restatements, certain factors can be probative of scienter, including whether:

- The restatement corrected a significant overstatement of revenue—as compared with total revenue—for the period under scrutiny;

- The restatement occurred at a suspicious time, such as the end of a fiscal quarter or year;

- The previous accounting violated the company's own internal accounting policy;

- The company made prior similar restatements of revenue; and

- There were continuous disputes between management and the company's auditor where circumstances indicated more than a mere good faith disagreement.

*Gelfer v. Pegasystems, Inc.*, 96 F. Supp. 2d 10, 16 (D. Mass. 2000) (denying motion to dismiss

where scienter was adequately pled); *Chalverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 234

(D. Mass. 1999) (same); *see also In re Galileo Corp. S'holders Litig.*, 127 F. Supp. 2d 251, 266

(D. Mass. 2001) (dismissing complaint where there was no violation of internal Company

policy); *In re Focus Enhancements, Inc. Sec. Litig.*, 309 F. Supp. 2d 134, 159 (D. Mass. 2001)

(dismissing complaint where past practice could not have formed the basis for scienter).

Each of these factors supports dismissal here.  The magnitude of the restatement at issue

is not probative of scienter.  Despite Plaintiffs' misleading allegations presenting the magnitude

of the restatement as a percentage of "implementation and other revenue," *see, e.g.,* AC ¶ 231,

Athena's restatement was a miniscule part of its *total* revenue for the years and quarters restated.

*See* p. 9 (restatement expressed as percentage of total revenue).  This restatement is nowhere

near the degree of restatements that courts have considered—in combination with other factors—

as probative of scienter.  *See Chalverus*, 59 F. Supp. 2d at 234 (restatement was 158% of *total*

revenue for that quarter); *Gelfer*, 96 F. Supp. 2d at 16 (restatement ranged from 27% to 110% of

*total* revenue for the fiscal quarters restated).  Indeed, in *Taleo*, the Court found a restatement

amounting to 4% of *total* revenue insufficient to allege scienter.  2010 WL 597987, at *11.

Thus, Plaintiffs' theory that Defendants sought to engage in fraud by shifting a tiny percentage of

the smallest reported component of revenues to a different time period is simply not plausible.

Moreover, Plaintiffs have not alleged—nor could they— that the timing of the

restatement is suspicious.  Since the IPO, Athena's implementation fee accounting was

consistent and transparent.  Birnbach Decl., Ex. B, at 23, 50 (2007 SEC Form 10-K), Ex. C, at

23, 50 (2008 SEC Form 10-K); *see also Taleo,* 2010 WL 597987, at *9 ("Plaintiff acknowledges,

however, that Defendants historically, and consistently, interpreted EITF 00-21 . . . .").  Thus, the

restatement involved a restatement of all Company earnings since the IPO.  Application of SAB

104 "in such a consistent and transparent manner raises a plausible inference that Defendants'

error was innocent."  *See Taleo,* 2010 WL 597987, at *10.

Plaintiffs similarly cannot allege that Athena violated its own internal accounting policy,

as the Company *followed* it.  *See, e.g.,* Birnbach Decl., Ex. B, at 23 (2007 SEC Form 10-K)

("[when] service has been implemented . . . we begin recognition of implementation revenue

over the life of the contract").  To the contrary, and unlike *Chalverus* where the court considered

internal policy violations in connection with other factors, the Company was absolutely

transparent about the services it provided customers, customer retention, sources of revenue, and

its internal policy for recognizing implementation fee revenue.  *See* 59 F. Supp. 2d at 234; *see*

*also Taleo*, 2010 WL 597987, at *13 (no internal accounting policy violations).

Finally, the Amended Complaint is, appropriately, devoid of any allegations of previous

restatements or disputes with the Company's auditor.[21]  Plaintiffs' attempt to cite a prior non-

GAAP issue to show some defect in internal controls is unavailing.  *See* AC ¶¶ 259-60.

Although scienter—in limited circumstances—can be established by showing that the questioned

accounting practices are sufficiently similar to prior accounting practices found to be fraudulent,

Plaintiffs' attempt to use the non-GAAP issue to show scienter smacks of comparing apples to

oranges.  *Compare Gelfer*, 96 F. Supp. 2d at 15 (defendants should have been on notice that

accounting practices were fraudulent having been sued on *this very issue* in the past) to *Taleo*,

2010 WL 597987, at *10 ("prior deficiencies, which are *unrelated* to the manner in which Taleo

accounted for its bundled products," were insufficient to plead scienter) (emphasis added).  The

restatement concerns a revision in the Company's methodology for accounting for

implementation fees, which constitute a small portion of Athena's total revenue.  AC ¶¶ 100,

102.  The non-GAAP issue on which Plaintiffs attempt to hang their hats concerns a Company

decision to present its stock compensation expenses net of tax in its non-GAAP metrics, which

are presented for information purposes only.  This change is not a restatement and has no impact

on GAAP earnings per share.  Birnbach Decl., Ex. N, at Ex. 99.1 (SEC Form 8-K) (Feb. 4,

2010).

Moreover, the announcement of the internal review of accounting for implementation

---

[21]   To the contrary, and as discussed in Section II.B.4, *infra*, Deloitte's certification of all of the financial
statements subject to the restatement mitigates against scienter.

fees and the revised methodology for calculating non-GAAP income were announced in the *same* month.  If Plaintiffs' statements are accepted as true, the Company was dealing with the non-GAAP and GAAP issues *at the same time*.  Thus, the Court should adopt the far more "plausible nonculpable explanation" that the non-GAAP income issue could *not* have somehow put the Defendants on notice of a potential unrelated GAAP issue related to implementation fee recognition.  *See Tellabs,* 551 U.S. at 314.

<ol start="4">
<li>**The Audit Or Review Of All Financial Statements For The Periods In Question By The Company's Independent Auditor Is Strongly Probative Of The Absence Of Scienter**</li>
</ol>

The Amended Complaint is especially weak in light of Deloitte's review of Athena's financial statements, including auditing the annual financial statements for *all* of the periods in question.  Birnbach Decl., Ex. B, at F-2 (2007 SEC Form 10-K), Ex. C, at 68, F-2 (2008 SEC Form 10-K).  The fact that Deloitte concluded that the Company's "consolidated financial statements present[ed] fairly, in all material respects, the financial position of athenahealth, Inc.," *see id.*, compels an inference against the existence of any impropriety."[22]  *Serabian*, 24 F.3d at 362; *see also In re PEC Solutions Sec. Litig.*, No. 03-CV-331,  2004 WL 1854202, at *12 (E.D. Va. May 25, 2004), *aff'd*, 418 F.3d 379 (4th Cir. 2005) ("Defendants' financial statements were reviewed by independent auditors, who provided an opinion that the Company's financial statements were fairly prepared in accordance with GAAP").  Plaintiffs do not allege that Athena withheld facts concerning its implementation process, fee structure, and customer retention from Deloitte.  *See Taleo*, 2010 WL 597987, at *13 (plaintiff "does not allege facts that suggest the Defendants attempted to deceive Taleo's auditors").  The Amended Complaint does not allege

---

[22]  A plaintiff's failure to add the auditor as a defendant in a securities fraud suit based on a revenue restatement can be dispositive of whether the complaint states a claim for securities fraud.  *See In re PEC Solutions Sec. Litig.*, No. 03-CV-331,  2004 WL 1854202, at *12 (E.D. Va. May 25, 2004), *aff'd*, 418 F.3d 379 (4th Cir. 2005) ("Plaintiffs do not challenge [the auditors'] opinion and a failure to challenge the independent auditors' opinions weakens an allegation that a defendant violated GAAP.")

that Deloitte ever challenged or even disapproved of the Company's accounting procedure during the restatement period, nor could it, in light of Deloitte's clean audit opinions in the disclosures. Indeed, it was only after *Athena* hired a new CFO who initiated an internal review of the Company's implementation fee revenue recognition policy that Deloitte changed its position on whether the Company's financial statements were prepared in accordance with GAAP. *See* AC ¶¶ 102, 213; Birnbach Decl., Ex. D, at 2 (Earnings Call Transcript) (Mar. 16, 2010), Ex. H (SEC Form 8-K) (Jan. 11, 2010). These facts permit a compelling inference of non-fraudulent intent, cutting against a conclusion that the Company or the Individual Defendants knew or should have known that statements regarding implementation fees were false when made. *See Tellabs,* 551 U.S. at 310, 323-24; *Advest*, 512 F.3d at 59.

### B.       Plaintiffs' Allegations Highlight The Mere Existence Of A Restatement And Are, Therefore, Insufficient To Allege Scienter

In the absence of any specific facts permitting a strong inference of a conscious intent to defraud or recklessness, Plaintiffs' allegations boil down to a futile accusation that the Company restated a small portion of its total revenue after concluding that its prior accounting was inconsistent with GAAP. *See, e.g.,* AC ¶¶ 126, 230 (by virtue of the restatement, the Company "admitted that . . . the original financial statements contained an untrue statement of material fact"). A restatement of earnings, without more, does not support even a weak inference of scienter. *Segue*, 106 F. Supp. 2d at 169 (dismissing complaint). Similarly, "[m]erely stating in conclusory fashion that a company's books are out of compliance with GAAP would not itself demonstrate liability under section 10(b) or Rule 10b-5." *Ezra*, 466 F.3d 1, at *12 (internal citation omitted); *see also In re Peritus Software Serv., Inc. Sec. Litig.*, 52 F. Supp. 2d 211, 223 (D. Mass. 1999) (dismissing complaint based on restatement and noting "a mere failure to recognize revenue in accordance with GAAP does not, in itself, suffice to establish scienter"). In

the absence of specific facts permitting a strong inference of scienter, the Amended Complaint merely highlights a restatement, and must be dismissed.

### C.    The Individual Defendants' Stock Sales Negate Any Inference of Scienter

Plaintiffs' insider trading allegations—which do little more than recite the First Circuit standard—must be rejected.  "[T]he mere fact that insider stock sales occurred," as Plaintiffs have alleged here, "does not suffice to establish scienter."  *See Focus*, 309 F. Supp. 2d at 162 (internal citation omitted); *Stiegele ex rel Viisage Technology, Inc. v. Bailey*, No. 05-10677, 2007 WL 4197496, at *12 (D. Mass. Aug. 23, 2007) (dismissing complaint); *see also Waters*, 699 F. Supp. 2d at 345 ("It is well-established that allegations of insider trading are not by themselves sufficient to plead scienter . . . .").  "The plaintiffs must plead facts which would warrant, first, a finding that there was a suspiciously abnormal or unusual pattern of trading, and second, an inference of scienter from that finding."  *In re Parametric Tech. Corp. Sec. Litig.*, 300 F. Supp. 2d 206, 217 (D. Mass. 2001) (O'Toole, J.) (dismissing complaint with prejudice); *see Greebel*, 194 F.3d at 198 (trading must be "unusual, well beyond the normal patterns of trading by those defendants").  The Amended Complaint alleges nothing more than trading, largely pursuant to trading plans, and the timing and the pattern of which fails to support a strong inference of scienter.

### 1.    Plaintiffs' Allegations Of Stock Sales And Profits Do Not Suffice, Especially Where The Individual Defendants Retained The Vast Majority Of Their Holdings

Plaintiffs' attempt to point out mere trading volume and profits does not advance any analysis of whether the alleged insider trading was suspicious or unusual.  Plaintiffs seem to hang their hats entirely on allegations that the Individual Defendants sold 43.39% (Bush) and 16.64% (Byers) of their holdings and earned "more than $21.2 million" and "more than $3

million" during the more than two year Class Period.[23]  *See* AC ¶¶ 252, 254.  "[L]arge numbers do not necessarily create a strong inference of fraud."  *Taleo*, 2010 WL 597987, at *12 (trades of 38% and 61% insufficient for scienter) (internal citation omitted); *see In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 987-88 (9th Cir. 1999) (in affirming dismissal of complaint, noting that trades of 75.3% and 43.6% did not support scienter in light of other facts); *see also Malin v. XL Capital LTD.*, 499 F. Supp. 2d 117, 152 (D. Conn. 2007) (in dismissing complaint, holding that while plaintiffs "emphasize the size of the stock sales and … profit . . . [t]he gross proceeds, without more, do not aid the analysis.").  As in *Malin*, the Amended Complaint must be dismissed because it "alleges only the number of shares each executive sold, the share price on the date sold, and the gross profit realized from each sale."  499 F. Supp. 2d at 151; AC ¶ 252; AC Exs. A, B.  Under these circumstances, "[i]t is impossible, from the information provided by Plaintiff[], to determine whether the sales were 'unusual in timing or amount.'"[24]  *Malin*, 499 F. Supp. 2d at 151; *see W. R. Carney v. Cambridge Tech. Partners, Inc.*, 135 F. Supp. 2d 235, 256 (D. Mass. 2001) (dismissing complaint with prejudice and noting that merely alleging number of shares sold and their aggregate value does not raise a strong inference of scienter).  In fact, as

---

[23]   These percentages abruptly appear at the end of the Exhibits to the Complaint and Plaintiffs provide no basis for their calculations.  AC Exs. A, B.  According to the actual numbers in the SEC filings, Mr. Bush (including trusts whose activities are reported by him despite disclaiming beneficial ownership, as Plaintiffs have attributed to him) reduced his initial holdings by 31% by the end of the Class Period, and Mr. Byers by 32%.  Birnbach Decl., Ex. O (Summary of Mr. Bush's Trades), Ex. P (Bush SEC Forms 3 and 4), Ex. Q (Summary of Mr. Byers's Trades), Ex. R (Byers SEC Forms 3 and 4); *see Clorox*, 228 F.3d at 32 ("It is a well settled rule that when a written instrument contradicts allegations in the complaint to which it was attached, the exhibit trumps the allegations") (internal citation omitted).

[24]   In addition, Plaintiffs' attempt to create the appearance of a large trading volume by extending the Class Period to over 29 months is of no avail.  Courts have flatly rejected this pleading technique "to sweep as many stock sales into their totals as possible, thereby making the stock sales appear more suspicious than they would be with a shorter class period."  *See Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1118 (N.D. Cal. 2009) (class period of nearly 2.5 years); *In re The Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092-93 (9th Cir. 2002) (in affirming dismissal of complaint, noting that "overarching consideration[]" is that 15-month class period is "unusually long"); *Malin*, 499 F. Supp. 2d at 150 (noting that insider trading allegations "relate to an exceedingly lengthy class period" of 24 months.); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1083 (N.D. Cal. 2001) (90-week class period is "major mitigating factor" for defendants' somewhat suspicious trades totaling 39% of their holdings.).

discussed in Section II(C)(3), *infra*, the SEC disclosures referenced in the Amended Complaint

negate any inference of suspicious trading. *Stiegele,* 2007 WL 4197496, at *12 n.3 (court may

consider SEC filings on a motion to dismiss); *accord Waters*, 699 F. Supp. 2d at 345-46.

Indeed, the fact that the Individual Defendants *retained* the vast majority of their holdings

in the Company refutes any notion that they cashed out "while in possession of non-public

adverse information" and "took full advantage of the artificial inflation" of stock price. *See* AC

¶ 252. Even using Plaintiffs' alleged numbers, which are not accurately calculated based on the

underlying SEC filings, the Individual Defendants *retained* 83.36% and 56.61% of their stock

holdings. AC ¶¶ 252, 254. This retention of the vast amount of their holdings undermines

scienter. *See, e.g., Peritus*, 52 F. Supp. 2d at 225 (dismissing complaint where retention of 62%

or more by individual defendants "suggests that the sales were not unusual or motivated by a

desire to capitalize on knowledge of inflated stock values"); *Wenger v. Lumisys, Inc*., 2 F. Supp.

2d 1231, 1251 (N.D. Cal. 1998) (dismissing complaint where officers "retained the vast majority

of their holdings," i.e., 60% on average).

### 2. The Individual Defendants Traded Largely Pursuant To 10b5-1 Trading Plans

The fact that the Individual Defendants traded largely pursuant to 10b5-1 trading plans,[25]

AC ¶ 255, directly contradicts any allegation that that their trading was "unusual, well beyond

the normal patterns of trading by those defendants." *See Greebel*, 194 F.3d at 198. A 10b5-1

plan rebuts an inference of scienter because it removes control of sales decisions to a broker.

*Stiegele,* 2007 WL 4197496, at *13. The mere fact that the Class Period encompasses the plan

---

[25] Other than an IPO over-allotment sale and some sales during the summer of 2008, all trades reported by Mr. Bush were pursuant to 10b5-1 plans. Birnbach Decl. Ex. O (Summary of Mr. Bush's Trades). Similarly, all of Mr. Byers's trades except for one trade on August 11, 2008 were pursuant to his 10b5-1 plan. *Id.* at Ex. Q (Summary of Mr. Byers's Trades). SEC Forms 4 state in a footnote, where applicable, that sales were "effected pursuant to a Rule 10b5-1 trading plan." *Id.* at Ex. P (Bush SEC Forms 3 and 4), Ex. R (Byers Forms 3 and 4).

adoption dates does not undermine their validity, especially where there was no publicly traded

stock, AC ¶ 256, or any reason whatsoever to enter into trading plans before the Class Period.

*See Taleo*, 2010 WL 597987, at *12 (dismissing complaint where "Plaintiff . . . does not allege

that [defendants] amended their 10b-5 plans, and the fact that they may have entered into the

plans during the Class Period is not inherently suspicious, given its length [of approximately 3

years]"); *In re Int'l Rectifier Corp. Sec. Litig.*, No. 07-02544, 2008 WL 4555794, at *19 (C.D.

Cal. May 23, 2008) ("Although the 10b5-1 trading plan was entered into during the class period,

given the four year class period, the Court is unable to find anything unusual or suspicious about

this fact" where there were no allegations that defendant had "actively amended, modified or

manipulated his 10b-5 trading plans.").

### 3. The Pattern Of The Individual Defendants' Stock Sales Mitigates Against Scienter

Even without their trading plans, the pattern and timing of the Individual Defendants'

trades is anything but suspicious, and Plaintiffs allege no facts as to suspicious timing.[26]  The

vast majority of the supposed insider trading occurred months before the restatement.  *See* AC

Exs. A, B.  For example, approximately 80% of the Individual Defendants' trades occurred

before mid-2009, eight months before the announcements of the internal review and the

subsequent Restatement.[27]  *See Taleo*, 2010 WL 597987, at *12 (timing not suspicious because

the bulk of executive's trades occurred months before restatement); *Focus*, 309 F. Supp. 2d at

164 (timing not suspicious because the vast majority of sales occurred after a public

---

[26]   The allegation that the Individual Defendants "began trading after Defendants engaged in improper accounting of the Company's implementation revenue," AC ¶ 253, adds no weight to the scienter pleading because until the first day of the Class Period, there was no public trading in the Company's stock.  *See* AC ¶¶ 2, 256.  Moreover, as executive officers of the Company, the Individual Defendants were subject to a lock-up agreement prohibiting sales for 180 days from the IPO, unless such prohibition was released by the underwriters, as in the case of Mr. Bush's over-allotment sale.  Birnbach Decl., Ex. S, at 115 (IPO Prospectus).

[27]   Through June 30, 2009, Mr. Bush allegedly sold 544,816 shares or 81% of his class period total of 674,136 shares, Mr. Byers 71,500 shares or 75% of his class period total of 95,500 shares.  AC Exs. A, B.

announcement that caused stock price to rise, rather than before a non-public event).  If there truly was some "scheme" to inflate stock price and pocket the profit, AC ¶¶ 1, 289, one would expect to see a disproportionate volume of trades "before a big 'event' unknown to the public," *See Greebel*, 194 F.3d at 207.  To the contrary, the trades are "fairly evenly distributed throughout the Class Period, rather than clustered at its end when insiders theoretically would have rushed to cash out before the fraud was revealed and stock prices plummeted," thereby negating an inference of scienter.  *See Malin*, 499 F. Supp. 2d at 151-52 (internal quotation marks and citation omitted); AC Exs. A, B.

Indeed, despite Plaintiffs' allegation that the Individual Defendants "executed [their sales] at [unspecified] times calculated to maximize their personal benefit from the artificial inflation of athenahealth's stock price," AC ¶ 253, the weighted average sale price per share was $31.45 for Mr. Bush and $32.77 for Mr. Byers.  AC Exs. A, B.  These numbers are a far cry from the Class Period high of $47.82 that the Company's stock allegedly achieved through Defendants' "scheme."  *See* AC ¶¶ 252-255, 270, 289; *see also Teachers' Retirement Sys. of LA v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007) (affirming dismissal where "defendants' sales generally occurred at prices that were not especially high for the class period.").  The single largest sale by Mr. Bush of 80,000 shares on September 25, 2007—about 12% of his aggregate sales—was executed at the Class Period *low* of $18.00 per share.[28]  AC Ex. A.  Similarly, Mr. Byers sold his shares for as low as $23.41 on April 25, 2008, and his largest trade of 20,000 shares—about 20% of his aggregate sales—occurred at $33.24 on August 11, 2008.  AC Ex. B.

---

[28]  The allegation that Mr. Bush "profited from the IPO," AC ¶ 256, is not a basis for scienter.  In addition to the sale being executed at the lowest price during the Class Period, the sale was made pursuant to the underwriters' standard option, which was publicly disclosed, to purchase additional shares if they sold more shares than originally planned.  *See* Birnbach Decl., Ex. S, at 115 (IPO Prospectus), Ex. P (Bush Forms 3 and 4) (footnote 1 to Form 4 filed on Sep. 25, 2007).  Accordingly, Plaintiffs have failed to allege facts supporting anything unusual or suspicious about this sale.

Moreover, three days before his sale of 1,500 shares in late October 2009, Mr. Byers actually acquired 13,750 shares via options he exercised, thereby replenishing more than 14% of the 95,500 shares sold during the Class Period.  Birnbach Decl., Ex. Q (Summary of Mr. Byers's Trades), Ex. R (Byers Forms 3 and 4); AC Ex. B; *see Jones v. Corus Bankshares Inc*., 701 F. Supp. 2d. 1014, 1029-30 (N.D. Ill. 2010) (dismissing complaint against a defendant where his purchase of shares during the class period, combined with other factors, negated an inference of scienter); *Malin*, 499 F. Supp. 2d. at 153 (dismissing complaint where acquisitions of shares during the class period undermined inference of scienter).

### III.    The Amended Complaint Does Not Adequately Allege Loss Causation

The Amended Complaint must be dismissed in its entirety because it fails to plead loss causation with particularity.  *See* 15 U.S.C. § 78u-4(b)(4); *In re Alkermes Sec. Litig.*, No. 03-12091, 2005 WL 2848341, at *12 (D. Mass. Oct. 6, 2005) (dismissing Section 10(b) claims where plaintiff failed to plead loss causation with particularity).  It is not enough for a plaintiff to argue that the issuer's stock price was inflated.  Rather, a plaintiff must allege that a corrective disclosure, i.e. statement(s) identifying a prior material misrepresentation or omission, caused a significant decline in the stock price, causing actual economic loss for the plaintiff.  *Marblehead*, 639 F. Supp. 2d at 164 (citing *Dura*, 544 U.S. at 342); *see also Alkermes*, 2005 WL 2848341, at *11 (there must be a causal link between the alleged misconduct and the economic harm ultimately suffered by plaintiff).

Plaintiffs have failed to plead loss causation because Plaintiffs have not linked the March 15, 2010 announcement of the restatement to a significant *drop* in Athena's stock price.  *See Dura*, 544 U.S. at 347.  There are three corrective disclosures at issue:  the February 25, 2010 announcement of the internal review of implementation fee accounting, the March 15, 2010 announcement of the restatement, and the April 29, 2010 announcement of the Company's first

31

quarter 2010 results.  *See* AC ¶¶ 6-8.  The announcement of the restatement on March 15, 2010, which is at the core of Plaintiffs' claims, resulted in an immediate 6.5% *increase* in the stock price.  Birnbach Decl. Ex. M (Athena stock prices).  Plaintiffs cannot plead loss causation.

Further, Athena's stock price drop was far from sudden, and was instead part of a general decline since January 2010, with a gradual rebound since mid-July.  Birnbach Decl. Ex. T (stock price line graph) (demonstrating frequent periods of downward trends and rebounds in stock price throughout the Class Period to the present), Ex. M (Athena stock prices) (same).  Courts have distinguished slow, steady declines, such as that experienced by Athena in 2010, from sharp drops resulting from corrective disclosures.  *See, e.g.*, *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 546 (S.D.N.Y. 2007) (rejecting loss causation argument where "[l]ead Plaintiffs allege a slow, steady decline in [Defendant's] securities, not a sharp drop resulting from the announcement of a massive liquidity crisis"); *In re Buca, Inc. Sec. Litig.*, No. 05-1762, 2006 WL 3030886, at *9 (D. Minn. Oct. 16, 2006) ("Further, the Court does not find that this decline establishes loss causation where the share price was trending downward throughout the Class Period . . . ").  Thus, the Amended Complaint fails to plead loss causation.

## IV.    Plaintiffs Fail To State A Claim For Control Person Liability

Plaintiffs' claim against the Individual Defendants for violations of Section 20(a) of the Exchange Act, *see* AC ¶¶ 300-03, must be dismissed because the Amended Complaint fails to state an underlying violation of Section 10(b) or Rule 10b-5.  Section 20(a) imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable" for a securities fraud violation.  15 U.S.C. § 78t(a).  Plaintiffs have both failed to plead an underlying violation of the Exchange Act and that the Individual Defendants controlled any person who committed any such violation, warranting dismissal.  *See Advest*, 512 F.3d at 67-68 (affirming dismissal of Section 20(a) claim); *Marblehead*, 639 F.3d at 165 (dismissing Section 20(a) claim).

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice.

Dated:  October 1, 2010

Respectfully submitted,

athenahealth, Inc., Jonathan Bush, and Carl B. Byers,

By their attorneys,

 /s/ Deborah S. Birnbach
Deborah S. Birnbach (BBO #628243)
Haimavathi Varadan Marlier (BBO #668400)
Marcy D. Smirnoff (BBO #663662)
Goodwin Procter LLP
53 State Street
Boston, MA 02109
Tel:  617-570-1000
Fax:  617-523-1231
dbirnbach@goodwinprocter.com
hmarlier@goodwinprocter.com
msmirnoff@goodwinprocter.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 1, 2010.

*/s/ Deborah S. Birnbach*

LIBA/2119563.2