**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ANDREA CASULA, On Behalf of Herself and All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>ATHENAHEALTH, INC., JONATHAN BUSH and CARL B. BYERS, )<br><br>Defendants. )<br>_____ ) | No. 1:10-cv-10477-GAO<br><br><u>CLASS ACTION</u><br><br>**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**<br><br>Leave to File Granted on Nov. 29, 2010 |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................1

FACTUAL BACKGROUND ..........................................................................................3

ARGUMENT ...................................................................................................................7

I.     Legal Standards on a Motion to Dismiss ...........................................................7

     A.     Rule 12(b)(6) Legal Standard ...............................................................7

     B.     Exchange Act Legal Standard ...............................................................8

II.     The Complaint Raises a Strong Inference of Defendants' Scienter ...................9

     A.     Legal Standards for Scienter ................................................................9

     B.     The Complaint Alleges Sufficient Facts Demonstrating Defendants'
             Scienter ...............................................................................................11

          1.     The Complaint's Allegations Establish that Defendants Knew that
               the Expected Performance Period Was Longer than a Year .....................12

          2.     The Company's Restatement and Defendants' GAAP Violations
               Support a Strong Inference of their Scienter .............................................16

          3.     Defendants' Attempts to Hide Behind Deloitte Fall Flat ..........................25

          4.     Defendants' False Certifications and Lack of Internal Controls
                Support a Strong Inference of Scienter .....................................................27

          5.     The Core Operations Doctrine Supports a Strong Inference of
                Scienter .....................................................................................................28

          6.     Defendants' Class Period Stock Sales Support a Strong Inference
                of Scienter .................................................................................................30

               a.     Defendants' Insider Trading Was Suspicious in Amount .............31

               b.     Defendants' Bush and Byers' 10b5-1 Plans Do Not Negate
                    a Strong Inference of Scienter .......................................................32

                c.     The Pattern of Defendants' Insider Trading Does Not
                    Mitigate Against Their Scienter .....................................................34

          7.     Defendants' Non-Culpable Explanation Is Not Compelling ....................35

III.     Plaintiff Adequately Alleges Loss Causation ..................................................................36

IV.     Plaintiff Has Adequately Pled Control Person Liability....................................................40

CONCLUSION.................................................................................................................................40

## TABLE OF AUTHORITY

**CASES**

*380544 Can., Inc. v. Aspen Tech., Inc.*,
    544 F. Supp. 2d 199 (S.D.N.Y. 2008)...........................................................................16

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
    512 F.3d 46 (1st Cir. 2008)................................................................10, 11, 25, 40

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002).........................................................................................10

*Alfus v. Pyramid Tech. Corp.*,
    764 F. Supp. 598 (N.D. Cal. 1991) ...........................................................................31

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009)..................................................................................................8

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)......................................................................................................8

*Brumbaugh v. Wave Sys. Corp.*,
    416 F. Supp. 2d 239 (D. Mass. 2006) ...........................................................32, 36, 37

*Clorox Co. Puerto Rico v. Proctor & Gamble Comm. Co.*,
    228 F.3d 24 (1st Cir. 2000)........................................................................................20

*Colon v. Diaz-Gonzalez*,
    2009 WL 3571974 (D.P.R. Oct. 26, 2009) ................................................................36

*Crowell v. Ionics, Inc.*,
    343 F. Supp. 2d 1 (D. Mass. 2004) ...........................................................................28

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)..........................................................................................36, 37, 38

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976)....................................................................................................10

*Firestone v. Firestone*,
    76 F.3d 1205 (D.D.C. 1996) ......................................................................................40

*Foman v. Davis*,
    371 U.S. 178 (1962)....................................................................................................40

*Fox v. First BanCorp*,
     2006 WL 4128534, (D.P.R. Nov. 6, 2006) ....................................................................27

*Friedberg v. Discreet Logic*,
     959 F. Supp. 42 (D. Mass. 1997) ................................................................................31

*Gelfer v. Pegasystems, Inc.*,
     96 F. Supp. 2d 10 (D. Mass. 2000) .............................................................................24

*Greebel v. FTP Software, Inc.*,
     194 F.3d 185 (1st Cir. 1999) ..............................................................20, 21, 30, 31

*Helwig v. Vencor, Inc.*,
     251 F.3d 540 (6th Cir. 2001), *cert. dismissed*, 536 U.S. 935 (2002) ...............................8

*Hoff v. Popular, Inc.*,
     2010 U.S. Dist. LEXIS 77788 (D.P.R. Aug. 2, 2010) ................................................37, 40

*In re ArthroCare Corp Sec. Litig.*,
     --- F. Supp. 2d ----, 2010 WL 2901536 (W.D. Tex. Jul. 20, 2010) ............................17, 18

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
     324 F. Supp. 2d 474 (S.D.N.Y. 2004) ........................................................................29

*In re Baan Co. Sec. Litig.*,
     103 F. Supp. 2d 1 (D.D.C. 2000) ...............................................................................23

*In re Biogen Idec, Inc. Sec. Litig.*,
     2008 WL 4810045 (D. Mass. Oct. 25, 2008) ..............................................................33

*In re Bristol-Myers Squibb Sec. Litig.*,
     312 F. Supp. 2d 549 (S.D.N.Y. 2004) ........................................................................15

*In re Buca, Inc. Sec. Litig.*,
     2006 WL 3030886 (D. Minn. Oct. 16, 2006) ...............................................................39

*In re Cabletron Sys., Inc.*,
     311 F.3d 11 (1st Cir. 2002) ................................................................14, 15, 31

*In re Campbell Soup Co. Sec. Litig.*,
     145 F. Supp. 2d 574 (D.N.J. 2001) ............................................................................29

*In re Cardinal Health, Inc. Sec. Litig.*,
     426 F. Supp. 2d 688 (S.D. Ohio 2006) .......................................................................32

*In re Credit Suisse-AOL Sec. Litig.*,
     465 F. Supp. 2d 34 (D. Mass. 2006) ........................................................................8, 37

*In re Enron Corp. Sec., Derivative & ERISA Litig.,*
258 F. Supp. 2d 576 (S.D. Tex. 2003) ....................................................................27, 33

*In re FirstEnergy Corp. Sec. Litig.,*
316 F. Supp. 2d 581 (N.D. Ohio 2004).........................................................................20

*In re Focus Enhancements, Inc. Secs. Litig.,*
309 F. Supp. 2d 134 (D. Mass. 2001) ...........................................................................22

*In re Intelligroup Sec. Litig.,*
527 F. Supp. 2d 262 (D.N.J. 2007) ...............................................................................28

*In re Medicis Pharm. Corp. Secs. Litig.,*
2010 U.S. Dist. LEXIS 81410 (D. Ariz. Aug. 9, 2010)............................................ *passim*

*In re MicroStrategy Inc. Secs. Litig.,*
115 F. Supp. 2d 620 (E.D. Va. 2000) ............................................................................16

*In re Miller Indus., Inc. Sec. Litig.,*
12 F. Supp. 2d 1323 (N.D. Ga. 1998) ...........................................................................35

*In re Orbital Sciences Corp. Sec. Litig.,*
58 F. Supp. 2d 682 (E.D. Va. 1999) ..............................................................................32

*In re Praecis Pharms., Inc., Sec. Litig.,*
2007 WL 951695 (D. Mass. Mar. 28, 2007)..................................................................15

*In re ProQuest Sec. Litig.,*
527 F. Supp. 2d 728 (E.D. Mich. 2007).........................................................................27

*In re Ramp Networks, Inc. Secs. Litig.,*
201 F. Supp. 2d 1051 (N.D. Cal. 2002) .........................................................................26

*In re Raytheon Sec. Litig.,*
157 F. Supp. 2d 131 (D. Mass. 2001) .......................................................................20, 21

*In re Rent-Way Sec. Litig.,*
209 F. Supp. 2d 493 (W.D. Pa. 2002)............................................................................18

*In re Rhodia S.A. Sec. Litig.,*
531 F. Supp. 2d 527 (S.D.N.Y. 2007)............................................................................39

*In re Sonus Networks Secs. Litig.,*
2006 U.S. Dist. LEXIS 28272 (D. Mass. May 10, 2006) ................................................28

*In re Stone & Webster, Inc., Sec. Litig.,*
253 F. Supp. 2d 102 (D. Mass. 2003) ...........................................................................12

*In re Taleo Corp. Sec. Litig.*,
    2010 WL 597987 (N.D. Cal. Feb. 17, 2010) ............................................................17, 20

*In re TyCom Ltd. Sec. Litig.*,
    2005 U.S. Dist. LEXIS 19154 (D.N.H. Sept. 2, 2005) ................................................36, 37

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (N.D. Cal. 2009) ..................................................................................32

*In re Vetex Pharms., Inc, Sec. Litig.*,
    357 F. Supp. 2d 343 (D. Mass. 2005) .........................................................................16

*Keeney v. Larkin*,
    306 F. Supp. 2d 522 (D. Md. 2003) ............................................................................15

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    513 F.3d 702 (7th Cir. 2008) ......................................................................................29

*Miss. Pub. Emps.' Ret. Sys. v. Bos. Scientific Corp.*,
    523 F.3d 75 (1st Cir. 2008)..........................................................................9, 31, 33, 40

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC, Inc.*,
    537 F.3d 35 (1st Cir. 2008)..........................................................................................16

*Neitzke v. Williams*,
    490 U.S. 319 (1989).......................................................................................................8

*Orton v. Parametric Tech Corp.*,
    344 F. Supp. 2d 290 (D. Mass. 2004) .........................................................................27

*PR Diamonds, Inc. v. Chandler*,
    364 F.3d 671 (6th Cir. 2004) ......................................................................................18

*Primavera Investors v. Liquidmetal Techs., Inc.*,
    403 F. Supp. 2d 1151 (M.D. Fla. 2005).......................................................................12

*Rodriguez-Torres v. Caribbean Forms Mfr., Inc.*,
    399 F.3d 52 (1st Cir. 2005)..........................................................................................33

*Roeder v. Alpha Indus., Inc.*,
    814 F.2d 22 (1st Cir. 1987)............................................................................................8

*Ross v. Abercrombie & Fitch Co.*,
    501 F. Supp. 2d 1102 (S.D. Ohio 2007) ..................................................................8, 32

*SEC v. Ginsburg*,
    362 F.3d 1292 (11th Cir. 2004) ..................................................................................34

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................................................ *passim*

*Zuckerman v. Smart Choice Auto. Group, Inc.*,
    2000 U.S. Dist. LEXIS 13489 (M.D. Fla. Aug. 29, 2000) ...............................................29

Lead Plaintiff Waterford Township General Employees Retirement System ("Plaintiff" or "Waterford GERS"), individually and on behalf of all persons or entities that purchased and/or acquired the common stock of athenahealth, Inc. ("athenahealth" or the "Company") between September 20, 2007 and February 25, 2010 (the "Class Period") (the "Class"), by and through their undersigned counsel, respectfully submits this memorandum of law in opposition to the motion to dismiss ("Motion" or "Def. Mem.") filed by Defendants athenahealth, Jonathan Bush ("Bush"), and Carl B. Byers ("Byers") (collectively, "Defendants") (Bush and Byers, together, the "Individual Defendants").

## INTRODUCTION

Throughout the Class Period, Defendants improperly and prematurely amortized implementation fees – those fees associated with implementing its software services for customers. As a result of Defendants' accounting fraud, described in detail in the Amended Class Action Complaint ("Complaint") and below, Defendants were required to restate the Company's financial statements for the fiscal years ended 2005, 2006, 2007, and 2008, and each quarterly period in 2008, as well as the first three quarters of 2009.  In contravention of relevant accounting rules, Defendants amortized the Company's implementation revenue over the length of its initial contracts with clients – usually a one-year period – as opposed to the expected performance period of *twelve years*, which represented the Company's estimated expected customer life.  In so doing, Defendants front-loaded athenahealth's recognition of implementation revenue and therefore artificially boosted many of the crucial financial metrics reported to the market, including the Company's revenues, net income, and earnings per share.

Now, facing liability under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") for their accounting fraud, Defendants seek dismissal of Plaintiff's Complaint

1

largely by trivializing the significance of the restatement.  As the materiality of their false statements is indisputable, Defendants primarily challenge the adequacy of Plaintiff's allegations of scienter.[1] In specific, Defendants assert that the Complaint fails to raise a strong inference of scienter because (1) it does not allege that Defendants had any knowledge of the falsity of their Class Period statements; (2) application of the governing accounting rules is complex and Defendants utilized reasonable judgment; (3) the magnitude of the restatement negates any inference of scienter; (4) the Company's independent auditor issued unqualified opinions for the statements in question; and (5) the context of the Individual Defendants' stock sales negates any inference of scienter.  Each of these arguments falls flat.

The Complaint more than adequately satisfies the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 9(b) of the Federal Rules of Civil Procedure.  As described more fully below, Plaintiff has sufficiently alleged Defendants' scienter in that, throughout the Class Period, Defendants were well aware of the expected performance period that should have governed athenahealth's amortization of implementation revenue.  Further, Defendants failed in what should have been a straight-forward application of the relevant accounting rules; the restatement had significant impacts on the Company's key financial metrics; opinions from their independent auditor cannot relieve Defendants of their ultimate responsibility over the Company's financial statements; and the pattern and amount of Defendants' Class Period stock sales are probative of their scienter.  Accordingly, Defendants' efforts to strike down Plaintiff's Complaint are unpersuasive, and this Court should deny their motion to dismiss.

---

[1]     Defendants also argue that Plaintiff has failed to plead loss causation because the Company's March 15, 2010 announcement is not linked to any decline in athenahealth's stock price.  However, as detailed below, the March 15, 2010 announcement and any corresponding stock movement does not bear on the sufficiency of Plaintiff's loss causation allegations.

## FACTUAL BACKGROUND

athenahealth was founded in 1997 and completed an Initial Public Offering ("IPO") in September of 2007. ¶¶26-27. The Company provides Internet-based business services for physician practices, including, among others, revenue cycle management services (*i.e.*, athenaCollector), clinical cycle management services (*i.e.*, athenaClinicals), and other practice management services (*i.e.*, athenaCommunicator). ¶¶2, 30-34. To take advantage of the services offered by athenahealth, clients are not required to purchase any hardware or software licenses. ¶29. Instead, they can access the Company's services through a web portal. *Id.* Accordingly, the Company refers to its business model as "software-as-a-service." ¶60. The Company charges a monthly fee for its services based on a percentage of collections. ¶47.

Once a client signs up with athenahealth, the Company's Professional Services personnel work with the client to get it up and running on the athenahealth system. ¶¶35-38. This process is known as the implementation process and involves several phases, including enrollment, uploading client data, and training for the practitioner's staff. *Id.* This process is time-consuming and often experiences delays. ¶¶71-80. Clients are charged fees for this implementation service, which are received in two installments: half upon the signing of the contract, and the remaining fees upon the completion of the implementation. ¶¶50-52.

Throughout the Class Period, Defendants represented that the Company accounted for implementation fees as deferred revenue until the completion of its implementation service, at which time it recognized this revenue ratably on a monthly basis over the expected performance period. ¶¶56-58. Defendants knew that the expected performance period for athenahealth's implementation fees was well over a year in length. ¶¶62-92. First, under Defendants' software-as-a-service model, Defendants continued many of the services related to implementation over the course of its relationship with clients. ¶60. Indeed, this was "part of the uniqueness of athena," and customers

selected athenahealth over competitors because it gave them access to the system, ongoing services and training rather than a software license.  *Id.*  Customers were provided with services related to implementation even after the implementation process was complete.  ¶¶61-62.

Moreover, the implementation process was often plagued by substantial delays.  ¶¶77-80. Because it took so long for customers to get onto the athenahealth system, most customers would have to be customers for much longer than a single year.  ¶79.  In addition, as admitted by Defendants throughout the Class Period, the Company had a client retention rate of approximately 92%, and its client contracts automatically renewed after their initial one-year term.  ¶¶90-91.  As numerous confidential witnesses explained, the Company's high client retention was driven by the fact that once a client became a part of the athenahealth system, it was very difficult for the client to back out its data and leave.  ¶¶63, 68-70.

Defendants knew that the Company's expected customer life was longer than a year.  As confidential witnesses explained, the Individual Defendants closely monitored attrition rates and implementation fees through the Company's Customer Relationship Management Software ("CRM") – salesforce.com and Sugar – and a Weekly Implementation Status Report.  ¶¶82, 85-87. The Weekly Implementation Status Reports were discussed at monthly meetings with the executive team.  ¶87.  Moreover, the Defendants repeatedly discussed attrition and renewal rates at the Company's quarterly meetings.  ¶¶83-85.

Despite their knowledge of the Company's long relationships with clients and the lengthy performance period associated with its implementation fees, during the Class Period, Defendants amortized the Company's implementation revenue over the length of its initial contracts with clients, which in the vast majority of cases was only a one-year period.  In such a way, Defendants improperly recognized implementation revenues prematurely in clear violation of Generally

Accepted Accounting Principles ("GAAP").  ¶¶93-96 and 212-235.  Defendants' GAAP violations were so pervasive that the Company's financial statements for the fiscal years ended 2005, 2006, 2007, and 2008, and each quarterly period in 2008, as well as the first three quarters of 2009 were misstated.  ¶100.  Moreover, Defendants' GAAP violations caused the Company's net loss to be understated by 26%, 34%, and 114% for the years 2005, 2006, and 2007, respectively, and implementation and other revenue was overstated by approximately 50%.  ¶231.  Although Defendants' financial statements during the Class Period were false and misleading, Defendants repeatedly certified their accuracy in Sarbanes-Oxley certifications which accompanied the Company's quarterly and annual filings.  Moreover, the Individual Defendants also falsely certified that the Company's internal controls over financial reporting were effective for these periods. ¶¶239-251.

By improperly recognizing the Company's implementation revenue, Defendants succeeded in artificially inflating the Company's revenues, net income, earnings per share, and numerous other financial metrics that they touted to the market.  ¶¶93-96.  As a newly public company which did not offer guidance, athenahealth's net income and earnings per share were particularly important metrics that analysts looked to in determining "consensus estimates."  ¶27.  The Company's satisfaction of such estimates is critical to maintaining its stock price and investor confidence.  *Id.*  Thus, through Defendants' accounting manipulations, the price of athenahealth's common stock was artificially inflated during the Class Period.  ¶¶93-96.

On February 25, 2010, the market finally learned the truth about Defendants' improper accounting.  ¶97.  On this day, after the market closed, Defendants revealed that the Company would be postponing the release of its financial results for the fourth quarter of 2009 and the year ended December 31, 2009, in order to allow additional time to complete the year-end audit and ***conduct an***

*internal accounting policy review* related to the *timing of amortization for deferred implementation revenue*. *Id.* The market was shocked by this announcement, as is evidenced by analyst statements that the announcement was "disconcerting" and diminished athenahealth's management's credibility. ¶98. Moreover, the announcement and resulting analyst commentary caused the Company's stock price to plummet by nearly 18% from $43.52 on February 25, 2010 to $35.87 on March 1, 2010, on unusually heavy trading volume, resulting in millions of dollars of investor losses. ¶99.

On March 15, 2010, the Company revealed that it would in fact be required to restate its prior period financials for the fiscal years ended 2005, 2006, 2007, and 2008, each quarterly period in 2008, and the quarterly periods for first quarter through the third quarter in 2009 due to a change in the amortization period for deferred implementation revenue. ¶¶100-102. The Company revealed that previously it had been amortizing revenues over an expected performance period of the initial contract term, which, for the vast majority of contracts, was one year in duration. *Id.* However, the Company stated that the appropriate expected performance period of the implementation fees was actually *twelve years*, which represented the estimated expected customer life. *Id.* Through the Company's restatement, Defendants admitted that they had materially overstated implementation revenues during the Class Period. Moreover, Defendants revealed that that the Company's financial disclosure controls and procedures were ineffective during the Class Period. ¶¶102, 243.

While the Company's stock price did not decline as a result of these disclosures, this was due to the fact that: (1) the market was already apprised of the Company's improper recognition of revenue from the February 25, 2010 disclosure, which was reflected in the stock price decline between February 25, 2010 and March 1, 2010; and (2) Defendants attempted to offset the announced restatement with positive information regarding the Company's financial results. ¶275.

6

These disclosures had the intended effect of offsetting the news regarding the restatement and buoying the Company's stock price.  ¶276.

Thereafter, on April 29, 2010, the market learned the full impact that Defendants' accounting machinations had on the Company's financial results.  ¶104.  On this date, the Company announced its first quarter 2010 results and explained that the Company's bottom line results were impacted by increased investments in sales and marketing *as well as higher general and administrative expenses of approximately $1.0 million related to the Company's recent accounting review and restatement process.  Id.*  The market was again stunned by this revelation, causing the Company's stock price to plummet by nearly 24% from $35.35 on April 29, 2010 to $26.96 on May 6, 2010, on unusually heavy trading volume, resulting in millions of dollars of investor losses.  ¶109.

At the same time investors were suffering, Defendants Bush and Byers lined their pockets. In fact, with athenahealth's stock price buoyed by their misrepresentations during the Class Period, these Defendants unloaded significant percentages of their common stock holdings for proceeds totaling more than $24 million.  ¶¶252-256.

## **ARGUMENT**

### I.    **Legal Standards on a Motion to Dismiss**

####     A.      **Rule 12(b)(6) Legal Standard**

When faced with a Rule 12(b)(6) motion to dismiss an action alleging securities fraud, "courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true."  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("*Tellabs*").[2]  "To survive a motion to dismiss, a complaint

---

[2]      Internal citations, footnotes, and quotations are omitted, and emphasis is added, unless otherwise noted.

must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombl*y, 550 U.S. 544, 570 (2007)).  Importantly, "the court may grant dismissal only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 38 (D. Mass. 2006) (citing *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir. 1987)) (denying motion to dismiss securities fraud claims).

Rule 12(b)(6) does not permit "dismissals based on a judge's disbelief of a complaint's factual allegations." *Neitzke v. Williams*, 490 U.S. 319, 327 (1989).  Indeed, "when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the fact finder." *Twombl*y, 550 U.S. at 563.  Thus, "a complaint will not be dismissed pursuant to Rule 12(b)(6) unless there is no law to support the claims made, the facts alleged are insufficient to state a claim, or there is an insurmountable bar on the face of the complaint." *See Ross v. Abercrombie & Fitch Co.*, 501 F. Supp. 2d 1102, 1105 (S.D. Ohio 2007); *see also Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir. 2001), *cert. dismissed*, 536 U.S. 935 (2002) (holding that "[w]hile Congress unquestionably strengthened the pleading standard for securities fraud, the Reform Act would hardly serve its purpose to protect investors and to maintain confidence in the securities markets, were it to become a choke-point for meritorious claims").

## B.      Exchange Act Legal Standard

Under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, it is unlawful for any person, directly or indirectly, to commit fraud in connection with the purchase or sale of securities.  15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5.  "A claim for securities fraud under

section 10(b) and Rule 10b-5 must contain six elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Miss. Pub. Emps.' Ret. Sys. v. Bos. Scientific Corp.*, 523 F.3d 75, 85 (1st Cir. 2008) (reversing lower court's dismissal of securities fraud action).

On a motion to dismiss a federal securities fraud action, in addition to the well-settled Rule 12(b)(6) standards, the Court must also consider the pleading standards of the PSLRA and Rule 9(b). *See id.* This requires that a plaintiff who alleges, *inter alia*, violations of Section 10(b) shall "specify each statement alleged to have been misleading, [and] the reasons why the statement is misleading."[3] 15 U.S.C. §78u-4(b)(1). The PSLRA also provides that, "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.*; *see also Bos. Scientific Corp.*, 523 F.3d at 85. With respect to scienter, the PSLRA dictates that the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2). As set forth herein, Plaintiff has satisfied the pleading requirements of the PSLRA and Rule 9(b), and, accordingly, the Court should deny Defendants' Motion in its entirety.

## II.     The Complaint Raises a Strong Inference of Defendants' Scienter

### A.     Legal Standards for Scienter

In order to maintain a claim for a violation of Section 10(b) of the Exchange Act, a plaintiff must allege a defendant's scienter – "a mental state embracing intent to deceive, manipulate, or

---

[3]     Defendants' criticism of the structure of the Complaint is not well taken. *See* Def. Mem. at 10 n.11. The size of the Complaint – which encompasses a Class Period extending more than two years – is the result of Defendants' lengthy fraud and has nothing to do with Plaintiff's style of pleading. Defendants' attempt to divert the Court's attention away from Plaintiff's particularized allegations should be summarily disregarded.

defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).  In the First Circuit, allegations of recklessness suffice to establish scienter.  *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 58 (1st Cir. 2008) ("In this circuit, a plaintiff may satisfy the scienter requirement with a showing of either conscious intent to defraud or 'a high degree of recklessness.'") (quoting *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002)).

In *Tellabs*, the Supreme Court "establish[ed] the following prescriptions" to assist district courts in making the determination whether a securities fraud complaint pleads a "strong inference" of scienter:

- ***First***, faced with a Rule 12(b)(6) motion to dismiss a §10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true.

- ***Second***, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.  The inquiry, as several Courts of Appeals have recognized, is whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.

- ***Third***, in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences.

551 U.S. at 322-23.

Considering each of these "prescriptions," the Supreme Court adopted the following pleading standard:  "A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.  "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 326.  By either of these formulations, and as explained by

the First Circuit in *ACA*, 512 F.3d at 59, "where there are equally strong inferences for and against scienter, *Tellabs* now awards the draw to the plaintiff."

The Court further concluded that "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. To be sure, instead of a "most plausible of competing inferences" standard, *Tellabs* instructs courts reviewing securities fraud complaints "not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 326; *see also ACA*, 512 F.3d at 52 (holding that *Tellabs* also affirms the First Circuit's "rule that the complaint is considered as a whole rather than piecemeal."). An application of these standards to Plaintiff's Complaint leaves no doubt that Plaintiff has adequately alleged that Defendants acted with the requisite scienter.

**B.    The Complaint Alleges Sufficient Facts Demonstrating Defendants' Scienter**

Plaintiff's scienter allegations more than adequately satisfy the standard set forth in *Tellabs.* As detailed herein, the Complaint sets forth detailed facts regarding how Defendants knew or should have known that the Company was prematurely recognizing and thus inflating the Company's implementation revenues. Indeed, Plaintiff has alleged that: (1) Defendants closely monitored customer attrition, renewal rates, and implementation revenue through reports, meetings and the Company's CRM system, and thus knew that the Company's expected performance period for its implementation fees was well over a year in length (*see, e.g.*, ¶¶88-92); (2) the nature of Defendants' GAAP violations and the magnitude of the restatement evidences Defendants' knowledge and/or severe recklessness in issuing false and misleading statements and financial results during the Class Period (*see, e.g.*, ¶262); (3) Defendants were severely reckless in certifying the accuracy of the Company's financial statements and the effectiveness of the Company's internal controls over

11

financial reporting (*see, e.g.*, ¶¶124, 248, 239-251); (4) Defendants' awareness of potential accounting errors with respect to the Company's implementation revenue and earlier accounting errors demonstrate their recklessness towards GAAP compliance (*see, e.g.*, ¶¶257-261); (5) Defendants held the highest positions in athenahealth (*see, e.g.*, ¶¶18-25); and (6) Defendants Bush and Byers's Class Period stock sales were unusual in amount (*see, e.g.*, ¶¶252-256).  These allegations taken collectively raise a strong inference of scienter with respect to Defendants. *Tellabs*, 551 U.S. at 326.

### 1. The Complaint's Allegations Establish that Defendants Knew that the Expected Performance Period Was Longer than a Year

The Complaint sufficiently alleges that Defendants were, at a minimum, severely reckless in amortizing revenue over the contract life of one year because they knew that the Company's expected performance period was longer than a year. *See* ¶¶82-92.  Indeed, Defendants' knowledge that the performance period of implementation fees was longer than a year is evident from their repeated acknowledgement of athenahealth's low attrition rate and the Company's automatic renewal of its one-year contracts.  ¶¶88-92.

Moreover, Defendants' scienter is also evidenced through their receipt of, and corporate use of reports detailing attrition rates, implementations, and associated fees. *See In re Stone & Webster, Inc., Sec. Litig.*, 253 F. Supp. 2d 102, 131 (D. Mass. 2003) (finding strong inference of scienter where complaint detailed defendants' receipt and use of internal reports showing company's true financial condition); *see also Primavera Investors v. Liquidmetal Techs., Inc.*, 403 F. Supp. 2d 1151, 1158 (M.D. Fla. 2005) (finding defendants acted with severe recklessness where complaint sufficiently alleged that "[e]ach of the individual defendants held a controlling position during the class period, received advanced copies of [the company's] reports, corporate filings, and press releases, and personally participated in conference calls to analysts and investors. By virtue of their

positions, [individual defendants] enjoyed both unfettered access to internal adverse information about [the company] and ample opportunity to prevent the release of any misleading statement.").

Here, the Complaint alleges how Defendants, through their executive positions, were privy to numerous reports and databases that detailed the Company's customer attrition rates.  ¶¶82, 85-87. Indeed, confidential witnesses detail how the Individual Defendants closely tracked customer attrition rates through the Company's CRM Software – salesforce.com and Sugar.  ¶82.  In addition, the Defendants received a Weekly Implementation Status Report, which included information regarding the number of clients in implementation.  ¶86.  These reports were discussed by the Individual Defendants at monthly meetings with the "executive team."  ¶87.  The Complaint also alleges that renewal and attrition rates were frequently discussed by the Individual Defendants at the Company's quarterly meetings.  ¶¶83-84.  Moreover, confidential witnesses recounted how Defendants Bush and Byers were "intimately familiar with how long customers had been with athena."  ¶84.

Thus, through detailed confidential witness accounts and Defendants' own admissions, the Complaint establishes that Defendants closely monitored attrition rates, renewal rates, and implementation fees, and knew that the expected performance period for implementation fees was longer than a year.  In such a way, Defendants knew that their statements concerning the Company's recognition of these fees were false and misleading when made.

Despite Defendants' assertions to the contrary, Plaintiff's confidential witness allegations support a strong inference of their scienter.  Indeed, in accordance with *Tellabs*, all of Plaintiff's allegations must be considered in evaluating the Complaint, including statements made by former employees of the Company and other confidential witness information regarding such allegations. The Court should consider the "level of detail provided by the confidential sources, the corroborative

13

nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources and similar indicia." *In re Cabletron Sys., Inc.*, 311 F.3d 11, 29-30 (1st Cir. 2002) (holding complaint sufficiently met pleading requirements).  Plaintiff's Complaint is replete with such detail.  It contains exacting biographical descriptions of its nine confidential witnesses, including their positions, titles, job descriptions, locations, and dates of employment.  *See* ¶¶26-87.  Moreover, all of the confidential witnesses included in the Complaint independently corroborate each other, thus presenting a unified picture of Defendants' fraud, and have provided minute detail of the Company's practices, the Individual Defendants' knowledge, and how they came to learn the information that they provided.[4] Accordingly, the confidential witness allegations more than amply satisfy the standards set forth in *Cabletron*.  311 F.3d at 30.

Despite the more than adequate specificity with which the Complaint describes the allegations attributed to confidential witnesses, Defendants claim that the information attributed to confidential witnesses is not specific enough and that these witnesses fail to establish Defendants' knowledge.  Def. Mem. at 16-18.  In particular, they argue that the confidential witnesses simply repeat information already disclosed to investors and lack knowledge regarding accounting judgments or how revenue recognition accounting principles were applied to the Company's business.  *Id*.  Defendants' attempts to discount the confidential witness statements and Plaintiff's well-pleaded allegations miss the mark.

Contrary to Defendants' assertion, Plaintiff's confidential witnesses provide significant details about the Company's implementation process and Defendants' knowledge as to the

---

[4]     Moreover, the confidential witness accounts are corroborated by Defendants' own admissions.

Company's expected performance period that were **not** disclosed to the market during the Class Period.  For example, the confidential witnesses provided detailed information on the Company's implementation process, its tendency towards delays, client retention, attrition, and the Company's fee system and commission claw-backs, among numerous other details.  ¶¶35-81.  Moreover, Defendants' argument that the confidential witness allegations are unrelated to the Company's implementation fee accounting procedures is entirely without merit.  As detailed above, Plaintiff's confidential witnesses provide details regarding the Defendants' knowledge of implementation fees, renewal rates, and attrition rates, which establishes that Defendants knew that the Company's expected performance period was longer than a year.  In such a way, the confidential witness allegations are **directly** related to Defendants' implementation fee accounting procedures and Defendants' knowledge thereof.  The confidential witnesses' knowledge of accounting or specific accounting judgments does not undermine the particularized information that these witnesses provide.  *See Cabletron*, 311 F.3d at 30-31.

Moreover, Plaintiff is not required to plead "evidence" at this stage of the proceedings.  *See Keeney v. Larkin,* 306 F. Supp. 2d 522, 528 (D. Md. 2003).  Defendants' argument wholly ignores the doctrine of *Tellabs*, which provides that the inference of scienter raised by Plaintiff need not be "of the 'smoking-gun' genre," and that "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."  551 U.S. at 324-26.  Furthermore, when the statements of the confidential witnesses are considered with the myriad of other indicia of scienter alleged by Plaintiff, they collectively raise a strong inference of scienter.[5]

---

[5]     None of the cases cited by Defendants supports their position regarding Plaintiff's confidential witness allegations.  Indeed, in *In re Praecis Pharms., Inc., Sec. Litig.*, No. 04-12581-GAO, 2007 WL 951695, at *9 (D. Mass. Mar. 28, 2007), and *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 565 (S.D.N.Y. 2004), the courts do not even assess the particularity of

### 2. The Company's Restatement and Defendants' GAAP Violations Support a Strong Inference of their Scienter

The Company's restatement and the nature of Defendants' GAAP violations also give rise to a strong inference of their scienter.  Allegations of GAAP violations pled in conjunction with other details establishing that a defendant acted with the requisite state of mind are sufficient to establish scienter.  *See In re Medicis Pharm. Corp. Secs. Litig.*, No. 08-1821, 2010 U.S. Dist. LEXIS 81410, at *13-*14 (D. Ariz. Aug. 9, 2010).  These details include: "(1) the magnitude, obviousness, and reasonableness of the violation; (2) the omission in public statements of material facts related to the GAAP violation; (3) the defendant's potential motive or reason for using the accounting methods it did; and (4) other statements or conduct indicating that the defendant intentionally or recklessly misapplied GAAP."  *Id.*  Here, numerous of these details establish Defendants' scienter.

First, the pervasiveness of Defendants' GAAP violations and the magnitude of the Company's restatement support Defendants' scienter.  *Medicis*, 2010 U.S. Dist. LEXIS 81410, at *16-*17; *In re MicroStrategy Inc. Secs. Litig.*, 115 F. Supp. 2d 620, 636 (E.D. Va. 2000) (holding that the magnitude of the restated financials and the pervasiveness and repetitiveness of the company's GAAP violations contributed to a strong inference of defendants' scienter).  Here,

---

confidential witness statements with respect to the individual defendants' scienter.  In *N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC, Inc.*, 537 F.3d 35, 51-52 (1st Cir. 2008), the court found that two confidential sources added nothing to the complaint's already deficient allegations.  Likewise, in *In re Vetex Pharms., Inc, Sec. Litig.*, 357 F. Supp. 2d 343, 353-354 (D. Mass. 2005), the court found the confidential witness allegations to be insufficient because they did not have personal knowledge of the most important facts they alleged and used very vague language.  Finally, in *380544 Can., Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199 (S.D.N.Y. 2008), the court found the allegations of one confidential witness to be insufficient where that witness did not possess personal knowledge as to the facts alleged.  In contrast to Defendants' cited cases, the Complaint contains the detailed allegations of ***nine*** confidential witnesses who had personal knowledge of the detailed accounts provided.  Thus, as further detailed above, the allegations attributed to these confidential witnesses further support a strong inference of Defendants' scienter.

Defendants' GAAP violations led to a restatement of significant magnitude.  Indeed, Defendants understated athenahealth's net loss by 26%, 34%, and 114% for the years 2005, 2006, and 2007, respectively, and implementation and other revenue was overstated by approximately 50%.  ¶231. Courts have found far less significant restatements to be probative of scienter.  *See, e.g.*, *In re ArthroCare Corp Sec. Litig.*, --- F. Supp. 2d ----, No. A-08-CA-574-SS, 2010 WL 2901536, at *21 (W.D. Tex. Jul. 20, 2010) (where restatement covered four years and reduced total revenue by 12.4%, 7.3%, 4%, and 1%, concluding "the magnitude of the Restatement [], the fact it occurred over a substantial period of time, [and] the relative simplicity of the issues involved-while perhaps not sufficient on their own to establish scienter-do significantly contribute to a finding of scienter"). Moreover, the GAAP violations here were also pervasive.  As further detailed in the Complaint, athenahealth perpetrated its improper revenue recognition method for a period of at least five years. ¶233.  As a result, the Company was required to restate more than four years of financial statements to correct fraudulent accounting for fiscal years 2006, 2007 and 2008, as well as the 2008 quarters and the first three quarters of 2009.  *Id.*  Courts have similarly held that such pervasive accounting violations are probative of scienter.  *See, e.g.*, *Medicis*, 2010 U.S. Dist. LEXIS 81410, at *16-*17; *ArthroCare*, 2010 WL 2901536, at *21.[6]

---

[6]     Defendants attempt to rely on *In re Taleo Corp. Sec. Litig.*, No. C 09-00151, 2010 WL 597987 (N.D. Cal. Feb. 17, 2010), to argue that their consistent and transparent GAAP violations demonstrate that their error was innocent. Def. Mem. at 22. However, as detailed below, in contrast to *Taleo*, Defendants' violations of SAB 104 were not transparent to the market.  *See Taleo*, 2010 WL 597987, at *10. Rather, Defendants never fully informed the market ***during*** the Class Period of the critical fact that they were amortizing such revenues over the initial contract of one year rather than the actual expected performance period.  ¶223. Thus, Defendants' consistent violation of SAB 104 over a five-year period demonstrates the pervasiveness of their GAAP violations and not their innocence.

Defendants' suggestion that the magnitude of the restatement is not probative of scienter is misguided.  Def. Mem. at 21-22.[7]  In arguing that the restatement had a "miniscule" impact on the Company's total revenue, Defendants ignore that the restatement had a significant impact on related but indispensable other metrics, including net income and earnings per share, which are derived from total revenue.  ¶231.  In fact, analysts following athenahealth routinely focused on these metrics in evaluating the Company, its outlook, and the value of its stock price.  Contrary to Defendants' suggestion, the percentage of total revenue is not the only measure of the significance of a restatement, let alone the key measure.  Indeed, courts have held that a restatement of a company's net income and earnings per share demonstrate scienter.  *See, e.g.*, *ArthroCare*, 2010 WL 2901536, at *21 (in finding strong inference of scienter, noting how restatement had decreased ***net income*** by 98.9% in 2007, 12.6% in 2006, and 19% in 2005); *In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 506-07 (W.D. Pa. 2002) (finding magnitude of restated ***net income*** and ***earnings per share*** figures probative of scienter).

Moreover, the simplicity and obviousness of Defendants' accounting violation gives rise to an inference of their scienter.  *Medicis*, 2010 U.S. Dist. LEXIS 81410, at *17-*18 (quoting *PR Diamonds, Inc. v. Chandler,* 364 F.3d 671, 684 (6th Cir. 2004)) (holding that an inference of scienter "may be drawn from allegations of accounting violations that are so simple, basic, and pervasive in nature, and so great in magnitude, that they should have been obvious to a defendant"); *see also ArthroCare*, 2010 WL 2901536, at *21 ("relative simplicity of the issues involved" in the company's restatement supported inference of scienter).  The GAAP provision at issue here – SAB 104 – was

---

[7]     As an initial matter, Plaintiff's allegations as to the percentage of revenue restated are not misleading.  Def. Mem. at 9 n.8 and 22.  The Complaint clearly states that the adjustments are shown as a percentage of "implementation and other revenues" not total revenues.  ¶231.

simple and straightforward.  SAB 104 provides that "[t]he revenue recognition period should extend beyond the initial contractual period if the relationship with the customer is expected to extend beyond the initial term and the customer continues to benefit from the payment of the up-front fee . . . ."  ¶222.  Here, Defendants repeatedly stated throughout the Class Period that the "***implementation service is not separable from the ongoing business services***."  *See* ¶223.  Thus, Defendants clearly knew and understood that its customers were continuing to benefit from the payment of up-front implementation fees.  SAB 104 further provides that such service revenue "should be recognized on a straight-line basis . . . over the contractual term of the arrangement or the expected performance period during which those specified services will be performed, which ever is longer . . . ."  ¶222.

Defendants clearly knew and understood this provision, as they stated the following in their public filings: "we record implementation fees as deferred revenue until the implementation service is complete, at which time we recognize revenue ratably on a monthly basis ***over the expected performance period***."  ¶223.  As detailed in the Complaint, Defendants knew that the expected performance period was longer than a year because: (1) they admitted that the Company's clients typically purchased one-year contracts that renewed automatically; (2) the Company's initial implementation process, which included enrollment, data entry and training was designed to benefit the client for the life of the relationship not just for the initial contract term; (3) Defendants continued to provide product-related support for clients without charging additional fees beyond implementation fees; (4) athenahealth had extremely low attrition rates because once its systems were implemented, it was nearly impossible for the Company's customers to leave; (5) the Company had a commission claw-back period of 18 months; and (6) implementations were often delayed for numerous reasons.  ¶¶82-92, 94, 223.  Yet, despite this, Defendants improperly amortized its implementation revenues over a one-year period and violated GAAP.  ¶93.

19

In an attempt to evade liability for the Company's GAAP violation, Defendants argue that the "application of SAB 104 to implementation revenues is complex and requires an exercise of judgment." Def. Mem. at 18. However, Defendants provide **no explanation** as to why such an application is complex, and the cases cited by Defendants in support of their argument are wholly inapplicable. Def. Mem. at 18-19.[8] Likewise, the fact that other companies employ similar accounting procedures does not speak to the complexity of SAB 104 or its application to the Company's implementation revenue under the facts of this case. Def. Mem. at 19.[9]

Moreover, the fact that SAB 104 requires an exercise of judgment does not render it complex or defeat an inference of scienter. *See* Def. Mem. at 18. Indeed, the District of Massachusetts rejected this very argument in *In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 148 (D. Mass. 2001), in stating that "[t]he fact that the application of GAAP tolerates a range of reasonable treatments

---

[8]   Indeed, neither *Taleo* nor *Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999), involved SAB 104. For example, the accounting provision at issue in *Taleo* was not SAB 104 but rather EITF 00-21, which deals with revenue arrangements with multiple deliverables. 2010 WL 597987, at *9-*13. The analysis under this provision is quite different and far more complex than SAB 104. *See id.* Likewise, in *Greebel*, the accounting provision at issue was FAS 48, which prohibits the seller from recognizing income from the sale unless *six* conditions are met. 194 F.3d at 203. Moreover, in contrast to this action, in *Greebel*, there was no restatement at issue and falsity was disputed. 194 F.3d 185. Under these circumstances, the court found that the GAAP allegations in the complaint were excessively general because they failed to "include such basic details as the approximate amount by which revenues and earnings were overstated, the products involved in the contingent transactions, the dates of any of the transactions; or the identities of any of the customers or FTP employees involved in the transactions." *Id.* at 204. Further, without this information, the court found it difficult to infer that defendant's "revenue recognition decisions were unreasonable enough to violate GAAP, or that they give rise to a strong inference of scienter." *Id.* at 205.

[9]   Nor is it appropriate for the Court to consider SEC filings from other companies in athenahealth's industry having nothing to do with this action. *See* Def. Mem. at 19. Such filings are **not** integral to or explicitly relied upon in the Complaint and therefore fall outside the Court's purview in ruling on Defendants' Motion. *See Clorox Co. Puerto Rico v. Proctor & Gamble Comm. Co.*, 228 F.3d 24, 32 (1st Cir. 2000). Regardless, even assuming their consideration, these filings may not be advanced for the truth of the matters asserted therein to decide facts that are in dispute. *See In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 591-92 (N.D. Ohio 2004).

does not, however, vindicate the defendants so easily."  The application of GAAP principles always requires an exercise of judgment, but GAAP is designed to provide a reliable degree of predictability.  *Id.* ("There are indeed numerous occasions for judgment calls in the application of GAAP.  But GAAP are intended to provide a reliable degree of predictability, and an application of GAAP that strays beyond the boundaries of reasonableness will provide evidence from which scienter can be inferred.").  Indeed, if defendants could avoid liability for any accounting violation in which they were required to exercise judgment, there would be no liability for GAAP violations under the securities laws.  The First Circuit has clearly determined that such an outcome is not permitted.  *Id.* ("The First Circuit, although noting the malleability of GAAP, did not hesitate to hold that 'violations of GAAP standards . . . could provide evidence of scienter.'") (quoting *Greebel*, 194 F.3d at 203).

Likewise, Defendants' suggestion that the application of SAB 104 is complex because it requires companies to make a two-step determination defies logic.  Two steps can hardly be considered the standard for GAAP complexity for publicly-traded companies and their executives.  Regardless, as athenahealth admitted that the implementation services were not separable from the ongoing business services, there was really only one step in Defendants' analysis.  Thus, the only issue here is the length of the expected performance period, and it is undisputed that Defendants knew that it was longer than the initial one-year contract.[10]

_____

[10]     Defendants' assertion that the "Amended Complaint is devoid of any suggestion that the implementation services themselves took longer than one year," misses the point.  Def. Mem. at 19. Training and other services related to implementation often continued beyond completion of the implementation process.  ¶¶60-61.  Moreover, the Complaint alleges that the Defendants knew and repeatedly admitted that the Company's implementation service is not separable from the ongoing business services, that it had a low attrition rate, and that its contracts renewed year after year.  ¶223. Accordingly, whether or not the implementation process took a year had no bearing on Defendants' judgment as to the expected performance period.

In addition, Defendants' omission in public statements of material facts related to its GAAP violation supports an inference of scienter. *Medicis*, 2010 U.S. Dist. LEXIS 81410, at *13-*14; *In re Focus Enhancements, Inc. Secs. Litig.*, 309 F. Supp. 2d 134, 152 (D. Mass. 2001) (holding that the omission of the relevant accounting treatment from public disclosures may give rise to an inference of scienter). Indeed, while Defendants repeatedly informed the market that athenahealth recognized implementation revenues over the expected performance period (¶¶55-58), they never fully informed the market ***during*** the Class Period of the critical fact that they were amortizing such revenues over the initial contract period of one year rather than the actual expected performance period. ¶223. Indeed, it was only at the end of the Class Period that Defendants fully revealed that they had been recognizing implementation revenues over the contract period, which was typically one year, and not over the longer expected performance period of ***twelve years***. ¶¶97-109.

In an attempt to refute this allegation, Defendants cite their SEC filings and argue that athenahealth "transparently amortized implementation fees ratably over the contract period, typically one year." Def. Mem. at 20. However, their SEC filings are far from transparent. For example, in the Company's 2007 Form 10-K, Defendants represent the following conflicting policies:

- "we begin recognition of implementation revenue ***over the life of the contract***" (Def. Mem., Ex. B at 23).

- "we record implementation fees as deferred revenue until the implementation service is complete, at which time we recognize revenue ratably ***on a monthly basis over the expected performance period***." (Def. Mem., Ex. B at 50).

Likewise, in the Company's 2008 Form 10-K, Defendants represent that:

- "we begin recognition of implementation revenue ***over the life of the contract***." (Def. Mem., Ex. C at 23).

- "we record implementation fees as deferred revenue until the implementation service is complete, at which time we recognize revenue ratably ***on a monthly basis over the expected performance period.***" (Def. Mem., Ex. C at 50).

22

Accordingly, the Company's Class Period SEC filings did not fully or clearly inform the market that Defendants were recognizing implementation revenue over the contract period of one year rather than a longer expected performance period.[11] Defendants' omission of this critical fact supports their scienter.

The Complaint also details Defendants' motive for violating GAAP by prematurely amortizing implementation revenue. *See Medicis*, 2010 U.S. Dist. LEXIS 81410, at *13-*14. The Complaint alleges that Defendants were motivated to engage in these aggressive accounting machinations to portray the Company in the best possible light to the market and to artificially inflate the Company's stock price. ¶95. Indeed, the implementation process was time-consuming and involved a large expenditure of resources by Defendants. *Id.* Yet, under athenahealth's pricing methodology, the Company could not begin to collect monthly, collection-based fees until after the implementation was completed and the Company began to provide services to clients. *Id.* Accordingly, by aggressively amortizing implementation fees over a one-year period rather than a twelve-year period, Defendants were able to inflate the Company's income and revenue streams in the same year they undertook the clients' implementations. *Id.* Thus, Defendants' motive for using the accounting methods they did also supports a strong inference of scienter. *See In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 21 (D.D.C. 2000) (GAAP "violations involving the premature or

---

[11]     Similarly, Defendants' argument that they did not violate their own accounting policies fails. Def. Mem. at 22-23. Defendants repeatedly represented that they recognized revenue ratably on a monthly basis over the expected performance period, which they did not. As revealed at the end of the Class Period, they amortized implementation revenue over the initial one-year contractual period and not the expected performance period of twelve years. ¶100. Moreover, Defendants clearly violated their own internal accounting policies by violating GAAP, which they repeatedly represented they adhered to in the preparation of their financial statements. *See* ¶¶122, 131, 139, 150, 159, 169, 182, 190, 201. Finally, as detailed above, their internal policy for recognizing revenue was far from transparent.

inappropriate recognition of revenue suggest a conscious choice to recognize revenue in a manner alleged to be improper, and may therefore support a stronger inference of scienter.").

Finally, Defendants' previous conduct in intentionally or recklessly misapplying GAAP supports a strong inference of their scienter. *See Medicis*, 2010 U.S. Dist. LEXIS 81410, at *13-*14. As detailed in the Complaint, Defendants were aware of the potential problems in the manner in which they were accounting for implementation revenue. ¶257. Indeed, in the fourth quarter 2008 conference call, Defendants admitted that they already made a change in the way they were accounting for implementation revenue with respect to a specific group of physicians. *Id.* Yet, they continued to engage in their improper recognition of implementation revenues. Notably, Defendants do not dispute this allegation.

Likewise, Defendants committed an accounting violation in the way they were calculating non-GAAP adjusted net income, which overstated the Company's earnings. ¶259. Although they knew about this issue since at least December of 2009, they did nothing to rectify it until February 4, 2010, when the Company announced that it had revised its methodology and its fourth quarter and full year results to reflect this change. *Id.* Defendants attempt to downplay their flagrant disregard for GAAP by arguing that this incident involves a non-GAAP issue and is thus irrelevant to their scienter with respect to the restatement. Def. Mem. at 23. This argument misses the point. The fact that Defendants committed another accounting violation which overstated the Company's earnings just before they restated their financial statements further demonstrates their repeated flagrant disregard of accounting rules. This supports a strong inference of Defendants' intentional, or at least reckless, disregard of GAAP mandates here. ¶261. *See also Gelfer v. Pegasystems, Inc.*, 96 F. Supp. 2d 10, 15 (D. Mass. 2000) (finding it "strongly probative of scienter" where defendants were alleged to have engaged in the same improper accounting practices that had formed the basis of an earlier

securities fraud action against them).  In any event, Defendants' non-culpable inference with respect

to their overstatement of non-GAAP earnings is hardly more compelling than that advanced by

Plaintiff.  *See* Def. Mem. at 24.  And, "where there are equally strong inferences for and against

scienter, *Tellabs* now awards the draw to the plaintiff."  *ACA*, 512 F.3d at 59.

In sum, the restatement and the nature of Defendants' GAAP violations support a strong

inference of their scienter.  *Medicis*, 2010 U.S. Dist. LEXIS 81410, at *13-*14.

### 3.    Defendants' Attempts to Hide Behind Deloitte Fall Flat

Defendants' repeated attempts to avoid liability by hiding behind Deloitte's issuance of clean

audit opinions during the Class Period should not be sanctioned.  Def. Mem. 7, 20, 23-25.  As an

initial matter, Defendants' argument is misleading in that Deloitte did not issue opinions for any of

the quarters that Defendants restated; Deloitte's clean opinions were only rendered in connection

with the Company's year-end audits.  Regardless, as detailed in the Complaint, it is management

who is responsible for a company's financial statements and not its auditor.  Indeed, AU §110.03

provides that:[12]

> The financial statements are management's responsibility.   The auditor's
> responsibility is to express an opinion on the financial statements.  Management is
> responsible for adopting sound accounting policies and for establishing and
> maintaining internal control that will, among other things, initiate, record, process,
> and report transactions…consistent with management's assertions embodied in the
> financial statements.  The entity's transactions and the related assets, liabilities, and
> equity are within the direct knowledge and control of management.  The auditor's
> knowledge of these matters and internal control is limited to that acquired through
> the audit.  Thus, the ***fair presentation of financial statements in conformity with***

---

[12]    AU refers to the U.S. Auditing Standards, which is the codification of Statements on
Auditing Standards ("SASs") and related Auditing Interpretations.  They are published by the
American Institute of Certified Public Accountants ("AICPA") and constitute Generally Accepted
Auditing Standards ("GAAS").   In April 2003, the PCAOB ("Public Company Accounting
Oversight Board") adopted many of these preexisting standards as its standards, including AU 110.
http://pcaobus.org/Standards/Auditing/Pages/default.aspx.

*generally accepted accounting principles is an implicit and integral part of management's responsibility* . . . .

¶216.  Accordingly, Defendants' compliance with GAAP was their responsibility and not Deloitte's. Deloitte's issuance of clean audit opinions in certain annual reports during the Class Period does not absolve Defendants of liability.   Indeed, the Company's audit committee determined that the Company's financial statements and related audit opinions of Deloitte could no longer be relied upon for 2005, 2006, 2007, 2008, and the first three quarters of 2009.  ¶213.  And, as Defendants admit, Deloitte also concluded that athenahealth had improperly accounted for its implementation fees and that they should be amortized over an expected performance period of the expected customer life. Def. Mem. at 25; ¶102.

Moreover, Defendants' position defies logic in that it essentially asserts that there can be no securities fraud where an independent auditor has issued an unqualified opinion.  Clearly this is not the case, as public companies often commit fraud despite the issuance of unqualified opinions by their independent auditors.  *See In re Ramp Networks, Inc. Secs. Litig.*, 201 F. Supp. 2d 1051, 1074 n.6 (N.D. Cal. 2002) ("The Court also rejects Defendants' assertion that scienter 'cannot be shown' in the face of the clean audit opinion it received from Arthur Andersen. . . . there is no hard and fast rule that there can be no scienter where there has been a clean audit.").  Thus, Deloitte's clean audit opinions do not undermine the multiple, compelling indicia of scienter alleged in the Complaint. This inference of non-culpability proffered by Defendants is ***not more*** compelling than the strong inference of scienter offered by Plaintiff, and, accordingly, Defendants have not defeated Plaintiff's scienter allegations.  *Tellabs*, 551 U.S. at 324.[13]

---

[13]     Defendants misleadingly try to cast the restatement as concerning "a revision in the Company's methodology for accounting for implementation fees."  Def. Mem. at 23.  SFAS 154 specifically prohibits restatements for changes in accounting estimates or accounting principles.

### 4.   Defendants' False Certifications and Lack of Internal Controls Support a Strong Inference of Scienter

During the Class Period, Defendants Bush and Byers signed certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX").  *See, e.g.*, ¶124.  As a result, they are deemed to have ratified the statements made in public filings.  *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 587 (S.D. Tex. 2003) (defendants who sign documents filed with the SEC containing material misrepresentations, regardless of whether they participated in drafting the document, make a statement and may be liable under §10(b)).  Here, ***all*** of Defendants' Class Period statements were false and misleading – a fact which Defendants do not dispute.  The Complaint alleges in detail that Defendants knew that the Company's SEC filings and the financial statements they contained were inaccurate.  Thus, Defendants were, at a minimum, severely reckless in certifying the accuracy of the Company's financial statements, and, accordingly, their SOX certifications are probative of their scienter.  *See Fox v. First BanCorp*, Civil No. 05-2148, 2006 WL 4128534, at *9 (D.P.R. Nov. 6, 2006) (finding allegations of scienter sufficient where plaintiffs alleged, *inter alia*, that individual defendants "signed certifications attesting to the integrity of First BanCorp's financial statements and internal controls even though the controls suffered material weaknesses"); *see also In re ProQuest Sec. Litig.*, 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007) (holding that "[t]he SOX certifications give rise to an inference of [defendant's] scienter because they provide evidence either that he knew about the improper accounting practices or, alternatively, knew that the controls he attested to were inadequate").[14]

---

Thus, by virtue of the restatement, Defendants have admitted their accounting errors and not simply a change in methodology.

[14]   Indeed, even the cases cited by Defendants acknowledge that these indicia may be considered collectively as indicative of fraudulent intent.  *See Orton v. Parametric Tech Corp.*, 344 F. Supp. 2d

Moreover, the Company's failure to maintain adequate internal controls also supports a strong inference of Defendants' scienter. *See Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 20 (D. Mass. 2004) (allegations that a company failed to maintain adequate internal controls are probative of scienter, and can add to the strength of a case based on other allegations). Here, Defendants Bush and Byers certified in every SEC filing that they carried out an evaluation of the effectiveness of the Company's disclosure controls and that the Company's internal controls over financial reporting were effective. *See, e.g.*, ¶242. However, following the restatement, Defendants admitted that the Company's financial disclosure controls and procedures were not effective and that they had identified significant control deficiencies that constituted a material weakness in the Company's internal control over financial reporting, rendering it ineffective. ¶243. Thus, Defendants' failure to strengthen the Company's known inadequate internal controls and their execution of false and misleading certifications regarding these controls further evidences their scienter. *See* ¶¶239-251; *In re Sonus Networks Secs. Litig.*, No. 04-10294, 2006 U.S. Dist. LEXIS 28272, at *70 (D. Mass. May 10, 2006) (finding that the admitted material weaknesses in the company's internal controls and procedures strengthens the inference that the company's CFO acted recklessly when he certified the financial statements).

### 5.   The Core Operations Doctrine Supports a Strong Inference of Scienter

Scienter can be imputed to Defendants through their positions as high-ranking officers under the "core operations" doctrine. The "core operations" doctrine provides that if the subject matter of

---

290, 307 (D. Mass. 2004) ("Although none of the general allegations proffered by the Purchasers in their Complaint is determinative on its own, this Court may consider them together as indicative of fraudulent intent."); *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 355-256 (D.N.J. 2007) (noting that when combined with other indicia of scienter, erroneous SOX certifications can create a strong inference of scienter).

Defendants' misstatements concerns the core operations of the Company, this supports "the inference that the defendant knew or should have known the statements were false when made." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004).[15] "Indeed, if facts that contradict a high-level officer's public statements were available when the statements were made, it is reasonable to conclude that the speaker had intimate knowledge of those facts or should have known of them." *Id.*

As in *Atlas*, since the Individual Defendants were high level officers within the Company, and made false and misleading statements concerning the core operations of athenahealth, this further supports an inference that Defendants knew or should have known that these statements were false when made. *See id.* Here, athenahealth's core business is to provide Internet-based business services for physician practices. ¶28. To provide these services to its customers, athenahealth first has to get customers up and running on its system through its implementation process. ¶35. Thus, implementation is an integral part of every client relationship and the gateway to all of the Company's product and service offerings. *See id.* As such, athenahealth's implementation process is a critical or "core" operation performed by Defendants. Indeed, Defendants' public filings repeatedly detail the importance of implementation to the Company's business model and the implementation revenues that it received. *See, e.g.*, ¶¶122, 139, 150, 159, 169, 182, 190, 201. Thus,

---

[15]     *See also Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) ("*Tellabs II*") ("That no member of the company's senior management who was involved in authorizing or making public statements about the demand for [the company's core products] knew that they were false is very hard to credit . . . ."); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001) (denying motion to dismiss in part because the plaintiff successfully pled that facts critical to the business's core operations were so important they could be attributed to key officers); *Zuckerman v. Smart Choice Auto. Group, Inc.*, No. 6:99-CV-237-Orl-28A, 2000 U.S. Dist. LEXIS 13489, at *5-*6 (M.D. Fla. Aug. 29, 2000) (finding scienter sufficiently alleged when a defendant "was integrally involved in running [the company] and evaluating the financial condition of the company.").

the numerous public statements made by Defendants concerning the Company's implementation revenue during the Class Period confirm that this was an important or "core" operation of the Company.  *See id.*

Moreover, as detailed above, during the Class Period, Defendants Bush and Byers held the highest positions within the Company.  Defendants Bush and Byers served as athenahealth's CEO and CFO, respectively, throughout the Class Period.  ¶¶15, 16.[16]  Therefore, they each possessed the power and authority to control the contents of athenahealth's various SEC filings, including but not limited to quarterly and annual reports, and press releases, as well as presentations to securities analysts, and institutional investors.  (¶¶18-25 and 236-238).  Defendants' high positions within athenahealth and their involvement with the Company's key operations support the inference that they had knowledge of: (1) the Company's implementation revenue recognition policies; (2) the GAAP rules with respect to recognition of implementation revenues; (3) the Company's low attrition rates and automatic renewal of customer contracts; (4) the true expected performance period of the customer contracts of 12 years; and (5) the Company's premature recognition of implementation revenue over a one-year period rather than the expected performance period of 12 years.

**6.     Defendants' Class Period Stock Sales Support a Strong Inference of Scienter**

Notwithstanding the abundance of direct evidence supporting Plaintiff's scienter allegations, Defendants Bush and Byers's Class Period stock sales also support a strong inference of scienter. *See Greebel*, 194 F.3d at 198 (holding "that allegations of unusual insider trading by a defendant with access to material non-public information can support a strong inference of scienter").  Plaintiff alleges that Defendants Bush and Byers were highly motivated to engage in fraudulent conduct by

---

[16]     Defendant Byers served as the Company's CFO until his retirement in January 2010.  ¶16.

virtue of their massive insider selling during the Class Period.   ¶¶252-255.   Unusual trading *or* trading at suspicious times *or* in suspicious amounts by corporate insiders has long been recognized as probative of scienter.  *Greebel*, 194 F.3d at 198.  Indeed, facts showing unusual insider trading during the class period are routine considered probative "motive and opportunity" allegations in a securities fraud case.  *See, e.g., Bos. Scientific Corp.*, 523 F.3d at 92-3 (finding insider trading allegations probative of scienter).

###### a.      Defendants' Insider Trading Was Suspicious in Amount

As Defendants Bush and Byers's stock sales were both suspicious in amount, they are probative of scienter.  *See Greebel*, 194 F.3d at 198.  Here, Defendant Bush sold over 670,000 shares of common stock for proceeds exceeding $21,000,000.  ¶254.  These sales were suspicious in amount in that they represented approximately 43% of Defendant Bush's stock holdings.  *Id.* Likewise, Defendant Byers sold in excess of 100,000 shares of stock for proceeds totaling more than $3.7 million, representing approximately 19% of his common stock holdings, as demonstrated through Defendants' SEC-filed Form 4's.  ¶254.  Courts have found similar stock sales to be probative of scienter.  *See, e.g., Friedberg v. Discreet Logic*, 959 F. Supp. 42, 51 (D. Mass. 1997) (holding that where the five individual defendants, collectively, sold twelve percent of their total holdings, this was probative of scienter); *see also Cabletron*, 311 F.3d at 27, 40-41 (selling 1/3 of holdings during class period deemed significant); *Alfus v. Pyramid Tech. Corp.*, 764 F. Supp. 598, 605 (N.D. Cal. 1991) (sales by CEO of 11% of holdings during the class period supports inference of scienter).[17]

---

[17]      In contrast to Defendants' mischaracterizations and cited cases, Plaintiff's allegations are not limited to the number of shares sold, the date and gross proceeds.  Def. Mem. at 27.  Plaintiff has also alleged the percentage of Defendants' holdings that were liquidated demonstrating that their class period sales were unusual in amount.  Here, the fact that the Complaint does not contrast

Despite the significant percentages of Defendants' holdings that were liquidated during the

Class Period, Defendants argue that this is insufficient to raise a strong inference of their scienter

because they retained some of their holdings. Def. Mem. at 27-28. This argument fails to pass

muster, especially at this early stage of the proceedings. *See Ross*, 501 F. Supp. 2d at 1117 (holding

that even though defendants had retained the majority of their holdings, the inference of scienter

raised by plaintiffs' allegations of insider sales was at least as compelling, and thus dismissal at this

stage was inappropriate); *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 254 (D. Mass. 2006)

(rejecting defendants' argument that their insider trading was insignificant because they retained

80% and 50% of their holdings, respectively).[18]

### b.     Defendants' Bush and Byers' 10b5-1 Plans Do Not Negate a Strong Inference of Scienter

In an attempt to avoid liability for their insider sales, Defendants argue that since they

"traded largely pursuant to 10b5-1 trading plans," this "directly contradicts any allegation that their

trading was unusual. . . ." Def. Mem. at 28-29. As an initial matter, raising the affirmative defense

of trading under a 10b5-1 trading plan is premature on a motion to dismiss. *See In re Cardinal*

---

Defendants' Class Period sales with prior trading activity is irrelevant as the Company was not publicly traded prior to the Class Period. Regardless, as the percentage of shares sold by Defendants was so large and unusual, this in and of itself is probative of scienter. *See In re Orbital Sciences Corp. Sec. Litig.*, 58 F. Supp. 2d 682, 686 n.4 (E.D. Va. 1999).

[18]     Likewise, Defendants' assertion that Plaintiff has attempted to "create the appearance of a large trading volume by extending the Class Period to over 29 months" is wholly without merit. Def. Mem. at 27 n.24. The Class Period appropriately encompasses all of Defendants' false and misleading statements – a fact which Defendants do not dispute – and is hardly a tactic to make Defendants' Class Period stock sales look more suspicious than they would otherwise be. Rather, the length of the Class Period is solely the result of Defendants' lengthy fraud. Accordingly, in stark contrast to the cases cited by Defendants, the length of the Class Period does not mitigate against the strong inference of scienter created by Defendants' stock sales here. *See, e.g.*, *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092-1093 (N.D. Cal. 2009) (noting that the allegations for misrepresentation for the extended class period were woefully inadequate).

*Health, Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 734 (S.D. Ohio 2006) ("As it is typically premature to raise affirmative defenses in a motion to dismiss, this Court will not consider the impact of [the defendant's] purported 10b5-1 trading plan at this stage of the pleadings."); *see also Bos. Scientific Corp.*, 523 F.3d at 92 (declining to consider context of 10b5-1 trading plans because "[i]t was defendants' choice to move to dismiss the case on the pleadings without presenting evidence," and finding that plaintiff's insider trading allegations provided support against defendants' motion to dismiss).

Moreover, as Defendants have raised their 10b5-1 plans as an affirmative defense, they have the burden of proof of establishing the elements of this defense. *See Rodriguez-Torres v. Caribbean Forms Mfr., Inc.*, 399 F.3d 52, 64 (1st Cir. 2005); 17 C.F.R. 240.10b5-1. In this case, Defendants' alleged affirmative defense of Rule 10b5-l(c) is not clear from the face of the Complaint because, in order for it to qualify, Defendants must prove that the plan was entered into in good faith setting forth objective trading criteria and ***before the insider became aware of material nonpublic information***. *See* SEC Release No. 34-43154, 17 C.F.R. §240.10b5-l(c)(l)(i) & (ii); *In re Enron Corp. Secs.*, 258 F. Supp. 2d at 592. Here, it is not evident from the face of the Complaint that Defendants' plans satisfied these criteria. *See id*. Moreover, as admitted by Defendants (Def. Mem. at 28-29), Defendants Bush and Byers entered into their 10b5-1 plans after the start of the Class Period and after the fraud began.[19] Accordingly, this affirmative defense is not clear on the face of the Complaint and does not defeat allegations of insider sales as supporting a strong inference of scienter. *See In re Biogen Idec, Inc. Sec. Litig.*, No. Civ. A. 05-10400, 2008 WL 4810045, at *14

---

[19] Defendant Bush's plans were executed on January 7, 2008, January 9, 2008, March 3, 2009, and June 9, 2009. Defendant Byers's plans were executed on January 8, 2008 and December 16, 2008.

(D. Mass. Oct. 25, 2008) (finding that non-suspicious inferences of 10b5-1 trading plans are undermined when such plans were entered into during the class period).

Furthermore, Defendants' invocation of this affirmative defense is misleading.  While Defendants attempt to sweep all of their sales under the auspices of their 10b5-1 plans, as they admit in a footnote, not all of their Class Period sales were made pursuant to their plans.  Def. Mem. at 28 n.25.  Rather, significant portions of their Class Period sales were ***not made*** pursuant to these plans. For example, while Defendants state that "all of Mr. Byers's trades except for one trade on August 11, 2008 were pursuant to his 10b5-1 plan," they fail to acknowledge that his August 11, 2008 trade was the most significant that he made during the Class Period.  Indeed, on this day, he sold 20,000 shares for proceeds of $664,800, almost a third of his Class Period proceeds and, as Defendants admit, "about 20% of his aggregate sales."  *See* Def. Mem. at 30, Ex. R.  Similarly, Defendants also argue that other than the IPO over-allotment sale and "some" sales during the summer of 2008, all of Defendant Bush's Class Period sales were made pursuant to his 10b5-1 trading plan.  Def. Mem. at 28 n.25.  However, even without the IPO over-allotment, the summer sales that Defendants refer to totaled $10,822,997 and constituted more than half of Defendant Bush's Class Period proceeds.  *See* Def. Mem. Ex. R.  Accordingly, to the extent the Court considers Defendants' 10b5-1 defense at this early juncture – which it should not – this defense does not apply to any of these sales.

### c.   The Pattern of Defendants' Insider Trading Does Not Mitigate Against Their Scienter

Defendants also argue that the pattern and timing of the Individual Defendants' trades is not suspicious because "[t]he vast majority of the supposed insider trading occurred months before the restatement."  Def. Mem. at 29.  However, this argument ignores that any insider sales made with material non-public information are probative of scienter.  *SEC v. Ginsburg*, 362 F.3d 1292, 1297-1298 (11th Cir. 2004) ("Scienter requires that the insider . . . possess material nonpublic information

at the time of the trade.  In addition, it requires that the material nonpublic information be used in a trade.  Proof of knowledge of such information at the time of a trade 'gives rise to a strong inference of use.'").  As detailed in the Complaint, Defendants Bush and Byers possessed material non-public information concerning the Company's improper recognition of implementation revenue, regardless of the proximity of their sales to the final curative disclosures.  *See* ¶¶252-255.  Thus, their possession of this knowledge at the time of their trades gives rise to an inference of use and supports a strong inference of scienter.  Moreover, as a result of Defendants' fraud, artificial inflation caused the stock price to increase over time.  Defendants profited from the artificial inflation of the stock price regardless of whether they purchased at peak prices.  Accordingly, Defendants have failed to defeat the inference of scienter raised by Plaintiff with respect to Defendants Bush and Byers' Class Period sales.[20]

### 7.    Defendants' Non-Culpable Explanation Is Not Compelling

The Complaint's allegations set forth numerous compelling indicia of Defendants' scienter.  *See* Sections II.B.1 through II.B.6.  In sharp contrast, Defendants have failed to raise any "compelling, non-culpable" explanations for their conduct.  Rather, they argue that their restatement was the result of a simple change in accounting methodology and that "Plaintiffs' allegations boil down to a futile accusation that the Company restated a small portion of its total revenue after concluding that its prior accounting was inconsistent with GAAP."  Def. Mem. at 25.  The Complaint makes absolutely clear that Defendants' restatement was the product of a pattern of

---

[20]    Defendant Bush's sale of 80,000 shares in the IPO further supports an already strong inference of his scienter.  Indeed, courts have held that an individual defendant's sale of personal stock in a public offering supports an inference of motive and opportunity.  *See, e.g., In re Miller Indus., Inc. Sec. Litig.*, 12 F. Supp. 2d 1323, 1332 (N.D. Ga. 1998) (finding insider stock sales during public offering at beginning of class period created strong inference of scienter).

Defendants' severely reckless and/or knowing violations of GAAP and not a harmless change in accounting methodology, as Defendants misleadingly assert. Defendants knew that the expected performance period of the Company's implementation fees was longer than a year and yet improperly amortized the Company's implementation revenue over a one-year period in order to artificially inflate the Company's revenues and stock price. Moreover, Defendants' restatement was pervasive and had a significant impact on Defendants' net income and earnings per share. Accordingly, Plaintiff's allegations raise a strong inference of scienter that is *more* compelling than the opposing inference of non-fraudulent intent that Defendants raise.

## III.     Plaintiff Adequately Alleges Loss Causation

Plaintiff adequately alleges loss causation because it has pled that Defendants' false statements artificially inflated athenahealth's stock during the Class Period and that shareholders suffered economic losses when corrective disclosures were made. Plaintiff's allegations are pled in accordance with the Supreme Court's decision in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005), and its progeny, and in accordance with Rule 8 notice pleading, which governs loss causation. *See Brumbaugh*, 416 F. Supp. 2d at 256 (holding that *Dura* acknowledged that Rule 8(a)(2) applies to the pleading of economic loss and proximate causation); *In re TyCom Ltd. Sec. Litig.*, No. 03-CV-1352, 2005 U.S. Dist. LEXIS 19154, at *42 (D.N.H. Sept. 2, 2005) ("In *Dura*, the Supreme Court explained that a plaintiff's allegations of loss causation under §10(b) are only subject to the pleading standards of Fed. R. Civ. P. 8(a)(2) requiring a short and plain statement of the claim showing that the pleader is entitled to relief."); *see also Colon v. Diaz-Gonzalez*, No. 04-2371, 2009

WL 3571974, at *6 (D.P.R. Oct. 26, 2009) ("the loss causation pleading requirements should be interpreted so as not to impose a significant burden on plaintiffs").[21]

In *Dura*, the Supreme Court held that to plead loss causation, a plaintiff must allege "the traditional elements of causation and loss." 544 U.S. at 346. The Supreme Court found that a complaint failed to allege loss causation where it failed to claim that "share price fell significantly after the truth became known." *Id.* at 347. In short, the only requirement in pleading loss causation is to provide fair notice of loss causation. *See In re Credit Suisse-AOL*, 465 F. Supp. 2d at 46. *Dura* did not place any limits on what type of damage theory is, or is not, cognizable.

In addition, to sufficiently plead loss causation, a plaintiff must allege in a short and plain statement a disclosure or revelation of truth about a defendant's prior misstatement or omission that is in some way connected with a stock price drop. *Dura*, 544 U.S. 346. As such, according to *Dura* and its progeny, loss causation need only satisfy Rule 8's "short and plain statement" requirement, not Rule 9(b)'s particularity requirements. *Brumbaugh*, 416 F. Supp. 2d at 256; *In re TyCom Ltd.*, 2005 U.S. Dist. LEXIS 19154, at *42. Plaintiff's loss causation allegations readily meet these requirements here.

The Complaint alleges that, as a result of Defendants' false and misleading statements regarding the Company's implementation and other revenue, total revenue, net income, operating income, net income per share and general financial condition, as well as its expected performance period and GAAP compliance, the Company's stock was artificially inflated during the Class Period

---

[21] As a preliminary matter, loss causation is a fact-based inquiry that is generally not proper to resolve on a motion to dismiss. *See Hoff v. Popular*, *Inc.*, No. 09-1428, 2010 U.S. Dist. LEXIS 77788, at *47 (D.P.R. Aug. 2, 2010) ("Moreover, [d]isputes about loss causation turn primarily on questions of fact.").

until the relevant truth about athenahealth was revealed on February 25, 2010, March 15, 2010, and April 29, 2010. *See*, *e.g.*, ¶¶269-280. Specifically, on February 25, 2010, when Defendants disclosed to the market that the Company had postponed the release of its financial results for the fourth quarter of 2009 and the year ended December 31, 2009 in order to undertake an internal accounting policy review related to the Company's timing of amortization for deferred implementation review, the Company's common stock plunged by approximately 18%, as it fell $7.65 per share to close at $35.87 on March 1, 2010 on abnormally high trading volume. ¶¶271-272. Additionally, the Complaint alleges that after the market closed on April 29, 2010, the market learned that the Company's bottom line results for the first quarter 2010 would be impacted in part by "higher general and administrative expense of approximately $1.0 million related to the Company's recent accounting review and restatement process." The Company's stock price dropped nearly 24% as it fell $8.39 to close at $26.96 on May 6, 2010 on abnormally high trading volume. ¶¶271, 273. Moreover, the Complaint alleges that the timing and magnitude of these stock price declines negate any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry factors, as is evidenced by the performance of the Company's peer index on those days. ¶279.

Despite Plaintiff's clear satisfaction of the pleading standards imposed by *Dura*, Defendants attempt to defeat Plaintiff's loss causation arguments by arguing that Plaintiff cannot plead loss causation because the Company's stock price increased by 6.5% following the March 15, 2010 announcement of the restatement. Def. Mem. at 31-32. This argument is wholly lacking in merit. First, the March 15, 2010 announcement is not the corrective disclosure forming the basis of the Complaint as Defendants assert. Def. Mem. at 4. Rather, Plaintiff's loss causation allegations stem from the significant drops in the Company's stock price following the Company's February 25 and

38

April 29 announcements, as detailed above.  It is of no moment that the Company's stock price did not drop following the Company's issuance of the restatement on March 15, 2010.  As detailed in the Complaint, the lack of a stock price decline following this announcement was due to: (1) the fact that the market *was already* apprised of the Company's improper recognition of implementation revenue from the February 25, 2010 announcement; and (2) Defendants attempted to offset the announced restatement with positive statements regarding the Company's financial results.  ¶275.  These disclosures had the intended effect of offsetting the news regarding the Company's restatement and buoying the Company's stock price.  ¶276.

Likewise, Defendants' argument that athenahealth's stock price drops were "far from sudden" but rather part of a general decline in the Company's stock price also fails.  Def. Mem. at 32.  In the days immediately following Defendants' disclosures on February 25, 2010 and April 29, 2010, the Company's stock price fell 18% and 24%, respectively, on unusually heavy trading volume.  ¶¶272-273.  These steep and immediate stock price drops can hardly be considered part of a slow, steady decline as Defendants purport.  Moreover, the stock price declines in the instant action are clearly distinguishable from those in the cases cited by Defendants.  *See In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 546 (S.D.N.Y. 2007) (complaint sought recovery for the losses Plaintiffs incurred over the entire *thirty-five month* period that the value of the company's securities declined); *In re Buca, Inc. Sec. Litig.*, No. 05-1762, 2006 WL 3030886, at *9 (D. Minn. Oct. 16, 2006) (plaintiff only alleged a single drop in stock price following one of four partial disclosures that occurred over a nearly one-year period and the share price was trending downward throughout the Class Period).  As Plaintiff has alleged in detail the fraudulent scheme that caused the inflated stock prices, disclosure of that fraud, and the resulting drastic decline in stock price, they have adequately pleaded loss causation.

## IV.    Plaintiff Has Adequately Pled Control Person Liability

Defendants claim that Plaintiff's Section 20(a) control persons claim fails because the Complaint fails to plead an underlying violation of the Exchange Act and that the Individual Defendants controlled any such violation.  Def. Mem. at 32.  Defendants' assertion falls flat.  As detailed above, the Complaint adequately alleges a claim under Section 10(b) and Rule 10b-5, on which a Section 20(a) claim is dependent.  In addition, Plaintiff has alleged that the Individual Defendants were control persons with respect to the underlying violations.  ¶¶18-25 and 236-238. Therefore, Defendants' argument against control person liability should be rejected.  *See Bos. Scientific Corp.*, 523 F.3d at 93-4 (reinstating Section 20(a) claims along with Section 10(b) claims, and further declaring that control is a question of fact not to be resolved at the pleading stage); *Hoff*, 2010 U.S. Dist. LEXIS 77788, at *53 (denying motion to dismiss Section 20(a) claims "[g]iven the court's finding that Plaintiffs have sufficiently pleaded a Section 10(b) and Rule 10b-5 claim under the Exchange Act").

## CONCLUSION

For the reasons stated above, Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss.[22]

---

[22]    As demonstrated above, the Complaint is particularized and alleges sufficient facts raising a strong inference of Defendants' scienter and loss causation.  However, if for any reason the Court finds the Complaint, or any part thereof, insufficient, Plaintiff respectfully requests leave to amend the Complaint pursuant to Fed. R. Civ. P. 15, in order to cure any possible pleading deficiencies.  "In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, [or] undue prejudice to the opposing party . . . the leave sought should . . . be 'freely given,'" for "[d]ismissal with prejudice is warranted only when a trial court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.D.C. 1996).  *See also ACA*, 512 F.3d at 52 ("we hold that under the reasoning of *Tellabs*, the PSLRA does not alter the liberal amendment policy of Federal Rule of Civil Procedure 15.").

DATED:  November 30, 2010              ROBBINS GELLER RUDMAN
                                          & DOWD LLP


                                       _____
                                              /s/ Jack Reise
                                            JACK REISE

                                       JACK REISE (pro hac vice)
                                       ELIZABETH A. SHONSON (pro hac vice)
                                       120 East Palmetto Park Road, Suite 500
                                       Boca Raton, FL  33432
                                       Telephone:  561/750-3000
                                       561/750-3364 (fax)
                                       jreise@rgrdlaw.com
                                       eshonson@rgrdlaw.com

                                       *Lead Counsel for Plaintiff*

                                       HUTCHINGS, BARSAMIAN, MANDELCORN
                                          & ZEYTOONIAN, LLP
                                       THEODORE M. HESS-MAHAN, BBO #557109
                                       110 Cedar Street, Suite 250
                                       Wellesley Hills, MA  02481
                                       Telephone:  781/431-2231
                                       781/431-8726 (fax)
                                       thess-mahan@hutchingsbarsamian.com

                                       *Liaison Counsel*

                                       SULLIVAN, WARD, ASHER & PATTON, P.C.
                                       CYNTHIA J. BILLINGS
                                       25800 Northwestern Highway
                                       1000 Maccabees Center
                                       Southfield, MI  48075-1000
                                       Telephone:  248/746-0700
                                       248/746-2760 (fax)

                                       *Additional Counsel for Plaintiff*

41

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on November 30, 2010.

<u>          */s/ Jack Reise*          </u>
JACK REISE