UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANDREA CASULA, on Behalf of Herself and All Others Similarly Situated, | )<br>)<br>) |
| Plaintiff, | )<br>)<br>) |
| v. | )   CIVIL ACTION NO. 1:10-CV-10477-GAO<br>) |
| ATHENAHEALTH, INC., JONATHAN BUSH and CARL B. BYERS, | )<br>)<br>) |
| Defendants. | )<br>) |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

Deborah S. Birnbach (BBO #628243)
Kathryn L. Alessi (BBO #651110)
Goodwin Procter LLP
53 State Street
Boston, MA 02109
Tel:  617-570-1000
Fax:  617-523-1231
dbirnbach@goodwinprocter.com
kalessi@goodwinprocter.com

**Attorneys for Defendants**

## TABLE OF CONTENTS

I.      THE AMENDED COMPLAINT FAILS TO RAISE A STRONG INFERENCE
        OF SCIENTER. ...................................................................................................3

        A.      The Amended Complaint Lacks Particularized Allegations Showing
                Defendants' Knowledge That Statements Were False When Made. ......................3

        B.      Plaintiffs Over-Simplify and Misinterpret SAB 104 ...............................................6

        C.      Where Defendants Fully Disclosed The Accounting Methodology And
                Facts Concerning Customer Relationships, Plaintiffs Allege An
                Implausible Fraud Committed In Plain Sight. .......................................................11

                1.      Defendants Accurately Disclosed That Implementation Revenue
                        Was Amortized Over The Initial Contract Period. .................................. 11

                2.      Absent Allegations That Anything Was Hidden From The
                        Company's Auditors, Their Clean Audit Opinions Throughout The
                        Relevant Period Negate Scienter. ............................................................ 14

        D.      Plaintiffs' Other Allegations Do Not Establish Scienter. .....................................14

        E.      The Individual Defendants' Stock Sales Do Not Support Scienter. .....................16

II.     PLAINTIFFS' LOSS CAUSATION ARGUMENTS FAIL. ...........................................19

# TABLE OF AUTHORITIES

Page(s)

CASES

*In re AFC Enterprises, Inc. Sec. Litig.,*
348 F. Supp. 2d 1363 (N.D. Ga. 2004) ...................................................................10

*In re ArthroCare Corp. Sec. Litig.,*
No. A-08-CV-574, 2010 WL 2901536 (W.D. Tex. July 20, 2010)........................10

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,*
324 F. Supp. 2d 474 (S.D.N.Y. 2004)..............................................................14, 15

*In re Biogen Idec, Inc. Sec. Litig.,*
No. 05-10400, 2008 WL 4810045 (D. Mass. Oct. 25, 2008) .................................18

*In re Bristol-Myers Squibb Sec. Litig.,*
312 F. Supp. 2d 549 (S.D.N.Y. 2004).................................................................6, 11

*In re Campbell Soup Co. Sec. Litig.,*
145 F. Supp. 2d 574 (D.N.J. 2001) ........................................................................15

*In re Credit Suisse First Boston Corp.,*
No. 02-12056, 2005 WL 852455 (D. Mass. Mar. 31, 2005) ..................................20

*Durham v. Whitney Information Network, Inc.*
No. 06-CV-00687, 2009 WL 3783375 (M.D. Fla. Nov. 10, 2009) ........................16

*Ernst & Ernst v. Hochfelder,*
425 U.S. 185 (1976)..................................................................................................3

*In re The First Marblehead Corp. Sec. Litig.,*
639 F. Supp. 2d 145 (D. Mass. 2009) .................................................................3, 18

*In re Focus Enhancements, Inc. Sec. Litig.,*
309 F. Supp. 2d. 134 (D. Mass. 2001) ...................................................................17

*In re Galileo Corp. S'holders Litig.,* 127 F. Supp. 2d 251 (D. Mass. 2001) ..................................3

*Greebel v. FTP Software, Inc.,*
194 F.3d 185 (1st Cir. 1999) ..................................................................................17

*In re Int'l Rectifier Corp. Sec. Litig.,* No. 07-02544, 2008 WL 4555794 (C.D. Cal. May
23, 2008) ..................................................................................................................18

*Isham v. Perini Corp.,*
665 F. Supp. 2d 28 (D. Mass. 2009) ........................................................................4

*Malin v. XL Capital Ltd.*,
    499 F. Supp. 2d 117 (D. Conn. 2007) ...............................................................................17, 18

*In re Medicis Pharm. Corp. Sec. Litig.*, No. CV-08-12821, 2010 WL 3154863 (D. Ariz.
    Aug. 9, 2010) .................................................................................................................................10

*Miss. Pub. Employees' Retirement Sys. v. Boston Scientific Corp.*, 523 F.3d 75 (1st Cir.
    2008) ...............................................................................................................................................18, 19

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC, Inc.*,
    537 F. Supp. 3d 35 (1st Cir. 2008) ...............................................................................................18

*In re Parametric Technology Corp.*, 300 F. Supp. 2d 206 (D. Mass. 2001) ..........................11, 17

*In re PEC Solutions Sec. Litig.*,
    418 F.3d 379 (4th Cir. 2005) .........................................................................................................10

*Primavera Investors v. Liquidmetal Technologies, Inc.*, 403 F. Supp. 2d 1151 (M.D. Fla.
    2005) ...............................................................................................................................................15

*In re Raytheon Sec. Litig.*,
    157 F. Supp. 2d 131 (D. Mass. 2001) .......................................................................................4, 5

*Shaw v. Digital Equipment Corp.*, 82 F.3d 1194 (1st Cir. 1996) .................................................11

*In re Smith & Wesson Holding Corp. Sec. Litig.*, 604 F. Supp. 2d 332 (D. Mass. 2009) ..............18

*Stiegele ex rel Viisage Technology, Inc. v. Bailey*,
    No. 05-10677, 2007 WL 4197496 (D. Mass. Aug. 23, 2007) .................................................18

*In re Stone & Webster, Inc., Sec. Litig.*,
    253 F. Supp. 2d 102 (D. Mass. 2003) .......................................................................................4, 5

*In re Taleo Corp. Sec. Litig.*,
    No. C 09-00151, 2010 WL 597987 (C. D. Cal. Feb. 17, 2010) ..................................... passim

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*,
    551 U.S. 308 (2007) .........................................................................................................................14

*In re Watchguard Sec. Litig.*,
    No. C05-678J, 2006 WL 2038656 (W.D. Wash. Apr. 21, 2006) ...........................................13

*Zuckerman v. Smart Choice Auto. Group, Inc.*,
    No. 6:99-CV-237, 2000 WL 33996254 (M.D. Fla. Aug. 29, 2000) .......................................15

STATUTES

15 U.S.C. § 78u-4(b) (2006) ...............................................................................................................3

## OTHER AUTHORITIES

Securities and Exchange Commission Staff Accounting Bulletin 104 ................................ passim

## INTRODUCTION

Notwithstanding its fifty-plus paragraphs of confidential witness ("CW") allegations, the Amended Complaint fails to put forth a single allegation showing that Defendants possessed facts or information alerting them that the Company's historical method of accounting for implementation fees was incorrect, let alone fraudulent. Wholly absent from the Amended Complaint is any allegation of Defendants' involvement with the accounting judgment at all. The Amended Complaint fails to identify who made the judgment or performed the analysis, much less that Defendants received a document or had a conversation whereby they were informed that the line item reflecting implementation revenues was false. Simply put, Plaintiffs allege *no* contemporaneous facts from which the Court can infer that Defendants knew or understood that the accounting judgment and publicly disclosed amortization period estimate was improper. Indeed, there is not even an allegation that *anyone*—including the Company's independent auditors—believed the accounting judgment to be wrong at the time that the financial statements were publicly reported.

Faced with Defendants' motion to dismiss, and lacking any facts to establish Defendants' contemporaneous understanding that the accounting judgment was improper, Plaintiffs' Opposition ("Opp.") grasps for some other support for an inference of scienter. But Plaintiffs' additional arguments fare no better:

- *First*, Plaintiffs' suggestion, made without reference to any authority, that the accounting judgment amounted to nothing more than a question of the expected length of the customer relationship, and was therefore "simple and straightforward," disregards the plain language of SAB 104. The exercise of accounting judgment requires the application of complex accounting considerations, including whether the customer would continue to benefit from the payment of the up-front implementation fee beyond the initial contract period and for how long. Other SaaS companies made similar and far less conservative accounting judgments during the same period, further underscoring the complex nature of the accounting judgment.

- **Second**, contrary to Plaintiffs' contention based on partial sentence excerpts from Company's disclosures, Defendants expressly disclosed the Company's determination that the expected performance period was equal to the initial contract period, along with its rates of customer retention.  In light of the Company's disclosures viewed in full, Plaintiffs' allegations of omitted information as supporting an inference of scienter fall flat.  If, as Plaintiffs' contend, the accounting flaw was so obvious from the length of the customer relationship alone, Plaintiffs have described what amounts to an implausible fraud in plain sight, as the entire market knew the length of Company's customer relationships.

- **Third**, Plaintiffs' argument that Defendants *must have known* that the accounting judgment was improper because of their "high positions" and their involvement with the Company's "core operations" is not supported in the case law or the Amended Complaint's allegations.  Not every estimate factoring into an accounting judgment is a core operation; the cases cited by Plaintiffs involved allegations directly speaking to the defendants' awareness of falsity (and not just to some vague reference to defendants' position or access to information), or an obviously fraudulent scheme.

- **Fourth**, Defendants' stock sales do not support an inference of scienter where the Amended Complaint lacks any allegations showing the trading to be unusual in timing or otherwise.  An examination of the trades in context reveals the contrary— namely, that the trades were spread evenly throughout and not clustered at the end of the Class Period and many were made pursuant to SEC Rule 10b5-1 trading plans.

Plaintiffs are left with nothing but the unremarkable fact of the restatement, which amounted to 3% or less of total revenue during the Class Period.  However, "Plaintiff[s] cannot rely on th[e] fact [of a restatement] alone to establish scienter."  *In re Taleo Corp. Sec. Litig.*, No. C 09-00151, 2010 WL 597987, at *8 (C. D. Cal. Feb. 17, 2010).  The court in *Taleo* dismissed a strikingly similar securities fraud claim based on a restatement where the complaint failed "to show that the defendants knew specific facts at the time that rendered their accounting determinations fraudulent," and where "there [we]re no facts from which the court could conclude or infer that the accounting was so simple and basic that defendants could not have made an innocent mistake."  *Id.* at *8, *10.  Any inference of scienter that could be drawn as a result of Plaintiffs' allegations is outweighed by the far more plausible and compelling explanation that the Company's interpretation of SAB 104 evolved as a result of the self-initiated

internal review by a new CFO and with input from Deloitte's national office.  This conclusion is supported by the Amended Complaint and SEC filings referenced therein, including Deloitte's unqualified audit opinions throughout the period, during which time there is no allegation that any information was withheld from the auditors.  Where the Amended Complaint fails to plead scienter, and fails equally in its attempt to show loss causation, it must be dismissed in its entirety with prejudice.

## ARGUMENT

I.   **THE AMENDED COMPLAINT FAILS TO RAISE A STRONG INFERENCE OF SCIENTER.**

    A.   **The Amended Complaint Lacks Particularized Allegations Showing Defendants' Knowledge That Statements Were False When Made.**

Plaintiffs' Opposition fails to refute the key point in Defendants' opening brief ("Opening Br.")—that the Amended Complaint is devoid of a single allegation showing that Defendants knew that the accounting judgment for the implementation fee amortization period was improper or an unreasonable application of complex revenue recognition accounting rules, much less that Defendants intentionally falsified the timing of implementation revenue.[1]

As the *Taleo* case instructs, a complaint cannot survive dismissal under the heightened pleading standard where the scienter allegations boil down to nothing more than the hindsight allegation, drawn from the fact of a restatement, that the defendants *must have* understood the accounting judgment to have been improper.  *See* 2010 WL 597987, at *7-9; 15 U.S.C. § 78u-4(b) (2006).  Filed following a restatement through which Taleo changed its accounting policy to defer and amortize revenue from set-up and training services ratably over a three-year contract

---

[1]    To establish scienter, Plaintiffs must allege particularized facts showing "a mental state embracing intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *see In re The First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 163 (D. Mass. 2009) ("conscious intent to defraud or a high degree of recklessness"); *In re Galileo Corp. S'holders Litig.*, 127 F. Supp. 2d 251, 265 (D. Mass. 2001) ("Recklessness . . . involves more than a failure to investigate, even in the fact of warning signs of trouble.").

period (as opposed to recognizing revenue up front as the services were performed), the *Taleo* complaint alleged, as here, that the company "recognized revenue before it was earned, in order to drive up Taleo's stock price," and pointed as one of the bases of scienter to defendants' involvement with the finance and accounting function of the business and their awareness of the company's operations. *Id.* at *2, *8; *see, e.g.,* AC ¶¶ 18, 95-96.  The court dismissed the complaint where, among other things, it failed "to show that the defendants knew specific facts at the time that rendered their accounting determinations fraudulent."[2] *Id.* at *8; *see also Isham v. Perini Corp.*, 665 F. Supp. 2d 28, 34 (D. Mass. 2009) (dismissing complaint that failed to "allege details of defendants' alleged fraudulent involvement, including specifics as to what defendants had knowledge of and when.").[3]

The instant case diverges greatly from *In re Stone & Webster, Inc., Sec. Litig.*, cited by Plaintiffs, in which the court found a strong inference of scienter where the complaint alleged that the defendants received reports prepared by the company's accountants showing accounts to be up to 700 days overdue and received telephone calls from vendors complaining about nonpayment—that is, where the reports established the defendants' knowledge of the falsity of statements that the company had sufficient liquidity.  253 F. Supp. 2d 102, 131 (D. Mass. 2003). Likewise, in another case relied upon by Plaintiffs, *In re Raytheon Sec. Litig.*, the court found there to be a "strong inference of contemporaneous knowledge of a serious GAAP problem," and the inference of scienter to be "considerably strengthened," as a result of, among other things, a divergence between losses recorded on reports (classified and quantified therein as "write offs,"

---

[2]    Plaintiffs do not, and cannot, deny that the Amended Complaint suffers from the same defect, but try to distinguish *Taleo* on other irrelevant grounds.  *See* Opp. at 17 n.6, 20 n.8; Section I(C)(1) and note 8, *infra*.

[3]    "To satisfy this requirement, complaints typically identify internal reports, memoranda, or the like, and allege both the contents of those documents and defendants' possession of them at the relevant time."  *Isham*, 665 F. Supp. 2d at 34.

separate from "possible" write offs) received by the defendants, on the one hand, and the information that was made available to the public, on the other.  157 F. Supp. 2d 131, 138, 147-49 (D. Mass. 2001).

Here, Plaintiffs rely largely on CW allegations for scienter, but the CWs had *no role in the Company's finance or accounting activities and no knowledge of the accounting judgments made at Athena.*  The Amended Complaint sets forth *no facts* indicating that any of the CWs had any knowledge of accounting generally, of how Athena made accounting judgments, or of what revenue recognition accounting principles applied to implementation revenues.  Nor do Plaintiffs allege that the particular accounting judgment at issue, that the "expected performance period" for amortization of implementation revenues under SAB 104 was reasonably estimated by the initial contract period, was in any way inappropriate.[4]  *See* Opening Br. at 16-18.  In fact, there is no allegation concerning Defendants' involvement at all in the accounting judgment, or even concerning the baseline facts of who at the company made the accounting judgment, what principles the responsible individual(s) considered in making the judgment, or what information the individual(s) relied upon in estimating the expected performance period in which customers would benefit from implementation services.

In contrast to *Stone & Webster* and *Raytheon*, where the defendants allegedly received reports establishing their contemporaneous knowledge of falsity of the company's public statements, Plaintiffs do not allege that Mr. Bush or Mr. Byers received any document or had any conversation whereby they were informed that the implementation revenue numbers in the financial statements were false, or otherwise came to understand that Athena's historical

---

[4]   To the contrary, the CWs merely reiterate information that the Company repeatedly disclosed to investors concerning Athena's products, implementation process, pricing information, and customer retention rates.  *See* AC ¶¶ 29-87; Opening Br. at 16-18.  Plaintiffs' suggestion that these allegations establish scienter rests largely on their mischaracterization of SAB 104 as amounting to nothing more than a question of length of customer relationship, but this is not the entirety of the accounting judgment.  *See infra* at Section I(B).

accounting judgment was improper.  Indeed, there is not even an allegation that *anyone* believed the accounting judgment to be improper during the Class Period, much less that anyone raised that issue to Defendants contemporaneously.  Plaintiffs' allegations that the Individual Defendants received reports concerning the number of customers in implementation and implementation status get them nowhere given Plaintiffs' failure to explain how such information is relevant to the accounting judgment, let alone to show that it would in any manner impact the historical accounting judgment.  *See* AC ¶¶ 85-87; Opp. at 13.

Plaintiffs' utter failure to plead facts showing Defendants' contemporaneous understanding that the accounting judgment was improper is fatal to their claims.  *See Taleo*, 2010 WL 597987, at *8-10 (in dismissing complaint, noting absence of allegations showing defendants knew they should have used different accounting treatment); *see also In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 565-66 (S.D.N.Y. 2004) (dismissing complaint where plaintiff failed to plead that defendants knew or should have known that revenue should have been accounted for differently and, thus, that contemporaneous financials were incorrect).

### B.    Plaintiffs Over-Simplify and Misinterpret SAB 104.

Lacking any facts that would establish Defendants' contemporaneous understanding that the accounting judgment was improper, Plaintiffs seize instead upon facts pertaining to the Company's publicly disclosed low customer attrition rates and suggest without authority that the length of the customer relationship is the entirety of the accounting judgment: "Defendants closely monitored customer attrition, renewal rates, and implementation revenue through reports, meetings and the Company's CRM system, *and thus knew* that the Company's expected performance period for its implementation fees was well over a year in length."  Opp. at 11 (emphasis added); *id.* at 13, 15 (similar); *see also* AC ¶ 81.  Contending that the accounting judgment amounted to nothing more than a question of the expected length of the customer

6

relationship, Plaintiffs claim that "[t]he GAAP provision at issue here—SAB 104—was simple and straightforward." *See* Opp. at 4, 18-19.

This conclusion ignores the plain language of the accounting literature. When determining the proper timing of amortization for recognizing nonrefundable upfront fees such as implementation fees, companies must exercise accounting judgment on when these fees are "earned" by applying complex, interrelated accounting principles. *See* Birnbach Decl.,[5] Ex. F. at 10-11 (SAB 104 discussing various revenue recognition principles) (incorporated by reference in AC ¶ 55). SAB 104 instructs that where there are ongoing services that are essential to the customer receiving the benefit of an up-front fee, revenue from such fee should be deferred and amortized over time:

> Supply or service transactions may involve the charge of a nonrefundable initial fee with subsequent periodic payments for future products or services. The initial fees may, in substance, be wholly or partly an advance payment for future products or services. In the examples above, the on-going rights or services being provided or products being delivered are essential to the customers receiving the expected benefit of the up-front payment. *Therefore, the up-front fee and the continuing performance obligation related to the services to be provided or products to be delivered are assessed as an integrated package. In such circumstances, the staff believes that up-front fees, even if nonrefundable, are earned as the products and/or services are delivered and/or performed over the term of the arrangement or the expected period of performance[39] and generally should be deferred and recognized systematically over the periods that the fees are earned.[40]*

*Id.* at 46 (SAB 104) (excerpt; emphasis added). SAB 104 outlines *two* considerations in determining the proper amortization period: whether "[1] the relationship with the customer is expected to extend beyond the initial term *and* [2] the customer continues to benefit from the payment of the up-front fee (e.g., if subsequent renewals are priced at a bargain to the initial up-front fee)." *Id.*

---

[5]     Exhibits A - T are attached to the Birnbach Decl. dated October 1, 2010, filed with Defendants' Opening Brief. Exhibits U - AA are attached to the Declaration of Deborah S. Birnbach dated December 30, 2010.

at 46 n.39 (emphasis added).  The accounting literature requires the Company to consider

whether and for how long the customer would continue to benefit from the payment for

implementation services beyond the initial contract period.  *Id*. at 46.

Plaintiffs' argument completely disregards this second continuing benefit piece of the

analysis, and the Amended Complaint alleges no facts describing what Defendants knew or did

not know about this analysis.  Indeed, Plaintiffs make only the bald assertion that because

Athena stated in its SEC filings that "implementation service is not separable from the ongoing

business services," "Defendants clearly knew and understood that its customers were continuing

to benefit from the payment of up-front implementation fees."  Opp. at 19.  As SAB 104 states,

however, the fact that the up-front fees and the ongoing services are not separate, or are "an

integrated package" for accounting purposes, is only the beginning—not the end—of the

analysis.  Birnbach Decl., Ex. F, at 46 (SAB 104).  Their connectedness is precisely what triggers

deferral and amortization in the first place.  The language quoted by Plaintiffs says nothing other

than that the Company will defer and amortize the revenues and absolutely nothing about the

analysis to determine *over what period* implementation revenue would be amortized.[6]  Athena

had always deferred and amortized this revenue, so the issue here is the length of the

amortization period—the very part of the SAB 104 analysis that Plaintiffs ignore.

The accounting analysis is even more complex for a company in Athena's position.

Athena sells changing product offerings to a dynamic client base rather than a single product,

unchanging, to a static universe of customers.  *See* AC ¶¶ 2, 14, 28, 60.  Given Athena's web-

based Software as a Service ("SaaS") model, the products initially implemented by the Company

were being constantly updated to address new services and customer needs.  *See* AC, ¶ 2.  As

---

[6]    Plaintiffs also ignore the SEC's additional guidance on the analysis of continuing benefit—"e.g. [namely,
       including, but not limited to], if subsequent renewals are priced at a bargain to the initial up-front fee."

one CW put it, clients liked Athena because the service offering would not be "obsolete in six months." AC ¶ 60. Reflecting upon the restatement, Athena's new CFO stated the historical policy "made sense given the rapid pace at which our services change and intuitively the value of our implementation is received during the first year." Birnbach Decl., Ex. D, at 2 (Earnings Call Transcript, Mar. 16, 2010) (quoted in AC ¶ 102). Further, while the number of physicians using Athena's services was under 5,000 on average in 2005, it tripled to "more than 15,700" by the end of 2009 so that Athena was required to evaluate whether experiences with existing customers would hold true for the ever-growing number of first-time customers. Birnbach Decl., Ex. AA, at 55 (2007 SEC Form 10-K, Mar. 7, 2008) (incorporated by reference in AC ¶ 33); AC ¶14. Plaintiffs utterly ignore these facts. *See* Opp. at 19; AC ¶¶ 61-62, 94.

To put Athena's accounting judgment and estimate into historical context, other SaaS companies made similar or far less conservative accounting judgments during the Class Period.[7] *See* Opening Br. at 14 n.13, 19. For instance, unlike Athena, which always deferred and amortized nonrefundable up-front fees, Taleo historically recognized its consulting revenue (mainly from set-up and training services) up front "as services were rendered." *Taleo*, 2010 WL 597987, at *3. In November 2008, Taleo announced that its auditors requested a re-evaluation of the accounting policy. *Id.* at *4. After five months of deliberation, Taleo announced that it had decided to defer and amortize non-refundable up-front fees over the term of the contract—precisely the practice that Athena followed until its own restatement.[8] *Id.*

---

[7]     Plaintiffs do not dispute this historical context. *See* Opp. at 20. Plaintiffs claim that the Court may not consider other companies' SEC filings "for the truth of the matters asserted." *See id.* n.9. However, these examples are cited instead to show that other SaaS companies' policies were all over the map and to give context for the complexity of the accounting judgment at issue.

[8]     Plaintiffs' claim that *Taleo* is inapplicable because it concerned EITF 00-21, rather than SAB 104, also reflects their misinterpretation. *See* Opp. at 20, n.8. While the main change was that Taleo decided to defer nonrefundable up-front revenues as required by EITF 00-21, EITF 00-21 then triggered analysis under SAB 104 as to the appropriate length of the amortization period. *See* Birnbach Decl., Ex. B. at 44 (SAB 104)

Particularly in light of the features unique to Athena's business and similar or less conservative accounting practices followed by other SaaS companies, Plaintiffs cannot claim that the accounting judgment was so "simple and straightforward" for the restatement to be probative of scienter.[9]  *See In re PEC Solutions Sec. Litig.*, 418 F.3d 379, 389 (4th Cir. 2005) (GAAP error does not establish scienter; plaintiff must allege facts to show that "no reasonable accountant would have made the same decisions if confronted with the same facts"); *Taleo*, 2010 WL 597987, at *10 (rejecting plaintiffs' argument that accounting judgment was "simple and straightforward" where plaintiffs failed to allege that defendants should have known Taleo's accounting treatment was improper and court could not rule out an innocent mistake).

The Amended Complaint and the Opposition, with their myopic focus on expected length of customer relationship, reveal nothing whatsoever about the analysis that was conducted to determine the other, more complicated piece of the accounting judgment—that is, whether customers would continue to benefit from the implementation fees beyond the initial contract period and for how long—and certainly nothing from which the Court can infer Defendants' awareness or belief that the accounting judgment was fraudulent.  Plaintiffs are left with the fact of the restatement, which does not establish scienter.  *See Taleo*, 2010 WL 597987, at *8

---

("Question: Assuming these arrangements qualify as single units of accounting under EITF Issue 00-21, when should the revenue relating to nonrefundable, up-front fees in these types of arrangements be recognized?").

[9]      The facts at issue in the cases relied upon by Plaintiffs, involving violations of relatively simple accounting principles or obviously fraudulent accounting violations, are worlds away from the instant case.  *See, e.g., In re Medicis Pharm. Corp. Sec. Litig.*, No. CV-08-12821, 2010 WL 3154863 (D. Ariz. Aug. 9, 2010) (allegations of boosting revenue by selling short-dated pharmaceutical products without reserving full value of anticipated returns, where GAAP allowed such treatment for exchange of products of same "quality" and not exchange of expired products with fresh products) (cited in Opp. at 16-18, 22-25); *In re ArthroCare Corp. Sec. Litig.*, No. A-08-CV-574, 2010 WL 2901536 (W.D. Tex. July 20, 2010) (elaborate insurance fraud and revenue recognition scheme including "sale" to fictitious subsidiaries without actual order or movement of inventory) (cited in Opp. at 17-18).  Here, the fees were nonrefundable and Athena received payment up front for implementation services, and there is no allegation that the implementation fees earned by the Company were inflated or that the manner in which the Company earned the fees was improper.  *See In re AFC Enterprises, Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1372-73 (N.D. Ga. 2004) ("The accounting errors identified, although GAAP violations to be sure, were errors in accrual of income and expenses, not attempts to fabricate revenue or to conceal expenses.")

("Plaintiff cannot rely on th[e] fact [of restatement] alone to establish scienter and must allege facts to show that the defendants knew specific facts at the time that rendered their accounting determinations fraudulent."); *Bristol-Myers*, 312 F. Supp. 2d at 565, 565 n.10 (rejecting plaintiffs' reliance on defendant's supposed knowledge of "'facts' upon which the restatement was based . . . that is, the four factors applied in the Restatement" because plaintiffs failed to allege "how the Company knew at the time that the accounting was improper").[10]   Accordingly, Plaintiffs' claims must fail.

### C. Where Defendants Fully Disclosed The Accounting Methodology And Facts Concerning Customer Relationships, Plaintiffs Allege An Implausible Fraud Committed In Plain Sight.

#### 1. Defendants Accurately Disclosed That Implementation Revenue Was Amortized Over The Initial Contract Period.

Plaintiffs argue that the Company's disclosures omitted a "critical fact" that "Defendants were recognizing implementation revenue over the contract period of one year rather than a longer expected performance period."  Opp. at 22-23 (quoting partial sentences from the Company's SEC filings).  Contrary to the picture that Plaintiffs try to paint by excerpting snippets of the Company's filings, Defendants did disclose in SEC filings and other public statements throughout the Class Period that, until the March 15, 2010 restatement, the Company determined the expected performance period to be equal to the initial contract period.[11]

For example, the annual reports filed with the SEC contained the following disclosures:

---

[10]   Defendants do not claim that "the fact that SAB 104 requires an exercise of judgment" alone "defeat[s] an inference of scienter."  Opp. at 20.  Rather, Defendants argue that given the complexity of the accounting judgment under SAB 104, *the fact of the restatement does not alone* establish scienter and Plaintiffs must allege particularized facts showing that Defendants understood the accounting treatment to be improper at the time the statements at issue were made.

[11]   *See Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996) (court may take judicial notice of documents, including those publicly filed with the SEC; "Were the rule otherwise, a plaintiff could maintain a claim of fraud by excising an isolated statement from a document and importing it into the complaint, even though the surrounding context imparts a plainly non-fraudulent meaning to the allegedly wrong statement."); *In re Parametric Technology Corp.*, 300 F. Supp. 2d 206, 213 n.7 (D. Mass. 2001) (O'Toole, J.) (in dismissing complaint with prejudice, considering SEC Form 10-Q, "even parts not relied on by the plaintiffs.").

> All revenue, other than implementation revenue, is recognized when the service is performed. As the implementation service is not separable from the ongoing business services, *we record implementation fees as deferred revenue until the implementation service is complete, at which time we recognize revenue ratably on a monthly basis over the expected performance period.*
>
> *Our clients typically purchase one-year contracts that renew automatically upon completion.* In most cases, our clients may terminate their agreements with 90 days notice without cause. We typically retain the right to terminate client agreements in a similar timeframe.

Birnbach Decl., Ex. B, at 50 (2007 SEC Form 10-K, Mar. 7, 2008) ("Critical Accounting Policies") (incorporated by reference in AC ¶ 33), Ex. C, at 50 (2008 SEC Form 10-K, Mar. 2, 2009) ("Critical Accounting Policies") (incorporated by reference in AC ¶ 35) (emphasis added).

These same annual reports specifically disclosed the use of the contract period:

> During the implementation cycle, we expend substantial time, effort and financial resources implementing our service, but accounting principles do not allow us to recognize the resulting revenue until the service has been implemented, at which time *we begin recognition of implementation revenue over the life of the contract.*

Birnbach Decl., Ex. B, at 23 (2007 SEC Form 10-K), Ex. C, at 23 (2008 SEC Form 10-K) (emphasis added).  Moreover, in discussion with analysts about implementation costs incorporated by reference in the Amended Complaint, Mr. Byers stated: "from an accounting standpoint, it's important to note that we expense our implementation costs as they happen, *but we defer the implementation revenue over the life of the initial contract period*."  Birnbach Decl., Ex. G, at 14 (Earnings Call Transcript, Aug. 6, 2009) (incorporated by reference in AC ¶ 189) (emphasis added).  This express disclosure of Athena's existing accounting judgment prior to the restatement, contained in the very disclosures referenced in the Amended Complaint, puts to rest any claim that Defendants hid their existing accounting policy.

Not only did the Company openly disclose how it recognized implementation revenues

(along with facts concerning the source of the Company's implementation fees, the

implementation process and delays, and rates of customer retention), but it also listed the amount

of implementation fee revenues as a separate line item so that investors could see its exact

amount every quarter of the Class Period—all of which enabled Athena's shareholders, analysts,

or any other interested party to evaluate the propriety of the Company's accounting.  *See*

Opening Br. at 20 n.19; *see, e.g.*, Birnbach Decl., Ex. B, at 46 (2007 SEC Form 10-K), Ex. C, at

46 (2008 SEC Form 10-K).  In light of these disclosures, Plaintiffs' allegations of omitted

information as showing scienter fall flat.  Indeed, if an accounting error were so obvious from the

length of the customer relationship alone, then Plaintiffs have described what amounts to an

implausible fraud in plain sight, as the entire market knew the length of Athena's customer

relationships.  *See* AC ¶¶ 88-91 (Athena's public disclosures of automatic contract renewal, low

attrition rates, and high customer loyalty);[12] *see also Taleo*, 2010 WL 597987, at *10 ("[T]he fact

that Defendants applied EITF 00-21 in such a consistent and transparent manner raises a

plausible inference that Defendants' error was innocent."); *In re Watchguard Sec. Litig.*, No.

C05-678J, 2006 WL 2038656, at *5-6 (W.D. Wash. Apr. 21, 2006) (allegations did not support

strong inference of scienter where defendants "consistently disclosed" accounting error on which

restatement was based and where "blatant error had been committed in each quarter in open and

notorious fashion for years").

---

[12]   Athena made additional disclosures beyond those instances referenced in AC ¶¶ 88-91.  *E.g.*, Birnbach Decl.,
Ex. B, at 50 (2007 SEC Form 10-K) ("Our clients typically purchase one-year contracts that renew
automatically upon completion"), Ex. U, at 16 (2007 Form 10-Q, Nov. 13, 2007) (incorporated by reference in
AC ¶ 122) (same), Ex. C, at 50 (2008 SEC Form 10-K) (same), Ex. V, at 17 (2008 Form 10-Q, May 6, 2008)
(incorporated by reference in AC ¶ 139) (same), Ex. W, at 16 (2008 Form 10-Q, Aug. 5, 2008) (incorporated
by reference in AC ¶ 150) (same), Ex. X, at 19 (2008 Form 10-Q, Nov. 7, 2008) (incorporated by reference in
AC ¶ 159) (same), Ex. Y, at 1 (IPO Prospectus, Sep. 20, 2007) ("We have experienced a contract renewal rate
of at least 97% in each of the last five years") (incorporated by reference in AC ¶ 110), Ex. Z, at 15 (2007 SEC
Form 10-Q, Nov. 13, 2007) (incorporated by reference in AC ¶ 122) (same).

2.      **Absent Allegations That Anything Was Hidden From The Company's Auditors, Their Clean Audit Opinions Throughout The Relevant Period Negate Scienter.**

Plaintiffs do not answer the point that the Company's auditors issued clean audit opinions, never once calling into question Athena's implementation fee revenue accounting practices.  Deloitte audited Athena's annual financial statements and reviewed quarterly statements for all of the periods in question, during which time the Company openly revealed its customer retention rate and in plain view amortized implementation fees over the initial contract period.  Defendants do not argue, as Plaintiffs claim, that "there can be no securities fraud where an independent auditor has issued an unqualified opinion."  Opp. at 26.  Rather, Plaintiffs' failure to allege that the Company withheld information from its auditors or that Deloitte objected to Athena's pre-restatement accounting policy for implementation revenue undercuts any inference that Defendants knew or should have known that statements regarding implementation fees were false when made.  *See Taleo*, 2010 WL 597987, at *13 (scienter inference undermined where plaintiff "does not allege facts that suggest the Defendants attempted to deceive Taleo's auditors.").  Indeed, the far more compelling inference is that the Company's interpretation of SAB 104 evolved as a result of the self-initiated internal review by a new CFO and corresponding input from Deloitte's national office, and that Defendants had no reason to believe, or even suspect, that the accounting judgment was inappropriate.  *See* AC ¶ 102; *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 324 (2007) ("A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.").

D.      **Plaintiffs' Other Allegations Do Not Establish Scienter.**

Plaintiffs' reliance on Defendants' "high positions" and their involvement with the Company's "core operations" to establish scienter fares no better.  *See* Opp. at 28-30.  This case

14

is far from the case principally relied upon by Plaintiffs, *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.* 324 F. Supp. 2d 474 (S.D.N.Y. 2004). *See* Opp. at 29. There, a restatement due to the company's failure to write down the value of its cargo fleet transformed the company from one with a profit of $185 million to one with a deficit of $178 million, resulting in its bankruptcy. *Atlas*, 324 F. Supp. 2d at 484. In that case, the court said, "the size and nature of the restatement suggests that this was no mere error caused by the improper application of hyper-technical accounting rules—it indicates that there were systematic accounting abuses within Atlas that resulted in a serious public misrepresentation of the company's financial condition." *Id.* at 489. The *Atlas* complaint also pointed to "red flags relating to the core operations of the company" that would have alerted the defendants to the falsity of the company's financial statements. *Id.* at 491 (customers were leaving Atlas and planes were sitting idle; company also admitted later it was "paying far more than what the aircraft were worth" at the time).[13]

As discussed in Defendants' opening brief, courts have routinely rejected attempts to plead scienter by virtue of corporate positions. *See* Opening Br. at 16 n.14. Unlike *Atlas,* here there is a complex accounting judgment and no red flags. Plaintiffs allege no facts that would have alerted Defendants that this accounting judgment, blessed by the auditors, was incorrect. Plaintiffs allege nothing more than Defendants' positions and their awareness of what the market already knew, the length of customer relationships. These allegations do not support an

---

[13] Likewise, other cases cited by Plaintiffs also included specific allegations supporting defendants' knowledge and not just some vague reference of position. *See In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001) ("More importantly, though, Plaintiffs identify specific circumstances under which Defendants . . . had access to and received information about the sales efforts and the related accounting practices.") (cited in Opp. at 29 n.15); *Zuckerman v. Smart Choice Auto. Group, Inc.*, No. 6:99-CV-237, 2000 WL 33996254, at *2 (M.D. Fla. Aug. 29, 2000) ("Plaintiffs allege that Smith had personal notice that one of the Company's major outlets reported a systematic practice of falsifying customer information submitted to the Company's credit review and approval division.") (cited in Opp. at 29 n.15); *Primavera Investors v. Liquidmetal Technologies, Inc.*, 403 F. Supp. 2d 1151, 1158 (M.D. Fla. 2005) (complaint alleged defendant's actual knowledge that representations about alloy strength were false, including allegation he directed employee to convince potential customers not to request samples) (cited in Opp. at 12).

inference that they knew or should have known anything about the amortization period for implementation revenues being fraudulent.  *Taleo*, 2010 WL 597987, at *9 (suggesting "core operations" pleading does not assist in establishing scienter in cases "involv[ing] application of a GAAP principle that appears to require some exercise of judgment.").  Indeed, in *Taleo*, where the facts are far more analogous, the "core operations" argument did not save the complaint from dismissal where plaintiffs did not allege that defendants had first hand knowledge of facts key to conclude that the accounting treatment for consulting revenue should have been different.  *Id.* at *8-9.  Case law does not support the leap that Plaintiffs wish to make—that because Defendants were senior officers, they *knew* that the post-deferral amortization period for implementation revenues should have been twelve years and that the Company's existing estimated performance period for that amortization was in any way improper under GAAP.[14]  *See* Opp. at 30.  Indeed, if the subtleties of determining the length of the amortization period of a properly-deferred 4-7% revenue component were "core," it is difficult to imagine what is not core.[15]

## E.    The Individual Defendants' Stock Sales Do Not Support Scienter.

Plaintiffs' argument that Defendants' Class Period stock sales provide indirect evidence

---

[14]   The Company was founded in 1997, and the Company's first customer "went live" in 2000.  AC ¶¶ 26, 64.  Consequently, as of 2005, the first year affected by the restatement, even the longest customer relationship was only five years.  AC ¶¶ 7, 64.  Plaintiffs' claim that Defendants would have been aware at the time the statements were made in 2005 and forward that an estimated expected performance period for customers to benefit from up-front specific implementation services was 12 years makes no sense.

[15]   Plaintiffs do not dispute that courts in this jurisdiction assess the size of the restatement as against *total* revenue, as Defendants do, but instead argue, inexplicably, that the Court should assess the magnitude of the restatement using other metrics that offer less meaningful comparisons (e.g., implementation revenue itself, which of course is the restated item, and net income, which, for Athena, which was just beginning to break even during the Class Period, distorts percentages due to tiny amounts of net income).  *Compare* Opening Br. at 9, 21-22, *with* Opp. at 18, *and* AC ¶ 231; *see also Durham v. Whitney Information Network, Inc.*, No. 06-CV-00687, 2009 WL 3783375, at *13 (M.D. Fla. Nov. 10, 2009) (declining to infer scienter where the "size of the restatements, although substantial when gauged as against operating income and net income, is less overwhelming when placed in the context of AFC's entire business operations" and GAAP violation was "errors in accrual" rather than "attempts to fabricate  revenue"); *Taleo*, 2010 WL 597987, at *11 (finding the magnitude of restatement not significant where it was under 4% of total revenue, while the consulting revenue (the line item at issue) was overstated by 21%).

of scienter fails where they can point to nothing other than percentages of shares sold.[16]  *See*

Opp. at 31-32.  The "mere pleading of insider trading without regard to either context or the

strength of the inferences to be drawn is not enough."  *Greebel v. FTP Software, Inc.*, 194 F.3d

185, 198 (1st Cir. 1999) (finding no inference of scienter where the plaintiffs provided no

evidence that the trading was out of the ordinary or suspicious, despite large trading volume); *see*

*also In re Focus Enhancements, Inc. Sec. Litig.*, 309 F. Supp. 2d. 134, 163-64 (D. Mass. 2001)

(interpreting *Greebel* as indicating that timing is more important than amount of sales, and

declining to find suspicious trading because sales "did not occur before a big 'event' unknown to

the public," even though amounts were suspicious);  *Parametric*, 300 F. Supp. 2d at 217

(dismissing complaint with prejudice, "plaintiffs must plead facts which would warrant, first, a

finding that there was a suspiciously abnormal or unusual pattern of trading and, second, an

inference of scienter from that finding.").

　　Here, not only does the Amended Complaint lack any allegations showing the trading to

be unusual in timing or otherwise, but an examination of the trades in context reveals *the*

*contrary*.  Notwithstanding that Mr. Bush requested that the new CFO conduct the review of the

Company's accounting policies that ultimately led to the restatement, the Individual Defendants'

trades were not "clustered at [the] end [of the Class Period]"—immediately prior to the

announcement of the internal accounting review on February 25, 2010 or immediately prior to

the announcements related to the CFO transition—but rather were "fairly evenly distributed

---

[16]　　Plaintiffs' reference to percentages of shares sold (in addition to number of shares sold and gross profits) does not save their argument.  *See* Opp. at 31 n.17; Opening Br. at 27; *Taleo*, 2010 WL 597987, at *12 (trades of 38% and 61% of holdings did not support scienter); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 153 (D. Conn. 2007) (defendants sold up to 30.81%, but "[c]ourts have found no inference of scienter in cases involving similar and even greater percentages of sales").  Moreover, the percentages Plaintiffs rely on are off by a wide margin and, in response to Defendants' argument highlighting this deficiency, Plaintiffs do not offer any explanation.  *See* Opening Br. at 27 n.23; AC Exs. A, B; Opp. at 31.

throughout the Class Period."[17]  *Malin*, 499 F. Supp. 2d at 151-52 (finding insider sales not

suspicious); Opening Br. at 29-31.  In addition, on average, the Individual Defendants received

approximately $32 per share during the Class Period—a result wholly inconsistent with

Plaintiffs' allegation that the price of Athena's stock reaching nearly $48 was due to Defendants'

"scheme."[18]  *See* Opening Br. at 30.  That many of the trades during the Class Period were

executed pursuant to 10b5-1 trading plans further dilutes Plaintiffs' already implausible insider

trading allegations.[19]  *See* AC ¶ 255; Opening Br. at 28-29; *see, e.g., In re The First Marblehead

Corp. Sec. Litig.*, 639 F. Supp. 2d at 164 (referring to trading plans and finding insider trading

allegations insufficient); *In re Smith & Wesson Holding Corp. Sec. Litig.*, 604 F. Supp. 2d 332,

345 (D. Mass. 2009) (same); *Stiegele ex rel Viisage Technology, Inc. v. Bailey*, No. 05-10677,

2007 WL 4197496, at *13 (D. Mass. Aug. 23, 2007) (same); *see also N.J. Carpenters Pension &

Annuity Funds v. Biogen IDEC, Inc.*, 537 F.3d 35, 55 n.20 (1st Cir. 2008) (taking judicial notice

of trading plans, although the court did not address arguments related to trading plans in

affirming dismissal for failure to plead scienter).[20]

---

[17]   To the contrary, approximately 80% of the Individual Defendants' trades occurred before mid-2009, eight months before the February 25, 2010 announcement.  *See* Opening Br. at 29.

[18]   Pointing to Mr. Byers's August 2008 trade (executed at $33.24) and Mr. Bush's IPO over-allotment sale in September 2007 (executed at the Class Period low of $18) and some of his sales in the summer of 2008 (executed at $30-$33.29), Plaintiffs overlook the contrary inferences that flow from the timing and sales prices. *See* Opp. at 34; AC Exs. A, B.

[19]   The fact that Defendants entered into the plans during the Class Period matters not at all where (i) the Class Period starts from the date of the IPO so that there was no reason whatsoever to enter into such plans earlier and (ii) the class period is so lengthy.  *See Taleo*, 2010 WL 597987, at *12 (finding nothing unusual or suspicious about the fact the 10b5-1 trading plans were adopted during the class period because the class period was approximately 3 years); *In re Int'l Rectifier Corp. Sec. Litig.*, No. 07-02544, 2008 WL 4555794, at *19 (C.D. Cal. May 23, 2008) (same where class period was 4 years and plaintiffs did not allege defendant had "actively amended, modified or manipulated" the plans).  These facts distinguish this case from *In re Biogen Idec, Inc. Sec. Litig.*, where the class period was not tied to the IPO.  No. 05-10400, 2008 WL 4810045, at *3, *6, *14 (D. Mass. Oct. 25, 2008) (declining to rely on 10b5-1 plans adopted during the class period, but finding nothing suspicious about insider trading); *see* Opp. at 33-34.

[20]   *Miss. Pub. Employees' Retirement Sys. v. Boston Scientific Corp.*, 523 F.3d 75 (1st Cir. 2008) does not contain a blanket prohibition against the consideration of 10b5-1 plans on a motion to dismiss, as Plaintiffs suggest.

## II.     PLAINTIFFS' LOSS CAUSATION ARGUMENTS FAIL.

Stretching for a basis to plead loss causation, Plaintiffs exclude from their loss causation argument the favorable quarter and year-end results announced on March 15, 2010 (and the corresponding stock price increase) while leaving in the unfavorable next quarter results announced on April 29, 2010 (and the corresponding stock price decrease).[21]  Opp. at 36-39. Plaintiffs' cherry-picking of the ingredients that go into the loss causation analysis serves only to underscore their pleading deficiency.

First, Plaintiffs' inclusion of the April 29 quarterly earnings announcement in the loss causation analysis makes no sense where (i) with respect to the restatement, the Company (having already announced the internal accounting review on February 25 and the resulting restatement on March 15) that day announced that its revenue was impacted by, among other things, the approximately $1.0 million in expenses incurred as a result of the accounting review and restatement and (ii) Plaintiffs claim elsewhere that the market had already absorbed "the Company's improper recognition of revenue from the February 25, 2010 announcement."  Opp. at 39.  If, as Plaintiffs contend, the market had already absorbed the news as of February, why would this later announcement of a relatively insignificant general and administrative expense related to the review and restatement process that was expected by the market given the prior announcement of the accounting review and restatement move the market, let alone result in a

---

See Opp. at 33.  Rather, the court there declined to consider the 10b5-1 plans because the plans and arguments related to them were not presented to the lower court.  *See Boston Scientific*, 523 F.3d at 84.

[21]     Plaintiffs plead that the Company made three corrective disclosures, on February 25, 2010, March 15, 2010 and April 29, 2010.  AC ¶¶ 269-280.  On February 25, Athena announced that it would postpone the release of its financial results for the fourth quarter and the year ended December 31, 2009 to conduct an internal accounting policy review related to the timing of amortization for deferred implementation revenue.  On March 15, Athena announced that it had restated the implementation and other revenue within its previously filed consolidated financial statements to reflect a longer amortization period for deferred implementation revenue. On April 29, in conjunction with its quarterly earnings release, Athena announced that its bottom line results were impacted by various items, one of which was an administrative expense of approximately $1.0 million related to the accounting review and restatement process.  *Id.*

19

24% drop in the stock price?  *See* AC ¶¶ 8, 109.  Far more likely is that the stock price decline

following the April 29 announcement resulted from the relatively weak financial results reported

that day, characterized by some analysts as "lower-than expected results on weak collections per

physicians" and a "disappointment."  *See* AC ¶ 108(a)-(b); Opp. at 39.[22]

Second, Plaintiffs selectively read the March 15 announcement and corresponding price

*increase* out of the loss causation analysis entirely.  Opp. at 38-39.  They suggest that the lack of

stock price decline was "of no moment" and was due in part to the market's knowledge of an

accounting review from the February 25 announcement.  Opp. at 39.  But this effort to discount

the import of the March 15 announcement (wherein the Company disclosed that it had decided to

restate its financial statements as a result of the internal accounting review) rings hollow,

particularly given Plaintiffs' claim that the relatively minor announcement of $1.0 million in pre-

tax accounting review and restatement expenses could alone result in a 24% stock price decline.

*See* AC ¶ 263.

## CONCLUSION

For the foregoing reasons, and those set forth in Defendants' opening brief, the Amended

Complaint does not state a claim under Section 10(b) or Section 20(a) of the Securities Exchange

Act of 1934 and should be dismissed with prejudice.  *See In re Credit Suisse First Boston Corp.*,

No. 02-12056, 2005 WL 852455, at *11 (D. Mass. Mar. 31, 2005) (O'Toole, J) (dismissing with

prejudice for failure to meet heightened pleading requirements).

---

[22]  Plaintiffs cannot ignore the impact of the weak quarterly financial results on the stock price following the April 29 announcement, particularly where they try to attribute the stock price increase following the March 15, 2010 announcement to the "positive statements regarding the Company's financial results."  *See* Opp. at 39.

Dated:  December 30, 2010

Respectfully submitted,

athenahealth, Inc., Jonathan Bush, and Carl B. Byers,

By their attorneys,

 /s/ *Deborah S. Birnbach*
Deborah S. Birnbach (BBO #628243)
Kathryn L. Alessi (BBO #651110)
Goodwin Procter LLP
53 State Street
Boston, MA 02109
Tel:  617-570-1000
Fax:  617-523-1231
dbirnbach@goodwinprocter.com
kalessi@goodwinprocter.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 30, 2010.

*/s/ Deborah S. Birnbach*

LIBA/2141558.2

21