UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 10-10477-GAO

ANDREA CASULA, on behalf of herself and all others similarly situated,
Plaintiff,

v.

ATHENAHEALTH, INC., JONATHAN BUSH, and CARL B. BYERS,
Defendants.

OPINION AND ORDER
September 30, 2011

O'TOOLE, D.J.

Lead plaintiff, Waterford Township General Employees Retirement System ("Waterford GERS"), individually and on behalf of all persons or entities that purchased or acquired common stock of athenahealth, Inc. ("Athena" or the "Company") between September 20, 2007 and February 25, 2010, brings this securities fraud action against Athena and two of its executives, Jonathan Bush and Carl B. Byers (the "Individual Defendants"). The two-count Amended Class Action Complaint alleges (1) violations of Section 10(b) of the Exchange Act and Securities and Exchange Commission ("SEC") Rule 10b-5 against all the defendants; and (2) Section 20(a) of the Exchange Act against the Individual Defendants. Before the Court is the defendants' motion to dismiss pursuant to Federal Rules of Civil Procure 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b).

## I.    Background[1]

Athena was founded in 1997 and became publicly traded on the NASDAQ after an IPO in 2007. Co-defendant Jonathan Bush was the Company's co-founder. He also served as Chairman of the Board, President, and Chief Executive Officer. Carl Byers, who is now retired, previously served as the Company's Chief Financial Officer, Senior Vice-President, Treasurer, and Chief Accounting Officer. They both signed the Company's quarterly and annual reports filed with the SEC during the time period at issue.

Athena provides Internet-based business services for physician practices, including, among others, revenue cycle management services, clinical cycle management services, and other practice management services. Its business model is "software-as-a-service," i.e., clients access the Company's services through a web portal, rather than by special hardware or software licenses. Its service offerings are based on four integrated components: (1) proprietary Internet-based software; (2) a continually updated database of payer reimbursement process rules; (3) its back-office service operations that perform administrative aspects of billing and clinical data management for physician practices; and (4) its automated and live patient communication services.

### A.    The Implementation Process

Athena's sales force was responsible for finding clients for its various products and ultimately negotiating contracts with them. The contracts, unique to each client, included service level agreements detailing the services for which the client contracted and the terms and costs of

---

[1] For the purposes of this motion, the Court accepts as true all factual allegations in the Complaint. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

"implementation," the process in which clients "get up and running" on the Athena system.[2] (Am. Class Action Compl. ¶ 35 (hereinafter Compl.).) The implementation process varied from client to client, but typically took approximately three to five months from the execution of the contract to the completion of implementation.[3]

As part of the implementation process, a number of Athena personnel would be assigned to the client to assist with the execution, including planning, training, monitoring, and working with the client to resolve issues that arose. The implementation process was outlined in a document known as the "implementation plan," which included details regarding implementation, the schedule, and the tools used in the process. Clients signed off on the initial implementation plan, and continued to sign-off as various phases of implementation were completed. Specific phases that required sign-off by clients included uploading the client data on the Athena system, training, and the "go live" date, the date on which the physician's previously existing accounting system would officially terminate and the client would begin using the athenaCollector system. The "go live" date signified the completion of the implementation.

B.      Client Retention

Client contracts were typically for one year and were renewed automatically unless affirmatively terminated. Generally, Athena customers were long-term customers. Athena closely tracked customer attrition rates, which were very low, admittedly approximately eight percent and possibly much lower. The low attrition rate was attributable, at least in part, to how

---

[2] According to the complaint, the following details regarding implementation pertain particularly to one service offered by Athena, the "athenaCollector system," which had to be implemented before other Athena systems, such as "athenaClinicals" and "athenaCommunicator." While those two systems had their own implementation processes, they usually occurred only after athenaCollector had been up and running with the client for a period of time.

[3] Though the plaintiff alleges that the implementation process typically took three to five months, (Compl. ¶ 42), it argues that the expected performance period of implementation was much greater, as discussed more thoroughly below.

challenging it would be for a client to leave Athena after moving its client billing and collection services to the Company, as well as to the substantial amount of time and resources expended during the implementation process.

C.      Athena's Fee System

The Company's pricing methodology involved the following components:

*Monthly Fee*: The Company charged customers a monthly fee based on percentage of collections, generally three to five percent. The Company also charged a recurring fee for one particular system, athenaClinicals, which was approximately $800 per provider within the practice.

*Implementation Fee*: The implementation fee was designed to cover the cost of getting clients up and running on the Athena system. Costs included the time of various Athena employees, the development of the "work flows" required to properly set up the client on the system, the enrollment process whereby Athena obtained relevant information about the insurance payers and established necessary parameters to process claims in accordance with the contracts between providers and insurance companies, on-site visits, travel costs, and client training.

To determine the charge, Athena considered the number of physicians who would use the system and the number of sites and amount of staff that required training. Generally, it amounted to approximately $2,700 per doctor, though the price varied significantly depending on the size of the client. The non-refundable fees, billed up front, were paid in two installments: (1) "up front" when the deal was signed; and (2) when the implementation was complete and the system "went live."

Implementation fees comprised between 2.8% and 3.5% of the Company's total revenues during the operative time period.

*Minimum fee*: Minimum fees were fees assessed after the completion of implementation once the customer had "gone live," but while Athena was "ramping up" collections for the customer. (Id. ¶ 54.) Typically, there was a four to six month lag period between the time implementation was complete and when Athena could expect to start collecting the full monthly value of a particular deal. The fee was typically set at eighty-five percent of the expected full monthly revenues from the customer.

D.    Athena's Revenue Accounting

During the time period at issue, Athena recorded implementation fees as deferred revenue until the implementation service was complete and ongoing services commenced. At that point, the fees were amortized, or recognized ratably, on a monthly basis over the "expected performance period." The Company had determined that the expected performance period was equal to the one-year initial contract period.

To some extent, the Company disclosed in both SEC filings and earnings calls how it recognized implementation fee revenues. It also disclosed its high rate of customer retention. Additionally, the Company's independent auditor, Deloitte & Touche, audited the Company's annual financial statements for 2007 and 2008, and reviewed quarterly financial statements through the third quarter of 2009, the time period in which the Company amortized and recognized ratably the implementation fees over the one-year contract period. Deloitte found that the Company's financial statements "present[ed] fairly, in all material aspects, the financial position of athenahealth, Inc." (Decl. of Deborah S. Birnbach in Supp. of Defs.' Mot. to Dismiss the Am. Class Action Compl., Exs. B at 8, C at 11 (hereinafter Birnbach Decl.).)

E.    March 15, 2010 Restatement

When a new CFO, Timothy Adams, joined Athena on January 11, 2010, Bush asked Adams to review the Company's financial statements and accounting policies. On February 25, 2010, the Company announced it would conduct an internal accounting policy review, initiated by the Company, related to the timing of amortization for deferred implementation fees. It also announced it would postpone the release of its financial results for the fourth quarter of 2009 and the year ending December 31, 2009. Stock prices declined from $43.52 on February 25, 2010 to $35.87 on March 1, 2010.

On March 15, 2010, the Company announced it would restate its financial results related to the recognition of implementation fee revenue for the years ending December 31, 2005 through 2008 and for the first three quarters of 2009. The Company revised the expected performance period over which to amortize implementation fee revenue, and determined that the revenue should be deferred over the expected customer life, estimated to be twelve years. The next day, the Company's stock price rose slightly, increasing from $37.29 at the close of trading on March 15, 2010 to $39.71 at the close on March 16, 2010.

On April 29, 2010, the Company announced its first quarter 2010 results. It announced that its bottom line results "were impacted by . . . higher general and administrative expense of approximately $1.0 million related to the Company's recent accounting review and restatement process." (Compl. ¶ 104.) The Company's stock prices fell from $35.35 at the close on April 29, 2010 to $26.96 at the close on May 6, 2010.

**II.**    **Discussion**

    A.    Applicable Framework

In order to survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual allegations to "raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Furthermore, a securities fraud claim must also comply with Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA, which require heightened specificity in pleadings alleging securities fraud. The complaint must set forth "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made upon information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

In order to state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 193 (1st Cir. 2005) (citing Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005)). Although the defendants argue that the plaintiff has failed to adequately allege both scienter and loss causation, the central issue—and the dispositive one, because all elements must be adequately pled—is scienter.

Scienter is a "mental state embracing intent to deceive, manipulate or defraud." City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp., 632 F.3d 751, 757 (1st Cir. 2011) (internal quotations omitted). A plaintiff may demonstrate scienter by showing that the defendants either "consciously intended to defraud, or that they acted with a high degree of recklessness." Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002). Recklessness

involves "a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it." Waters, 632 F.3d at 757 (quoting Greebel v. FTP Software, Inc., 194 F.3d 185, 189 (1st Cir. 1999)).

"The PSLRA mandates 'a special standard for measuring whether allegations of scienter survive a motion to dismiss.'" Id. (quoting Greebel, 194 F.3d at 195). A plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). An inference of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Waters, 632 F.3d at 757 (quoting Tellabs, 551 U.S. at 314). Therefore, "[w]hen there are equally strong inferences for and against scienter, the draw is awarded to the plaintiff." Id.

B.    Application

Though the 133-page Complaint alleges numerous misrepresentations by the defendants, at the heart of the plaintiff's case is the Company's manner of accounting in its financial statements for implementation fees. The plaintiff alleges that the defendants improperly amortized the Company's implementation revenue over only the initial term—usually one year—of its client contracts, as opposed to the actual, and much longer, expected performance life of the customer relationship. The plaintiff contends that by that accounting method, the Company front-loaded its recognition of implementation revenue, thereby artificially boosting the Company's revenues, net income, earnings per share, and other financial metrics reported to

8

the market, all of which were repeatedly certified for accuracy in the Company's quarterly and annual filings.

                1.        Generally Accepted Accounting Principles ("GAAP")

According to the plaintiff, the amortization of implementation revenue over only the length of the one-year initial contracts was a violation of GAAP. GAAP are "the basic postulates and broad principles of accounting pertaining to business enterprises, approved by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants . . . . These principles establish guidelines for measuring, recording, and classifying the transactions of a business entity." In re Raytheon Sec. Litig., 157 F. Supp. 2d 131, 139, n.2 (D. Mass. 2001) (internal quotations omitted). The SEC requires public companies to file quarterly and annual financial statements that are prepared in conformity with GAAP.

The GAAP at issue is set forth in SEC Staff Accounting Bulletin No. 104 ("SAB 104"). SAB 104 provides guidance as to revenue recognition in a variety of circumstances. As a general matter, SAB 104 holds that revenue is realizable and earned when (1) there is pervasive evidence of an arrangement, (2) services have been rendered, (3) the seller's price is fixed or determinable, and (4) collectability is reasonably assured. (Birnbach Decl. Ex. F at 10-11.) Of relevance to the present claims, SAB provides more specific guidance concerning when revenue relating to "nonrefundable up-front fees" should be recognized. In summary, revenue from an up-front fee should be deferred and recognized systematically over the length of business relationship where ongoing services are provided, without which the customer would not receive the benefit of the up-front fee:

> Supply or service transactions may involve the charge of a nonrefundable initial fee with subsequent periodic payments for future products or services. The initial fees may, in substance, be wholly or partly an advance payment for future products or services. In the examples above, the on-going rights or services being

provided or products being delivered are essential to the customers receiving the expected benefit of the up-front payment. Therefore, the up-front fee and the continuing performance obligation related to the services to be provided or products to be delivered are assessed as an integrated package. In such circumstances, the staff believes that up-front fees, even if nonrefundable, are earned as the products and/or services are delivered and/or performed over the term of the arrangement or the expected period of performance and generally should be deferred and recognized systematically over the periods that the fees are earned.

(Id. at 46 (footnotes omitted).)

A footnote to the section instructs that the "revenue recognition period should extend beyond the initial contractual period" if two conditions are met: (1) "if the relationship with the customer is expected to extend beyond the initial contract term;" and (2) "the customer continues to benefit from the payment of the up-front fee (e.g., if subsequent renewals are priced at a bargain to the initial up-front fee)." (Id. at 46 n.39.)

The first condition was clearly met. Athena's relationships with customers were "expected to extend beyond the initial contract term." Whether the second condition was met is somewhat less clear. The relevant portion of SAB 104 gives some examples of the kinds of "nonrefundable up-front fees" that the guidance pertained to, including initiation fees, technology access fees, activation fees, internet access fees, fees for web advertising for a period of time, and fees for hosting a customer's web site. (Id. at 42-44.) None of the examples is exactly similar to fees charged by Athena for installation services, although the web hosting example does apparently regard as within the class of nonrefundable up-front fees the costs "incurred in the initial loading of information on the host company's internet server and setting up appropriate links and network connections." (Id. at 44.)

SAB 104 also emphasized that the "when to recognize" question should be answered in light of "specific facts and circumstance." (Id. at 44.) It cautioned that "[u]nless the up-front fee

is in exchange for products delivered or services performed that represent the culmination of a separate earnings process, the deferral of revenue is appropriate." (Id.) But "[w]hether there is a separate earnings event should be evaluated on a case-by-case basis." (Id. at 45.)

During the period relevant to the fraud claims, Athena concluded that the appropriate deferral period was the contract term, typically one year, rather than the estimated length of the customer relationship. This was contrary to the advice in SAB 104's footnote 39, quoted above, but only if the installation revenue was not legitimately classified as a "separate earnings event." Nonetheless, in changing the recognition principle in 2010, the defendants acknowledged that their prior practice was not in compliance with SAB 104.

2. Does the defendants' GAAP violation raise a strong inference of scienter?

"Allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim. Only where such allegations are coupled with evidence of 'corresponding fraudulent intent' might they be sufficient." Day v. Staples, Inc., 555 F.3d 42, 56 (1st Cir. 2009) (quoting Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000) (internal quotations omitted)); accord In re Raytheon, 157 F. Supp. 2d at 147 ("[W]hile violations of GAAP provide evidence of scienter, a defendant's failure to recognize revenue in accordance with GAAP does not, by itself, suffice to establish scienter.") (internal quotations and citations omitted). The question then is whether the alleged GAAP violation, combined with other circumstances indicative of fraudulent intent or recklessness, raises the strong inference of scienter. See Chalverus v. Pegasystems, Inc., 59 F. Supp. 2d 226, 233 (D. Mass. 1999).

Here, there are no other circumstances indicative of fraudulent intent or recklessness sufficient to raise a strong inference of scienter. First, although the plaintiff contends that SAB 104 is "simple and straightforward," (Lead Pl.'s Opp'n to Defs.' Mot. to Dismiss the Am. Class

11

Action Compl. 18-19 (dkt. no. 34)), as the brief discussion above illustrates, the guidance is not only nuanced but subject to evaluation depending on a "case-by-case" consideration of "specific facts and circumstances". The illustrations given were germane in some respects, such as payment for access to and uploading of software, but they also did not address some of the services involved in Athena's installation process for which revenue was received, such as the training of customer personnel. Was that a circumstance that might justify a different recognition rule? Even SAB 104 recognized there was room for debate on such questions. (Id. at 4445 ("Some have questioned whether revenue may be recognized in these transactions to the extent of the incremental direct costs incurred in the activation.")

Moreover, while the Company was recognizing the installation revenue in full in the first year of the customer contract, it was getting a sign-off on its financial statements from its outside auditor. It does not matter whether that fact means that the auditors specifically agreed with or sanctioned the treatment of installation revenue, but it does weigh heavily against an inference of intent to defraud.

Nor does that fact that the Company acknowledged its accounting error and changed it justify an inference of scienter. The change is fully consistent with recognition of an honest mistake of judgment; there is nothing about a change of accounting procedures in itself that suggests a prior intent to defraud. That is particularly true where the accounting practice in question affected only a very small portion of the Company's overall revenue, compare Gelfer v. Pegasystems, Inc., 96 F. Supp. 2d 10, 16 (D. Mass. 2000), and where it was self-initiated by the Company.

The plaintiff also points to the Individual Defendants' trading as evidence of scienter, but the timing and circumstances of the trading are not suspicious. See Greebel, 194 F.3d at 197-

98 (noting that "unusual trading or trading at suspicious times or in suspicious amounts" is probative of scienter, but that it must, among other things, be "unusual, well beyond the normal patterns of trading by those defendants" to do so); In re Parametric Tech. Corp., 300 F. Supp. 2d 206, 217 (D. Mass. 2001).

Finally, to the extent that the plaintiff seeks to demonstrate scienter on the part of the Individual Defendants by virtue of their executive positions in the Company, the plaintiff alleges only that they had high positions in the Company and that they were aware of the length of customer relationships. Those facts establish they were responsible for the revenue recognition practice at issue, but they say nothing about intent to defraud.

To the extent that the facts support any inference (as opposed to a supposition) of scienter, such an inference is outweighed by the far more compelling explanation that the defendants legitimately considered the Company's practice of using one-year contracts as the expected performance period to be a permissible interpretation of SAB 104 and thus adequate compliance with GAAP. SAB 104 is not straightforward, and in light of the lack of on-point guidance from the SEC, it cannot be said that the defendants' interpretation of it was such an "extreme departure from the standards of ordinary care" that it amounts to recklessness. See Waters, 632 F.3d at 757 (quoting Greebel, 194 F.3d at 189).

Having failed to demonstrate that the inference of scienter is "cogent and at least as compelling" as the opposing inference one could reasonably draw from the alleged facts, see Waters, 632 F.3d at 757 (quoting Tellabs, 551 U.S. at 314), the plaintiff's claim under Section 10(b) must be dismissed.[4]

---

[4] Consequently, it is unnecessary to reach the defendants' loss causation arguments.

C.    Individual Defendants

Section 20(a) imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable" under Section 10(b) and Rule 10b–5. 15 U.S.C. § 78t(a). Because the plaintiff has not adequately pled an underlying violation of the Exchange Act, the Section 20(a) claim against the Individual Defendants necessarily also fails. See Greebel, 194 F.3d at 207.

IV.    Conclusion

For the foregoing reasons, the Defendants' Motion to Dismiss the Amended Class Action Complaint (dkt. no. 26) is GRANTED and the Complaint is DISMISSED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge

14